ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of -- )
)
Swinerton Builders Northwest )　ASBCA No. 57329
)
Under Contract No. NAF26-04-C-0025 )

APPEARANCES FOR THE APPELLANT: Durward E. Timmons, Esq.
Milton L. Smith, Esq.
Ryan J. Klein, Esq.
Sherman & Howard L.L.C.
Colorado Springs, CO

Arnold R. Hedeen, Esq.
Hedeen & Caditz, PLLC
Seattle, WA

APPEARANCES FOR THE ARMY LODGING FUND:
Raymond M. Saunders, Esq.
Army Chief Trial Attorney
LTC Lawrence P. Gilbert, JA
Robert T. Wu, Esq.
MAJ John C. Dohn II, JA
Erica S. Beardsley, Esq.
Trial Attorneys[1]

OPINION BY ADMINISTRATIVE JUDGE DICKINSON

This appeal arises from a contract awarded by CFSC[2] on behalf of respondent Army Lodging Fund (AL, ALF or Fund), a Nonappropriated Fund Instrumentality (NAFI), to Swinerton Builders Northwest (appellant or SBN) to build a 185-room

---

[1] Mr. Wu and MAJ Dohn represented the Fund at the hearing and Ms. Beardsley represented the Fund at the time the briefs were filed.
[2] The U.S. Army Family and Morale, Welfare and Recreation Command, known at all times relevant to the matters before us as the U.S. Army Community and Family Support Center (CFSC), is a field operating activity of the U.S. Army and the organization responsible for contracting on behalf of the Army Lodging Fund (answer ¶¶ 2, 3).

lodging facility at Fort Lewis, Washington.[3] Only entitlement is before us for decision.[4]

## JURISDICTION

It is undisputed that CFSC has never issued a contracting officer's final decision addressing SBN's 2005 and 2008 Requests for Equitable Adjustment (REAs) or SBN's 3 June 2010 certified claim. It is further undisputed that SBN appealed to the Board from a deemed denial on 18 August 2010.

Under the Disputes clause of the NAF contract at issue, the Board has jurisdiction over an appeal from the denial of a claim arising under the contract (finding 25). The contract's Disputes clause, however, does not contain a provision for an appeal from a deemed denial of a contractor's claim. Under certain circumstances we have taken jurisdiction in the absence of a final decision under a NAF contract.

> It is well established that the purpose of the Disputes clause is to provide the parties with a rapid and inexpensive means of resolving disputes between the parties. *Mite Corporation*, ASBCA No. 18534, 73-2 BCA ¶ 10,312.

> Prior to the CDA's enactment and under contracts where the CDA does not apply, we have taken jurisdiction over disputes that have existed for lengthy periods without a final decision. *See Mite Corp., supra*; *Atlantis Construction Corp.*, ASBCA No[s]. 44044, 44860, 96-1 BCA ¶ 28,045. As the Board explained in *Mite Corp., supra*, at 48,687, failure or refusal by the CO to issue a final decision within a reasonable time constitutes a final decision [denying the appeal and] giving jurisdiction to the Board.

*Charitable Bingo Associates, Inc., d/b/a Mr. Bingo*, ASBCA No. 53249, 01-2 BCA ¶ 31,478.

The situation before us is even more compelling than the one the Board addressed in *Charitable Bingo*. From the 3 June 2010 submission of SBN's claim to the September 2012 hearing, not only did CFSC not issue a contracting officer's final

---

[3] Fort Lewis and McChord AFB were combined and became Joint Base Lewis-McChord as of 1 October 2010. http://www.military.com/base-guide/joint-base-lewis-mcchord.
[4] The number of days of any delay are considered to be part of entitlement (tr. 1/9).

2

decision, but the contracting officer never formally acknowledged receipt of SBN's 6,800-page claim, nor did he ever meaningfully respond to the many pleas from SBN and its counsel in letters and phone calls seeking a response to the claim. We find CFSC's near-complete failure of response to SBN's claim in more than two years to constitute a refusal to issue a final decision which, if not deemed to be a denial of SBN's claim, would effectively deprive SBN of its right of appeal under the contract's Disputes clause (*see* finding 25). We, therefore, hold that we have jurisdiction over this appeal from a deemed denial.[5]

## FINDINGS OF FACT

A. Background and Pre-Contract Matters

1. Appellant SBN is a corporation organized and existing under the laws of the State of Delaware and has its principal place of business in San Francisco, California. The company was originally started as a small construction business in 1888 and at the time they were awarded the contract which is the subject of this appeal they were performing over a billion dollars in construction business per year. (R4, tab 3 at 1964[6], tab 127 at 2873; tr. 1/21-22, 45, 5/173)

2. Under a pre-existing indefinite-delivery, indefinite quantity (IDIQ) contract between CFSC and ORB[7], ORB was tasked with providing a 10% concept design for the Fort Lewis Lodge design-build project that included a site plan drawing, followed by ORB's drafting of the Request for Proposals (RFPs), within which the 10% concept design and site plan drawing were incorporated. John Patterson,[8] ORB's Vice

---

[5] Neither party alleges that our jurisdiction is based on the Contract Disputes Act (CDA). Since we have held that we have jurisdiction pursuant to the Disputes clause of the contract and the basis of our jurisdiction is not material to our consideration of the entitlement issues presented, we do not address the issue of CDA jurisdiction.

[6] Page number references are to the consecutively-numbered pages unless specified otherwise.

[7] ORB was an architectural firm on contract to CFSC to prepare the RFP for the Lodge project and to be CFSC's on-site representative during contract performance (tr. 2/102-03, 120, 8/39-40, 42, 9/30-33, 10/12-13, 15-16). ORB, in turn, contracted with BCE Engineers (BCE) to review the mechanical design, starting with the 35% design review (tr. 2/120, 123, 9/39-40, 46).

[8] Mr. Patterson has 23 years of active military duty, reaching the rank of Chief MSgt, and had been a military project manager/designer) (tr. 10/6-11, 123-24). He is not a licensed professional engineer (tr. 10/11-12), however, he has worked very closely with Fort Lewis since 1984 on "engineering and construction

3

President and military projects manager, was the individual responsible for drafting the RFP. (Tr. 10/14, 18, 27; *see also* R4, tabs 171, 1001 (SOW for A/E preparation of RFP)) Mr. Patterson specifically developed RFP Sections C-1 through C-5 and portions of Sections J and L, leaving other sections unchanged as "standard language" (tr. 10/19-28, 136-47, 168). He testified that he was particularly concerned with the "site layout plan, utility plan" (tr. 10/19).

1.  Request for Proposals

3. On 20 October 2003, the Fund issued RFP No. NAF26-04-R-0004 for the design and construction of a four-story, 100,500 square foot, 185-room Army lodging facility (Lodge) at Fort Lewis, Washington (R4, tabs 2, 169 at 3122, 3353, tab 1012). The RFP included the following language:

> No appropriated funds of the United States will become due or be paid to the Contractor or Concessionaire by reason of this contract. This contract is governed exclusively by the provisions of Army Regulation 215-4.[9]

(R4, tab 2 at 866) The RFP identified contracting officer (CO) Bartholomew, who was assigned to the CFSC, NAF Contracting Directorate (CFSD-NC), and stated that CFSC was located in Alexandria, Virginia. SBN's Montoya testified that he scheduled many meetings with CO Bartholomew, "but I never had meetings" (tr. 3/183). It is a matter of record that CO Bartholomew's office (as well as that of COR Dyer) was located in Alexandria, Virginia, and the project was under construction in Tacoma, Washington. Further, the record is replete with instances of CO Bartholomew participating in meetings and other conversations by phone, as well as some face-to-face meetings. Both parties dealt with the challenges of being on opposite coasts. (Ex. A-9; *see, e.g.,* tr. 3/201, 204, 256-57, 4/108-09, 111) The RFP further advised as to CO Bartholomew's authority under any resultant contract:

> The Contracting Officer is the only person authorized to approve changes to any of the requirements under this contract, and notwithstanding any provision contained elsewhere in this contract, said authority remains solely

---

projects, primarily maintenance and repair projects on existing facilities, renovations, small additions perhaps, but all disciplines and all cost brackets."

[9] SBN's counsel used a copy of AR 215-4 during cross-examination of CO Wallace but did not offer the document into the record. After the testimony, appellant's counsel asked that the Board take judicial notice of the current version of AR 215-4; without objection from government counsel, the request was granted (tr. 12/216).

4

with the Contracting Officer. In the event the Contractor effects any change at the direction of any person other than the Contracting Officer, the change will be considered to have been without authority and no adjustment will be made in the contract price to cover any increase in changes incurred as a result thereof.

(R4, tab 2 at 954; *see also* R4, tab 2 at 1034, 1036, 1043; tr. 12/156) CO Bartholomew was not called to testify at the hearing by either party.

4. The Fund's Project Manager for the Lodge project, as well as being identified as the contracting officer's representative (COR) in the RFP, was Drew Dyer. COR Dyer has a degree in civil engineering (1976) and has been a licensed professional engineer since 1989. He has extensive construction project management experience from 1978 through the time of his hearing testimony in 2012, including being the manager of the engineering branch of the Washington (DC) Airport Authority responsible for Dulles International Airport and Washington National Airport (now Washington Reagan Airport) as well as several smaller airports in Texas and Florida. From 1998-2001 he was employed by CFSC as one of 3 project managers, together with 2 COs to manage 14 Navy NAF design-build projects around the world. Since 2001 he has been employed by CFSC to manage Army Lodging NAF projects around the world. He was involved with the project now at issue at Fort Lewis beginning in 2003 during development of the RFP. (Tr. 8/13-33, 52, 9/8-11, 77-81, 12/175-76) As the COR, he was a technical advisor to the CO (tr. 12/157, 175).

5. Both CO Bartholomew and COR Dyer were CFSC employees and were based in Alexandria, Virginia, however, their jobs required frequent travel to various project locations. Their visits to the jobsite at issue in this appeal were infrequent and their involvement in the matters now before us was primarily by phone, email and letter (tr. 1/114-15, 181-82, 2/107, 115, 7/269-70, 271-74, 9/8-10, 81-8, 105-08, 116-17, 131-32, 134, 10/153, 11/17, 39, 63-65, 96, 101-02, 103-05, 12/25-26, 66; ex. A-9).

6. ORB's Monson was hired to be CFSC's representative at the jobsite (*see* finding 2) and was described as CFSC's "eyes and ears." Mr. Monson was retired from the Corps of Engineers where he had worked from 1973-2001 and had been involved in construction projects, including some for CFSC. He is a licensed architect in the state of Washington (tr. 11/6, 33-37). Mr. Monson attended "99%" of the project meetings but had no contractual authority. (Tr. 1/180-83, 233-34, 2/107, 115-16, 4/108-09, 5/10, 39, 7/270-72, 9/79, 86-89, 10/114, 119, 121-22, 11/6-7, 21, 38-44, 46, 100-02, 106, 12/156) His first involvement with the project was in October 2004 (tr. 11/6, 9), and his primary duties were to observe the construction activities on a daily basis and be the on-site point of contact for SBN's quality control personnel (tr. 11/7; *see also* finding 18, § 3.14). Mr. Monson was also responsible to review

5

SBN's pay applications for the purpose of coming to agreement as to the percentage of project completion and to sign them before SBN submitted them to CFSC (R4, tab 1215 at 2327-28; tr. 11/17-19, 52-55, 69-70, 93-94). He left the project in January 2007 (tr. 11/9).

7. RFP SECTION C-1, GUIDANCE TO CONTRACTORS, PROJECT INFORMATION, included the following information pertinent to the matters now before us:

1.2 Project Description: The project includes all design and construction necessary to construct a new 185-Room Lodging Facility. The project includes all demolition, site grading and preparation, site utilities and improvements and construction necessary to provide a complete and useable facility.

1.3 Scope of Work:

A. Lodging Facility:
   1. Design and construct a new Lodging Facility that will include 185 guest rooms, lobby and registration areas, breakfast room, fitness room, administrative offices, public toilets, guest laundries and vending areas, support storage and maintenance areas, an in-house laundry, a delivery dock, parking for 100 vehicles, and miscellaneous ancillary support areas.
   2. The work includes coordinating with the installation of Government Furnished Government Installed (GFGI) equipment, finishes and furnishings.

B. Design Work:
   1. Conceptual architectural and site plan drawings are included in this Request for Proposal (RFP). The design solution represented by the RFP concept level drawings[10] is acceptable to the Government. However, innovative, creative, or cost-saving proposals that meet or exceed the RFP-specified requirements are encouraged and will be rated accordingly. **Offerors who choose to submit alternate building or site configurations must meet all requirements in the RFP**.

---

[10] The RFP contained 10% concept design and drawings (finding 2).

6

2. The following is a list of mandatory features for the design of the facility in addition to other criteria required in the RFP:

....

   d. Maximum building height is 4-stories. Maximum ridge height is 55 feet.

   ....

   f. Guest Room floor plan, layout and sizes shall be in accordance with the concept guest room drawings provided in the RFP. Mechanical chases, plumbing chases, etc. are to be integrated **without reducing net areas shown or specified**.

   ....

3. The conceptual plans provided in the RFP represent the Government's effort to communicate one possible design solution that meets the Owner's requirements. These plans are acceptable to the Government but Offerors may submit alternate plans that they believe maximize the benefit to the Government. Those Offerors who decide to use the Government's layout are still required to submit these layouts as part of their proposal. The successful Offeror shall execute the design using the layouts approved by the Government. PDF files of the RFP concept drawings will be made available for the Offerors' use in preparing their proposals. A CADD file is available for the Site Utilities Plan.

4. The requirements in the RFP are minimum standards and may be exceeded by the Offerors. **Deviations from these technical or functional requirements shall be** *clearly identified* **for Government review and** *may* **be approved if considered by the Government to be in its best interest.**

5. The extent of development of these documents in no way relieves the successful Offeror from his responsibility of completing the design, construction documentation and construction of the facility in

conformance with applicable criteria, codes and standards.

6. The Contractor will be required to meet with the Government during the design phase of the project (Design Kick-off Meeting and Submittal Review Meetings, etc.). Discussions and reviews during the meetings will further refine the accepted design solution. The Contractor should anticipate adjustments to the conceptual layouts during the design process.

7. See Section H of the RFP for Design Submittal Requirements and Design Meeting Requirements after award.

C. Concept Room Construction:

1. Design and construct a temporary water resistant mock-up concept room[11] for each guest room type to demonstrate the intended construction and layout, including any variations in room size/configuration caused by seismic/structural bracing, columns, etc. **The mock-ups shall be located on the project site where directed by the Owner**. The mock-ups shall consist of floors, walls and ceilings of the intended construction and include representations of windows, doors, kitchenette equipment, casework, specialties, fixtures, lighting, switches, outlets, grilles, registers, thermostats and sprinkler heads. Sample plumbing fixtures, outlets, grilles, registers, thermostats, kitchenette equipment and sprinkler heads shall be in place but need not be operational. Mock-furnish each concept room mock-up in accordance with FF&E list in Section J.

2. Mock-up concept room construction can begin after the Project Kick-Off Meeting. The Contractor shall provide for a Government walkthrough of rough construction (framing, drywall, no finishes) to coincide with the 35% Design Review Meeting. A final Government walk-through of the completed concept room Mock-ups shall be scheduled by the Contractor at an appropriate time to allow for design corrections and adjustments prior to submission of the final design. All changes to design during the design process must be physically

---

[11] SBN understood that the mock-up concept rooms were to be temporary structures external to the lodge it was building (app. br. at 147-48).

8

presented in mock-ups prior to submission of final design. The Contractor shall be responsible for removing the mock-ups after completion of new building construction. Contractor may re-use salvageable FF&E, plumbing fixtures and kitchen unit in the construction.

3. Final Concept Room[12]: The Contractor shall provide one fully finished, fully furnished (including GFCI and CFCI items) guest room of each type during construction phase for final approval of finishes and workmanship, before the remaining rooms are finished. This milestone item will be shown in the Project Construction Schedule at a point in the construction progress as mutually agreed upon. These rooms will be approved by the Government before remaining final finishes are begun.

1.4   Special Conditions:

A. This project will be awarded as a "design/build" project. The Design/Build Contractor entity will bear full responsibility for development of the final facility architectural/engineering designs and of the construction of a complete and usable facility. **The Design/Build Contractor's architect/engineer will be "the Architect/Engineer of Record" and as such, will bear full responsibility for the design and construction Quality Assurance. Construction *may* be authorized prior to completion of design on project segments provided that the Contracting Officer considers that design of the segment of construction to be started is sufficient to permit the construction start.[13] Changes during construction due to design changes that were not requested by the Government will be the responsibility of the Design/Build Contractor,** including situations where the Contracting Officer permits construction of segments prior to the completion of design.

---

[12] SBN understood that the Final Concept Rooms were to be internal to the lodge it was building (app. br. at 147-48).

[13] We interpret this sentence as permitting the issuance by the CO of Limited Notices to Proceed (LNTP) for various portions of the project (*see also* finding 20).

....

    C.  The Contractor shall engage registered architects and professional engineers licensed in the State of Washington and LEED certified to design the facilities and oversee the design and construction work. See Section H for sustainable design evaluation requirements.

....

1.5    Construction Scheduling:

    A.  Offerors shall submit a Project Schedule as part of their response to this Request for Proposal in accordance with the requirements of Section L. The schedule shall include the anticipated monthly adverse weather days indicated in Section H.

(R4, tab 2 at 867-71) (Emphasis added)

8. RFP SECTION C-1, GUIDANCE TO CONTRACTORS, GENERAL INFORMATION, included the following information pertinent to the matters now before us:

2.2    Definitions: Throughout this [RFP], certain terms, abbreviations and acronyms are used. The definitions for these items are as follows:

....

    B.  AL: Army Lodging activity
    C.  Contracting Officer: A person with the authority to enter into, administer, and/or terminate contracts on behalf of the Non-Appropriated Fund Instrumentality which is party to this contract and make related determinations and findings. The term includes certain authorized representative[s] of the Contracting Officer acting within the limits of their authority as delegated by the Contracting Officer.

....

10

E.  COR (Contracting Officer's Representative): The on-site representative of the Contracting Officer with authority to act for the Contracting Officer in areas specified by letter of designation.

....

H.  DOIM: Directorate of Information Management at Ft. Lewis, Washington.

G.[14]  DPW: Directorate of Public Works at Ft. Lewis, Washington.[15]

H.[14]  FDS: Facility Data Sheet(s).

I.  FF&E: Furnishings, Fixtures and Equipment

J.  The Fund: The Non-Appropriated Fund Instrumentality of the U.S. Army, also referred to as NAF or NAFI that is a party to this contract.

K.  Government: The term will generally refer to the NAFI or Fund. The use of the term "Government" shall not be construed to infer that appropriated funds of the United States are involved in this project. No appropriated funds of the United States shall become due, or be paid, to the Contractor by reason of this contract.

....

O.  Installation: Ft. Lewis, Washington.

P.  NAFI: Same as "The Fund"

....

R.  Owner: Same as "The Fund".

S.  Post: Ft. Lewis, Washington

....

---

[14] The duplication of the definition references "G" and "H" is in the original document.

[15] DPW was responsible for the maintenance of the Fort Lewis infrastructure (buildings, roads, etc.) and was "the keeper of the utility maps, the as-built records of all the facilities" at Fort Lewis. A division of DPW coordinated the locating and marking of existing utilities by base personnel before it issued digging permits. (Tr. 9/14-15, 24-25)

V. User/Using Agency: The AL activity at the installation that will be the ultimate user activity when the facility is completed·[16]

....

2.4    Validity of Information Provided:

A. A topographic drawing of the site showing locations of various utility lines has been incorporated as an attachment to this RFP under Section J. The information regarding underground utility lines was obtained from DPW. This information is provided for the Contractor's convenience. It is not a part of the contract and is not a warranty of actual conditions. Basic information maps and any other data obtained from DPW or other installation or other Government sources are provided for information only, and must be verified by site investigation. The Government will not be responsible for erroneous data if the errors can be reasonably detected through site investigation.

B. While the sizes and materials included on the utility maps are generally accurate, the exact location of underground systems cannot be guaranteed and must be verified by the Offeror through site investigation prior to submitting an offer.

C. No site-specific soil investigation of the site has been conducted by the Government. The information included in Section J is of a general nature and is included only for general guidance. This document is not part of the Contract Documents and is not a warranty of subsurface conditions. The Government does not assume responsibility for subsurface conditions. The selected Contractor shall conduct his own soil investigation to establish the design criteria for foundations and pavements.

---

[16] *See* definition 2.2B quoted just above, where "AL" is Army Lodging, the entity for whom the Fort Lewis Lodge was being constructed (R4, tab 2 at 860). The Army Lodging Fund was the source of nonappropriated funds used to fund the project now at issue. COR Dyer was responsible for managing the Army Lodging funds associated with this project (tr. 8/30-31, 52, 9/26-30, 117-18).

D. The Offeror may at his own expense, provide other investigations, surveys, etc. that are necessary to prepare a proposal, complete the design, and/or construct the project. Any such site investigation activities shall be coordinated with appropriate installation personnel. Prior to contract award, all inquiries shall be made of the Contracting Officer only.

2.5 Information Verification:

A. Offerors shall examine the site and determine for themselves the existing conditions and general character of the site. Claims for additional costs due to conditions that could have been verified by site investigation will not be permitted.

B. The Offeror shall be responsible to determine that all of the existing service utilities are of sufficient capacity to accommodate all of the design loads for this total facility. Should the Offeror determine that one or more of the existing service utilities are not adequate to accommodate the design loads for this total facility, then the Offeror shall submit with his initial and any subsequent proposal, the requirements, design data and the price for increasing the capacity of each existing service utility system or for providing a new service utility system. Design loads for this facility shall be calculated in accordance with the criteria specified in this Request for Proposals with the most stringent criteria governing. The Offeror shall be responsible for verification and field location of any and all information provided in the RFP and on any attached or enclosed drawings or other documents. The capacity information provided is for reference only.

C. Independent consultation with the AL and the installation concerning the project requirements is prohibited since evaluation of proposals will be based on requirements stated in the Request for Proposals. Verification of data can be obtained by contacting the Contracting Officer.

D. Questions regarding design, coordination, or interpretation of RFP requirements during the proposal phase shall be directed to the Contracting Officer.

E. The Contracting Officer will hold a Pre-Proposal meeting and site visit at Fort Lewis (See Section L, Pre-Proposal Conference). Any subsequent requests for site visits will

be directed to and coordinated with the Contracting Officer.

(R4, tab 2 at 871-73; tr. 10/28-33, 157-59)

9. RFP SECTION C-1, GUIDANCE TO CONTRACTORS, SITE INFORMATION, included the following information pertinent to the matters now before us:

3.1 Property:

A. The project will be located on US Army land, Ft. Lewis, Washington.
B. The existing site was originally developed as an area for administrative buildings. These buildings and their foundations have been or will be demolished by DPW, but the underground utilities were not removed. It is believed that all former water and sewer lines have been capped and abandoned.
C. Easements have not been recorded for the utilities located throughout the site.

    ....

3.2 Utilities:

    ....

D. Electricity: There is an existing 13.8KV, 3-phase primary electrical distribution line on the perimeter of this site. Coordinate the services drop location with DPW during design and construction. An existing underground feeder line and pad-mount transformer exists on the site and may have to be rerouted/relocated depending on the final site plan arrangement.
E. Telephone: Telephone wiring will be run into and through a Communications Manhole adjacent to the site. An existing ductbank travels west from this manhole to Bldg 2003, DOIM main switch building. Coordinate installation of new twisted pair bundle in this ductbank back to

14

2003. The Contractor will make cross-connections at 2003 under DOIM supervision/direction. Coordinate all requirements with Post DOIM during design and construction.

F. Natural Gas: Natural Gas is available at the site. Puget Sound Energy (PSE) owns the lines. Coordinate connection points and construction requirements with DPW and PSE during design and construction.

(R4, tab 2 at 873-74; tr. 10/33-35)

10. RFP SECTION C-1, GUIDANCE TO CONTRACTORS, PRODUCTS AND SUBSTITUTIONS, included the following information pertinent to the matters now before us: '

A. Products are generally specified by ASTM or other referenced standards and/or by manufacturer's name, model number, or trade name. When specified only by referenced standard, the Offeror may submit for approval any product meeting this standard by any manufacturer.

B. Products listed by manufacturer's name, model number, or trade name generally are for design guidance criteria. The Offeror has the option of providing the listed product or submitting an equal substitute (see 5.2 below) product for approval by the Contracting Officer.

1. If a product is listed with the annotation "no substitution", the Government has determined that the particular product is the only one that will satisfy the project requirements, and no substitute product will be acceptable.

5.2 Substitution:

A. A product proposed as an "equal" shall be such that all its salient characteristics conform to those of the listed brand name product. These salient characteristics may include, but are not

15

limited to: design, function, size, quality, durability, color, style, texture, and other attributes which, given the nature of the project, may significantly affect its acceptability as a substitute <u>for</u> the listed product. **The Contracting Officer will make the final determination as to whether a proposed substitute product is equal and/or acceptable.**

B. Offerors who propose to provide substitute products shall submit an itemized list of all proposed substitutions with their proposal. This list shall include the name of the listed product, the name and model of the proposed substitution, and the name and address of its manufacturer, and the quantity involved. With this list, provide the following for each proposed substitute item, as applicable:
   1. Catalog cuts completely describing the product and its physical characteristics.
   2. Performance and test data and specifications.
   3. Color and/or pattern selections.
   4. Recommended uses.
   5. Installation recommendations.
   6. Maintenance instructions.
   7. Copy of warranty.

C. If no proposed substitutions are included with the proposal the Offeror shall provide the products listed in the RFP.

(R4, tab 2 at 876) (Emphasis added)

11. RFP SECTION C-1, GUIDANCE TO CONTRACTORS, ATTACHMENTS, included the following information pertinent to the matters now before us:

6.1    The following documents are included as attachments to this RFP under Section "J" and shall be considered a part of the requirements for design and construction of the facility:

J-1    Low Voltage Schematic Drawings
J-2    Geotechnical Information
J-3    Installation Design Guide (IDG)

16

J-4    Fort Lewis Design Standards[17]
J-5    Fort Lewis Guide Specification 01410
J-6    Galaxy System Equipment
J-7    UFC-4-010-01 DoD Antiterrorism Standards for Buildings
J-8    UFC 3-600-01 Fire Protection Engineering for Facilities
J-9    Construction Sign Specifications
J-10    Drawings
Utilities Plan
Suggested Site Plan
Suggested Main Floor Plan
Suggested Upper Floor Plan
[Guest Room Layout Plans[18]
J-11    Breakfast Service Area Requirements
J-12    Department of Labor Wage Determination
J-13    Prefabricated Dwyer Kitchen Units Guidelines
J-14    FF and E / Lists and Product Data

(R4, tab 2 at 876-77)

12. RFP SECTION C-2, CODES AND STANDARDS, included the following information pertinent to the matters now before us:

> 1.1    The project shall be designed and constructed in accordance with the applicable codes, standards, design parameters or regulations noted in this section or other sections of the [RFP]. In case of conflict between codes, standards, or regulations, the Fort Lewis Installation Design Standards shall apply.
>
> ....

---

[17] The Fort Lewis Design Standards were drafted by ORB's Patterson in 1995-96 under an IDIQ contract between ORB and DPW (tr. 10/143-46).

[18] This drawing is listed and included in Section J-10 of the contract but is not included in this list in the contract. We presume that its omission here was unintentional and is immaterial to the matters before us.

2.1    General: Design and construction shall be in accordance with the most stringent requirements of the following codes, standards, and regulations:

     A. Fort Lewis, WA Installation Design Guide (IDG)

     B. Fort Lewis, Washington Public Works Design Standards

(R4, tab 2 at 878)

13. RFP SECTION C-3, FUNCTIONAL REQUIREMENTS, included the following information pertinent to the matters now before us:

1.1    Scope:

     A. This section includes descriptions of the basic functional and operational requirements for the Lodging Facility.

     B. The requirements included herein provide general guidance and minimum standards for the overall operational features desired by the Government. The Offeror should develop a design for the new Lodging Facility that meets or exceeds these requirements.

     ....

**5.    LODGING FACILITY / BUILDING**

5.1    General

     ....

     C. The Guest Rooms shall be designed and constructed as indicated in RFP documents.

(R4, tab 2 at 885-89)

14. RFP SECTION C-4, DESIGN REQUIREMENTS, included the following information pertinent to the matters now before us:

# 1    GENERAL

1.1    The requirements included in this Section establish the basic parameters for design of the various project elements. Additional requirements related to construction activities and products are included in Sections C-1, C-3 and C-5. Codes and standards are referenced in C-2.

1.2    The Contractor shall design all necessary architectural, civil, structural, mechanical, and electrical systems in accordance with the requirements and parameters established in this [RFP].

....

1.4    See the Fort Lewis Design Standards in Section J for minimum design standards. Where design standards specified herein are in conflict with the [IDG], the IDG shall apply.

....

# 4.    ARCHITECTURAL DESIGN

4.1    General:

A. This Lodging Facility shall be composed of one building, designated #2107, only except that the Grounds Maintenance Storage Building, designated #2108, shall be a separate stand-alone building.

....

G. The maximum height of the building shall not exceed 4 stories or 55 feet.

....

# 8.    HEATING VENTILATION & AIR CONDITIONING (HVAC) DESIGN

....

8.3    HVAC Systems:

A. General: The HVAC system shall attain the following main objectives: Occupant Comfort; Indoor Air Quality; Acceptable Noise Levels; Energy Efficiency, Reliable Operation; Ease of Maintenance; and Prevention of humidity problems within the building envelope. The Contractor shall develop a HVAC system from the following:

1. Self contained (PTAC)[19] through the wall air to air heat pumps for all guest rooms and any public spaces with exterior exposures, unless otherwise indicated in FDS. The DOIM Comm Room will be conditioned using an independent, wall mounted PTAC unit with independent controls. Other spaces to be air conditioned shall be part of **a VAV system utilizing constant volume fan powered terminal boxes, air cooled chiller and hot water boiler for primary air handler and re-heat at the terminal unit.** Code-required outside air ventilation and make up air shall be provided [to] the primary air handling unit using chilled water cooling and hot water heating to precondition all outside air before delivery through ductwork to each space. The outside air handling unit shall have the outside air intake at least 10 feet above grade. The central AHU[20] shall be provided with minimum 30% efficiency prefilters followed by 65% efficiency filters. PTAC units to be provided with throw- away filters.

....

---

[19] A photograph of a PTAC unit (inside wall and outside wall) can be found in the record at Ex. A-3 at EK-36.

[20] Air handling unit (tr. 1/80).

D. Controls: The HVAC system shall be controlled by a DDC system that complies with the Fort Lewis Design Standard DDC Design Guide Specification (See Section J). Each AHU and terminal unit shall have a LonWORKS or BACnet DDC controller connected to a Tridium JACE[21] controller. The JACE controller shall be connected to the building LAN (Ethernet Cat 5) and routed to a desk-top computer, with Tridium Niagra Web Supervisor and Workplace Pro, installed in the mechanical room. The maintenance staff shall have access to the system through any computer connected to the Network via use of a web browser that is password protected.

E. ...An existing ONITY "Senercomm" *InnPulse* On-line system will be relocated from the Check-in point in existing Building 2111 to the new facility. Senercomm "SensorstatDDC"[22] programmable digital thermostats or equal will be provided in new guest rooms. Connect all new room thermostats and Bldg 2111 thermostat system to the relocated *InnPulse* Server, update software/system as required.... Coordinate with comm./data requirements and electrical capacities.

(R4, tab 2 at 890-902; tr. 1/126-28, 4/8, 29-30, 30-32, 8/36-37, 12/67-74) ORB's Patterson, who drafted this section of the RFP, testified that:

The majority of the lodge is made up of individual guest rooms served by individual terminal units, or AC units. The intent of [8.3.A.1] was to heat and cool the remaining back [of] house and front of house spaces such as the front lobby, desk, back of house areas, breakfast bar, etcetera, etcetera, etcetera, with a single system with a central boiler

---

[21] A photograph of the JACE controller and the ONITY room-control system is in the record at Ex. A-3 at EK-41 (top).

[22] A photograph of such a thermostat with an occupancy sensor is in the record at Ex. A-3 at EK-37 (top).

and chiller fed by / an[] air handler I suppose, and fed by terminal boxes within each space.... A VAV system.

....

Fort Lewis specifically, and other military installations in general, have limited staffs when it comes to maintenance. The Fort Lewis HVAC shop currently only has about three or four people. At that time, there were maybe 10 or 12. They demand, if you will, they require a single central maintainable boiler and chiller....

....

So, the basic intent of those sentences was to provide a mechanical room with a boiler chiller that could be easily visited by DPW maintenance personnel for filter changes, strainer cleaning, etcetera, etcetera, in one location. And then, the remainder of the system would be a variable air volume, VAV, unit type system, that would feed conditioned air to the remaining public spaces.

....

Fort Lewis was built and rebuilt starting in 1917 to present day. If you look at the older systems on Fort Lewis, they are oil fired furnaces with perimeter heat. There are HVAC systems. The one common thread, with the exception of some Army Air Force exchange facilities that operate under different rules and do their own maintenance, the one common thread is that all of these facilities have a central furnace or heating source with either a hydronic loop or a VAV system or whatever.

There are several quasi-commercial facilities on Fort Lewis that are operated by the Army Air Force exchange service, the commissary services, etcetera, and they do have some package units, storefront type rooftop units on them. But, the overall norm is the central boiler chiller system.

(Tr. 10/35-39) With respect to ¶¶ 8.3.D-E, ORB's Patterson testified that:

22

I incorporated that language. Paragraph D, the basic description of the required DDC system, was essentially dictated or written by the Fort Lewis public works controls shop, so that the system would be compatible with the Fort Lewis net for design or for digital systems. The Paragraph E, guest room thermostats, is a unique paragraph to lodging facilities, in that Army lodging uses an ONITY [S]ensorStat, what they call an [I]nnPULSE[] system, to further control guest room heating and cooling.

That was essentially provided by Army lodging, and tweaked a little bit, if you'll note the last sentence, "Connect new room thermostats and Building 2111." It is site specific in that respect, but it is more or less a standard paragraph for lodging facilities.

....

So, depending on the definition of draft, I did not draft those two paragraphs, I incorporated them. But, I modified them to show the Fort Lewis condition on the existing head end equipment.

....

The intent at the time that this document was generated, was that the / Building 2111 was where the existing lodge check-in desk was located and etcetera, and it was where the Onity head end equipment was located. So, the intent of this was that when the new lodge was built, the check-in desk and the associated equipment would be moved into the new facility, but the head end equipment that had been relocated was still required to talk to the thermostats in Building 2111. The intent was that 2111 would continue to operate next to the new lodge.

....

[Paragraph D] was included at the request of the Fort Lewis DDC shop, John Timmers and Dale Brigham, as being a requirement to ensure that the new lodge would talk to their base DDC system.

23

....

> [The Fort Lewis DDC system] is a [Tridium]-based digital control system that allows John Timmers and/or his people to be able to monitor what's going on from a remote location, a laptop, with various aspects of the installed system in any building. Ideally they would be also able to control from a remote location. I'm not sure how well that worked out, or is working out....

(Tr. 10/39-41; *see also* tr. 12/61-62) BCE's Heiberg testified:

> [T]he common areas and the central mechanical systems are turned over to Public Works for ongoing maintenance, and as a result, they need to see what's happening with them so that integration is real important. It's like the building has two different control systems; this one goes to Public Works, they take care of it; the other Onity control units, the PTACs, that's something that MWR or MCOM takes care of. So that's where that whole standard reference document of what the Tridium is and how it needs to work and what the requirements are and that was our main concern about that, and there was some concerns on the Onity side, but that was—this is the one that many contractors, very large contractors have failed to do out at Fort Lewis, so there's a—it's a difficult process, and we wanted to make sure that this one would have a reasonable chance of success.

(Tr. 11/140-41) With respect to the basewide system at Fort Lewis, Heiberg testified:

> It is a large network that is controlled primarily out of Building 2012, with a series of PCs that are managed by the Public Works that communicate with the various buildings. Some they don't communicate at all with, all the newer ones do. It's a base standard in progress, if you will. They've been building on it for 10 or 15 years, and probably prior to this project, it was probably less than 10 years old at the time of this project. Tridium using an open protocol network for controllers, they would accept BACnet or Lonworks based controllers; that was the thing back then. BACnet wasn't developed as much as Lon was, so that there's a lot more buildings using Lonworks out on

24

the base. It's just a way to integrate it in, and then Tridium and JACE was a very flexible graphics program that brought this information in to PCs and allowed them to customize access into each building with floor plans and graphics and so forth. And each time a building was being planned out at Fort Lewis, it would be, the controls companies would be referred to a standard by which to bring this new building into the base standard.

....

They were very particular about a R2 version of software that they were running at the time. Tridium R2, very large program from a software standpoint, not super expensive, but nevertheless anybody doing work out there would need to buy a software package to license that site and bring it into the network. R2 was a version; they subsequently came out with an AX, which is more of a fragmented version. I don't get into a lot of details of the capabilities and differences between the software, but the R2 was more of a legacy type of control system. By that, kind of the big offering from the Tridium people. If you had R2, you could be at Building 2012 and look at a building XYZ on base, and download software all the way down to an individual room's heat pump. So you had from the top down, you had full capability of programming down to the last device.

The AX system broke that apart and said okay, you'll need another little controller or software version to write to the little heat pump or an intermediate global controller. It wasn't logging on from the top and going all the way down; you had to get a laptop out and fire up other software to do local programming.

(Tr. 11/141-43)

17. RFP SECTION C-5, OUTLINE SPECIFICATIONS, included the following information pertinent to the matters now before us:

**1      GENERAL**

1.1     Purpose:

25

A. Unless otherwise indicated, the Offeror/Contractor has the option of selecting all materials, systems, and equipment for use in the project. The technical requirements included in these Outline Specifications establish the minimum acceptable standards for the various products that may be used in the project. The Fort Lewis Public Works Design Standards (See Section J) also specify minimum acceptable standards and criteria for certain materials and systems for use on Fort Lewis. In the event of a conflict between these outline specifications and the Fort Lewis Design Standards the most stringent interpretation will apply.

B. Unless otherwise indicated, the inclusion of an item in these specifications does not require that the item be included in the project. In similar fashion, the omission of an item from these standards does not indicate that the item cannot or should not be included in the project.

C. See Section C-1, paragraph 5, "PRODUCTS AND SUBSTITUTIONS" for guidance regarding substitutions.

1.2　Work Included in This Contract:

A. The work includes design and construction of all architectural, civil, structural, mechanical, electrical, plumbing and fire protection items required to provide a complete facility that can be used satisfactorily for its intended purpose without excessive maintenance or operational costs.

....

## 2.　SITE WORK

2.1　Selective Demolition:

....

C. Utilities: Maintain existing utilities that are to remain in service and protect them against damage during demolition operations.... Utilities that are not in service and are not in conflict with new construction may be left in place. Contractor shall be responsible for removing capped utilities that are in conflict.

....

2.4  Site Development:

A. Surveys and Layout of Work

....

3. The Contractor shall coordinate with DPW to locate and mark underground utilities.

....

## 15.  MECHANICAL

15.1  General:

....

G. The contractor shall have the responsibility to coordinate Mechanical equipment as it interfaces internally with DDC controls and externally with Division 16[23].

....

15.4  HVAC Equipment

A. General: All HVAC equipment and systems shall be of good quality, easy to maintain and conform to the standards listed below where applicable. HVAC equipment shall be controlled and monitored by the DDC system as referenced herein. **Where possible provide**

---

[23] We understand "Division 16" to be commonly used prior to 2004 in the construction industry to refer to "Electrical" work.

HVAC equipment that has a direct interface with the existing Post system. If equipment is provided that does not have a direct interface then the contractor is required to provide the equipment for interface to perform the necessary control functions as called out in paragraph on Automatic Temperature Controls.

....

B. Chiller: Air-cooled heat rejection for equipment shall be Trane, McQuay, or Carrier.

....

C. Air-Handling Units: Horizontal....

D. PTAC Heat pumps: Air-cooled. Through the wall at Guest Rooms, wall-mount at Comm. Room. Complete with compressor, fan, coils, and controls to make a complete and operable system. Outside air intakes shall not be provided at individual PTACS. Contractor shall select PTAC heat pumps based on quality and maintainability. Acceptable products include GE / Zoneline and McQuay / ComfortPac.

E. Unitary Heating Equipment: Individual heaters for ancillary areas shall be hot water.

....

15.6   Automatic Temperature Controls: **Controls shall be stand-alone DDC and compatible with the Fort Lewis EMS "Tridium" system. The system will be connected to the Post-wide EMS system at a later date. The DDC system shall monitor HVAC equipment as defined in the paragraph herein. See Design Requirements in Section C3 & C4 for additional information regarding the control system. The DDC control system shall monitor, report and/or alarm the following HVAC functions and any other points required to control, operate and maintain the critical areas of the facility.**

....

28

F. Direct Digital Control (DDC) Points List: The following is a list of the *minimum* required DDC points:
   1. Air Handling Units (AHU)

      ....

   4. PTAC Heat Pump Units

      ....

   5. Fans (other than AHU system fans)

      ....

   6. Terminal Units

      ....

   7. Boiler System

      ....

   8. Chiller System

      ....

G. **The DDC system shall provide automatic control of the common area HVAC system. This includes the AHU's their zone terminal units and associated exhaust fans and heating/cooling equipment.**
   1. **In addition, provide for DDC control of individual PTAC heat pump units. This shall be a sub-DDC system designed specifically for the hospitality industry (ONITY "SenerComm" *SensorstatDDC* or equal), yet compatible with Tritium EMS for future connection to the Post system. Contractor shall be required to provide information about the DDC system submitted including: history, capabilities, compatibilities, useful life, maintenance costs, experience and reliability for use in this PTAC / heat pump application. The intent is to**

**control/adjust each guest PTAC from a central control point using the ONITY "InnPulse" on-line monitoring/reporting system at the front desk, in addition to providing occupied/unoccupied sensing and setbacks and allowing the individual guest to control/adjust at the guest room.**

(R4, tab 2 at 908-09, 932, 934-41) (Emphasis added)

18. RFP SECTION H-3, CONTRACT QUALITY CONTROL/QUALITY ASSURANCE, included the following information pertinent to the matters now before us:

3.1 Definitions:

A. Contractor Quality Management System (CQMS): The means by which the contractor assures himself that his design and construction comply with the requirements of the contract.

B. Contractor Quality Control (QC): The Contractor's inspection, examination and control of his own, his suppliers', and his subcontractors' work and activities to ensure compliance with contract requirements.

C. Contractor Quality Assurance (QA): The means by which the Contractor fulfills his responsibility for assuring that the QC system is functioning effectively.

3.2 General: The Contractor shall establish and maintain an effective [CQMS] in compliance with contract clauses, professionally accepted design and professionally accepted inspection of construction practices and as herein provided. The CQMS consists of plans, procedures, and organization necessary to provide a design and materials, equipment, workmanship, fabrication, construction and operations which comply with contract intent and specific requirements. The system shall cover both design services and construction operations, both on site and off site, and shall be keyed to the

30

proposed design and construction sequence. The Contractor will designate a **Professional Architect or Engineer (A/E), registered in the State where the work is being performed, as the responsible CQMS authority**. Different professionals may be appointed for the separate design and construction phases....

....

3.7     Quality Control Organization:

A. Design: Design quality control shall be the responsibility of the Architect/Engineer who will seal all drawings and specifications as the "Architect/Engineer of Record." The Design Professional (Architect/Engineer of Record) responsible for the design of any project element shall also be the final approval authority for shop drawings and any other tests and submittals effecting [sic] the final design of that element.... The Architect/Engineer of Record shall certify in writing to the Contracting Officer that the required design quality reviews have been completed and that to the best of his knowledge and belief the design meets the requirements of the RFP. The Architect/Engineer of Record shall review and approve (seal) all engineering calculations and designs unless otherwise approved by the Contracting Officer.

....

3.14    Government Quality Assurance: The Government's quality assurance activities will consist of construction project observation, review of CQC activities and records, and discussions of area where contract deviations appear evident.

3-14.1 Request for deviations shall be presented in a RFI format to the Architect of Record for approval. Subsequent to approval by the Architect of Record a

copy of the request for deviation shall be submitted to the contracting officer for review and acceptance.

(R4, tab 2 at 955-56, 960) (Emphasis added)

19. RFP SECTION H-10, RESPONSIBILITIES OF THE CONTRACTOR, included the following information pertinent to the matters now before us:

10-1    This project will be awarded as a "design/build" project. The design/build Contractor entity shall bear full responsibility for development of the final designs and construction of a complete and usable facility. The design/build Contractor's architect (or engineer) shall be the "Architect (or Engineer) of Record" and as such, shall bear full responsibility for the design.

10-2    The successful Offeror shall proceed to finalize the proposed design upon issuance of the Notice to Proceed for Design by the Contracting Officer, after Award of the contract.

10-3    Unless otherwise permitted by the Contracting Officer in writing, the Contractor shall engage professional architects and engineers registered in the state the work is being performed (for each discipline) to oversee all aspects of the design and construction work as set forth herein. The proposal submittal materials shall indicate the proposed designer's qualifications and design competence relative to the project. At final submission, construction drawings shall be signed and bear the designer's professional seal.

10-4    The Architect (or Engineer) of Record is required to become thoroughly familiar with the site through site visits....

10-5    Neither the NAFI's review, approval or acceptance of, nor payment for, any of the services required under this contract shall be construed to operate as a waiver of any rights under this contract, and the Contractor shall be and remain liable to the NAFI in

32

accordance with applicable law for all damages to the NAFI caused by the Contractor's negligent acts or omissions in connection with designs, drawings and specifications furnished under this contract.

(R4, tab 2 at 965)

20. RFP SECTION H-15, CONTRACTOR DESIGN SUBMITTAL AND DESIGN MEETING REQUIREMENTS AFTER AWARD, included the following information pertinent to the matters now before us:

A. Pre-Design Conference: Within 14 calendar days after Design NTP, prior to commencing work, the Contractor shall meet with Government representatives at Ft. Lewis for a two-day predesign conference.

The Contracting Officer will review administrative and technical requirements for the contract during the pre-design conference....

The Contractor shall keep and distribute conference meeting minutes to attendees.

B. Design Submittals:

The Contractor shall make four design submittals for this project in addition to any required by the Contracting Officer for fast track approval. The first submittal will be at the 35% design stage, the second at the 65% stage, the third at the 95% stage, and the fourth at the 100% stage. Each submittal will incorporate all comments made regarding the previous submittal. The Contracting Officer will review designs for compliance with contract requirements but not for design validity. The Contractor remains fully responsible for the design. Any portions of the overall design submitted must be sufficient in detail to permit *professional evaluation* as to the extent that the elements to be constructed meet contract requirements. Design submittals will include, at

33

the appropriate level (35%, 65%, 95%, or 100% design submittals), the items noted herein.

C. Review Meetings:

After Government review of each design submittal has been completed, meet with the Contracting Officer at Ft. Lewis, Washington for a 1 /day conference to discuss review comments and the Design/Build Team's responses for the specific design submittal. The responses to review comments shall be submitted to the Government in writing one week after receipt by Contractor.

D. General Design Data:

1. Design analysis and calculations. (The Fund will review the design analysis or calculations to assure they have been accomplished). The Design Analysis shall include as minimum:
2. A description of the general parameters, functional and technical requirements, and objectives and provisions of the design shall be described. A summary of economic factors influencing the design choice of systems used in the project will be provided along with an indication of how initial and life cycle costs were considered.
3. Design calculations and supporting documentation shall be done to support design considerations.... Calculations and data for the following shall be included in the analysis:
   a. Civil Site Design/Site Utility Design
   b. Structural Design/Foundation Design
   c. Building Code/Life Safety Analysis
   d. Mechanical Systems Design
   [e.] Electrical Systems Design
4. Design drawings showing the name of the Contractor's Architect/Engineer of Record. Drawings shall be prepared on acceptable

34

Mylar drafting material and shall include a minimum:

a. Drawing scales:....

b. Utility Drawings....

c. Site Landscaping plans....

d. Building plans: Floor plans for the Lodging Facility building(s) showing overall dimensions, room dimensions, typical layouts, plumbing fixtures, door swings, location of electrical lights, switches, outlets, fans, etc., heating and air conditioning diagrammatic layout, building and food service equipment, and the calculated gross and net floor area....

e. Structural drawings....

f. Mechanical drawings shall include, in addition to layout drawings for all systems, single line diagrams of each type of piping and duct system. Type and capacity of all mechanical equipment shall be clearly indicated including necessary schedules listing operating data.

g. Electrical Drawings and Criteria:....

5. Specifications: The technical provisions shall be in sufficient detail so that, when used with the applicable construction drawings, construction can be completed without additional specifications except as necessary to deal with unforeseen conditions or to accomplish changes made during construction. The specifications may require furnishing additional information such as shop drawings, manufacturers' literature, certificates of compliance, material samples, and guarantees to assure that the work can be completed and conforms with the contract requirements and that supervision of the project can be maintained.

....

F. If the Contractor elects to obtain additional topographic surveys or soil investigations beyond those furnished with the RFP, this data shall be submitted for review with the other design data.

   1. Topographic survey shall include contour lines of sufficient frequency for development of construction plans. Horizontal and vertical control shall be shown.

   2. Soil investigations shall include any boring logs, testing results, or design analyses performed by the Contractor.

   ....

H. Design reviews will be held at Ft. Lewis, Washington. The [CO] will review the Contractor's submittal for compliance with the contract requirements and the proposal on which the award was based. If the submittal is not approved, the Contractor shall make the necessary corrections or revisions and submit a completed corrected design not later than fourteen (14) calendar days after being returned by the [CO]. No additional time extensions will be granted for the processing of re-submittals. The Contractor shall make a minimum of four (4) design submittals in addition to any others required for fast track approval (i.e. limited Notice to Proceed) or for correction, clarification, etc. The first scheduled submittal shall be at 35 percent design completion and the second scheduled submittal shall be at 65 percent completion.

   1. Minimum requirements for 35% design submittal:

      a. All drawings and items required by paragraph H-15 [D.] (General Design Data) developed to approximately 35 percent completion.

      b. Specifications: table of contents and draft outline specifications.

36

c. List of all requested substitutions for review and approval.

d. Design analysis developed to the extent required to support the design or that portion of architectural, civil, utility distribution, structural, electrical, and mechanical systems included in this submittal.

e. Additional soils report and topographic survey if completed or required.

2. Minimum Requirements for 65% design submittal:

a. All drawings and items required by paragraph H-15 [D.] (General Design Data) developed to approximately 65 percent completion, except that all Civil and Structural foundation drawings shall be developed to approximately 100 percent completion. Fully developed civil/site plans including required SWPPP and storm water management plans will be required before consideration of advanced (or limited) Notice to Proceed (LNTP).

b. Completed specifications for site work, site utilities, and a draft of the specifications for the remaining work, including index, general conditions, and technical sections.

c. Design analysis developed to the extent required to support the design or that portion of architectural, civil, utility distribution, structural, electrical, and mechanical systems included in this submittal.

3. Minimum Requirements for 95% design submittal:

a. All drawings and items required above completely developed.

b. Completed specifications. Interior signage specification shall include a professional "wayfinding" plan for approval.

c. Completed designs analysis.

37

d. Equipment Schedules: Based on the results of calculations, provide a complete list of the material and equipment proposed for the building including heating, plumbing and cooling with the manufacturers published cataloged product installation specifications and roughing-in data.

e. Shop drawing submittal register.

4. Minimum Requirements for 100% submittal:

a. All drawings and items required above, completely developed and incorporating all comments and revisions from the 95% review.

(R4, tab 2 at 966-70)

21. RFP SECTION H-21, CONTRACTOR-PREPARED PROGRESS SCHEDULE, included the following information pertinent to the matters now before us:

In accordance with the Contract Clause I-48, "Schedules for Construction Contracts," the Contractor shall submit as part of the initial design submittal, a critical path progress schedule showing the manner in which he intends to prosecute the work. Preparation and updating of the schedule shall be as follow[s]:

21-1 The progress schedule shall be prepared in the form of time-scaled (Gannt Chart) summary network diagram graphically indicating the sequence proposed to accomplish each work operation and appropriate inter-dependencies between the various activities. The chart shall show the starting and completion dates of all activities on a linear horizontal time scale beginning with the dates of Notice to Proceed for Design and indicating calendar days to completion. Each significant activity in both design and construction phases of the project shall be represented and a cost for the activity indicated. The sum of the activity costs shall total to the contract amount for the project. The Contractor shall indicate on the chart the

38

important work activities that are critical to the timely overall completion of the project. Key dates for important features or portions of work features are milestone dates and shall be indicated on the chart. Based on this chart, the Contractor shall prepare an earnings-time curve ("S" curve) showing the rate of progress in terms of money and percent completion. Schedule progress may not include the value of materials or equipment delivered to the job site but not yet incorporated into the work. This schedule shall be the medium through which the timelessness [sic] of the Contractor's construction effort is appraised, and periodic payment estimates are processed pursuant to the Contract Clauses.

....

21-4.1 Failure by the Contractor to maintain adequate progress in accordance with the progress schedule may result in withholding of progress payments, as determined by the Contracting Officer.

(R4, tab 2 at 972-73)

22. Section I of the RFP included contract clauses specific to Nonappropriated Fund (NAF) construction. Section I-2, NONAPPROPRIATED FUND INSTRUMENTALITY (FEB 1997), included the following information pertinent to the matters now before us:

The Nonappropriated Fund Instrumentality (NAFI) which is party to this contract is a nonappropriated fund instrumentality of the Department of the Army. NO APPROPRIATED FUNDS OF THE UNITED STATES SHALL BECOME DUE OR BE PAID THE CONTRACTOR BY REASON OF THIS CONTRACT. This contract is NOT subject to The Contract Disputes Act of 1978.

(R4, tab 2 at 975) In addition, Army Regulation (AR) 215-1, Military Morale, Welfare, and Recreation Programs and Nonappropriated Fund Instrumentalities, § II, Terms, defines a nonappropriated fund instrumentality (NAFI) as:

39

A U.S. Government organization and fiscal entity that performs essential Government functions. It is not a Federal Agency. It acts in its own name to provide, or assist other DOD organizations in providing MWR and other programs for military personnel, their Families, and authorized civilians. It is established and maintained individually or jointly by two or more DOD components. As a fiscal entity, it maintains custody of and control over its NAFs, equipment, facilities, land, and other assets. It is responsible for the prudent administration, safeguarding, preservation, and maintenance of those APF resources made available to carry out its function. With its NAFs, it contributes to the MWR programs of other authorized organizational entities, when so authorized. It is not incorporated under the laws of any State or the District of Columbia, but has the legal status of an instrumentality of the United States. NAFIs are not "persons" subject to federal trade and antitrust laws, and they are not subject to State regulation or control in the absence of specific authorization in a Federal statute.

AR 215-1 defines nonappropriated funds (NAFs) as:

Cash and other assets derived from sources other than Congressional appropriations, primarily the sale of goods and services to DOD personnel and the Family members are used by the NAFI to support or provide authorized programs. NAFs are Government funds used for the collective benefit of those who generate them. These funds are separate and apart from funds that are recorded in the books of the Treasurer of the United States.

"There are no tax dollars involved in this project. All the funding comes from Soldier's dollars generated from other Lodging stays." (R4, tab 127 at 2872; tr. 12/148-50)

23. The RFP included Section I-4, CHANGES—CONSTRUCTION (FEB 1997) (R4, tab 2 at 975-76); RFP Section I-21, PROMPT PAYMENT FOR CONSTRUCTION CONTRACTS (FEB 1997) (*id.* at 987-95).

24. RFP Section I-20, PAYMENTS UNDER FIXED-PRICE CONSTRUCTION CONTRACTS (FEB 1997), included the following information pertinent to the matters now before us:

(c) If the Contracting Officer finds that satisfactory progress was achieved during any period for which a progress payment is to be made, the Contracting Officer shall authorize payment to be made in full. However, if satisfactory progress has not been made, the Contracting Officer may retain a maximum of 10 percent of the amount of the payment until satisfactory progress is achieved. When the work is substantially complete the Contracting Officer may retain from previously withheld funds and future progress payments that amount the Contracting Officer considers adequate for protection of the NAFI and shall release to the Contractor all the remaining withheld funds. Also, on completion and acceptance of each separate building, public work or other division of the contract, for which the price is stated separately in the contract, payment shall be made for the completed work without retention of a percentage.

(R4, tab 2 at 986-87)

25. RFP Section I-25, DISPUTES (FEB 1997), stated:

(a) This contract is subject to the rules and regulations promulgated by the Secretary of Defense and Secretary of the Army for NAF contracting.

(b) The contract is not subject to the Contract Disputes Act of 1978 (41 U.S.C. 601-613).

(c) All disputes arising under or relating to this contract shall be resolved under this clause.

(d) "Claims," as used in this clause, means a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract forms, or other relief arising under or relating to this contract. A claim arising under a contract, unlike a claim relating to that contract, is a claim that can be resolved under a contract clause that provides for the relief sought by the claimant. A voucher, invoice, or other routine request for payment that is not in dispute

41

when submitted is not a claim under this clause. The submission may be converted to a claim under this clause, by complying with the submission requirements of this clause if it is disputed either as to liability or amount or is not acted upon in a reasonable time.

(e) (1) A claim by the Contractor shall be made in writing and submitted to the Contracting Officer for a written decision. A claim by the NAFI against the Contractor shall be subject to a written decision by the Contracting Officer.

(2) For Contractor claims exceeding $50,000, the Contractor shall submit with the claim a certification that-

(i) The claim is made in good faith;
(ii) Supporting data are accurate and complete to the best of the Contractor's knowledge and belief; and
(iii) The amount requested accurately reflects the contract adjustment for which the contractor believes the NAFI is liable.

....

(f) ...For Contractor-certified claims over $50,000, the Contracting Officer must, within 60 days, decide the claim or notify the Contractor of the date by which the decision will be made.

(g) The Contracting Officer's decision shall be final unless the contractor appeals as provided in paragraph (h) of this clause.

(h) The Contract[ing] Officer's final decision may be appealed by submitting a written appeal to the Armed Services Board of Contract Appeals within 90 days of receipt of the Contracting Officer's final decision. Decisions of the Armed Services Board of Contract Appeals are final and are not subject to further appeal.

(i) The Contractor shall proceed diligently with performance of this contract, pending final resolution of any request for relief, claim, appeal, or action arising under the contract, and comply with any decision of the Contracting Officer.

(R4, tab 2 at 996-97)

26. RFP Section I-35, REMOVAL OF CONTRACTOR'S EMPLOYEES (FEB 1997), provided:

The Contractor agrees to utilize only experienced, responsive and capable people in the performance of the work. The Contracting Officer may require that the Contractor remove employees who endanger persons or property, or whose continued employment under this contract is inconsistent with the interest of military security.

(R4, tab 2 at 1001)

27. RFP Section I-40, DIFFERING SITE CONDITIONS (FEB 1997), included the following information pertinent to the matters now before us:

(a) The contractor shall promptly, and before the conditions are disturbed, give a written notice to the Contracting Officer of (1) subsurface or latent physical conditions at the site which differ materially from those indicated in this contract, or (2) unknown physical conditions at the site of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract.

(b) The Contracting Officer shall investigate the site conditions, promptly after receiving the notice. If the conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performance of any part of the work under this contract, whether or not changed as a result of the conditions, an equitable adjustment shall be made under this clause and the contract modified in writing accordingly.

(R4, tab 2 at 1002-03)

28. RFP Section I-41, SITE INVESTIGATION AND CONDITIONS AFFECTING THE WORK (FEB 1997), included the following:

(a) The contractor acknowledges that it has taken steps reasonably necessary to ascertain the nature and location of work, and that it has investigated and satisfied itself as to the general and local conditions which can affect the work, or its cost, including but not limited to (1) conditions bearing upon transportation, disposal, handling, and storage of materials; (2) the availability of labor, water, electric power, and roads; (3) uncertainties of weather, river stages, tides or similar physical conditions at the site; (4) the conformation and conditions of the ground; and (5) the character of equipment and facilities needed preliminary to and during work performance. The Contractor also acknowledges that it has satisfied itself as to the character, quality and quantity of surface and subsurface materials or obstacles to be encountered insofar as this information is reasonably ascertainable from an inspection of the site, including all exploratory work done by the NAFI, as well as from drawings and specifications made a part of this contract. Any failure of the Contractor to take the actions described and acknowledged in this paragraph will not relieve the Contractor from responsibility for estimating properly the difficulty and cost of successfully performing the work, or for proceeding to successfully perform the work without additional expense to the NAFI.

(R4, tab 2 at 1003)

29. RFP Section I-44, SUSPENSION OF WORK (FEB 1997), included the following information pertinent to the matters now before us:

(a) The Contracting Officer may order the Contractor in writing to suspend, delay, or interrupt all or any part of the work of this contract for the period of time that the Contracting Officer determines appropriate for the convenience of the NAFI.

(b) If the performance of all or any part of the work is, for an unreasonable period of time, suspended, delayed,

44

or interrupted (1) by an act of the Contracting Officer in the administration of this contract, or (2) by the Contracting Officer's failure to act within the time specified in this contract (or within a reasonable time if not specified) an adjustment shall be made for any increase in the cost of performance of this contract (excluding profit) necessarily caused by such unreasonable suspension, delay, or interruption and the contract modified in writing accordingly. However, no adjustment shall be made under this clause for any suspension, delay, or interruption to the extent that performance would have been so suspended, delayed or interrupted by any other cause, including the fault or negligence of the Contractor, or for which an equitable adjustment is provided for or excluded under any other term or condition of this contract.

(c) A claim under this clause shall not be allowed (1) for any costs incurred more than 20 days before the Contractor shall have notified the Contracting Officer in writing of the act or failure to act involved (but this requirement shall not apply as to a claim resulting from a suspension order), and (2) unless the claim, in an amount stated, is asserted in writing as soon as practicable after the termination of the suspension, delay, or interruption, but not later than the date [of] the final payment under the contract.

(R4, tab 2 at 1004)

30. RFP Section I-51, LIQUIDATED DAMAGES / CONSTRUCTION (FEB 1997), provided that:

(a) If the Contractor fails to complete the work within the time specified in the contract, or any extension, the Contractor shall pay to the NAFI as liquidated damages, **the sum of $1,500.00 for each day of delay**.

(R4, tab 2 at 1006) We have found no evidence that the government assessed any liquidated damages under this contract.

31. RFP Section I-56, SUPERINTENDENCE BY CONTRACTOR (FEB 1997), included the following information pertinent to the matters now before us:

45

At all times during the performance of this contract and until the work is completed and accepted, the Contractor shall directly superintend the work or assign and have on the work [site] a competent superintendent who is satisfactory to the Contracting Officer and has authority to act for the Contractor.

(R4, tab 2 at 1012)

32. RFP Section L set forth the requirements for the initial design proposals. In particular, Section L-20-1 required:

A.   The following technical data shall be submitted as part of the technical proposal. Appropriate parts of the accepted proposal will be incorporated into the contract. Offerors are advised that the required data listed below will be utilized for technical review and evaluation. **Requirements, codes, standards and any other information contained or specified in SECTION C and elsewhere in this RFP *will be assumed to be included* and to be a part of the Offeror[']s proposal. It need not be repeated therein. *All alternates shall be specifically addressed and expanded upon in the proposal*.** The criteria specified in this RFP are binding contract criteria and in cases of any conflict, subsequent to award, between RFP criteria and Contractors['] submittals, **the RFP criteria shall govern unless there is a written agreement between the Contracting Officer and the Contractor waiving the *specific* requirement or accepting a *specific* condition pertaining to the offer.**

....

C.   Proposals will be evaluated for conformance to the minimum criteria in the RFP and for quality scoring. While the intent is to keep pre-award design effort to a minimum, proposals must provide enough design for the evaluation team to determine whether the proposed design meets the functional requirements for operational use during the anticipated life of the facility and to show engineering sufficiency and

46

soundness and the degree to which the proposal may exceed the minimum requirements. It must also form sufficient basis for developing a fair and reasonable price proposal.

D. In general, the proposal will be considered technically responsive if it includes the following:

....

(f) HVAC System:
  (i) Provide a brief narrative description of proposed system design and **why the particular system was selected**. Address thermal envelope design and operating characteristics of the HVAC system and the control system for guest rooms and other areas.
  (ii) Basic mechanical plan: Indicate on the architectural drawings major equipment locations and sizes.
  ....
  (v) **Provide catalog cuts** of proposed chillers, boilers, cooling towers, heat pumps and guest room units as applicable.
  (vi) **DDC Controls: Provide narrative description of intended EMS Control system and catalog cuts of equipment to be provided.**

(R4, tab 2 at 1036-39; tr. 12/132-37) (Emphasis added) CO Wallace[24], the original author of L-20-1 A. and C., testified that:

What we're basically telling the contractors is we've basically given you what our minimum requirements are and offerors may or may not be, depending on the other portions of the RFP, may be allowed to submit alternatives, alternative systems, alternative equipment, but that they have to specify that equipment separately in writing to the contracting officer. And the contracting

---

[24] (*See* finding 262)

47

officer has to incorporate that deviation in writing into the contract.

(Tr. 12/134-35)

33. RFP Section M, EVALUATION FACTORS FOR AWARD, provided:

## M-1. PROPOSAL EVALUATION AND SELECTION PROCESS:

a. A technical evaluation team will be established to evaluate each offer (proposal) in response to this Solicitation (RFP). The technical portion (Volume I / Parts 1, 2, and 3) of each offer will be evaluated independently and objectively by the evaluation team (See M-2 below for the factors).

b. Volume II, the Pricing and Financial offers will be evaluated separately by the Contracting Officer.

c. Award will be based on an integrated assessment of the evaluation factors. The Contracting Officer will award the contract to that offeror that is the most advantageous and offers the best value to the NAFI, price and other factors considered.

**M-2. EVALUATION OF OFFERS:** All offers (proposals) will be evaluated by the following factors. Price evaluation, M-2a is as important as all the factors under M-2b combined. Under Technical Evaluation (M-2b), Factor a is of the greatest importance. Factor b is less important than Factor a and slightly more important than Factor c. Factor c is less important than Factors a or b. See Section L-20 for descriptions and required submittals.

....

## M-2b. TECHNICAL EVALUATION:

Factor a.   Vol 1 / Part 1 / Functional and Aesthetic Design

48

|   | Factor b. | Vol 1 / Part 2 / Project Management Plan |
|---|---|---|
|   | Factor c. | Vol 1 / Part 3 / Team Qualifications and Experience |

(R4, tab 2 at 1044)

34. A Pre-Proposal Conference and site visit was held on 30 October 2003 (R4, tab 2 at 1045-51; tr. 1/49-52, 2/9-10, 36-38, 43-48, 7/228-33, 255-57, 286-87, 290-92, 298-99, 8/44, 9/172). A second site visit took place on 18 December 2003 (R4, tab 1012; tr. 1/52-53).

35. SBN's Henrickson testified that:

> [Botting][25] ask[ed] for a[n] amendment to submit alternate systems, because we couldn't meet the price with the boiler and chillers.
>
> And it didn't fit the design. And we got the amendment that allowed for alternate systems.

(Tr. 1/131-32) He then clarified that he did not know whose question about alternative systems resulted in the issuance of Amendment 5 (finding 36; tr. 1/132). Botting's Burrus testified that, if Amendment 5 had not been issued, Botting would have proposed the RFP-required boiler/chiller system with the alternate system as a separate line item (tr. 4/39-41).

36. RFP Amendment No. 00005 dated 22 December 2003 included the following information pertinent to the matters before us:

> 7 NOTE: There is a pad-mount transformer on the site which will be removed by DPW with demolition of the two wood buildings on site. Removal of existing wood poles, OH electrical lines, and the transformer pad will be accomplished by the Contractor. There is also an underground secondary electrical feeder, communications conduits and water lines running through the site which will have to be rerouted around the building footprint as required. Existing water laterals, sanitary and storm sewers no longer in use may be removed and capped.

---

[25] (*See* finding 44)

....

These questions and answers supersede or update any other stated requirements. Please note some questions/answers are similar.

....

Q13   Section C-4 item 8.3.A.1 The 3rd sentence mentions fan powered terminal units. Are non-fan powered units acceptable?

A13   Alternative systems may be submitted by Offerors for consideration.

....

Q34   Can the ceilings in the corridors be chanted to lay-in acoustical to facilitate the install of the systems, example fire alarm, telephone, computer, etc....

A34   Corridors may be lay-in acoustical but must meet minimum height requirements....

(R4, tab 2 at 1052, 1055, 1062, 1063, tabs 176, 177; tr. 1/54, 8/38-43) Amendment No. 00005 also included the requirement that corridor ceilings be a *minimum* of 8 feet, 4 inches high (R4, tab 2 at 1093).

37. RFP Amendment No. 00006 dated 20 January 2004 included the following information:

1.   Outside air shall be supplied to the guest suites by a separate HVAC system. Outside air intakes shall not be provided at individual PTAC units (See Section C-5 Page 32).

(R4, tab 2 at 1126)

38. RFP Amendment No. 00007 dated 21 January 2004 included the following information:

50

1. There have been a number of requests for clarification of air intake and centralized air distribution system requirements since the question and answer (Q/A #61) in Amendment #005, and the clarification in Amendment #0006. The new lodge requires a central air distribution system, to distribute fresh air to the rooms. Individual PTAC units in the rooms are not to be used for make up or outside air intake, as stated in Section C-5.15.4d.

(R4, tab 2 at 1129, tab 178) This *verbatim* language was reiterated in RFP Amendment No. 00009 dated 9 March 2004 (R4, tab 2 at 1129).

39. Volume II of the RFP contained SECTION J, a compilation of various drawings and documents including the following which are pertinent to the matters before us:

J-2     Geotechnical, Site Information

J-3     Installation Design Guide (Excerpts)

J-4     Fort Lewis Design Standards (Excerpts)

....

J-10    Drawings / Separate Attachment
- Utilities Plan
- Suggested Site Plan
- Suggested Main Floor Plan
- Suggested Upper Floor Plan
- Guest Room Layout Plans

(R4, tab 2 at 1145-53 (J-2), 1154-1355 (J-3), 1356-1508 (J-4), 1721-26 (J-10))

40. The J-2, Geotechnical, Site Information, document contained a narrative description of the various existing utilities in the project area as well as what was required to be provided under any resulting contract (R4, tab 2 at 1145-53). Specifically, ORB's Patterson, who drafted the RFP (finding 2), testified:

[I essentially wrote paragraph C-1, 2.4.A. which] describes the topographic drawing, which I did include under Section J. It's a compilation of known information

51

that was developed from [DPW] showing the location of known utility lines....

Within public works, there is a record drawing room with a huge amount of old, as-built drawings, utility layouts, topographic maps, etcetera, going back to 1917. And essentially, I went through all known information on that site and the utilities on that site.

I spoke to the superintendents of the various utility shops, water and waste, electric shop, both interior and exterior electric shops, etcetera, and did what I call some brain picking, and that drawing, which was included in Section J represented my best effort to / compiling everything that was known on that site from the as-built records.

(Tr. 10/28-29; *see also* tr. 10/43, 129-31; R4, tab 1000)

41. Among the J-10 drawings included in the RFP (R4, tab 2 at 1721-26 (Vol. 4 of 22); findings 11, 39) was the utilities plan. ORB's Patterson testified:

Drawing number one, the utilities plan, was drafted by me based on available information. Item two and three and four, the suggested site plan, main floor plan, and upper floor plan, was drawn by ORB, me, and that is the 10 percent concept design of one suggested solution that I alluded to earlier....

....

Drawing five is standard guest room layouts that were provided by Army lodging.

....

[J-10] is a site and utility plan of the construction site and surrounding area, showing all known utilities and features as developed from available utilities drawings at public works. It's a compilation of several different base sheets that were provided by public works, and communications line as provided by DOIM.... [Data was obtained from] public works, water waste utilities

52

department, electric shop, and the DOIM, the directorate of information management, with respect to communications lines, so two different agencies on Fort Lewis.

(Tr. 10/43-46; *see also* tr. 9/18-21, 48-49, 70-72)

## 2. SBN's Proposal

42. On 27 January 2004, SBN submitted a proposal in response to the RFP. The proposal included both a pricing proposal and a technical proposal and had 16-17 parts contained in two binders (R4, tabs 3, 4; tr. 1/54-57; app. br. at 15). The entire narrative describing the proposed HVAC system was:

> The proposed HVAC system includes multiple high efficiency packaged terminal heat pumps (PTAC) units serving the guest rooms. Studio rooms will have one PTAC unit and one-bedroom guest rooms will have two PTAC units. One unit will be located in the bedroom and the other in the living area. Tempered ventilation air is ducted to each guest room space from a central packaged rooftop 100% outside air make-up unit with cooling and gas heat.
>
> The lobby and administrative areas are served from a packaged variable volume rooftop unit located on the top-level roof well. Air is distributed to fan powered terminal units with electric heat to provide energy efficient comfort zoning.
>
> A split system cooling only unit provides cooling for the data room.
>
> The laundry area is served from a packaged rooftop unit with adequate make-up air to offset the laundry exhaust. This unit has gas fired heating and is located on the lower level roof.
>
> The maintenance, storage, and receiving office are served by a packaged rooftop unit with gas heating. This unit is located on the lower level roof.
>
> A central exhaust fan (located on the top level roof well) serves the guest room toilets and provides potential for

> energy recovery to the guest room ventilation system thru an air-to-air heat exchanger.
>
> Other exhaust systems will serve guest laundry room, management toilets, support area toilets, janitor, large laundry, and elevator machine rooms.

(R4, tab 3 at 1849; tr. 3/59-60, 79-80) Nowhere in the narrative did SBN or Botting state that they were proposing an HVAC/mechanical system for the common areas that was not the boiler/chiller system required by the RFP, but was a deviation or alternate system.

43. Eight years later at the hearing, Jensen/Fey's Fritzmeier testified that:

> Our collective experience found that installing a boiler-chiller in a facility like this was really kind of a step back in terms of quality. It was not something that is routinely done in hotel facilities, hospitality facilities of that type.
>
> And we looked at projects that we had done in the hospitality range that were comparable and the kind of systems that were used. And basically they're package systems. That's what's pretty routinely done in quality hotel facilities because they have advantages to the client, not only in terms of overall maintenance beyond the chiller, a boiler-chiller installation which has / with a boiler-chiller facility you have to have redundancy because if the boiler-chiller goes down, you have no way of maintaining any of the facility at a proper temperature.
>
> When you're doing package units, you maybe have to close down a portion of the facility because it will be uncomfortable, but you still have the majority of the facility available for your clients. So we generally find that to be a really strong driver in how you design the mechanical system for these buildings. That's something that we also routinely did in all of our other projects of all qualities.
>
> ....
>
> [The building is] a fixed size. So in order for us to be able to provide some of the extra amenities [like a

> breakfast room], we had to be very efficient in terms of our use of space.
>
> The boiler-chiller system didn't allow us to do that. The package units really did allow us to do that, to give, we thought, not only a better project in terms of contemporary design and maintainability, but it also allowed us to give those amenities that we felt so strongly about.

(Tr. 7/234-37)  SBN did not include any of this information in either its initial proposal or its Best and Final Offer (BAFO) (*see* finding 50).

44.  SBN's proposal identified the following entities as among their proposed subcontractors for the Lodge project:

| | |
|---|---|
| Architect | Jensen/Fey Architecture & Planning [Jensen/Fey] |
| Civil & Structural | DCI Engineers, Inc. [DCI] |
| Mechanical Design | W.A. Botting, Inc. [Botting or WAB] |
| Electrical Design | SME Inc. of Seattle [SME] |

(R4, tab 3 at 1963, 2070)  Jensen/Fey had designed over 60 hotels and motels in the seven years prior to SBN's proposal (R4, tab 3 at 1966).  SBN's proposal identified Jensen/Fey employees Charles Fritzmeier (Architect of Record), Kurt Jensen (Chief of Construction Quality Management System (CQMS)), Shauna Spencer (Chief of Construction Quality Control (CQC)), and Dan Rasmusson (Chief of Design Quality Control (DQC)).  (R4, tab 3 at 1980-81, 1992-94; R4, tab 5 at 2287).  SBN's proposal also identified the following SBN project management employees:

| | |
|---|---|
| Principal-in-Charge | Keith Henrickson |
| Project Executive | Eric Holopainen |
| Project Manager | Chris Bischoff |
| Superintendent | Tom Zeman |

(R4, tab 3 at 2070)

45.  The initial Evaluation of Proposals took place 28-30 January 2004 at Fort Lewis by a Technical Evaluation Board (TEB) made up of the following individuals:

| | |
|---|---|
| R. Drew Dyer, P.E. | CFSC, Project Manager, moderator, non-scoring |
| Steve Coulson | CFSC, Lodging Program Manager, evaluator, scoring |
| Denis Senftner | Northwest Region, MWR Director, evaluator, scoring |

Cindy Moinette[26]     Ft. Lewis, Assistant Lodging Manager, evaluator, scoring
John Patterson P.E.[27] ORB Organization, RFP AE firm, evaluator, scoring
Eve Hebb            CFSC, Interior Designer, evaluator, scoring
Gary Stedman[28]     Ft. Lewis, DPW, evaluator, scoring

(R4, tabs 183, 1012, 1014; tr. 8/43-44, 48-54, 76, 9/38-39, 51-61, 66-69, 10/48-67, 12/11-13, 25, 38-39, 107-10) After receiving in-person instructions from CO Bartholomew, a total of 9 proposals were evaluated over 2½ days, with approximately two hours spent with each proposal (tr. 10/55-56). SBN's proposal was ranked fifth on the total score. One weakness listed about SBN's proposal was "Lack of clarity on mechanical systems; where located?" SBN was given the lowest score of all 9 proposals (a score of 26 out of a possible 40) for "Building Design (Structural, HVAC, Mechanical, Plumbing, Electrical, Telecommunications, Force Protection)" but was scored second out of 9 for "Project Management Plan" and "D/B Team Qualifications/Experience." (R4, tabs 198, 199) Unlike SBN's proposal that contained a short, general description of its HVAC/mechanical design and nothing on the subject of DDC design, several of the other proposals received in response to the RFP included lengthy, detailed descriptions of their proposed HVAC/mechanical designs, including DDC design information (*see, e.g.,* supp. R4, tab 181 at 9960-66, tab 182 at 9978-97, tab 192 at 10045-47, tab 193 at 10058-59).

46. On 29 January 2004 SBN provided the following clarifications to CO Bartholomew in response to the CO's questions:

> **Question #2. From first glance there does not appear that there [is a] boiler room on the first floor. Is this correct?**
>
> *Response to Question #2: .... The boiler room is located adjacent to Maintenance Room 170A. The boilers are not*

---

[26] Cindy Moinette became the Lodging General Manager in 2005 and was responsible for managing approximately 930 rooms at Fort Lewis, McChord AFB and Yakima Training Center on behalf of Army Lodging, the owner of the new Lodge built under the contract now at issue (tr. 12/9, 11). Ms. Moinette was the POC for post passes (R4, tab 25 at 2409; tr. 12/26-27).

[27] The typewritten "P.E." was crossed out and a handwritten "INCORRECT" was annotated (R4, tab 1014). Mr. Patterson testified that he does not have an engineering degree and has no engineering certifications (tr. 10/11-12, 132-34). His primary experience is in architecture and construction (tr. 10/133).

[28] Gary Stedman has been in the Planning Division of Fort Lewis DPW since the mid-1990s; for 10-12 years prior to that he was in the Environmental Division of DPW at Fort Lewis (tr. 12/94).

*detailed on the architectural plans. They are shown in Room 170A at this time on the mechanical drawings. The intent is to have a room adjacent to Room 170A dedicated to the boilers.*

....

**Question #4. We did not find Maintenance Specifications and other narratives but we assume that you will be fully compliant with all technical requirements of the RFP.**

*Response to Question #4: Yes, per our revised pricing schedule attached we are fully compliant with the technical requirements of the RFP. None of the VE alternates [attached at SBN0032320] need to be incorporated for full compliance.*

**Question #5. Will you meet all applicable required codes for the design and construction of this project?**

*Response to Question #5: Yes, we will meet all applicable required codes for the design and construction of this project.*

**Question #6: Are you compliant with the square foot requirements of the RFP?**

*Response to Question #6: Yes, per Drawing A.2.1 area analysis, the total square footage of the project as proposed is 100,700 square feet.*

(R4, tab 1013; tr. 1/73-77, 80-82, 1/133-34)

47. Both ORB's Patterson in his preparation of the RFP and SBN's Architect of Record, Jensen/Fey, reasonably assumed that, since the DOIM ductwork was installed by base personnel, the Fort Lewis standard of 3 feet of cover had been accomplished (R4, tabs 184, 185; tr. 7/294-95).

48. A telephone conference was conducted on 5 March 2004 in which CO Bartholomew participated with SBN's Henrickson and Bischoff and Jensen/Fey's Jensen and Fritzmeier. Jensen/Fey's notes from the call included:

57

1. $1.5m has been added to the project budget.

2. Our proposal must be at $17,361,000 or less.

    ....

6. Fo[u]r additional changes have been made and are outlined in the Amendment:

    ....

    b. Structure can be located over utilities.

    ....

7. Our Proposal was "technically acceptable" and "fully acceptable".

    ....

11. The exterior architecture design and narrative was considered excellent.

12. The interior narrative was considered good.

    ....

15. The plans were well detailed.

16. The schedule was realistic.

    ....

18. Significant hospitality experience was outstanding.

19. Personnel were outstanding.

    ....

24. The specification maintenance plan needs to be included.

    ....

58

27. There needs to be a force protection narrative.

....

33. Mechanical room appears undersized.

....

35. The mechanical system needs to be clarified (narrative).

(R4, tab 1017; tr. 7/238-42) The copy of the notes in the record include handwritten marginalia added by an unidentified author sometime between 5-12 March 2004. Items 24, 27 and 35 were identified as items for Botting (WAB). In particular, Item 35 was annotated by circling the word "narrative" and placing a star above the circle as well as a handwritten note in the margin stating: "WAB REVISIT / ADJUST FOR REVISIONS." (R4, tabs 186, 1017; tr. 1/80) Over eight years later Jensen/Fey's Fritzmeier testified that:

> I think one of the other things that since it was something that we were particularly concerned about because we thought it was a real benefit and I'm pretty sure Keith [Henrickson] is the one who brought it up was the mechanical system. And the response from [CO Bartholomew] was as long as you're meeting the performance requirements of the RFP, we can make it work. And there may have been some additional discussion about well, this mechanical system allows us to do other things and there are some financial aspects that come into play if we can provide this system and so on and so forth.

(Tr. 7/241) None of this information was included in the notes of the 2004 conference call. Contrary to Mr. Fritzmeier's testimony, SBN's Henrickson testified:

> Q ...Was there a discussion of the HVAC alternative proposal during this conversation?
>
> A Not that I'm aware of.
>
> Q What did the mechanical, ...Item Number 35, what do you recall about that issue?

A       They just wanted us to clarify. We had already stated that was a package, but they wanted more clarification.

(Tr. 1/82)  Henrickson further testified that there is no documentation to memorialize Fritzmeier's alleged discussion and there is nothing in the record to show that later, when the 35% HVAC/mechanical design was objected to (finding 60), SBN ever argued that the now-alleged discussion of the HVAC/mechanical system with the CO had taken place (tr. 1/144-46).  We, therefore, give little weight to Mr. Fritzmeier's non-contemporaneous testimony.

49.  On 9 March 2004 CO Bartholomew requested BAFOs:

> 2.  As a result of the technical evaluations and the resulting discussions with offerors, all offerors are hereby provided the opportunity to submit a [BAFO] to clarify, correct, update or revise offers to comply with the RFP requirements, including all amendments. Only changes to the prior technical submissions are required.
>
> ....
>
> 6.  No further changes to the solicitation (RFP) shall be made without the expressed [sic] written approval of the [CO]....

(R4, tab 188)  The only change to the RFP referred to in paragraph 6 that is pertinent to the matters before us was memorialized in RFP Amendment No. 00009 dated 9 March 2004 and dealt with the DOIM ductbank (R4, tab 2 at 1129).

50.  On 23 March 2004, SBN submitted its one-volume BAFO (R4, tab 5; app. br. at 23).  SBN's BAFO identified 17 items that had been revised since SBN's initial 27 January 2004 proposal (R4, tab 5 at 2227-28; tr. 1/83-85).  The BAFO included an "expanded, added and clarified" HVAC System Description (R4, tab 5 at 2229).  The entire text of the HVAC System Description in the BAFO was:

> • The proposed HVAC system includes a total of (260) high efficiency packaged terminal heat pumps (PTAC) units serving the guest rooms. Studio units will have one PTAC heat pump and one-bedroom guest rooms will have two PTAC heat pumps. One heat pump will be located in the bedroom and the other in the living area.

60

- Tempered ventilation air is ducted to each guest room space from central packaged 100% outside air make-up units with cooling and gas heat[29] located on grade.

- The lobby and administrative areas are served from a packaged variable volume unit located on grade as indicated on the mechanical concept drawings. Air is distributed to fan powered terminal units with electric heat[29] to provide energy efficient comfort zoning.

- A split system air conditioning unit provides cooling for the data room.

- The laundry area is served from a packaged air conditioning unit with adequate make-up air to offset the laundry exhaust. This unit has gas fired heating and is located on the ground level.

- The maintenance, storage, and receiving office are served by a packaged rooftop unit with gas heating.[29] This unit is located on the lower level roof.

- Two central exhaust fans (located in the attic space) with exhaust duct extending to exhaust grilles in each guest room toilet.

- Other exhaust systems will serve guest laundry room, management toilets, support area toilets, janitor, large laundry, and elevator machine rooms.

(R4, tab 5 at 2257; tr. 3/79-80, 100-13) SBN's expert witness Kommers testified that "packaged" to a mechanical engineer/contractor means "self-contained" (tr. 3/34-38, 59-60; *see also*, tr. 3/72). However, Kommers also agreed that there are "packaged" boilers and "packaged" chillers and "packaged" boiler/chiller systems (tr. 3/40-41, 44-46, 52, 8/155-156; *see also* R4, tab 349 at 11151 (packaged terminal heat pump

---

29 We find that the use of the words "gas" and/or "electric" does not indicate the presence or absence of a boiler in the design for these areas.

units can be used with a boiler/chiller system)). Bolting's Burns testified that his design did not include a boiler/chiller system for the non-guest-room areas specified in the RFP because:

> [I]t was about 10 percent of the system's capacity, was what was the issue. It wasn't that it was the majority. You know, the majority of the equipment was packaged terminal heat pump equipment [for the guest rooms].
>
> What we were proposing was additional packaged equipment, mainly driven by the geometry of the building, being kind of a long spread out building, because there is a lot of cost involved in having to run piping between those, and there is no / there was no piping involved in this 90 percent of the capacity, anyhow.

(Tr. 3/92-93; *see also* tr. 4/8-9, 36)

51. By letter dated 26 March 2004, SBN assured the Fund that:
    Our proposal complies with the RFP and if awarded a contract we ensure material compliance with the RFP requirements. We have reviewed and verified our pricing and it is acceptable for the basis of a firm fixed price contract if awarded this project.

(R4, tab 1 at 5, tab 200; tr. 1/89-90) Again, SBN made no mention of its inclusion of an alternative HVAC/mechanical design in its BAFO. SBN provided the following clarifications, among others, in response to questions from the Fund:

> **Question #4:** We note that your proposal is silent in several key areas where the RFP called for specific work. We assume this silence is because you inten[d] to provide the required work/equipment and are not proposing alternatives that would have required submittals/catalogue/cut sheets. Is this correct:
> **Response to Question #[4]:** Yes_X___ No_____

(R4, tab 1 at 6, tab 200; tr. 1/86-89 ("you're just submitting on a very preliminary design...we hadn't even determined a lot of the items that we're going to use yet.... It's that early in the design.... We didn't put in cut sheets"), tr. 1/104 ("You're designing as you're building."), tr. 1/123-124)

52. The technical evaluation of BAFOs took place in April 2004 (R4, tab 169 at 3221-25, 1018-19; tr. 8/56-64, 9/61-66, 64, 69, 10/67-91, 12/110-12; *see also* R4, tabs 198, 199). ORB's Patterson testified that, at the time he reviewed SBN's BAFO:

> I did not have that concern [about whether or not SBN's BAFO included a boiler/chiller system] because [SBN] expressed a willingness to redesign the system to move the air handling units off the roof down to the main floor, and did not say that they were not providing a boiler chiller, so I assumed they were. My concerns were alleviated at that point.

(Tr. 10/166, 177-78)

> I did not recognize that a packaged VAV system meant that the heat and cooling source were built in part and parcel with the air handler. I didn't realize what that was, and there was no indication in the proposal that this was an exception to the RFP requirement for a central boiler and chiller.

> ....

> There is no note that the equipment listed is a variation from the boiler chiller, central boiler chiller. There is, however, now in hindsight, indication that packaged cooling and heating units were being called out in various spaces. It's not uncommon to get incomplete mechanical equipment schedules on a 10 percent [de]sign], so that may not have rung a bell without a note saying, "This is a variation."

> ....

> Depending on the submittal and the contractor, proposals can be incomplete in some areas, complete in others. You will routinely see contractors pulling together their submittals from all of their various subs at the last minute to get them to the room on time.
> Some routinely / or not routinely / some, occasionally, are incomplete. So, the fact that I didn't see a central chiller on this schedule doesn't in itself indicate we

63

weren't getting one without a note saying, "You're not getting one," if that makes any sense.

....

[If I had recognized that SBN was submitting an alternate system] [t]hat would have been commented on or annotated on my score sheet, my review sheet. I actually bumped them up on mechanical systems. If I had thought they were proposing any sort of an unsatisfactory alternative mechanically, I would have lowered their score, perhaps even zeroed it.

(Tr. 10/96-100)

B. Contract Award

53. On 11 May 2004, the Fund awarded design/build Contract No. NAF26-04-C-0025 in the firm-fixed-price amount of $17,359,397 to SBN.[30] The notification letter to SBN advised that an Award Meeting/Pre-Design/Build Conference was scheduled for 20 May 2004. Receipt of the letter was acknowledged by SBN's Henrickson on 27 May 2004. (R4, tabs 1, 6, 203-04) CO Bartholomew authorized a Limited Notice to Proceed (LNTP) for 35% design effective 21 May 2004 (R4, tabs 7, 203, 1021). The contract expressly incorporated the following by reference:

> (1) Request for Proposal (RFP) NAF26-04-R-0004, as revised by Amendments 0001, 0002, 0003, 0004, 0005, 0006, 0007, 0008, 0009, including all attachments, specifications, drawings and enclosures thereto.

> (2) Contractor's Offer, dated 27 January 2004, including all attachments, drawings and enclosures thereto.

> (3) Contractor's BAFO offer, dated 23 March 2004, including all attachments, drawings, BAFO Pricing, and enclosures thereto, which take precedence over the 27 January 2004 Offer.

---

[30] Other copies of the DA FORM 4069-R, SOLICITATION, OFFER, AND AWARD (Nonappropriated Funds), contained in the record, Rule 4, tabs 204, 1021, are identical to Rule 4, tab 1 at 1, except that the signature of CO Bartholomew is inexplicably dated 12 May 2004.

64

(4) Contractor's Price Clarification that the optional grounds maintenance building, with a value of $96,386.00, is included in their base bid [design and construction], and Other Clarifications, dated 26 March 2004, (1 Page).

(5) Contractor's Pricing Verification and Statement of Material Compliance, dated 26 March 2004 (1 Page).

(6) Contractor's Final Bid Extension and Clarifications, dated May 6, 2004 (2 Pages).

(7) Contract Number NAFBA1-04-C-0025, DA Form 4069-R Solicitation, Offer and Award (Nonappropriated Funds), dated 23 March 2004, signed by Keith Henrickson, Sr. V.P., Division Manager, Swinerton Builders, and signed by the Contracting Officer, D.F. Bartholomew, Jr., on 11 May 2004.

(R4, tab 1 at 2) The contract further specified the Order of Precedence that, in the event of any inconsistencies between the contract and SBN's proposal, the terms and conditions of the contract would prevail (id.).

54. The contract contained the following schedule for design and construction:

| | |
|---|---|
| Total number of calendar days after Notice to Proceed for Design (Does not include Government Review Time) | 145 Days |
| 35% Design Completion and Submittal | 21 Days |
| 65% Design Completion and Submittal | 49 Days |
| 95% Design Completion and Submittal | 12 Days |
| 100% Design Completion and Submittal | 35 Days |
| Total Number of Calendar days for Construction after Limited Notice to Proceed for Construction | 425 Days |

(R4, tab 1 at 8)

55. SBN hired Mr. Roberts as its Senior Project Manager in June 2004 and assigned Tom Zeman as its on-site superintendent (tr. 1/91, 178-80, 2/96-103, 117,

65

173). At the time of his testimony Mr. Roberts had been in construction for 40 years, 20 of which had been as a project manager for various construction companies (tr. 2/89-90, 92-96).

C. Performance

56. After the contract had been awarded to SBN, ORB's contract with CFSC was modified to include ORB's review of SBN's various design submittals. ORB formed a team to perform the design reviews that included BCE to review mechanical and electrical designs, AHBL Engineers to review structural and civil designs and ORB to review the architectural design and "overall" issues. (Tr. 10/100-01, 11/148) Patterson selected BCE on the basis of his 28 years of working with them on several hundred projects (tr. 10/101-02, 140-43).

> Q: When you engaged BCE to perform the scope of work we just discussed, did you know that they had participated as members of off[erors] who offered proposals on this project?
>
> A: I saw at the [TEB], and it took me by surprise,...that BCE was on one of the teams. I couldn't tell you which team that was. As I say, BCE is a multi-discipline, fairly large firm. There are 54 or 55 people. They routinely propose on design-build work with a lot of contractors. They don't clear that with me first. They don't work for me, so. They were, in fact, apparently on one of the proposals as the MEP.[31]
>
> Q: When you engaged BCE to perform the design submittal review scope of work, did you have any concerns as to their objectivity in conducting those reviews?
>
> A: Absolutely no, no.
>
> Q: In your review of BCE's work on the project, did you see any evidence of bias or impaired objectivity?

---

[31] "MEP" is an acronym for "Mechanical, Electrical and Plumbing" (tr. 13/15).

66

A:     No, sir. They are professional engineers, and professional in every sense of the word. That would not have entered into it.

(Tr. 10/102-03; *see also* tr. 11/131-32)

57. BCE's work was primarily in the areas of mechanical and electrical engineering and, at the time of its involvement in the project now at issue, its work consisted of approximately 50% public schools work and 50% military projects at Fort Lewis and McChord AFB (tr. 11/112-14, 150). The ORB contract tasked BCE to perform a peer review of SBN's various design submittals with particular attention to be paid to the mechanical, electrical, plumbing and fire protection portions of the submittals (tr. 11/116-17). Among the specific BCE employees that performed services under ORB's contract with BCE were Randy Heiberg[32], principal in the firm, and John Justice[33], referred to variously as a junior engineer or a production engineer (tr. 11/114-17, 129-31, 174-76). Mr. Heiberg testified that he was aware of the project before the ORB contract for design review but he wasn't directly involved prior to SBN's 35% design submittal (tr. 11/114-16, 130-31, 150-51, 161; *see also* finding 59). Mr. Justice was also first involved in the project now at issue after SBN's 35% design submittal (tr. 11/172-73, 185-88). SBN alleges that BCE was a direct competitor of Botting at the time of proposal submissions and that ORB's employment of BCE to conduct the peer review of SBN/Botting's HVAC/mechanical design submittals created a potential for bias. SBN admits it has no proof of actual bias. (R4, tab 169 at 3355; tr. 7/243-244; finding 66) After careful examination of the record before us, we find no evidence that the actions, opinions and recommendations of BCE were based on anything other than its professional consideration of the factual information presented to it.

1. 35% Design

58. SBN's 35% Design was submitted to the Fund on 10 June 2004, which was acknowledged by COR Dyer as being on schedule and a review meeting was scheduled for 8 July 2004 (R4, tabs 8, 9; tr. 9/41-46, 12/14-17).

---

[32] Mr. Heiberg, with BCE since 1992, has experience as an electrical engineer, mechanical electrical consultant, construction management, mechanical HVAC contracting, and automation controls (tr. 11/108-11).

[33] Mr. Justice is a mechanical engineer who worked for Boeing from 1996-1999 and had been with BCE since 1999. He was licensed as a Professional Engineer in 2006. (Tr. 11/169-72)

59. At the time of the 35% design review, BCE's Binh (or Ben) Nguyen was the BCE project lead and point of contact. Mr. Heiberg was brought onto the project at this point to assist and eventually replace Mr. Nguyen as the project lead:

> [M]y role responsibility was to ensure when submittals came in that they were organized. We'd get a set of plans, we'd have to pull the set of plans, reduce—pull the plumbing out, pull the HVAC drawings out and distribute it to the people who had time and expertise to do the review. So once I collected all the reviews, organized them into the forms that ORB had given us to use, and return those comments to them.

(Tr. 11/117-18; *see also* tr. 11/164) Mr. Nguyen left BCE between the 35% and 65% design submittals (tr. 11/119).

60. The Fund provided ten pages of detailed review comments to SBN on 1 July 2004. Comments M2 and M6, respectively, stated:

> Note the ventilation air for the guest rooms; and heating, ventilation, and air conditioning of all other spaces is to be provided by primary air handlers utilizing chilled and hot water coils per the RFP. The design does not indicate this type of system.
>
> ....
>
> The fan powered terminal unit schedule shows units with electric coils. Per the RFP these units are to be provided with hot water coils for reheat.

(R4, tabs 10 at 2314, tabs 207, 210) On 5-6 July 2004 the Fund provided more than ten additional pages of detailed comments to SBN, including:

> 65% design submittal is due **Fri., 27 August**. Design review meeting will be **on/about Tues., Sept.21**. It is our goal to issue a [LNTP] for construction to allow mobilization and site work (civil, utility, foundation, and structural activities) upon completion of that meeting and acceptance of the exterior structural mock-up rooms. With the same Limited NTP, we'd like to release Swinerton to order long lead items (HVAC units, elevators, etc.). In order to provide the a [sic] Limited NTP, the 65% design

submittal shall contain civil, structural, and long lead items to be 100% designed and with the engineer of record's professional seal and signature.

(R4, tab 11 at 2328, tab 12)

61. SBN's responses to the Fund's review comments M2 and M6 (finding 60) were understood to be:

> [B]asically, "WILL COMPLY" or "AGREE" except:
>
> [The response to M2] was: "Primary air handling units provide centralized ventilation system with direct expansion cooling, and combination of natural gas, electric and heat pump system for heating based on most energy efficient application"
>
> [The response to M6] was: "Based on our energy analysis, electric heating was selected based on lowest energy cost.["]

(R4, tab 14 at 2352) This is the first evidence we find in the record of SBN providing any explanation for its submission of an alternative design.

62. A list of decisions made and action items identified at the 8 July 2004 35% design review meeting was prepared by the Fund's Dyer and provided to Fund and SBN personnel. The following listed items are pertinent to the matters before us:

> 20. Swinerton to utilize Ft. Lewis standard construction specifications whenever possible (posted on the FLW IDG web site).
>
> ....
>
> 24. Corridor ceiling heights are shown 8'-4". There may be cases where corridor ceiling heights are adjusted downward to account for piping and ductwork. **In those cases, CFSC will be advised beforehand.** Swinerton **will not design or construct any corridor ceiling heights less than 8'-0"**.
>
> ....

69

27.    **[SBN] to provide justification for HVAC systems proposed for use or change to comply with RFP.**

If I have overlooked or mis-stated something important, please let me know.

(R4, tabs 13, 211-14, 1024; tr. 7/275-77)

63. By email dated 13 July 2004, Dyer forwarded to SBN and its Architect of Record the "thoughts of the peer review engineers" concerning SBN's responses to comments M2 and M6 regarding the mechanical system design.

> The system proposed does not meet the RFP requirements. If the contractor's design was based on the most energy efficient application, in our opinion the contractor needs to prove to the team that the original RFP allows the contractor to follow "that path" instead of designing per the RFP requirement.
>
> Secondly the contractor needs to prove that his design in fact is the MOST energy efficient design with the lowest energy AND OPERATING cost. We need to have the contractor include all calculations in the package for our review at 65% (If, and only if, the "more energy efficient mech system" is allowed and approved by AL.)

(R4, tab 14 at 2351, tabs 216-17) In a second email to the same recipients less than an hour later, Dyer expressed his concerns after receiving much more detailed input from BCE's Heiberg (R4, tab 15 at 2353-55, tab 217; tr. 11/164-68) on the subject of SBN's proposed mechanical system:

> Here's the other msg. I promised to forward...this one is from a senior principal of BCE Engineers (subcontract to ORB)...his views are "eye-opening" for me especially when he says you are asking us to accept a heating and cooling system that costs less initially, costs more to operate & maintain annually, and has a shorter life. Doesn't sound like something we really want to consider on our long term investment. As the choice of HVAC systems has space planning and structural considerations, I agree with Mr. Heiberg that you need to provide the type of system defined in the RFP or else defend your choice and convince Mr. Heiberg that his analysis on the negative

70

attributes was in error. This could possibly be resolved with a conference call. Let me know your course of action ASAP.

(R4, tab 15 at 2353, tab 217)

64. On 14 July 2004 a phone conversation between Botting and SBN was memorialized in handwritten notes by SBN that:

> [Botting's] Burns called: says what we have at 35% is what we proposed. **It's true that it isn't in complete RFP compliance but we have always been up front with that** and they accepted our proposal and design with the system that Randy Heiberg of BCE is now criticizing. Burns will work up a positive response and get us a draft by this Friday explaining [the] way this system is a good one, how the owner already [received] the value in the pricing and what they will do to make some more RFP accomodations [sic].

(R4, tabs 219, 1025) (Emphasis added) Contrary to SBN's statement that it had "always been up front with that," we have found that none of SBN's proposals, its BAFO or later discussions and assurances had identified to CFSC that SBN intended to provide something other than what the RFP required (*see* findings 42, 48, 50-51).

65. On 28 July 2004 COR Dyer requested CO Bartholomew's assistance in resolving the mechanical system design issues:

> Bart, need your help to correct the mechanical approach to heating and cooling the common spaces in the new Lodging facility at Ft. Lewis. This has been discussed in detail since we had the 35% design review meeting July 8. ORB prepared the technical sections of the RFP. Mr. Patterson described a particular approach to heating and cooling the common spaces that helps the Base meet their sustainability goals and objectives. I have discussed this issue with DPW and am convinced that we need to have [SBN] change their approach immediately. Pls. instruct [SBN] that they must design and provide the mechanical systems described in the RFP (Sections C-4, 8.3, 8.4, & 8.5 and C-5, 15.4, 15.5, 15.6, & 15.7).

71

Space planning issues are still in motion. I met with [SBN] today in their main office, Bellevue, WA. We discussed DOIM room sizing, housekeeping rooms sizes, a 2nd guest laundry, and consolidating the administration spaces. I will be expecting a series of sketches soon showing how all of this can be accomplished and meet the functional and operational objectives of AL.

(R4, tabs 16, 1027)

66. SBN's Roberts prepared a Summary Report dated 29 July 2004 in which he agreed that the HVAC/mechanical system in SBN's proposal was an alternate design not in compliance with the RFP but also took the position that providing the RFP-required boiler/chiller HVAC/mechanical system for the non-guestroom areas was a change to the contract:

> Subject: 35% Mechanical Review Comments for Air Conditioning in the Common Areas
>
> At this time, the design for the common areas of the building uses a warm air heating system. **That system does not comply with the original RFP for the project.** The COR is recommending to the Contracting Officer that he issue direction to [SBN] to provide a mechanical air conditioning system for the common areas of the building that uses boilers, chillers and fan powered terminal units as called for in the RFP.
>
> ....
>
> Subsequent research shows that the mechanical system Botting showed in the 35% design was the same system [included] in the technical proposal submission on January 27, 2004.... **It is correct that this system does not meet the specific requirements of the original issued RFP.**
>
> ....
>
> Comments by BCE Engineers after the 35% design review meeting continued to make the point that the proposed mechanical systems do not meet the RFP. More importantly, the comments state that the proposed system will consume more electrical energy and fuel than the

72

centralized system called for in the RFP, that the maintenance costs will be higher and that the equipment life of the proposed system will be shorter.

W.A. Botting countered that their system was at least as efficient as the system called for in the RFP, that the energy costs were comparable, and that the equipment life was also comparable. In addition, there is a very desirable redundant capability in their system, that does not exist in the RFP system. Upon receiving BCE's review comments, Tim Burns of W.A. Botting, re-evaluated their system, and re-checked their previous calculations. Tim determined that the system Botting proposed has an energy performance capability that is as good as the RFP system, and is probably a little better. The equipment life of their system is in the 10 to 15 year range, which is essentially the same as the RFP equipment. In addition, the fact that they do not rely on a chiller or boiler that is common to all systems, gives them a redundant capability of several systems that have an overlap, which gives their proposed system a desirable capability that the RFP system does not.

. . . .

At a meeting at [SBN]'s office on 28 July 2004, a telephone conference was held between Randy [Heiberg] of BCE Engineers, Tim Burns, of W.A. Botting, Drew Dyer of Army CFSC, and Bill Roberts of [SBN]. Mr. [Heiberg] stated that he had been charged with reviewing the system for compliance with the RFP and had found that it did not comply. He stated that he would need new criteria to evaluate what was proposed by [SBN], because the system did not comply with any of the Fort's design standards. He stated that the mechanical system in every building on Fort Lewis uses a boiler, or was hooked to a campus steam system. He stated that the design standards for Fort Lewis do not allow any system that does not employ a boiler.

Looking at the Fort Lewis design standards that are on line, we found a division 15566 listed that is titled "Warm Air Heating System." This system does **not** require a boiler. Mr. [Heiberg] may not have been aware of this section

73

when he made the statement that the Fort Lewis design standards do not allow any system that does not employ a boiler, because this appears to be a relatively new section, as it is dated 14 November 2003. Nevertheless, it appears that the Fort Lewis design standards do allow air conditioning systems that do not employ a boiler. According to Tim Burns of W.A. Botting, a warm air heating system is what they proposed.

It came to [SBN]'s attention after this meeting that BCE Engineers, who were doing the peer review of [SBN]'s mechanical design, had been the mechanical design member of one of the other design/build teams that had offered on the project. It seems inappropriate for a designer who was unsuccessful in its attempt to be awarded this project with its design to then be one of the peer reviewers of the successful designer.

Mr. Dyer returned to the Fort after the meeting and conference call on 7/28/04 and met with the [DPW] managers, who informed him that they were not interested in having the system proposed by the [SBN]/Botting team. Mr. Dyer then called Bill Roberts and informed him that he was trying to contact the Contracting Officer, Mr. Bartholomew, and tell him that he needed to provide written direction to [SBN] to comply with the RFP for the mechanical systems, and to disregard the amendment #5 direction in the event that [SBN] thought that direction allowed them to vary from the RFP system.

**Subsequent investigation into how the mechanical design became what it became, shows that Botting was using boilers and chillers in its design through November 19, 2003, but on January 5, 2004, the boilers and chillers were no longer in the design. It is still not clear what happened between 11/19/03 and 1/05/04 that caused the system to change. There is some speculation that when the silver LEEDs requirement was dropped, the system change was made, but that can't be proven at this point.**

<u>This research produces a number of questions:</u>

Why did Botting change the system from RFP compliant to what they submitted?

*Tim Burns did not know as of 11:30 A.M., 7/29/04. He is researching.*

....

Does the fact that the Fort Lewis design standards allow a warm air heating system give Botting the latitude to use such a system?

*Yes. It is a Fort Lewis design standard, **and an alternate system.***

If the Owner insists on changing the system to one with chillers and boilers like the RFP, what would it cost?

*A first pass for mechanical came up with an estimate of $246,200.00. There would be additional costs for electrical and finish systems to conceal all the additional piping such a system would require. An initial rough guess estimate is approximately $400,000.00.*

If the Owner insists on changing the system to one with chillers and boilers like the RFP, what other costs and impacts would be encountered beyond mechanical?

*Electrical, Sprinklers, Building Height, Ceilings, Delay?*

If the Owner insists on changing the system to one with chillers and boilers like the RFP, should that be the subject of an equitable adjustment to the Contract?

*That is reasonable.*

(R4, tab 17 at 2377-80, tabs 222-23, 275; tr. 1/99-100, 2/123-25; *see also* R4, tab 323) (Emphasis added)

67. On 30 July 2004 Botting responded to SBN's Roberts' request for information about the proposed alternative system:

We believe that our proposed system meets the RFP objectives. The RFP allows for packaged air cooled DX systems to serve the guest rooms as well as other spaces.

Our proposed system will provide better indoor air quality, noise levels and energy efficiency in these other spaces by means of packaged dx units with better air filtration potential. Our proposed system does not compromise LEED certification and contributes to the cost efficiency in meeting project budgets.

....

We are more than willing to entertain other system approaches. The cost of going to a chilled water / hot water heating system is being priced up and should be available this afternoon.

(R4, tab 224) Later the same day Botting provided an estimated cost of providing "a chilled water / hot water heating system" to be $246,200 and also noted that doing so would create a "serious problem" with "pipe congestion in the 1st floor ceiling" (R4, tab 225; tr. 2/127-28).

68. SBN's Henrickson forwarded Robert's summary report (finding 66) to CO Bartholomew several days before they planned to meet on 4 August 2004 to discuss the matter (R4, tab 17 at 2371; tr. 1/100). We find nothing in the voluminous record before us to document that a meeting actually took place on 4 August 2004.

69. A meeting was scheduled for 16 August 2004 at which SBN/Botting was to make its case for its proposed alternative mechanical design to Fort Lewis DPW personnel and with COR Dyer attending via teleconference (R4, tab 17 at 2375, tab 227). A presentation was made at the meeting by Botting for which the following information was contained in a handout:

1. Purpose to explain WA Botting heating system design, function, maintenance and equipment choices.

2. Tim Burns: PE Received Engineering degree from University of Washington....

3. 90% of building heated by self-contained heat pump[] units with ventilation air supplied by unitary units. 10% of building heated by other types of heat. (Lobby, Maintenance, Laundry.[)]

4. Basis of design.

a. Reasonable Energy usage and L[EED] certification
b. Allowed by Fort Lewis design standards
c. WA Botting energy study graph charts
d. Ease of Maintenance. Replacement parts available at local supply houses
e. Redundant equipment
f. Life expectancy between small unitary units, splits and large chillers/boilers. Compressors would be the same as contained in small air cooled chillers.
g. Info from Washington Air Reps
h. Other ideas that WA Botting rejected. Why a chiller and boiler plant was not a reasonable choice for this project.

(R4, tab 1030; tr. 3/92-96 (the total of the areas served by the alternate design was about 11% of the total building)) The record contains notes from the 16 August 2004 Mechanical HVAC Design Review Meeting; the author of the notes is not specified but, based upon the content of the notes we find that the notes were authored by SBN's Roberts:

Attendees:

| | |
|---|---|
| Tim Burns | [Botting] |
| Dave Fillo | [Botting] |
| Michael Hawkins | Washington Air Reps |
| Matt Adkins | Washington Air Reps |
| Gary Stedman | Fort Lewis Public Works [DPW] |
| Bernadette Rose | Fort Lewis Public Works [DPW] |
| Dale Brigham | Fort Lewis Public Works [DPW] |
| ? | Fort Lewis Public Works [DPW] |
| John Patterson | The ORB Organization |
| Randy Heiberg | BCE Engineers |
| Drew Dyer | Army CFSC (via telephone) |
| Bill Roberts | [SBN] |

Points:

1. Dale Brigham is the person for DPW who has to buy in to the system that the building will receive.
2. Prior to the meeting, Dale Brigham had never seen the drawings or mechanical narrative for the project. Other people in Public Works had previously reviewed the drawings, without significant comment, but Dale had not.

77

3. As a rule, Dale prefers boilers and chillers to packaged units.
4. Washington Air Reps and [Botting] pointed out that the small areas of this building that could get boiler and chiller systems, would only call for very small boiler and chiller equipment, not the large plant type facilities that would normally serve an entire building. 90% of this building is served by warm air heating systems in the form of PTAC units and packaged DX systems as allowed by the RFP.
5. Brigham and Patterson acknowledged that warm air heating systems are allowed by the Fort Lewis Standards.
6. Brigham acknowledged that there were numerous buildings on Fort Lewis that were heated by warm air heating systems instead of boiler systems and one of his greatest concerns with those buildings was that the warm air equipment that had been provided for them was from the low end of the quality spectrum. Air Reps stated that the equipment that was being proposed for this building was of greater quality than that. On scale of 1 to [5], with 5 being the best, the equipment proposed for this project is in the 3 to 4 range.
7. [Botting] pointed out that the piping that a boiler/chiller system would require would be a problem because the ceiling spaces where such piping would be housed was already full. This would require us to split up an already small boiler/chiller system into two to four even smaller systems, which would probably not give the Owner the kind of system that was desirable, however, it would be in strict compliance with the RFP.
8. [Botting] confirmed that the building[']s DDC system will monitor the equipment, whether it is packaged units, terminal units, or boiler/chiller units.

    ....


10. Brigham opined that the equipment that was being manufactured today is not as sturdy as the equipment that was manufactured 20 or more years

78

in the past, however, he acknowledged that his observation applies to boilers and chillers just as much as it does to any other piece of mechanical equipment.

11. Botting stated that the system it has proposed for the building makes the most sense because it allows redundancy, has many advantages over a boiler/chiller operation, such as lower maintenance and operations costs and a comparable equipment life expectancy.

12. Brigham asked to see the most advanced drawings that were available showing the piping, and to see product data of the equipment that was being proposed for installation in the building, so he could see if he could find a comfort level with the proposed system. It was agreed that Botting and Air Reps would compile that information and get the entire package to Mr. Brigham by Friday, 20 August 2004.

13. Mr. Brigham agreed to expedite his review of the proposed system for acceptability and to provide his answer in the shortest possible time.

Summary:
- Fort Lewis standards allow warm air heating systems.
- The RFP through its amendments allowed alternate systems to the boiler/chiller/VAV initially called for in the RFP.
- Botting's proposed system is a warm air heating system.
- Botting's proposed system is in material compliance with the modified RFP.
- If the DPW does not want to allow Botting's proposed system, and insists on the boiler/chiller direction, the boiler/chiller system provided will be a split system with several small boiler/chillers dotted throughout the building, unless DPW provides more specific direction. That system may not be desireable [sic] to DPW either, but it will comply with the RFP, so is allowable.

- If the Owner wishes any system other than that proposed by Botting, they need to provide direction in writing of what system they want, and provide an equitable adjustment for the cost and time that a change like that will produce.

(R4, tabs 230, 232; tr. 2/132-33; *see also* R4, tabs 231, 233 at 10261; tr. 2/133)

70. In an 18 August 2004 email SBN's Roberts gave the following direction regarding SBN's preparation of its 65% design due on 27 August 2004:

> Just a reminder to everyone that we have our last design coordination meeting before the 65% submittal, tomorrow at 2:00 P.M. here at [SBN]'s Bellevue office. Everyone should have their specifications figured out by this meeting. Civil has completed their 100% design and it has been submitted. **Remember that at 65% the structural and any mechanical or electrical underground, and architectural site is to be at 100%.** The plan is to assemble everything at Jensen/Fey's office on the 26th and ship it out at the end of the day so that the Owner receives it on the 27th. [SBN] needs time to review everything for budget, constructability and coordination before assembly, to give us a window to make revisions, so we really need the different packages to be ready and in to us by Monday, the 23rd.

(R4, tab 234) (Emphasis added) SBN's Roberts further expressed to Jensen/Fey his understanding that, as of 23 August 2004, the government had not approved Botting's proposed alternative HVAC/mechanical design but that SBN was still going to include the alternative design, not the RFP-required design, in its 65% design submission (R4, tab 235; tr. 2/133-35).

71. On 24 August 2004 Automated Controls, Botting's DDC subcontractor, submitted its input for the 65% design (R4, tab 236). Automated Controls is a dealer for Johnson Controls equipment in the Pacific Northwest (tr. 7/168-69, 11/139-40).

> We're a system integrator. So as a control contractor, when we come into a project, we're pulling chillers, boilers, air handlers, cooling towers, you have all these different systems, some with different protocols and we all marry them all into one system. That's how we kind of define it

as the brain of a building and we make them all work, talk to each other.

(Tr. 7/170)

Q:     And do you recall that the specification, the RFP called out a specific thermostat type?

A:     It called out Onity or equal as the base system associated with / it's all one for us. It's just all one system.

Q:     What was your belief about what the product information that you talked to, the Johnson Controls product, what was your belief about whether that was an equal to the Onity?

A:     It was definitely / hotel system, just like in this hotel,[34] they have a hotel system that / I mean they're an equal system. So the intent was that we would bring ours and do a comparison of theirs. Once we walked around the facility, they showed us into the rooms. They showed us their thermostats. They went and showed us the front end of their system and they said it's Onity. And then we all sat down to review okay, how are we going to look at this project as a design-build. We quickly knew that the or equal side of that was not an option. They wanted Onity. They made it really clear to us they wanted Onity. I don't even know if I got my [Johnson Controls] product submittal out of my bag to even show them at that point in time.

Q:     What was the cost of the Onity products compared to the JCI equal product?

A:     It's substantially more. I think they looked at it as a proprietary system. It was only one option. And so it was roughly $50,000 plus.

Q:     So that was an impact to you?

A:     That was an impact to WA Botting.

---

[34] The hearing in this appeal was held in a hotel in Seattle.

81

Q: And so what did you do after that? After you told it had to be Onity?

A: We followed the submittal process and submitted on the or equal.

Q: Why did you do that?

A: We wanted it to be documented that they weren't accepting the or equal from the project, so there would be a justification for the costs associated with going to the Onity.

(Tr. 7/177-79; *see also* R4, tab 1074; tr. 7/179-84, 205-06) The contract reserved to the CO the decision as to whether a proposed "equal" product was acceptable (finding 10).

72. On 24 August 2004 SBN requested permission to mobilize to the jobsite the week of 13 September 2004 (R4, tab 21). The CO and Dyer were concerned that it might not be wise to grant a LNTP for mobilization before the HVAC/mechanical system design issues were resolved (R4, tabs 20-21, 242).

73. On 25 August 2004 SBN's Roberts expressed concern to Jensen/Fey about the state of the specifications to be submitted with the 65% design:

I'm really concerned about the specifications. Starting with the index, it is still full of items that the 35% review commented on and doesn't reflect all of the sections submitted by DCI, Patriot Fire, and SME, or has sections mentioned for SME that they didn't submit. Other specification comments from the past are not addressed either, nor are the sections that I listed in the index I made up over a month ago.

[Roberts then listed 32 specification sections and identified the work needed to be performed in each.]

It would be pretty embarrassing to submit these specs without these revisions being made. In fact, we won't.

(R4, tab 237)

74. On 26 August 2004 DPW's Brigham rejected Botting's proposed alternative HVAC/mechanical design, directing that the system specified in the RFP be provided (R4, tabs 238, 241, 1031, 1033). On the same date SBN's Roberts forwarded that information to Jensen/Fey and Botting:

> At this time, Mr. Dyer (and unofficially) [ORB's]
> John Patterson, think that what you have proposed makes
> sense, and that providing boilers and chillers for 10% of
> the building isn't such a great idea, however, that does not
> mean that reason will ultimately prevail. I have suggested
> to Mr. Dyer that he ask John Patterson to provide a
> statement that your system makes more sense than that
> described in the RFP, or is at least as good, because
> Patterson's opinions are very highly respected by the
> Fort Lewis engineers. That is asking a lot of Patterson,
> since he wrote the RFP, but he may be willing to do that.
>
> I don't know which way this will go but I suggest that you
> get all of the material together that you e-mailed
> Mr. Brigham, (plans, product data, equipment cuts, energy
> studies, etc.), in hard copy form, and anything else you
> think could help if we were to get another opportunity to
> present on your system, (particularly some drawings of
> what they would see with boilers and chillers), and be
> ready to meet with Mr. Brigham's superiors should we get
> the opportunity.

(R4, tab 239; tr. 2/136-37) The rejection of Botting's proposed design by The Fund required Botting to:

> [R]edo our load calculations and the coordination for
> getting equipment room and routing for piping for the
> boiler and chiller and the air handlers and go through that
> whole coordination process, and it was…not…a simple
> task.

(Tr. 3/97) Jensen/Fey's Fritzmeier testified that:

> Well, it was a significant concern because it really
> impacted a number of things, not only the design work that
> had been done to date. Going back to a boiler-chiller
> system meant that we would essentially have to rearrange
> the entire building and eliminate some things to try to get it

to work. A lot of the amenities would go away [*see* finding 43]. And really, one of the other major concerns in terms of a boiler-chiller are not only the / well, the ducts and chases that need to be led all over the building, not only take up ceiling space, overhead space, but they also require penetrations through the floors that take up even more space. So we were not real happy to hear that that's the direction that things were going to go in.

(Tr. 7/245-46) We find that, by making the business decision to go forward with a building design that incorporated Botting's proposed alternative HVAC/mechanical system without first getting CO approval of that design in writing as required (finding 32), SBN assumed the risk that the alternative design would not be approved and that the building design would be required to accommodate the RFP-required HVAC/mechanical system.

### 2. 65% Design

75. SBN submitted its 65% design to the Fund on 27 August 2004 (R4, tab 23 at 2397, tab 24 at 2405, tab 249).

76. On 2 September 2004, after reviewing Botting's proposed alternative HVAC/mechanical system again, DPW rejected the alternative design because it did not include the boiler and chiller design required by the RFP (R4, tabs 22, 243, 1033). COR Dyer notified SBN's Roberts and further stated:

Personally, I disagree, but then again I am not the one who will be maintaining the system after construction is over.

Pls. initiate design for a system as described in the RFP. I have instructed the Government's team of reviewers to terminate their review of the mechanical portion of the 65% design package. If we need to stop review of other disciplines as a result of this decision, pls. advise immediately. I have targeted 15 September to receive the review comments. As you know, we are hoping to meet for a design review meeting on/about 21 September.

(R4, tabs 22, 243 at 10356, tabs 247, 1033; tr. 8/73-76) SBN's Roberts immediately notified Botting:

Here is the final word from our client on the mechanical design for Army Lodging. Please expedite your resolution of this issue, and provide us a schedule for that resolution.

Dave [Fillo], you mentioned a number of ideas that would provide a fairly low cost ($30K +/-) boiler/chiller solution for the areas that the RFP requires it in. How soon can a design be prepared to the 65% design level, so we can get it into the Army's hands for review? Please get back to me today with your plan, so I can let [COR Dyer] know what's up. Obviously we cannot let this delay the client's review of the 65% documents, so time is of the essence.

(R4, tab 243 at 10355, tab 1033) Botting replied:

I will contact Tim [Burns] and have him start making changes. I will forward the cost impacts of the change. The ceiling space on the first floor will be subject that will need to be cordinated [sic] with electrical, fire protection, plumbing and heating. My plan is to install chill and heat lines down the hall but only for the office area. Size would be 2" and 1-2" plus pipe insulation.

(R4, tab 243 at 10355, tabs 246, 1033) SBN's Roberts responded:

We will discuss cost impacts, as well as time impacts. It is our opinion that we were teamed with Botting to provide a design that meets the RFP for a specific cost that you previously quoted us. We expected each member of the team to accept the risk for their portion of the design, and we still do. First and foremost, we need an approved design. We couldn't even consider a discussion about costs, without first having an approved design.

(R4, tabs 244, 1033) Botting's Fillo provided the following background information to other Botting personnel as well as comments with respect to the way forward:

As you may be aware, for the last month Tim [Burns] and I have been dealing with the HVAC system at the Fort Lewis Lodge. Our March 31, 2004 proposal was based on using packaged air handler's [sic] and wall mounted heat pumps. 90% of the building is being heated and cooled by the guest room wall mounted heat pumps. The RFP called

85

for a chiller/boiler system for the remaining 10% of the heating system. Some time last December the decision by [Botting] was made to use packaged units for this last 10%. This small remaining heating and cooling load was not a [sic] cost effective using a boiler/chiller system. Our proposal to [SBN] was specific in the use of wall mounted heat pumps in the guest rooms and packaged units for the office, lobby, laundry, maintenance guest room ventilation and storage rooms. [SBN] received the advantage in there [sic] proposal to the Army of this system. Since the first review, the Fort Lewis Maintenance department is adamant that the RFP calls for the boiler/chiller except in the guest rooms and that is what they want and are getting. The objection seems to be by the maintenance department only. Tim and I have come up with 3 alternate designs that would meet the language of the RFP but not a rational solution that is good for the government but does meet the RFP. All three of these solutions will involve additional cost to WAB that I feel we should be [sic] pass on to [SBN]. As you see from the E Mail train [sic] below [SBN] does not agree. Tim and I at this time are proceeding on these 3 alternative designs and I will put a number to them. I feel though we need to get a commitment from [SBN] that they bear some risk too in being the General contractor on the project and they took our very cost effective HVAC system to the table with the Army. **I feel though we might have a weak hand. We don't have an email or document that points out that our proposal did not meet the RFP when we proposed it to them. WAB does not have e mails or documents that showed who made the decision to change to packaged units. If we go ahead and get a design done to the RFP and it is accepted do we have any bargaining advantage left? Our [sic] do we start talking then**. I also need to address with them there [sic] design change from a steel constructed building to a post tension concrete building system. I feel that the post tension will add about 6 hours per room. That is about 810 hours. [SBN]'s reason for going to post tension was the cost of steel has risen sharply. Post tension was a cost effective way for them to build the building at there [sic] budget amount.

(R4, tab 244 at 10358, tabs 245, 625, 1033; tr. 3/118-21) (Emphasis added)

77. On 4 September 2004 COR Dyer provided SBN with the first comments on "the 100% Civil package distributed in advance of the 65% design submittal" (R4, tabs 23, 249). SBN's Roberts forwarded the comments to Jensen/Fey, expressing embarrassment that the 65% design submittal was "not ready":

> These are the first comments. A large number of them indicate that we did not pay attention to the 35% submittal comments and basically were not ready with our 65% submittal. (Standardizing fonts margin, tabs…, language not specific to this project, specs. Not relevant to this project, etc.) This is why we needed the submittal done with enough time left to review it and fix it before we submitted. Not only is this not encouraging, it is somewhat embarrassing. Do we need more manpower on this design? What do you propose to get this cleaned up? At this rate, the 65% review meeting will not go well, and we are not going to be in any condition to receive our LNTP or go out with bid packages.

(R4, tab 249) CFSC's suspense date for completion of its review of the 65% submission was 15 September 2004 with the 65% design review meeting set for 21 September 2004 (R4, tab 24 at 2405).

78. On 10 September 2004, SME advised SBN that it had not received the electrical specifications for equipment and was, therefore, unable to make any revisions to its portion of the 65% review (R4, tab 250).

79. On 15 September 2004 SBN notified Dyer that plans and specifications for an alternative mechanical re-design had been included in SBN's second 65% design submittal (R4, tab 26). Botting's amended alternative design for the HVAC system was comprised of 4 small boilers and 4 small chillers:

> [I]n order to maximize the efficiency of the building, rather than just providing one boiler-chiller, we'll provide multiple boiler-chillers throughout the building so that the impact on the architecture can be minimized so that we don't have to have huge openings of the floor and big ducts running under the ceiling. We can minimize the size.

(Tr. 7/246, 3/21-22 (multiple units required smaller pipes)) This alternative HVAC/mechanical design was not approved, after which a third 65% design submittal was prepared that included a single boiler-chiller system (tr. 7/246-49, 253-54;

finding 87). The ongoing issue with Botting's alternative HVAC/mechanical system design and its impact on the overall building design affected all of the other disciplines and their designs:

> Well, there's actually quite a lot of work that goes into each one of those revisions because of their significant impact on every level. It's not just the architecture. It's all of the other disciplines that are impacted as well. Structural needs to do a revised design to accommodate changes in wall locations, ensure wall locations, and to make the structure work. Everybody needs to redo their calculations. The mechanical system needs to be redone. I mean electrical needs to be looked at, everything they're doing. So there's a significant impact. Every submittal, not to mention just needing to revise all the drawings beyond the engineering and architectural requirements, there's just revising, physically revising the drawings and doing another submittal and then sitting back and waiting for that submittal to be reviewed, responding to review comments.... So there is a lot of time involved.

(Tr. 7/249-50)

80. On 21 September 2004 Dyer told SBN that, even though the Fund was "reluctant to allow the start of mobilization until all aspects of the mechanical re-design are understood and impacts defined," they could begin the process of having two trailers moved from another jobsite to Fort Lewis (R4, tab 27; tr. 1/172-73, 179-80; *see also* R4, tab 1034; tr. 1/176-78, 230-31).

81. In the 22 September 2004 65% Design Review Comments, COR Dyer included:

> "See a ceiling height of 7'-11" above the Lobby area?
> Thought we were not going below 8'-0"?

(R4, tab 1215 at FOIA[35] -31)

82. On 23 September 2004 BCE/ORB provided comments with respect to SBN's mechanical system re-design (finding 79):

---

[35] (*See* findings 231-32)

As annotated throughout our review comments, many elements of the RFP submittal requirements were absent from the package and[,] as a result, our review is incomplete....

Because the missing information is such a critical element in the review of equipment selections, heating capacities, cooling capacities, energy performance and so forth, we are recommending that the submittal be returned "not approved" until the missing information can be provided and the review completed.

(R4, tabs 29, 30 at 2431-33; tr. 11/118-25, 132-33, 176-80, 190; *see also* R4, tab 1037)

83. The 65% Design Review Meeting took place on 28 September 2004. The minutes of the meeting, prepared by SBN's Roberts, included:

Major issues, and points covered:

1. The mechanical re-design [#2] was not approved. The Owner provided direction that the mechanical system must be re-designed using a single boiler and single chiller. The design is to be submitted to the Owner for review on 7 October 2004. This is an interim submission that will occur between the 65% and 95% review submittals.
2. The Owner stated that the [LNTP] will not be issued at this time. The Owner stated that the pre-construction conference is scheduled for 13 October 2004, on Fort Lewis. Part of the purpose of that meeting will be to determine when the [LNTP] will be issued. A complete mechanical re-design along with the architectural, structural and civil design to accommodate it (see paragraph 1 above), will be part of the requirement for the issuance of the LNTP.

   ....

24. [CO] Bartholomew agreed to issue [SBN] the authorization to mobilize to the site, set up its camp, fence the perimeter, and perform minor operations such as clear and grub, site demolition, silt fence

89

installation, etc. The letter will be issued this coming Friday, authorizing [SBN] to begin mobilizing on Monday, 4 October 2004.

(R4, tab 253; *see also* R4, tab 323)

84. Also on 28 September 2004 Botting stated its understanding of SBN's agreement to meet the CFSC's requirements for the boiler/chiller system as well as first floor ceiling height:

> The owner has insisted that a single heating and chilled water system is required. The domestic water heating system should be by itself. They asked [SBN] to provide extra height to the first floor ceiling space to accommodate the additional pipe count and sizes. [SBN] agreed. All required changes, calculation, [LEED] compliance summary, control system and sequence of operation, and details need to be submitted on October 4 at [SBN] to complete the 65% review process.

(R4, tab 252; *see also* R4, tab 1038)  Botting's re-design drawings, dated 29 September 2004, included several showing corridor ceiling heights no greater than 8'-0" (R4, tab 254).  At a mechanical re-design meeting at SBN on 30 September 2004:

> [P]rovisions [were made] for the single boiler and single chiller system and the piping required to make it work. The piping was accommodated by making all corridor ceilings no higher than 8'-0" and by raising the second floor by four inches, and taking two inches off of the distance between the third and fourth floors.

(R4, tab 323 at 10817; tr. 3/184-86)

85. On 2 October 2004 SBN forwarded Subcontract Agreement No. 623902-OS to Botting for signature (R4, tab 261).

86. On 7 October 2004 SBN submitted its third 65% design that included Botting's third HVAC/mechanical redesign utilizing the RFP-required single boiler/chiller system for the common areas and on 8 October 2004 BCE's Heiberg provided the following "short heads up comment" to CO Bartholomew and COR Dyer:

90

We actually received our set of re-submittals yesterday afternoon. We have begun our review and we are finding that [SBN]/Botting have made a substantial amount of design progress and improvements to the mechanical design. I doubt if we will have more than one page of comments.... **No controls information has been provided though**. Hopefully they are working on that submittal. There could be some issues that will need to get worked with that discipline so the sooner we get started, the sooner we can finish.

A couple of other items to think about in the meantime:

1. I am going to recommend final or official approval of the 65% submittal ONLY after the missing controls submittal have been received and approved. There are two independent control systems in the project of which we have seen nothing yet on them. Controls are a very important element of the project. Their silence [in] this area makes me a little suspicious.

....

I hope this helps. At least the mechanical systems are getting back on track.

(R4, tab 260; tr. 7/79-101, 147-48) (Emphasis added)

87. On 11 October 2004 BCE/ORB completed their review of SBN's third mechanical system re-design:

Most of our concerns from the first 65% re-submittal have been addressed. **The DDC system drawings, sequences, and specification, however, are still missing**. We recommend the missing controls information be submitted for review before proceeding past 65%.

(R4, tab 30) (Emphasis added)

88. The Pre-Construction Conference was held at Fort Lewis on 13 October 2004 (R4, tabs 31, 323 at 10817). At this meeting Botting's third HVAC/mechanical redesign submittal for a single boiler/chiller system for the common areas was

determined to be acceptable to CFSC and SBN, as was Botting's promise that DDC would be "fully addressed in the 95% submittal" (R4, tab 260).

89. On 15 October 2004 SBN submitted its revised Quality Management Plan in which it designated certain principals of Jensen/Fey Architects as its quality management organization. SBN also advised that it had "added the services of WJA Architects" to "beef up the QA/QC effort on the design side." (R4, tab 32; tr. 1/116-17, 7/250-51)

90. On 19 October 2004 SBN again sent a subcontract to WAB for signature (R4, tab 323 at 10817; finding 85).

91. On 22 October 2004 SBN forwarded to CFSC a letter from its electrical subcontractor, SME, on the subject of an alleged differing site condition in the form of existing transformer, vault and power lines running through the site. SME's Ellwood testified that he walked the site prior to submitting a proposal for the electrical work to SBN and at that time he had with him the RFP, including the drawing depicting the existing site conditions (R4, tab 2 at 1722). He further testified that he observed "[j]ust minor things." (Tr. 6/125-26, 186-91, 197-200) After contract award he again walked the site and testified he found nothing inconsistent with the RFP site drawing (tr. 6/192-96, 220-21; R4, tab 1034 at PH008) and requested contact information for base and utility personnel for the purpose of establishing temporary power on the jobsite (tr. 6/127, 196-97). During a meeting with a DPW employee, Mr. Ellwood testified that he was told that the existing site drawing in the RFP was not current:

> And then he, out of his records, pulled out a drawing to show me his drawing of the site that showed an additional primary line that came across the site in connection to a vault in the middle of the site that we were, on our drawing, to remove and abandon, and it couldn't be because it was a primary / he stated it was something added later. It was called a primary cross-connect and could not be removed but would have to be relocated.

(Tr. 6/129-131; *see also* tr. 6/198-200, 202) Upon inquiry from Judge Dickinson, it was determined that the drawing described as being in Mr. Buck's possession and allegedly shown to Mr. Ellwood has not been offered into the record as evidence by either party. The RFP/contract identified a primary electrical distribution line on the perimeter of the project site (finding 9) and a secondary electrical feeder that ran through the project site that would have to be rerouted (finding 36). On the basis of the opinion of ORB, the drafter of the RFP, that the RFP utility plan was not clear (R4, tab 263) and that COR Dyer testified that he learned after contract award that the information supplied by DPW for the RFP was not accurate (tr. 9/20-21, 73), we find

that the RFP/contract did not adequately identify the primary electrical interconnect (also referred to in the record as a cross-connect) that is now at issue.

92. Contract Modification No. P00001, with an effective date of 25 October 2004, authorized an LNTP for construction of foundations, slag, underground utilities and the building structure and established a completion date of 23 December 2005 (R4, tabs 34, 323), 425 days after LNTP for construction (*see* finding 54). SBN's Superintendent Zeman testified that it was not permitted to start any contract work, including site investigation, until the LNTP for construction was received (tr. 1/238).

93. As of a meeting on 27 October 2004 between SBN and its subcontractors regarding the 95% design, SBN acknowledged that all the guest room dimensions were too small and that the ceiling heights in all the public corridors were at a maximum height of 8'-0" (R4, tab 266).

94. On 28 October 2004 ORB's Patterson advised CO Bartholomew that DPW "will not allow the primary power interconnect to remain under the building, the Contractor must relocate it around the building footprint per the RFP" (R4, tab 268; *see also* finding 91).

95. SBN's Superintendent Zeman and Mr. Gonzales (QC) were on the jobsite full time starting on 29 October 2004 (R4, tab 268) and requested a Fort Lewis digging permit. The digging permit was issued on 1 November 2004. (R4, tab 1042; tr. 1/193-96, 223-26)

96. On 15 November 2004 it was reported that a gas line that had not been marked by PW was ruptured while a tree was being removed. The gas company repaired the ruptured line. (R4, tab 1044; tr. 1/191-92, 196-98, 12/39-41)

97. On 19 November 2004 SBN's Roberts advised COR Dyer of a meeting on-site the previous day:

> Tom Zeman and I met on site yesterday with Cliff Hawkswood, of Fort [Lewis] DOIM, and John Patterson of ORB to look at the options available to us to solve the problem created by the differing site conditions associated with the existing concrete encased communication ducts. Mr. Hawkswood approved our suggested method to "lower" the ducts so they would be well below our designed finish grades. Our preliminary ROM price to accomplish that change is $45,000.00. That price does not include the delays that this issue has and is

93

creating for us. We cannot tabulate those costs until we have the delay behind us.

Per John Patterson's suggestion, we will prepare a detailed work plan describing how we will accomplish this work for Mr. Hawkswood's review and comment, before any work actually starts. We will, of course, need the proper authorization under the change provisions of the Contract, to proceed, so we ask that Mr. Bartholomew provide us that authorization at earliest convenience.

We will also need to resolve the electric primary relocation change, as the existing primary duct parallels the communication ducts all the way through the site in the north/south direction, and crosses the east/west communication duct where it ties into the communications manhole east of the proposed building location. Consequently, the communication duct conflict cannot be resolved unless the electric primary conflict is resolved at the same time. At this time, we have no contractual authorization to act on this changed condition, although we provided timely notice of the problem to CFSC, with cost and delay notices over a week ago.

(R4, tab 280; tr. 1/244)

98. SBN's hearing Exhibit A-7 presents a summary chart of the critical path showing the contract work through which the critical path flowed, in what periods of time the critical path changed and delays it claims to have experienced on the critical path as follows:

|  | Dates | Work on the critical path [*alleged delays*] |
|---|---|---|
| Pre-Construction | May 2004 – 24 Oct 2004 | Mechanical Design [*Mechanical Design*] |
| Period 1 | 25 Oct 2004 – 28 Mar 2005 | Grading and utilities, excavation, foundation, concrete structure, roof systems, trade rough-in, activities leading to gypsum wall board (GWB) [*DOIM and phone cable reroute*] |
| Period 2 | 29 Mar 2005 – 1 Aug 2005 | Foundation, concrete structure, roofing systems, trade rough-in, activities leading to GWB, completion of the 95% design, 100% design and mock-up room completion [*trickle vent proposal and overexcavation*] |
| Period 3 | 2 Aug 2005 – 6 Dec 2005 | Framing completion, installation of roofing systems, activities leading to GWB, completion of the 95% design, |

94

| | | 100% design<br><br>[*framing LNTP and DDC spec resolution*] |
|---|---|---|
| Period 4 | 7 Dec 2005 – 4 Jun 2006 | Trade rough-in, activities leading to GWB, completion of GWB, millwork, painting and finishes<br><br>[*mock-up resolution and portion of electrical durations*] |
| Period 5 | 5 Jun 2006 – 26 Oct 2006 | Completion of GWB, millwork, painting and finishes<br><br>[*mock-up, 100% design review*] |
| Period 6 | 27 Oct 2006 – 6 Feb 2007 | Completion of interior finishes, punch list and inspections<br><br>[*portion of front desk modifications*] |
| Period 7 | 7 Feb 2007 – 25 May 2007 | Completion of interior finishes, punch list and inspections, completion sign-off<br><br>[*pre-final inspection, resequence punch list*] |

(Ex. A-7; app. br. at 279-81, App'x 3) Mr. Kerr, hired by SBN to review SBN's schedule analysis, differed from SBN's assessment of delay days by only one day (tr. 7/9-10, 17-19, 32-39, 73-74; ex. A-1). The Fund's expert witness, Mr. Coffin, agreed "in principal" with SBN's breakdown into the eight Periods and their durations as listed above. Mr. Coffin did not agree with SBN's assignment of responsibility for the various claimed delays. (Ex. G-5) We adopt neither SBN's nor Mr. Coffin's assignment of responsibility for delays on the critical path in Exhibit A-7. We address specific alleged delays and the responsibility for them in the various sections of our decision below.

99. The record contains SBN's "Work Plan For Additional Work to Mediate Differing Site Conditions at Army Lodging, Fort Lewis" dated 29 November 2004:

Primary Electric Ducts:

Existing Condition: An underground 15KV Primary
Electrical duct bank was found to traverse the entire site
from Pendleton Avenue to Utah Avenue, parallel to Maple
Road, approximately fifteen feet east of it. This duct bank
has to be relocated from the area that the new building is to
be constructed in, as it may not be located beneath the
building, however, the Fort Lewis Public Works
Department requires that the tie through from Pendleton
Avenue to Utah Avenue that was not shown in the RFP
documents must be maintained, so the primary cannot be
cut off and abandoned, as was the Contractor's original
plan.

95

To maintain the primary electric tie through, the existing duct bank must be abandoned, and a new route must be established. The new route for the primary electrical lines will start at the point where the primary duct bank enters the site on the south boundary at Pendleton Avenue. From there it will be routed west, parallel to Pendleton Avenue, then turn north parallel to Seventh Street to Utah Avenue, where it will turn east parallel to Utah Avenue to an existing handhold located approximately fifteen feet east of Maple Road and twenty feet south of Utah Avenue.

....

Relocation of Gas Lines:

Existing Condition: There is buried existing 2" diameter high pressure gas line in place located in the area that is 1 to 3 feet east of 8[th] Street and extends the length of the site from Pendleton Avenue to Utah Street. In the one place it was exposed it was found to be buried approximately 22". That places it at an elevation of +271.50' +/-.

This line passes through the area where we are installing the stormtech system, and the invert elevation of the lowest storm piping in that area is elevation +267.50'. If the gas line were installed deeper, in its present, location, it would need to be buried a minimum of seven feet deep.

In addition to the storm sewer system conflicts, the existing water line that passes under the future building pad must be relocated to the east of the proposed building location. The gas line in its present location will have to be crossed twice by this water line, but if the gas line is buried seven feet deep, that should eliminate the problem of elevation conflicts. If the gas line is rerouted to the east, instead of buried deeper, that too, will prevent conflicts with the rerouting of the water line.

....

Communication Duct Banks

Existing Condition: There are two existing underground concrete encased communications duct banks crossing the building pad, one in a north/south direction at grid 13, and another in an east/west direction, diagonally from grid E to grid G. Both ducts tie into a concrete vault that is located in the future drive/parking area, northeast of the new building entry. A third underground concrete encased communications duct ties into that vault as well. This duct leaves the vault in a northerly direction and ties into another underground vault at the north side of the property, just south of Utah Avenue. The elevation of the top of the concrete encasement of the ducts that pass under the building pad, is +273' to +273.15" [sic]. The elevation of the top of the communications vault in the future parking area is +274.86'. The elevation of the new building first floor slab on grade is +276.00'. The elevation of the bottom of the concrete spread footings that the duct banks pass under is +273.50'. The planned elevation of the future parking lot where the existing communications vault is located is +273.00' +/-. The elevation of the bottom of swale where the duct passes through in the east/west orientation is +270.75'. The invert elevation of the storm line that the north/south oriented duct passes under is +268.78'.

The Fort Lewis DOIM has approved lowering the communication ducts and revising the vault in order to allow the proposed new finish grades to work. They agreed to allow a variance for cover over the duct banks from 36" [to] 18" in planted areas, and to the thickness of the base course and asphalt in the paved areas.

> ....

Removal of Telephone Lines

Existing Condition: Several underground telephone lines have been identified by DPW on the site, and we have been advised that EDP will remove them, however, nothing has happened in the several weeks since we made contact and were advised that DPW will. The lines pass through the building pad in three locations, and their operable status is not clear.

97

(R4, tabs 282, 1046; tr. 2/151-53) A meeting was held on 30 November 2004 to discuss DSCs and mechanical changes (R4, tab 50 at 2516).

100. By letter dated 30 November 2004 to SBN, Botting took the position that its originally-proposed alternative HVAC/mechanical system for the non-guestroom areas "met the requirements of the RFP," despite its earlier admissions to the contrary (findings 64, 66, 76). Botting further stated that it should be compensated for the additional cost of providing the RFP-required boiler/chiller system (R4, tabs 283-84; tr. 3/121-23, 4/11-12, 60-61). SBN immediately forwarded WAB's letter, stating that SBN believed Botting's position "to be reasonable and to have merit" and further requesting "proper direction in accordance with the provisions of the Contract, specifically Article I-4, and I-23, for Botting to furnish the original mechanical system they proposed for the project, or for a change order to provide the system that employs the boiler/chiller assembly" (R4, tabs 285, 323).

101. As of 1 December 2004 the Architect of Record had not reviewed the ID drawings[36] nor integrated them into the architectural drawings and SBN had not provided a complete set of 65% design documents (R4, tabs 40, 306). CFSC's definition of an integrated design package was "all plans and specifications, developed for the project to the 65% level, which includes of course, the 100% civil and structural, that were the basis for the [LNTP], effective 25 October 2004" (R4, tab 41).

102. On 2 December 2004 SBN's Roberts memorialized a meeting on-site the previous day regarding a telephone line:

> [Y]esterday we were informed by Mr. Clowers, of the Fort
> Lewis DOIM division, that the phone line that the locator
> had identified on the east end of the project, may not be
> abandoned and removed as we were previously told. That
> phone line is active, and provides phone service to the
> existing hotel that is located to the east of the site, to the
> I.G.'s office building on the north side of Utah Avenue,
> north of the site, to the Headquarters building on the south
> side of Pendleton Avenue, south of the site, and to
> numerous other buildings in the area. Mr. Clowers guessed
> that the line was buried approximately three to four feet
> deep.

---

[36] We have found nothing in the record that defines the acronym of "ID." The Fund's brief describes "ID drawings" as "interior architecture material" (gov't br. at 85).

98

The line is located under the east end of the new building, and passes through the loading dock area. That area is scheduled to receive some of the deeper footings on the project. We will be excavating five feet deep for the footings around the loading dock so these phone lines will need to be relocated for us to construct the building.

We did contact [COR Dyer] and Mr. Bartholomew immediately, and the fact that both of you were available on post, was helpful for you to see first hand, yet another of the previously unidentified buried utility conditions that we have been encountering. This is your written notice of a changed condition, involving differing site conditions, that is delaying our ability to start the foundation, utility and underground work on the project. Please forward direction from the Contracting Officer at your earliest convenience as to how we are to proceed with this issue. At the present time, this is one more issue that is delaying our work on a day for day basis.

This notice will be followed by an RFI to provide us a reference number.

(R4, tab 286)

103. In an internal Fort Lewis communication dated 7 December 2004, DPW's Stedman provided the following information regarding "Utility Issues":

We held a meeting to discuss the utility issues with the New Army Lodge. Present were Colonel Perrenot (presiding), Ronald Schmidt (DCA Director), Cliff Hawkswood (DOIM), Steve Hart (SJA Civil Law), Paula Wofford (Deputy DPW), Steve Glover (Chief Planning Division), Jim Benson (Acting Chief Work Management), and Gary Stedman (PW Planning).

Natural Gas Line: At issue here is who pays for relocating the natural gas line that was not identified in the Digging Permit. Since Fort Lewis does not own the gas system, this is an issue between CFSC and the gas company.

99

The gas line was identified in the RFP (see page 3 Section J-2 (c)[)]. "Gas: An underground gas line appears to run through the center of the site east to west. Size and capacity are unknown at this time. The local Utility is Puget Sound Energy."

....

Underground electric line: The issue is what must be done with the underground electric line. CFSC has proposed two suggested courses of action: (1) change the line from underground to above ground. No. An overhead line cannot be secured. (2) build the lodge over the underground line. No. PW does not want the building built over the underground line.

This underground line was identified in the RFP as an underground eclectic [sic] line that would be relocated. (See Site Plan, Utility Plan drawings, Section J-10). [SBN] was aware of the line and the requirement to relocate the line in the RFP. The contractor is responsible for relocating and paying for the relocation.

Underground Communications Ducts: The issue is what to do with the DOIM communications ducts on the Army Lodge site. Initially DOIM agreed to have the ducts lowered in place (not a desirable situation, but acceptable), if it could be done without damaging the conduits and cables. Lowering the ducts was acceptable until it was determined the site preparation would remove so much surface material that existing man holes would be left more than 18 inches above the surface, and the comm[unication] ducts too near the surface. Also, when DOIM approved lowering in place, it was not known that the ducts would be under planned water detention systems. Communications ducts cannot be routed under water detention systems. The contractor will have to relocate the DOIM communication ducts, cables and manhole.

(R4, tab 1048; tr. 12/123-24)

104. As of 8 December 2004 SBN's sitework, utility and excavation subcontractor notified SBN that it was unable to proceed with its work due to "many underground obstacles discovered on site" identified as "electrical primary ducts, the communication ducts, the phone lines, and the gas line." SBN's Roberts did not pass this information on to CO Bartholomew and COR Dyer until 23 December 2004 in an email in which he further stated:

> Olympic Construction is ready to return to work with only one days [sic] notice, so once direction is provided, we will be able to respond immediately.

(R4, tab 309; *see also* Bd. ex. B-2; tr. 13/5-7)

105. The CO stated it was difficult to keep the various design submissions straight because SBN submitted documents "in pieces" and that none of the 35% or 65% comments had been tracked by SBN (R4, tab 42; *see also* finding 107). When SBN's Roberts indicated that the "old 65% drawings have been developed to the 95% point," CO Bartholomew on 9 December 2004 explained the design submittal process as follows:

> [Y]ou may not understand that contract deliverables are just that. There have been extensive delays experienced because we did not get the deliverables as required by the contract. Quality Control is unacceptable. I trust there are 65% electronic drawings being retained since they will likely be the basis for offsets if we continue to have difficulty getting what we contracted for.
>
> We want integrated 65% drawings submitted as required by the contract. If they are now at 95% integrated, submit what you will as the requirement for the 65% integrated drawings. We will then comment on what was to be an integrated 65% submission so you can then formally issue the 95% with our complete comments on the 65%.

(R4, tab 43; *see also* R4, tab 287)

106. On 10 December 2004 ORB's Monson reported to COR Dyer and CO Bartholomew a variety of government responses to the "underground" issues previously reported by SBN. He also reported that:

101

Gonzales is keeping a record of all RFI's and is tracking the questions and the answers; and is keeping a hard copy in his office of all RFI's....

Gonzales is making daily reports and is filing them in his office. He is up to 9 December 04 on his copies. They are averaging 2-3 laborers out here on a daily basis. One of these belongs to [SBN] and the other two are either Olympia Construction or SME. Narratives are stating land stripping and grubbing; and waiting on utility resolution...nothing more.

Gonzales will have his submittal register in place and up to date, on information he knows about, by the end of the day or Monday the 13th of December. I told him lightning will strike him and he will die if he doesn't. He is tracking the submittal from the time the construction folks give it to him until he receives a reviewed answer from the appropriate designer or government entity.

....

Aside from this...nothing has happened on this site aside from minor stripping and tree removal. This has been going on since before Thanksgiving when the first utility issue surfaced.

(R4, tab 288; tr. 11/61, 65-66, 95-96) ORB's Monson testified that Jensen/Fey, as Architect of Record, initiated RFIs which were then routed through him for distribution within the government; he had no authority to resolve any of the RFIs (tr. 11/16-17, 46-48, 98, 12/156).

107. As of 15 December 2004 a re-submission of SBN's original 65% HVAC/mechanical design continued to create confusion as to whether SBN's mechanical design included the RFP-required boiler/chiller system (R4, tabs 44, 292). SBN's Roberts claimed that SBN had been directed by CFSC to resubmit the original 65% design that included Botting's alternative HVAC/mechanical design (R4, tabs 45, 292, 1051). We find no evidence in the record of such a direction. After continued discussion between SBN, CFSC and Jensen/Fey (R4, tabs 45, 296), CO Bartholomew stated:

We are not asking for anything other than an integrated 65% document that was used for the LNTP for

102

construction. We must have it to deal with any proposed
design changes and deal with the site issues we have on
our plate at present.

(R4, tab 296) On 21 December 2004 SBN's Roberts agreed to submit an integrated
65% design that included the RFP-required boiler/chiller design as well as interior
design (R4, tabs 46-49, 301). CO Bartholomew responded:

I cannot understand why this is such a big deal and so hard
to do. We have an almost $18M project that we issued an
LNTP for based on multiple submissions and then have
great difficulty getting it in one set for a baseline
document. It also seems to be very difficult to track and
incorporate the comments we made at each iteration and
with the interims.

(R4, tab 301; *see also* R4, tab 311 at 10775-77) SBN's architect expressed its
understanding of what was required (R4, tab 303; *see also* R4, tab 311 at 10775).

108. As of 20 December 2004, two months after SBN had twice sent a
subcontract to Botting for signature on 2 October and 19 October 2004 (R4, tab 323 at
10817; findings 85, 90), there was still no signed subcontract agreement between SBN
and Botting and Botting was delinquent in providing its input for the 95% mechanical
design submittal (R4, tabs 294, 295; tr. 2/145). Also as of 20 December 2004 Botting
stated that "to continue in the construction phase of the project [it would] need a
contract with a contract value that reflects the equitable adjustment detailed in our
November 30th letter" and that failure to do so would impact Botting's submission of
95% design documents (R4, tabs 297, 1052; tr. 3/122-23). In a 17 December 2004
internal email Botting stated that:

Part of our leverage with the 95% docs is to stop the
coordination process in its tracks and start effecting [sic]
the ability of others to proceed with the project.

(R4, tab 1052; tr. 3/123-24, 4/36-37, 55)

109. On Monday, 20 December 2004, CFSC received RFI #17 (gas line) and
RFI #18 (phone line), both dated Thursday, 16 December 2004, and RFI #19
(communication lines), dated 20 December 2004 (R4, tabs 299-300, 310). Just one
day later, on 21 December 2004 SBN's Roberts notified SBN management personnel
about delays associated with differing site conditions reported in RFI ##15-19:

To give you some time frames for the delays we are experiencing, on October 22, 2004, we provided our first notice about differing site conditions and delay. That notice was for the electric primary problem and was actually submitted 3 days prior to the government issue of the LNTP. We have furnished notice after notice, since then, about all five[37] differing site conditions, via emails, RFI's, updated schedules, superintendent and CQC daily reports, and meeting minutes. The most recent string of notices were via RFI's 15, 16, 17, & 18, submitted on 12/16, and RFI 19, submitted yesterday. Each of those 5 RFI's tracks one of the 5 differing site conditions issues, and reiterates the day for day delay we are experiencing as a result of them. We also distributed the meeting notes from the December 15th progress meeting yesterday, that speaks of the delays in several places. We distributed our updated CPM schedule at the 12/15 progress meeting, which showed the delays, which we discussed at that time, and noted in the meeting notes.

Our files are bulging with notices. As yet, we have no direction on any of it, nor have we seen DPW out here doing something about the things that they could do something about, like moving the phone lines that run through our loading dock area, or relocating the gas line that runs through our storm detention area. Why we are not getting direction and why DPW is not taking care of some of these issues is anybody's guess. In the meantime, we are sitting here on an unbuildable and unacceptable site, undergoing a day for day delay.

(R4, tab 304) The following information about the alleged differing site conditions was included in the 5 January 2005 Progress meeting minutes (R4, tab 318):

|  | Description | RFI distr.date | Other information |
| --- | --- | --- | --- |
| RFI #15 | Primary electrical duct | 16Dec04 | 1Dec04 DPW involved; RFI "confirmed delay"; discussed at |

---

[37] SBN seeks compensation in this appeal for four alleged differing site conditions (*see* Section II below). The fifth alleged differing site condition was the potential for water lines to contain transite pipe at the point of connection. It was later determined that transite pipe was not encountered and is not now before us for consideration (R4, tab 460).

| | | | 5Jan05 progress meeting |
|--------|----------------------|---------|-------------------------------------------------------------------------------------------------------------------|
| RFI #16 | Transite pipe | 17Dec04 | 1Dec04 DPW involved; RFI "confirmed delay"; discussed at 5Jan05 progress meeting |
| RFI #17 | Gas line | 16Dec04 | 1Dec04 DPW involved (gas line owned by the gas company); RFI "confirmed delay"; discussed at 5Jan05 progress meeting |
| RFI #18 | Phone line | 17Dec04 | 1Dec04 DOIM involved; RFI "confirmed delay"; discussed at 5Jan05 progress meeting |
| RFI #19 | Communications ducts | 20Dec04 | 1Dec04 DPW involved; RFI "confirmed delay"; discussed at 5Jan05 progress meeting |

110. By email dated 22 December 2004, COR Dyer suspended review of SBN's 65% design submittal (*see* finding 107):

> Most of you by now realize that the recently received integrated 65% design submittal is **NOT** integrated at all. It does not include the mechanical system of a centralized boiler and chiller required by the RFP and Ft. Lewis DPW. Therefore, **you can immediately suspend** any review you're doing, until [CO Bartholomew] and I are satisfied that we finally receive a truly integrated 65% design submittal upon which the [LNTP] was issued. We are currently in discussions with [SBN] as to what should be included in a totally integrated design package, as they are having internal difficulties with understanding what they need to provide us before they are allowed to move forward to 95%.
>
> I apologize for [SBN]'s incompetence on the design process. Their Project Manager is totally inept and I am the first to say he needs to be removed from his "titled" position on this project. I personally don't see how we can move this vital project forward with him at [SBN]'s helm. The time and energy we've wasted so far would be frightening to calculate! Once we clarify with [SBN] what is required, and receive a time of distribution, you'll be notified as always. It's ridiculous to think we've reached this point with a group that was well regarded and had attained acclaim on other projects.

105

(R4, tab 306)

111. After several disagreements between CFSC and SBN's Roberts about the proper procedure for the processing of RFIs (R4, tabs 50, 307-08), CO Bartholomew, on 27 December 2004, sent the following email to SBN's Henrickson:

> Our relationship is in serious jeopardy. We will in no way accept Mr. Roberts' statements below about RFI's and may ask you to have him removed from the project. He has been an impediment at most turns and will not pick up the phone and call instead of this childish behavior. Swinerton Corporate should be advised that our holdings of your stock is [sic] dropping like a rock into an abyss. I may have to make a formal notification that I do not want to make.
>
> The issue with RFI's is we want them fully researched and submitted/sealed/approved by the A/E of Record / who is the Chief [of] your Quality Control Management System / not Bill Roberts. Your on-site QC for construction has also been of concern. We have a multi-faceted customer who accepts/rejects any design changes that [COR Dyer] and I consult/review. If we had a set of consolidated and agreed upon 65% drawings, much of this would not be taking place.

(R4, tab 50 at 2515, tab 312)

112. The 65% design package submitted by SBN on or about 30 December 2004 contained only drawings and was not a "complete package of drawings, specifications and design analysis/calc[ulations] showing the accepted design as of 65%" (R4, tabs 313, 318 at 10804).

113. Progress Meeting #3 was held on 5 January 2005, the minutes of which were prepared by SBN and included the following: SBN was awaiting direction from CFSC regarding differing site conditions (finding 109); the project completion date on the project schedule had been updated to 7 March 2006 or 10 March 2006[38]; and, the RFI review process was explained (R4, tabs 318, 1055).

---

[38] Both dates are contained in the minutes without explanation as to the conflict.

114. A "Site Issues" meeting was held on 10 January 2005 at the jobsite and was attended by CO Bartholomew, representatives from ORB, SBN, Jensen/Fey and SME, among others. The minutes of the meeting, prepared by SBN, included:

> 1-01. **Update From the Friday 1/7/05 Meeting between CFSC and the Fort** / 1/11/05 / Bart Bartholomew with CFSC provide[d] an overview of discussion from the Friday 1/7/05 meeting between CFSC and Fort Officials. The following was provided:
>
> 1.) Bart indicated that the gas line would probably be lowered. Direction may be given to [SBN] to proceed with this work as an added scope to the contract. [SBN] awaits a Change Directive from CF[SC] on this issue.
>
> 2.) Bart indicated that the phone lines will probably also be lowered. [SBN] addressed that the phone lines may not be lowered, as they are under a footing. Further determination may be necessary for this issue. A Change Directive may be given to [SBN] for this work as well. [SBN] awaits direction from CFSC on this issue.
>
> 3.) Bart indicated that Keith Henrickson of [SBN] and himself had previous discussions regarding the existing electrical duct bank. It was discussed that the Contractor is responsible for the portion of the reroute, which is shown on the SME electrical drawings, however the additional rerouting will be added scope per a Change Directive from CFSC. SME Electric was in attendance to confirm this understanding, and SME will provide the design for the reroute from their new transformer vault to the connection at Utah Street. CFSC is to include this direction in a Change Directive.
>
> ....
>
> 5.) Bart indicated that rerouting the DOIM lines would probably delay the project at least 60 days and will have considerable cost impacts. In an effort to reduce these impacts, CFSC wants to present a

civil re-design to Fort Officials for consideration. Bart indicated that a new meeting with the Garrison Commander has been set up for next Thursday, 1/13/05 at 2:00 P.M., to review such plans. See 1-02 below for details about this exercise. **Action: CFSC**

1-02. **Civil Re-design Directive: 1/7/05 / Bart** Bartholomew of CFSC has requested a civil re-design of the site to accommodate the existing DOIM ducts and vault. It was discussed that changing grades, drainage and some of the parking and driveway layouts may be necessary for this design change. Bart has requested that such re-design be provided within 48 hours of this meeting and made it clear that this exercise is additional work to the contract, which everyone will be reimbursed for. It was requested that the design be available for Bart's review by the end of the day on Wednesday, 1/12/05 (design to be delivered to Bart's hotel). After reviewing this possibility at the meeting, Darren Simpson of DCI Engineers indicated that they could probably come up with a re-design within this time frame. In order to do this, Darren has requested that top and bottom elevations of the duct bank be provided for this exercise. [SBN] will contact the earthwork Subcontractor immediately to start the necessary potholing[39]. Once the potholes are dug, the Surveyor will determine elevation at the given locations. At the end of the meeting DCI, ORB and [SBN] reviewed the site and identified the areas where elevations will be provided [*see*, R4, tab 1056]. It is noted that Olympic Construction was on site to start digging within ½ hour of this request and the Surveyor was tentatively scheduled for 1/11/05 A.M. to verify elevations. **Action: [SBN], DCI Engineers**

1-03. **Electrical Duct Rerouting: 1/7/05 / Bart** confirmed that the existing electrical primary power duct bank

---

[39] "Potholing" was described by SBN's Superintendent as hand excavation by shovel; "[g]ingerly trying to expose lines [horizontally and vertically] so you don't damage anything" (tr. 1/198-200).

will be rerouted, as necessary, to allow for the construction of the new building. It was confirmed by CFSC, [SBN] and SME[], that there is a split responsibility for this rerouting. The Contractor is responsible for the portion of the rerouting that is included in the SME[] design drawings and CFSC is responsible for the additional rerouting to make the interconnection from Pendleton Avenue to Utah Street. The additional rerouting includes the portion of the duct bank from SME's transformer vault around to the Utah Avenue side of the site. SME will provide a drawing showing the new interconnect arrangement. CFSC has a Contractor to do the work. The additional scope for [SBN] will be included in a Change Directive from CF[SC]. Pat Ellwood of SME[] suggested that relocating the existing cross-connect vault would save some money. **Action: CFSC/SME**

1-04. **Building Foundations: 1/7/05 / [SBN]** indicated that, at this point, it is not known if the building foundations will have to be put in deeper than shown on the current design. A Geotech report for the site has been developed to assist in determining this. If copies of this report are needed for design purposes, it is available from [SBN]. The answer to RFI #1, that provided the design for structural reinforced concrete bridges over the DOIM lines that are located directly under grid 13 was reviewed. That additional work will need to be included in the forthcoming change directive from CFSC as well.

1-05. **65% Submittal Specifications: 1/7/05 /** There was discussions confirming the contents of the 65% submittal specifications. Bart Bartholomew of CFSC confirmed that the 65% specification should include the boiler/chiller, since that system will be used in the new building. Bart confirmed that having the boiler/chiller system included in the 65% submittal does not give away any of the Contractor[']s rights in regard to the Boiler/Chiller Request for Equitable Adjustment, which is currently being reviewed by CFSC.

109

(R4, tab 1057; tr. 6/217-20)  A follow-up meeting was held on 13 January 2005 at the jobsite (R4, tab 1061; tr. 1/106-08).

115.  As of 14 January 2005 SBN expected direction from the Fund on the differing site conditions within a week.  It was also reported that Botting was still refusing to sign a subcontract, refusing to provide any input for the 95% design and refusing to provide submittals until SBN "guarantees them payment" for providing a boiler/chiller system, whether or not CFSC agrees to compensate SBN.  (R4, tabs 322, 1062)

116.  In internal CFSC, AL and DPW emails dated 18-21 January 2005 there is recognition of the incurrence of additional costs and delays to performance due to differing site conditions; the only question was which organization's funds should be used to pay for the work.

> [P]ayment for relocation of utilities misrepresented on the installation site plans provided in support of the Fort Lewis Lodging new construction project.
>
> Our folks/construction contractor have identified a redesign solution that will overcome the need to relocate the DOIM telecommunications trunks running through the proposed lodging parking area. This will result in an approximately $40K cost to the project for redesign and site work. It does however make moot the vast majority of the cost previously identified in utilities relocation that had been identified as necessary.
>
> Two other utilities remain outstanding. One is a communications line (600 pair telephone) and the other is a 2" gas line. The gas and communication lines are directly impeding our contractor's ability to proceed with excavation work / estimated cost to relocate comm[unication] and gas lines is $25K. Current cost of the delay associated with the inability of our contractor to proceed is $100K / some portion of this is associated with the time to identify the redesign solution to the DOIM telecommunications trunks. A separate issue (also not previously identified) costing about $90K is associated with an identified requirement to re-route and connect an electrical feeder (cross connect that goes around the site).
>
> ....

110

We have no choice but to absorb the redesign/site work (associated w/DOIM trunks) increase of $40K as a project cost. Similarly we are stuck with funding the delay costs of $100K (associated with work stoppage due to all the unidentified/misrepresented utilities). However, as we discussed it seems unreasonable for the project to bear the total $115K cost associated with the previously unidentified/misrepresented communication and gas lines as well as to fund any requirement for back-up power tie in to another building when such was not represented in the plans the installation provided as a departure point for our contractor's design effort.

(R4, tab 1064)

117. In the 19 January 2005 Progress Meeting #4 meeting notes, it was reported by SBN that it was still waiting for direction from CFSC as to the differing site conditions and that it had been delayed in proceeding with work on the project since 1 November 2004 as a result; SBN also noted that it was still waiting for a response from CFSC to Botting's 30 November 2004 request for additional compensation for providing the RFP-required boiler/chiller system (R4, tab 324; *see also* R4, tab 55).

118. On or about 24 January 2005 Botting submitted to SBN an REA:

In accordance with the contract and because of the showing it has made herein, Botting hereby requests that an Equitable Adjustment to its subcontract be issued in the amount of $579,681 for designing and installing a boiler/chiller system. As noted above, this request includes only the direct costs of engineering, labor, material, equipment, subcontractors, other direct job costs and markup. We have not included any indirect costs, inefficiency costs or extended duration costs.

(R4, tab 333)

119. On 26 January 2005 SBN's Roberts submitted three REAs to CFSC: an REA for Differing Site Conditions (REA 031); REA for Differing Site Conditions Delay (REA 035); and, REA for Mechanical System Upgrade (REA 014) (R4, tab 341; tr. 1/103, 2/162-65, 3/147-49).

111

a. REA 031 requested direct costs associated with twelve enumerated differing site conditions in the amount of $406,751 plus 32 calendar days (R4, tabs 335, 339). On 8 February 2005 SBN submitted a revised REA 031 (finding 124).

b. REA 035 for delay costs claimed to be due to alleged differing site conditions in the amount of $259,617.00 and 92 calendar days:

> The progress of the work on site was stopped on 1 November 2004, by the differing site conditions we encountered. The consequence of the delay has been no progress with any of the work on the project critical path, yet we have experienced extended general conditions expenses for each day of the delay for maintaining an on site staff to assist CFSC in solving the site problems, and to perform other administrative and managerial duties required by the Contract. The unfortunate aside of this delay is that we must request a time extension and an equitable adjustment for the costs that we have incurred as a result of it. At this time, if we were to receive a change order for the additional work to correct the site problems by the end of this week, we anticipate the delay to extend through Monday, 31 January 2005, which would be a total delay of 92 calendar days. Our extended general conditions have been reduced to a minimum during the delay period, which has kept our costs per calendar day down to $2,387.51 (including mark up). Other costs we have incurred are for the on site CQCC, standby time and some fixed costs for Olympic Construction, and a few cost increases that we have been apprised of by a few subs or suppliers. There are more escalation costs, and we will submit them separately, once we have the complete picture of them. We have enclosed a summary sheet that itemizes the known costs for this issue through 31 January 2005, along with a detailed breakdown of how we arrived at our extended general conditions number. The total cost that we request for the equitable adjustment to our Contract, if the delay were to stop and allow us to start the corrective site work on 1 February 2005, is $259,617.00, and 92 calendar days. Please cause a change order to be issued for that amount, or an adjusted amount if the delay continues past 1 February, to compensate [SBN] for the delay.

112

Once the delay has ended, we will be able to determine what other impacts our subcontractors and suppliers have incurred due to the delay. We are particularly concerned about price increases, as we have received several notices lately regarding such increases. We will keep you apprised of those costs, as we receive them, and compile a comprehensive package of them for CFSC to provide in a future change order.

(R4, tabs 334, 338)

    c. REA 014 for the provision of what it characterized as a "mechanical system upgrade to a boiler/chiller central HVAC system…as requested by Fort Lewis DPW and Army CFSC" in the amount of $807,454.00 with no time extension:

This is the mechanical system that is represented in the 7 October 2004, interim mechanical system design documents. If this upgraded system is desired for this project, we will require an equitable adjustment to our Contract for the additive amount of…$807,454.00…. The change has been priced using additional manpower on straight time to compress the work into the same time frame as the originally proposed system, therefore, no time extension will be required to perform the additional work required by this change. We do, however, reserve our rights to a time extensions [sic] and impact costs for this issue, should additional future changes create impacts that are not ascertainable from this single change. Our detailed costs estimate and backup documentation is enclosed for your review.

Due to the significant cost of this change, we will require a change order to our Contract in order to proceed with this additional work. We also request an expedited answer to this issue, as we must change the documents and revert to the originally proposed design if CFSC decides that they do not want to make the change to the upgraded system. Due to the fact that this issue has been before the Contracting Officer for more than 60 days, we ask that the expedited response to this [REA] be provided no later than 10 February 2005, which is 10 working days from this submission. If a change order is not received by that date, we must proceed with the work required to revise the

113

documents to the originally proposed design, and move forward from there, in order to mitigate delays and minimize additional costs. Please be advised that if we do not receive a change order for the upgraded system, we will require an equitable adjustment in the $100,000.00 range to revert to the originally proposed system, and to cover all of the additional costs for the multiple designs, and multiple design submissions that we have provided over the past several months, at CFSC's direction.

(R4, tabs 336, 337, 340)

120. The date of 27 January 2005 was set for the final design review meeting of the 65% design (R4, tab 53).

121. On 31 January 2005 SBN's Roberts notified COR Dyer that Gonzales had resigned and would be replaced by David Lee (R4, tab 67). COR Dyer "demand[ed]" that he be afforded a one-on-one discussion with any new candidate because of the "many issues with the Quality Control program" (R4, tab 56).

122. In a letter dated 3 February 2005 directly to CO Bartholomew, Botting offered the following items to CFSC as additional inducements for acceptance of Botting's originally proposed alternative HVAC/mechanical design:

Because we are confident that the packaged DX option is the best solution for the Fort Lewis Lodge, we are offering comprehensive warranties and service on the system, excluding the PTAC's. This includes a 5-year warranty on the compressors, a 25-year warranty on the stainless steel heat exchangers, substantial owner training, and 1-year preventative maintenance service by [Botting] qualified personnel on the packaged units.

Additional services available include:
- Preventative maintenance for PTACs
- Enhanced maintenance training materials (CD/DVD format, etc.)

(Supp. R4, tabs 346, 349) We find no evidence that the offered items were included in any of Botting's previous proposals or designs and Botting's letter did not indicate that it sought additional compensation for the provision of the offered items. We find that the amended alternative HVAC/mechanical design offered by Botting on 3 February 2005 was different from Botting's original alternative HVAC/mechanical design

included by SBN in its proposals. In handwritten notes dated 3 February 2005, Botting stated:

- Include 1 yr Preventative Maint.
    - Packaged DX System
    - PTAC's
    - ~~other~~
- Forward Engineer Stamp & Narrative that we
  stand behind system & offer 1 yr Preventative
  Maintenance + 5 yr comp. warranty and SS HE
  w/ 25 yr warranty

(Supp. R4, tab 340) CO Bartholomew[40] also made handwritten notes on 3 February 2005:

**Urgent** — [fax number omitted]
   **Please pass to [Botting's] Tim Burns**

powder coat on cover
see stainless heat exch – <u>not</u> aluminized
modulating burner
ddc – lon works included in unit (Honeywell)
maintenance per maintenance schedule
         on presentation package
1 year warranty begins after acceptance
supply all maintenance records to
         P.W. Fort Lewis
Final annual maintenance
         completed prior to turning
         over at end of 1st year.

**[signature]**                    **3 FEB 05**

**cc: [SBN]**

(Supp. R4, tabs 346, 348) CO Bartholomew requested additional information from Botting on the proposed AAON RM Series packaged units, the modulating burner for the make-up air units, the controller for the burners and the "compatibility for open protocol controls (i.e. Lonmark). The Fort uses Honeywell XL-10 for small air

---

[40] After comparing the signature on these notes to the CO's signature on numerous documents throughout the record, we find that the signature on these notes is that of CO Bartholomew.

conditioners and XL-15 for larger AHU's etc." (R4, tab 347) On 4 February 2005 Botting forwarded to CO Bartholomew eleven (11) pages of information in response to questions about AAON packaged units (R4, tab 350).

123. By letter dated 8 February 2005 CO Bartholomew advised Botting of concerns about its DDC proposal, stating:

> The Ft. Lewis specific question/concern is: "Is the system Lonworks based and Lonmark [sic] registered and can the contractor use Honeywell series XL10 and XL15 for the controllers?" It will be a big deal to the Ft. Lewis folks if these specific controllers and EMCS communications protocol are not provided.
>
> The other minor issue is to provide some specific AAON installations near Ft. Lewis where the base technical folks may go and see the packaged DX system. A few sites are all that is necessary since your letter indicates there are hundreds of installations in the region.

(R4, tabs 352, 354)

124. Also on 8 February 2005 SBN submitted a revised REA 031, reducing the amount sought as compensation for differing site conditions to $254,728.00:

> In preparing this proposal, we based our pricing on the assumption that it would take an additional four weeks to complete the site work to the point that we could restart our previous construction schedule, plus we included an additional three days time extension for the work to bridge the DOIM ducts under the structural columns at grid 13. We have now eliminated the phone line relocation and gas line relocation from our proposal, as CFSC requested, for others to perform the work, and have reorganized the electrical interconnect work per CFSC's request. This does create a greater potential for disruption of our work schedule by CFSC, therefore CFSC will need to pay close attention to expediting the work to meet our time line. All time extensions discussed herein are expressed in calendar days. The four week time extension assumption will be modified once we have received a written change order with direction to proceed with the changed work, and have been able to determine the total scope of the change and

the time required to complete it, and the completion of the Work undertaken by CFSC is analyzed.

....

Another issue raised by CFSC at our 2 February meeting was the responsibility they felt [SBN] had for survey and potholing of the site to prevent or mitigate site problems due to unknown and differing site conditions. The reality is that there is no way that any Contractor could do the exploratory work CFSC believes should have been done before turning in their respective proposal. One reason is that the Contract does not allow any work to be done on site, excavation included, until a site specific SWPP and the EPP are submitted and approved by the Fort, and a digging permit is obtained. On Fort Lewis, the digging permit is the vehicle for obtaining utility locates, and only after those locates have been done, may any excavation be performed on a site. In addition, a Contract must exist for the Fort Lewis DPW to review SWPP and EPP submissions and issue a digging permit. Further, prior to the issuance of a Contract for the project, we were not provided a survey of the existing site, beyond the very limited 11" X 17" drawings that were provided with the RFP and accounted for in our proposal. It wasn't until several weeks after the Contract was executed, before we were provided a survey by the base. Unfortunately that survey failed to locate the communications lines, phone lines, gas lines, and electrical primary lines that have created the majority of the problems we have encountered thus far. We did confirm that the elevations of the topography that the survey provided were reasonably close, which is what then enabled us to determine that all of the existing lines except the phone lines, were installed much shallower than Fort Lewis and other code standards required, thus creating numerous problems for our site grading solutions and our structural foundation work at grid 13 and elsewhere. None of that information was available to us until long after the Contract was signed, therefore, there was no opportunity for us, or any other Contractor, to include the cost for dealing with these differing site conditions in our design/build offer. That is why the Contract contains clause I-40, Differing Site

117

Conditions, which provides the means to address the items that we are now aware of since the inception of our agreement.

.....

**Package Number 1a: Electrical Primary Work, No Cost.**

This item involves only Contract work, which involves intercepting the existing 15KV electric primary at Pendleton Avenue, and extending it around the corner to a point west of the building parallel to 7th Street, from which, it will feed a new interconnect vault, provided by others, and not in this contract. From the interconnect vault we will feed a new transformer vault, that is part of our contract work, that will service the new building. There is no additional work involved in this item, but the interconnect vault that CFSC shall have furnished and installed by others, will now be installed in a location that will cause our power feed to our new transformer vault to be disrupted, therefore, the interconnect vault must be installed before we can start our electrical power work. Our electrical power work must be among the first work items to start, as soon as we are authorized to proceed with this change. We will also remove the existing wire from the existing primary power duct bank at Pendleton Avenue to the existing interconnect vault located in the center of the site. We will do no work at the existing interconnect vault or to the existing primary duct bank and wiring from the interconnect vault to the north of it. SME will not remove the existing transformer vault that is located in this vicinity and reuse it as the transformer vault from which to feed the new lodge. A new vault will be provided for that purpose, and the existing vault will be demolished in place. The additional costs involved with this item for the electrical design work that were authorized by [CO] Bartholomew at our on site civil and electrical redesign meeting on 10 January 2005, have been applied to the costs for the interconnect work that is outlined under package number 11. We have been advised that DPW will pay for the interconnect work, and that ORB is presently coordinating the scope and payment issues with them.

SME Electric has provided a detailed scope and price for the interconnect work, and we have no problem with SME contracting direct with DPW. We are standing by to help facilitate getting the work done.

**Package Number 1b: Interconnect Vault Option, Electrical Primary Work, No Direct Cost from [SBN] if the work is Contracted directly with SME Electric. If Contracted directly with SME Electric, their quote for the work is $4,615.72.**

This is an alternate that SME Electric has offered to prevent the interconnect vault work from impacting the electrical primary installation Contract work and probably the project schedule. Under this arrangement, SME will remove and relocate the existing electrical interconnect vault to integrate with their electrical primary installation. Their complete scope of work for this change is outlined in the backup information attached for this package.

**Package Number 2: Phone Cable Reroute, No Direct Cost if Performed by a Contractor other than [SBN]. $12,694.26 if performed by [SBN].**

In accordance with CFSC's direction at our meeting on 2 February 2005, the work to reroute the existing 600 pair direct bury cable that presently exists below the building footings at grid 25, and in the loading dock area will be performed by others of CFSC's choosing. Our previous proposal for this change included layout and survey of the reroute to miss all of our utilities and footings, including grade hop duties to ensure that the relocated work would be installed at the correct depth to not adversely effect [sic] any new utility installation in addition to the costs for Cannon Construction to do the cable reroute. CFSC will now be responsible for the survey, layout, grade hop, safety, insurance and supervision of this work. Please be advised that the cable material for this work may be a long lead item, and that the work is projected to take approximately one week to complete, so the coordination of this work with [SBN]'s work is critical to prevent delays, impacts and disruptions to [SBN]'s Contract and Change Order work. The building footings at the east end

119

of the building, around the loading dock and mechanical room area cannot be started until this phone cable reroute work is completed. [SBN] has provided a price of $12,694.00 if CFSC decides they want [SBN] to do the work.

. . . .

**Package Number 4: Reroute Gas Line, No Direct Cost if Performed by a Contractor other than [SBN]. $23,793.31 if Performed by [SBN].**

In accordance with CFSC's direction at our meeting on 2 February 2005, the work to reroute the existing live 2" gas line that is presently buried 22" deep, and traversing the site parallel to 8th [S]treet, approximately two feet east of the road will be the responsibility of CFSC. This line must be relocated as the gas company will not allow it to be buried any deeper than four feet, and they will not allow it to be buried under pavement or site structures, such as our "stormtech" storm drainage structure or the truck access road leading to the loading dock. The gas company provided a time and material estimate to do this work, which they estimate to contain 650 lineal feet of new gas line. This will reroute the gas line around the new grounds maintenance building. The gas line subcontractor has stated that it may take three or more weeks to start the work, from the time they receive the executed paperwork to proceed, so we require CFSC to expedite this work to prevent it from impacting [SBN]'s Contract work. [SBN] has provided a price of $23,793.00 if CFSC decides they want [SBN] to do the work.

**Package Number 5: DOIM Duct/Vault/Site Grading Changes, $121,447.49.**

This change covers the work to perform the revisions to the site grading and drainage per the revised civil drawings dated 1/19/05, delta 1. The additional costs in this change for potholing and quantity survey work have already been incurred by the Contractor to arrive at the design solutions for this issue. The costs for this change have been revised because the previous proposal from our earthwork and

utility subcontractor did not contain sales tax on materials. The costs included in this proposal only cover the delta between what was previously shown for the site grading and drainage, and what the engineering changes changed the system to, with 75% of the costs of the change paying for the additional fill to comply with the new grading elevations. The Contractor's responsibility for removing and replacing unsuitable soil encountered in the areas of the changed work has not changed. If such soil conditions are encountered, they will be removed and replaced at no additional cost to the Owner, before the additional fill that is part of this change is placed.

**Package Number 6: RFI #1, Foundation Work to Bridge Comm. Ducts at Grid 13, $17,597.00.**

We have reduced the pricing for this change from $22,197.00 to $17,597.00 by changing the time extension required to three days instead of four, and by streamlining some of the work items. This change covers the design and construction costs for the structural foundation work at grid 13, where the communications duct passes directly underneath the four reinforced concrete spread footings and support columns, in accordance with the instructions provided by the structural engineer in RFI #1. Analysis of this change concluded that a three calendar day time extension would also be necessitated by this change, and the costs for that time extension are included in this proposal as well. The additional costs in this change for survey work and design engineering have already been incurred by the Contractor to arrive at the design solutions for this issue. This change is the result of differing site conditions, and is a compensable change under Contract clause I-40.

**Package Number 7: Civil and Structural Engineering Design, $15,759.00.**

We have reduced the pricing for this change from $16,673.00 to $15,759.00 by reducing some of the markups. This change pays the civil and structural engineers for the additional design work they provided to engineer a solution to the differing site issues, particularly

as they relate to leaving the existing communications ducts in place. All of the costs for this change have already been incurred by the Contractor as this effort is what provided the design solutions for the DOIM duct and vault corrective site grading and drainage work.

....

**Package Number 11: Electrical Primary Interconnect, Phase 2, No Direct Cost from [SBN] if the work is Contracted directly with SME Electric. If Contracted directly with SME Electric, their quote for the work is $83,313.37 and needs to be combined with Package Number 1b, for a complete electrical interconnect system.**

This item covers the electrical work required to provide the interconnect from the relocated interconnect vault that is included in the electrical phase 1b work, and will be located west of the new lodge, next to 7th Street, then underground to the existing handhold located on site, south of Utah Avenue, and then north, across Utah Avenue through the existing underground conduits and then up the existing power pole to the connection point at the top of the pole. It is important that all parties understand that once the electrical phase 1 work is started, the interconnect between the system on Pendleton Avenue and the system on Utah Avenue will be out of commission and will not be back in commission until the phase 2 work is completed. DPW has indicated that they do not want the interconnect to be out of commission any more than two weeks, however, if the phase 1 work is authorized by change order, and the phase 2 work is not, the interconnect may be out of commission for a very long time. We understand that ORB is presently coordinating this with DPW, with the intention of having SME Electric do this work for DPW. We are available to assist ORB and DPW as necessary.

**Package Number 12: [SBN]'s Extended General Conditions for Time to Perform the Corrective Work, $66,850.00.**

This item addresses only [SBN]'s extended general conditions for 28 calendar days for the additional time that it is presently thought that it will take to perform the additional work to correct the site issues to the extent that the work will be back to the point that it was when the work was stopped due to the differing site conditions. The additional costs for the CQCC is included in item 8, with the architectural added costs for the change, and another 4 calendar days time extension with the extended general conditions is included in item 6, for bridging the DOIM lines per RFI #1. The entire time extension requested for this change is 32 calendar days, 28 for the time to complete the corrective site work, and four for the time to complete the RFI #1 additional work. We do, however, qualify this proposal, as we do not know the entire scope of work that will be authorized by the change order for this work, defining the total scope, we will be able to schedule the work accurately, and an adjustment in the time and costs must be made at that time, to either add or credit more time and cost, as the schedule dictates.

(R4, tabs 351, 353; tr. 2/78-86, 164)

125. On 9 February 2005 SBN notified CO Bartholomew that DPW personnel arrived on the jobsite:

Disconnecting and removing wire from the existing underground primary power interconnect that crosses the site, however, we were not informed that they were coming, nor do we know in any detail, what it is they are planning on doing. (They asked us to lay their work out for them, but we don't know what their work is, nor are we receiving any compensation to supervise or lay out their work.)

(R4, tab 1069) CO Bartholomew agreed with SBN that nothing should be done without proper coordination (R4, tab 1069).

126. By email dated 11 February 2005 CO Bartholomew advised SBN to "Please Start Your Engines!" and that the following work was authorized:

1. Effective...(14 February 2005), [SBN] is authorized to begin all electrical site reroute work and will coordinate

123

other electrical work by the garrison DPW as appropriate. Any legitimate additional change costs for this piece of work shall be negotiated but the work is directed.

2. The contractor is authorized and directed to perform the 600 pair telephone cable reroute at a cost Not to Exceed $12,694.26.

3. The contractor is authorized to perform the transit[e] pipe taps, by a licensed asbestos abatement contractor, as proposed, for the firm fixed price of $1,922.00.

4. The contractor is authorized and directed to perform the gas line reroute for a Not To Exceed cost of $23,793.00. Contractor is asked to coordinate this reroute to the extent necessary to avoid impacted site features and the new building. Request that unnecessarily longer reroutes by the gas utility subcontractor be strongly discouraged and coordinated with our on-site representative Mr. Bob Monson and/or John Patterson.

All other requests for changes and adjustments are under review. Other directives and change agreements will be under separate cover.

As soon as we receive a response from [Botting] on my 8 February 2005 letter on the building mechanical HVAC system controls and locations of local AAON installations, I will be prepared to accept the proposed systems at no additional costs.

(R4, tabs 320[41], 355, 1070) CO Bartholomew also formally accepted SBN's 65% design submission and authorized a Notice to Proceed with the 95% design. SBN's Roberts thanked CO Bartholomew for the direction and responded: "This is good news! All we need now is a decision on the mechanical system to know which direction to take." (R4, tabs 58-59)

127. On 11 February 2005 Botting again provided to CO Bartholomew the information about the AAON packaged units previously provided on 4 February 2005

---

[41] This copy of the document includes a handwritten notation (author unidentified) with an arrow pointing to the underlined words "no additional costs" and "No, $200,000 +/-" (R4, tab 320).

(finding 122), but it did not provide the requested information about the DDC controls (R4, tab 57).

128. By letter dated 14 February 2005 Automated Controls provided the following information about the DDC design to Botting:

> Base Mechanical System:
>
> A LonWORKS registered supervisory controller that is tied into Johnson Controls Field Controllers. The supervisory controller (NAE) is a WEB based controller that will allow the maintenance staff to have access to the system through any computer connected to the network via use of a web browser that is password protected. The NAE supervisory controller also has the capability to be networked into the FT. Lewis EMS system for future connection to the post system.
>
> The DDC system will provide automatic control of the common area HVAC system[.] This includes the AHU's, their zone terminal units, exhaust fans and heating/cooling equipment.
>
> Hotel Room System:
>
> Will provide DDC control of individual PTAC heat pump units. System is a sub-DDC system designed specifically for the hospitality industry (Johnson Controls, Modular Room Control (MRC) system), which we can provide information about history, capabilities, compatibilities, and useful life. Each guest PTAC can be controlled/adjusted from a central control point in the hotel system. On-line monitoring/reporting can also be done from the front desk, in addition to providing occupied/unoccupied sensing and setbacks and allowing the individual guest to control/adjust at the guest room.

(R4, tab 1072; tr. 7/171-72)

129. Contract Modification No. P00002, with an effective date of 14 February 2005, was issued to memorialize the parties' agreement to the following work:

Following our many meetings and discussions the past several weeks, the garrison/contractor electrical/other issues coordination meeting Drew [Dyer] and I participated in via teleconference earlier today, and a just concluded meeting with the Chief, Army Lodging, the following work is hereby authorized.

1.    Effective this date (14 February 2005), Swinerton is authorized to begin all electrical site reroute work and will coordinate other electrical work by the garrison DPW as appropriate. Any legitimate additional change costs for this piece of work shall be negotiated but the work is directed.

2.    The contractor is authorized and directed to perform the 600 pair telephone cable reroute at a cost Not to Exceed $12,694.26.

3.    The contractor is authorized to perform the transite pipe taps, by a licensed asbestos abatement contractor, as proposed, for the firm fixed price of $1,922.00.

4.    The contractor is authorized and directed to perform the gas line reroute for a Not to Exceed cost of $23,793.00. Contractor is asked to coordinate this reroute to the extent necessary to avoid impacted site features and the new building. Request that unnecessarily longer reroutes by the gas utility subcontractor be strongly discouraged and coordinated with our on-site representative Mr. Bob Monson and/or John Patterson.

All other requests for changes and adjustments are under review. Other directives and change agreements will be under separate cover.

As soon as we receive a response from W.A. Botting on my 8 February 2005 letter on the building mechanical HVAC system controls and locations of local AAON installations, I will be prepared to accept the proposed systems at no additional costs.

(R4, tab 60 at 2546)  Sometime in early February 2005 CFSC accepted Botting's 3 February 2005 amended alternative HVAC/mechanical design using AAON packaged units as well as the negotiated modulating burners, powder coating and the

additional maintenance, warranty and training (R4, tab 390, ¶ 2-04; *see also* findings 160, 164, 174). CO Bartholomew's acceptance of the amended alternate HVAC/mechanical system necessitated the submission of a fourth HVAC redesign to be included in SBN's 95% design submission:

> We will have to change the building back to the way it was originally designed, with the exception of the distance between floors that we changed to accom[m]odate the piping that the boiler/chiller system required. **We will leave the floor heights as they presently are. We will not change them.**

(R4, tab 359) Jensen/Fey's Fritzmeier testified that:

> It was not particularly easy because a lot of things had already been set in motion in terms of other design, disciplines clarifying their systems, particularly structural, a lot of architectural design had been done around the layout that was required to meet the requirements of that last 65 percent design submittal. So going back to the package units, there were things that were set in place that needed to be accommodated with a change in the mechanical system.

(Tr. 7/254)

130. On 16 February 2005 Automated Controls, Botting's DDC subcontractor, informed Botting that, even though Botting had not provided it with a copy of the RFP as it related to the DDC, it had provided Botting with an amount to include in Botting's HVAC/mechanical proposal to SBN for the entire DDC system (tr. 7/180-181, 197-201). However, after later being provided the RFP design requirements, Automated Controls admitted to Botting that it had made incorrect assumptions:

> Project History:
>
> - We quoted our standard DDC system…including [thermo]stats for the rooms but not a hotel system as called out in the design build spec. We were not given the design spec….
>
> - Dave [Fillo] and I met to figure out how to cover the cost of the flat spec'ed Onity Hotel System

127

(terms in spec also list "or equal" but after meeting with the Lodge personnel and review the existing facility they will be going with Onity).

- Dave and I submitted on the JCI[42] Hotel System (equal) with the intent it would be rejected and then we would request a scope change to cover the cost of the Onity Hotel System.

This is a government spec and a tough one to work around.

(R4, tab 1074; tr. 7/177-84 (even Automated Controls' proposed price to Botting for a non-hotel system was understated by $10-20,000.00), tr. 7/197-201)

131. On 17 February 2005 COR Dyer forwarded to the CO, DPW and ORB/BCE responses received from SBN/Botting regarding "the last 2 open issues with the mechanical design" which dealt with DDC design. DPW's response was:

The submitted variance on the DDC Controls is COMPLETELY UNSATISFACTORY! DPW, Fort Lewis position is non-concur. The language in the RFP & contract spec, as well as the Fort Lewis Design Standards require all DDC Controls to utilize LonWorks or Bacnet protocol devices directly integrated into a Honeywell or Tridium JACE (Java Application Control Engine), which is a (NAC) network area controller, communicating on the Ethernet protocol over Fort Lewis LAN/WAN infrastructure for remote control and monitoring. This project specifies a computer workstation to be located in the mechanical room, with Tridium Web Supervisor/Workplace pro engineering software installed, configured and programmed for schedule, energy, log, alarm and database services from a single seat. The use of alternative control solutions is not in compliance with our standards or vision and will not simply "tie-in" to the base EMCS. Our specified system has been refined to provide reliable and intuitive Graphical user interfaces that do not require software and is accessible with a standard web browser. There is also a misunderstanding that Johnson Controls, i.e. DX-9100 are our standard. This is false. The

---

[42] We understand this, within the context of the entire record, to be a reference to Johnson Controls.

DX-9100 actually does not meet our spec as the communications protocol is proprietary N2 Comm.

(R4, tab 61) BCE's Heiberg responded:

> I hope I am not the only one that is uncomfortable with what is transpiring here but it seems like there is no end to the liberties they are planning [to] take with the RFP.
>
> ....
>
> Dale Brighams' request that the Lonworks controllers being furnished for the project be the Honeywell XL10 and XL15 controllers seemed like a minor request in light of the elimination of the central boiler and chilled water system. Based on the [Botting] and Automated BCS letters, it appears they intend to use another Lonworks certified product instead. Related to this also, is the use of Non-Lon based controllers such as the AHU and UNT controllers. They typically use the Johnson "N2" bus over which they communicate with the DX9100. It appears that they are creatively navigating through the specs by putting a complicated DDC network configuration together. This is worrisome and may result in certain capabilities being lost in the shuffle. Features like being able to download a new program to a controller from Dale's workstation resulting in having to send a tech to the site with a laptop to reprogram a piece of equipment. Dale will probably want WAB to submit a network riser diagram and component data sheets on network equipment before being allowed to continue.
>
> Technically speaking: The Johnson Controls NAE web controller, in my opinion, is not equal to the Tridium JACE controller connected to a workstation running Tridium Niagra We[b] Supervisor and Workplace Pro. In fact, the way I read the RFP, this is a proprietary specification. The words ["] or equal" do not exist in this spec section.
>
> The 14 FEB letter from Automated goes on to explain future capability of being connected to the network and post system when according the RFP, it is a requirement of the project. The capabilities of the Tridium Niagra Web

Supervisor supports the feature of downloading new DDC programs to an individual controller, using the WEB.

To not provide this exact system and features constitutes non-conformance with the RFP.

The substitution of the Onity system with the Johnson MRC system raises several concerns. Is it really equal? Will integration of both the old and new buildings into one front end systems [sic] be possible? There is just not enough information on Johnson's solution for the hospitality industry. I think you are on the right path in having someone look into a detailed comparison of the two systems. I have my doubts that there is a true equal to the Onity system. In the following excerpt taken from the RFP, it is essentially a proprietary system specification as the contractor must "connect all new room thermostats and Bldg 2111 thermostat system to the relocated InnPulse Server, update software system as required." This is a performance specification that requires uniformity between the two building control systems that can only be provided with a proprietary Onity solution.

(R4, tab 62)  John Patterson (ORB) responded:

Just spoke to Tod Smith of ONITY...and he attempted to clarify his system to me.
The short version is that the Johnson MRC digital thermostats proposed will not work with the ONITY InnPulse system. ONITY builds all their own hubs, etc. From my limited understanding their system runs on an RS45 protocol (Sensorstat DDC2) and the Johnson MRC stats require a LonWorks BACNET protocol to communicate. The ONITY system is proprietary. The new room controllers to be provided under the Contract must talk to the ONITY system which is to be relocated from 2111 to the new front desk, we can't have two systems. There does not appear to be an "or equal" to the required t[hermo]stat.
The RFP language is pretty specific as to what the room control system must do, the Contractor needs to comply with the RFP.

(R4, tab 63) Botting's Burrus testified that no one at Botting did an independent review of Automated Controls' proposed DDC submission; they trusted that Automated Controls was proposing a system compliant with the RFP (tr. 4/45-51).

132. On 24 February 2005 COR Dyer sent the following email to SBN's Henrickson and Montoya, with a copy to CO Bartholomew:

> Ron [Montoya], I (we) need your help to find out what's going on with your subcontractor, WA Botting. It is quite simple. Either you provide us the mechanical controls described in the RFP, or not. It is NOT a negotiable item. **Bart and I have gone to the mat with DPW to allow the use of Botting's packaged HVAC units. The conditions we were given to allow that are satisfied, except for the controls issue.** I don't seem to understand why the reluctance on this?? If you think another meeting with DPW is in the cards, you're mistaken. [SBN] has been directed to start work anew, and from all reports, nothing has happened except for some coordination to relocate the gas and comm[unication] line. Your credibility is (to use Mr. Bartholomew's word) in the crapper. I could use a few other choice words…you're making yourself known at the Base in a most negative way! We are going to have an uphill struggle to transfer this project to them at the end!! I'm tired of Hard. Let's get beyond the controls issue, establish a date to receive the 95% design, and please get busy constructing the building!

(R4, tab 64) (Emphasis added)

133. On 24 February 2005 SBN's Roberts prepared a summary report on a variety of issues. With respect to alleged differing site conditions, he reported:

> 1. **Electrical Primary Interconnect, Phase 1**: Fort Lewis DPW elected to do this work, as well as the work listed for item number 11. They started working on it on 9 February 2005 and look like they are going to finish the work today. [SBN] received direction from CFSC (Bartholomew) on 2/11/05 for the performance of this work. [SBN] coordinated the work with DPW, and provided layout and other miscellaneous services to DPW. There are no additional costs to the Owner for [SBN's part in this issue,

131

however, *CFSC still needs to provide [SBN] a change order for this item*.

2. **Phone Cable Reroute:** On 2/11/05, CFSC (Bartholomew) provided [SBN] direction to proceed with this work for a not to exceed price of $12,694.26. [SBN] immediately ordered Cannon Construction to order the material and schedule the work. [SBN] has issued a subcontract to Cannon, the material is tentatively scheduled to arrive on site Monday, 28 February 2005. Cannon is obtaining their digging permit today, and the work will begin as soon as the material arrives. The work will take approximately 5 days to complete. *CFSC needs to provide [SBN] a change order for this item.*

....

4. **Gas Line Reroute:** On 2/11/05, CFSC (Bartholomew) provided [SBN] direction to proceed with this work for a not to exceed price of $23,793.00. [SBN] immediately contacted Pilchuck Mechanical, the Gas Company's Contractor and ordered the work. [SBN] has issued a subcontract to Pilchuck, and Pilchuck is in the process of preparing design drawings for their crew, and for obtaining their digging permit. Pilchuck anticipates starting the work next week or the following week. The work will take four to five days to complete. *CFSC needs to provide [SBN] a change order for this item.*

5. **DOIM Duct/Vault/Site Grading Changes:** Revised pricing for this change was submitted on 2/08/05, for $121,447.49. These costs are for the actual performance of the earthwork and storm utility work that was changed by the civil engineer to solve the problem of the location and elevation of the DOIM ducts and vault. On 2/11/05 CFSC (Bartholomew) provided instructions that all other changes, (presumably those not covered under items 1 through 4, above), were under review and that other directives and change agreements would be under separate cover. *At this time, there has been no directive or change agreement issued by CFSC authorizing this changed work to proceed.*

6. **RFI #1 DOIM Line Bridges @ Grid 13:** Revised pricing for this change was submitted on 2/08/05, for $17,597.00. These costs are for the additional work required to bridge the DOIM ducts that pass under four column footings at gridline 13, that the Contractor could not have know[n] of when designing the building. On 2/11/05 CFSC (Bartholomew) provided instructions that all other changes, (presumably those not covered under items 1 through 4, above), were under review and that other directives and change agreements would be under separate cover. *At this time, there has been no directive or change agreement issued by CFSC authorizing this changed work to proceed.*

....

11. **Electrical Primary Interconnect, Phase 2:** Fort Lewis DPW elected to do this work, as well as the work listed for item number 1. They started working on it on 9 February 2005 and look like they are going to finish the work today. [SBN] received direction from CFSC (Bartholomew) on 2/11/05 for the performance of this work. [SBN] coordinated the work with DPW, and provided layout and other miscellaneous services to DPW. There are no additional costs to the Owner for [SBN's part in this issue, however, *CFSC still needs to provide [SBN] a change order for this item*.

12. **General Contractor's Time Extension for the Time to Perform the Differing Site Conditions Corrective Work:** Pricing for this change was submitted on 1/26/05, and resubmitted on 2/08/05, for $66,850.00. These costs address only [SBN]'s extended general conditions costs for an estimated 28 calendar days for the time estimated to perform the additional work necessitated by the differing site conditions changes. As is the case with the CQCC, which we discussed under item 8 9above0, due to the fact that a small part of the changed work was authorized, but that a large part of it has not been authorized, it is likely that 28 days are no longer enough to cover the additional time required for the Contractor's General Conditions, and this item will need to be increased. On 2/11/05 CFSC (Bartholomew) provided instructions that all other

changes, (presumably those not covered under items 1 through 4, above), were under review and that other directives and change agreements would be under separate cover. *At this time, there has been no directive or change agreement issued by CFSC authorizing payment for this change.*

With respect to the HVAC/mechanical system and DDC design, he reported:

On 2/11/05, CFSC (Bartholomew) advised that once a response was received from W.A. Botting to a controls question and to a AAON equipment installation location question, he would be prepared to accept the proposed systems at no additional costs.... Due to all of the additional work that CFSC had required [SBN] and its designers to do to change to the boiler/chiller upgrade, it was not possible to provide the [AAON] system at no additional cost, since the additional costs [in the $100,000.00 range] had already been incurred.

On 2/16/05, W.A. Botting's response to the two remaining questions regarding the mechanical system was forwarded to CFSC from [SBN]. That information was forwarded to DPW by Drew Dyer on 2/17/05 with a comment that once [CFSC] receives DPW's concurrence, [CFSC] will modify [SBN]'s contract allowing installation of the AAON equipment. The comments provided to Botting's controls response by ORB, DPW, and BCE, on 2/18/05, did not approve Botting's controls system, and [CFSC] has not notified [SBN] that the AAON equipment is to be installed. Since the controls system is a separate system from the AAON equipment, the AAON equipment could be approved immediately, while clarification of the controls system is being provided. It makes no difference to the controls system whether the mechanical equipment is boiler/chiller or DX-AAON units. Selection of the mechanical system needs to be made as soon as possible so the design work can proceed.

On 2/23/05, Botting agreed that the controls system they were proposing had been selected by approaching the RFP as a performance specification, (based on project budget issues), not a proprietary one. **Botting understands what**

134

**the RFP is calling for, and they will provide it, if they have to.** They would like to present their case for an alternate system, and **if** after they are given a fair hearing by DPW, **the Tridium JACE and Onity system are determined to be the only acceptable system, Botting will provide it.** That being said, [SBN] still needs direction from [CFSC] on which mechanical system the project is going to go with.

(R4, tab 1076)

134. On 25 February 2005 CO Bartholomew and SBN's Montoya discussed what the CO characterized as "Bill Roberts…continues to be the communication problem" (R4, tab 1077). After the call, Montoya sent the following email to the CO (with a copy to COR Dyer, SBN's Henrickson and ORB's Monson):

> I appreciate the insight you have given me on the project. As we discussed, we believe it would be in our best interest if I became your main point of contact. As I said earlier, I might not have an immediate answer for you but I will gather the information and provide same as best and as timely as I can.
>
> We agree that we need to resolve these items once and for all so we can move forward with construction and not continue to "carry this baggage" any longer. The process you described with regards to the handling of these items also seems reasonable. Therefore, we will prepare a summary of the items under separate cover and address how they will be resolved…. We understand that the information we provided previously was merely an estimate and that CFSC would prefer to reimburse us for the actual costs incurred. We will prepare the information in such a manner that will facilitate a CO[43] being issued to us, which will allow us to authorize our designers/subcontractors to commence with the Work immediately.

(R4, tab 1078)

---

[43] We understand this, in this instance, to be an acronym for "change order."

135. On 2 March 2005 COR Dyer provided the following information to CO Bartholomew:

Here's what I can address from the March 1 telephone conversation with Mr. Montoya:

1. Mr. Montoya affirmed that the HVAC mechanical equipment controls will comply with the RFP and be compatible with the Ft. Lewis DPW computer and interface programs. This was the last condition yet to be satisfied by [SBN] and their mechanical subcontractor for the AAON packaged mechanical equipment. Therefore, all 8 conditions imposed by DPW to gain their approval of [SBN]'s approach to heating and cooling the common spaces has been satisfied. Pls. direct [SBN] to move forward on the now accepted mechanical design, using AAON [HVAC] equipment, manufactured exclusively for the FLW Lodge. No other manufacturer's equipment will be accepted or approved for substitution.

2. [SBN] should now direct the Architect and Engineers to prepare and deliver us a 95% design. There are no other outstanding issues (to my knowledge) precluding the 95% design moving forward post haste. Pls. have [SBN] provide me a proposed submittal date for planning purposes.

3. [SBN] is delinquent of initiating any site work associated with their electrical work and the redesign work necessitated because of the telecommunications duct banks. I hereby ask you once again direct [SBN] to man the site and get busy on their underground electrical, work associated with the redesign of the parking lot, porte cochere, drainage, etc., and laying out the work for foundation excavations (the foundations were released with the limited NTP, effective 25 October, 2004).... All site work shall commence in earnest as I thought we had done with your previous directive (effective 14 February). Since [SBN] has trouble with using email for contract direction, I suppose a "hard" modification is in order. Pls. include in the mod a negotiated settlement for the design effort already expended to leave the DOIM duct banks in

136

place. I want to pay for those services rendered. In my view, the +$15k for that task is not unreasonable.

Ron and I agreed to begin the effort of resolving the delay and contract time issues soon. I will be coordinating a West coast visit with you and Ron in an effort to get this accomplished. The black cloud over this project has got to be removed; reaching a settlement on the delay and time extension will (I believe) remove most of the cloud.

(R4, tab 66)

136. On 2 March 2005 SBN's Project Manager Roberts' base pass was rescinded (R4, tab 169 at 3269-70; tr. 2/160, 3/151-52, 8/88, 9/98-101, 134-36, 11/21-23).

It was totally out of the blue actually. Cindy Moinette from the hotel and Bob Monson came over to our trailer, and this was on the 1st of March. And Cindy explained that she had gotten a call or an email or something from Drew Dyer telling her to go pull my pass and have me get off the base.... Tom Zeman and Tim Hanson were there.

....

I told her and Monson that I wouldn't turn over anything until I had an opportunity to talk to my office.... Well, I talked to my office and the next day Cindy came over and said that Dyer was apoplectic about the whole thing and was going to call the MPs and have me arrested and escorted off the base. She was pretty upset, so I just gave her my pass.

....

[After they took the badge] I met with my team, Tim Hanson and Tom Zeman and I would meet almost every other day for coffee in the morning in a restaurant off base. And just talk about what we were going to do that day.
And subcontractor meetings that we had previously had onsite, Botting had an office with a meeting room in

137

downtown Tacoma that they let us use. So we would have subcontractor meetings there.

[SBN] had another project at Tacoma Community College and they had a meeting room so we could have meetings there. But it became just too cumbersome.

I mean we actually had to have subcontractors from the project, off the project half an hour away to have meetings and go back. And it just kind [of] watered down everything. So pretty much, it was pretty unworkable so I found another job...[in] mid-May....

(Tr. 2/166-69) SBN's Roberts and Montoya both testified that they have never gotten an explanation from CFSC as to why Roberts' badge was rescinded (tr. 2/168, 171-72, 3/154, 155, 158). Ms. Moinette also testified that COR Dyer never gave her a reason for taking Mr. Roberts' base pass (tr. 12/27, 42). Upon an invitation from Judge Dickinson to expand on this subject, Montoya testified that:

The only thing that I could discern from my observation of the interaction between the two, is that there was a very strong personality conflict[] between the two, and I don't know, it was two personalities that they couldn't get to mesh.

[Roberts] didn't really have many issues with other people, but he did rub [Dyer] the wrong way, but I didn't know what the hot buttons were of [Dyer], that [Roberts] was hitting.

I couldn't see them, but I knew [Dyer] would always get upset, and on occasion, [Dyer] would get upset with me, personally, as well, very upset, and to the point where he would raise his voice and argue with me, but I didn't argue back.

Once he realized I wouldn't engage, he would apologize to me, and his voice would calm down and we could continue on with the discussion, and I would just let him vent.

So, I don't know if I knew how to manage his personality a little bit different, but even what I said at a point sometimes, pushed his buttons, but I guess because of the way I dealt with him, and did not get excited about his disposition, I guess that seemed to be the way to manage [Dyer].

138

Q [Judge Dickinson]: So, I understand you to say that the issues that you were aware of, you viewed as personality conflict and not anything more that you could point to, specific situation or something?

A: I didn't see anything where [Roberts] had done anything to antagonize the relationship, in any manner, where he produced anything that was antagonistic or made accusations to [Dyer] or anything like that.

But there always seemed to be tension between the two. A lot of times, even when [Dyer] would first enter a room with us, and even just being myself, there always seemed to be tension, and I don't know what brought that on, that tension.

Eventually, I learned how to deal with [Dyer] and could try to get him to calm down, and I think he got more comfortable with me, that I was wanting to listen, to see what he was saying, and that he would approach me a little bit, more relaxed, but if I said, and I couldn't tell you what the trigger word was, but if I said something at certain times, he would go off on the deep end and get upset and start yelling and arguing and I'd just let him vent it out and then, pull the phone away from my ear a little bit, and then when he got calmed down, I said, "All right, are you read[y] to get back to the conversation," and more often than not, he would apologize for his outburst and say, "Yes, let's talk about it.["]

(Tr. 3/158-60; *see also* tr. 3/171-73) COR Dyer testified:

Q: What did you hope to achieve with Mr. Roberts being removed from the project?

A: I wanted personally, to achieve a more favorable working relation environment so that we could get the project done on time and with quality, and preferably within our budgetary range. That was my goal.

Q: And did that occur?

. . . .

139

A: It,… wound up not occurring. But the folks who came in after Mr. Roberts' departure were more inclined to understand the design-build process and became very focused and worked things the right way.

Mr. [LaSharr] came in, was a very determined individual, to try to set the course, chart the course a different direction. But we certainly didn't meet our schedule. The budget, I think we got real close to the top end of the contingency and, but I think it was a more positive step than have to deal with Mr. Roberts for the balance.

(Tr. 8/88-89)

137. On 8 March 2005 CO Bartholomew provided the following direction by email:

The 95 percent design shall be completed with all due haste. All issues shall be coordinated directly with [COR] Dyer.

. . . .

Proceed with all redesigned site work. Costs will be negotiated or reimbursed based on actual costs.

The mechanical system proposed and accepted at no additional costs shall be used in construction.

Proceed with all appropriate construction. This is a blanket directive.

No changes have been denied – only costs and entitlements requested deferred until we can meet face-to-face.

Coordinate all work with Bob Monson on site and communicate everything with [COR] Dyer.

I did not intend to leave anything out of this directive. Proceed post haste and let's get this new Army Lodge built as a Team!

(R4, tab 169 at 3512)

138. On 10 March 2005 SBN's Roberts advised COR Dyer and CO Bartholomew that the telephone line reroute work would require additional time and cost because it was discovered that it was not direct-buried but encased in steel pipe (R4, tab 357).

139. In emails dated 9-10 March 2005 COR Dyer advised SBN's Montoya that he did not recognize Roberts as SBN's Project Manager (R4, tab 169 at 3272, tabs 357, 1079-80; tr. 3/155-58, 10/117-19). There is no evidence that SBN objected or otherwise challenged CFSC, in writing or otherwise, on the subject of rescinding its Project Manager's base pass (tr. 1/111-12, 212-14). ORB's Monson, CFSC's on-site representative (finding 6) testified that he did not notice any difference in SBN's work on the project as a result of Roberts absence because work at the jobsite was not that far along and there wasn't much work to be impacted (tr. 11/23, 28-29, 80-81). Nevertheless, SBN now claims that the removal of Roberts from the jobsite had a "[t]remendous impact on SBN:

> [W]e lost all that history. We had moral[e] issues. Our subcontractors all of a sudden, they get very upset when you change person[nel] in the middle of a job. Especially a job that's got a few pending issues like this one. Our superintendent ended up quitting over this [*see,* finding 157]. So it was a tremendous impact to the company, to the project.

> [On a normal project, it would typically take] [t]hree or four months minimum [to get a new project manager and new superintendent up and running. And this] was not [a normal project].

(Tr. 1/113; *see also* tr. 1/215-16, 220-21, 239)

140. As of 17 March 2005 SBN's architect expressed concern about the status of the mechanical system to be used in the 95% design submission (R4, tab 362 at 11250). SBN's Roberts replied that:

> The mechanical redesign is still a question mark, as [Botting has] not committed to a date, and their proposal to change the make up air system [*see,* finding 145] could slow up structural and/or architectural design, along with the mechanical design.

(R4, tab 362 at 11249; *see also* R4, tab 71 at 2577-78, tabs 363, 365-66)

141

141. On 21 March 2005 after being informed by ORB's Patterson that SBN's Roberts was at the jobsite that day (R4, tabs 1082-83; tr. 10/120-21), CO Bartholomew informed Patterson and COR Dyer by email that:

> I will send an e-mail to appropriate authorities that identifies Mr. Roberts as an objectionable employee and possible security threat to Ft. Lewis and seek to have him denied access. He can appeal and I will be happy to respond to the Garrison and/or Corps Commander. They will have to take responsibility for him if he is subsequently allowed access to the installation.

(R4, tabs 368, 1083-84; tr. 9/90-92; *see also* tr. 10/123-27) COR Dyer responded, with copies to Monson, Patterson, Cindy Moinette and DPW's Stedman:

> I have informed [CO Bartholomew] of Mr. Roberts' blatant disregard of his disbarment from the Installation of Ft. Lewis. He and the person who allowed him access today are in big trouble. How he got on the jobsite today is beyond me. Anyway, if he shows up again, pls. summon the military police discreetly and explain that an objectionable person who is a security threat has been seen on site and must be immediately escorted off the premises. I am not going to put up with this, nor should anyone associated with the project.

(R4, tabs 369, 1084; tr. 9/91-94, 98-100) When referred to contract clause I-35 (finding 26), COR Dyer testified that:

> I believe that Mr. Roberts did not fulfill sentence number one, experienced, responsive and capable.
>
> Q: And Mr. Roberts was never provided any reason in writing whatsoever that he was inexperienced, irresponsible or incapable of performing the project. Isn't that correct?
>
> A: I do not know. I am not the contracting officer.
>
> Q: Okay. And you testified a moment ago that you didn't believe and didn't agree with [CO]

142

Bartholomew's characterization of Mr. Roberts as being a national security threat, correct?

A:     I do not believe he was a security threat, no.

(Tr. 9/97-98; *see also* tr. 9/134-36)

142.   On 22 March 2005 Ms. Moinette expressed concern to Steve Coulson, Chief of Army Lodging Operations:

> I am very concerned about the issues we have with [SBN] and moving forward with the new lodge. I do not want this project cancelled / Ft Lewis Soldiers and families need the additional lodging. This is the focus we all should be working to achieve. Mr. Roberts, Project Manager for [SBN] has caused many delays and problems with the project. Drew wants him off the job and is supported by Bart. [SBN] need[s] to make this happen. I have pulled Bill Robert[s]'s pass and auto sticker and he still managed to get on post and the job site yesterday. I feel Bill should respect Drew's action of having his pass pulled until the meeting scheduled 18 Mar with Bart, Drew and [SBN]. Hopefully some decisions will be made and finalized. I do not believe Bill Roberts is a security risk / but he has certainly caused problems for Drew and the project moving forward.

(R4, tabs 370, 1085)  Coulson responded:

> The [SBN] [REA] meeting that was scheduled for next week is contractual negotiation that has no bearing on the work which was directed to begin on 14 Feb 05; if you're not seeing significant evidence of site clearing, survey stakes, excavation and utilities re-route, please inform Drew ASAP. Our Contracting Officer, Bart, requested postponement of the [REA] review meeting due to both personal and professional obligations that must be addressed 28-31 March. I'm anticipating receipt of the 95% design NLT 1 April and would expect a side bar for contract resolution during an on-site review sometime the week of 25 April 05. The Project Manager personnel issue

143

was resolved in Jan 05; however, it appears as though Bart
needs to issue a written directive.

(*Id.*)

143. As of 22 March 2005 the gas line subcontractor advised that it was still waiting for a digging permit from Fort Lewis (R4, tab 367).

144. On 25 March 2005 ORB's Monson forwarded the following information to Dyer, Patterson, Bartholomew, Stedman and Moinette:

> Drew…as you requested of me I talked to Gary Stedman whom in turn talked to a Larry Freeman, Head of Physical Security Fort Lewis, yesterday; and this is what Mr. Freeman told Gary:
>
> An individual having access to Fort Lewis can only be barred entry due to the committment [sic] of a crime or other violation. (I nor Gary know what "other violation" entails.) According to Mr. Freeman, the original sponsor (Cindy) [Moinette] can remove or take possession of an individual's ID pass card and vehicle sticker so he cannot obtain entry. If he gets another pass through other temporary means then the original sponsor can have the MP's come and take his ID and vehicle passes again and escort him off the base.… According to Mr. Freeman, the "list of undesirables" at the main gate guard house is for those individuals that have committed a crime or "other violation".

(R4, tabs 372, 1095; tr. 9/101-03)

145. On 30 March 2005 SBN "showed up with…a proposal for 'trickle vents' rather than tempered forced air ventilation" (R4, tabs 69-70, 1088).[44] Botting represented to SBN that the trickle vent system met both code requirements and RFP requirements (R4, tab 70 at 2573, tab 1092). Botting's Burns testified that the trickle vents were proposed with "the intent…to simplify the system…, eliminating a couple of fan systems and all the duct work that had to compete for space going down the corridors" (tr. 3/97-98; *see also* tr. 4/13, 37-39, 52-54, 68, 7/258-60). SBN's Montoya

---

[44] SBN had already expressed its belief several weeks earlier that this proposal could further delay "structural and/or architectural design, along with the mechanical design" (finding 140).

144

forwarded the proposal, requesting that it be approved so it could be included in SBN's 95% design submission (R4, tab 70 at 2572, tab 1092; *see also* R4, tab 375; tr. 3/175-80, 5/126-27). The ORB/BCE team provided same-day input to COR Dyer, the bottom-line of which was that, while the trickle vents may meet code requirements, they did not meet the RFP requirements to provide "forced, tempered makeup air" as well as positive pressure ("overpressure") makeup air in the guest rooms which was considered important (R4, tabs 69, 1088).

146. On 6 April 2005 Jensen/Fey notified ORB's Monson that it had requested layout information for electrical, interior equipment and furnishings from CFSC in November 2004 and, to date, had not received the information which was essential to ordering long lead time items (R4, tabs 1096-97). Monson followed up with CFSC on 13 May 2005 (R4, tab 1108).

147. SBN's proposal to use a trickle vent system was rejected on 7 April 2005:

> Your idea was reviewed by ORB and Ft. Lewis [DPW]. Both groups came up with basically the same comments. The simple vent does not provide what is specified in the RFP, that a constant volume of air is introduced to the guest rooms creating a positive pressure. Other reasons include:
>
> a.      Concern about moisture being introduced into the room through the vent and wall structure. Could cause conditions to promote mold growth.
> b.      In the winter, the vent will present an avenue for the introduction of cold air directly into the room, making it uncomfortable for occupants.
> c.      Concern about wind and traffic noise introduced into the rooms. Also, the amount of fresh air introduced will vary during high or gusty winds.
> d.      While the idea does meet code, we think it is a cheaper solution. If you really wanted to sell the solution, an equitable credit should be offered. Depending upon the amount of the credit, we could then go about solving the perceptions of the above potential issues.
>
> Any overtures to discuss this further shall be directed to me.

(R4, tab 70 at 2574, tab 379; tr. 3/180-82, 4/14-15, 41-45, 5/127-28, 9/177-78) SBN's Montoya agreed on cross-examination that a trickle vent system "is not a central

145

ventilation system" (tr. 3/252). SBN's expert witness, Mr. Kommers, agreed (tr. 3/23-245, 27-29, 63, 65-70).

148. On 13 April 2005 Botting advised that, without the trickle vents it had proposed, the HVAC system did not meet the required DoD Antiterrorism standards and further:

> We will continue to move forward with the trickle vent concept as it would be irresponsible to proceed in any other manner. As previously stated, we have an obligation to provide a mechanical design that complies with the DoD standards that are intended to keep the occupants safe from terrorist activities.

(R4, tabs 389, 1090; tr. 4/15-18)

149. Items of note discussed at the 13 April 2005 Progress Meeting #7 were:

**Old Business**

....

1-03. **Existing Telephone Lines: 4/13/05** / This work has been completed, as directed by CFSC. It is noted that it was necessary to work an overtime night shift in order to complete this work due to an additional unforeseen condition associated with the existing telephone line. Upon excavation of the existing line, it was discovered that the line was not direct bury cable, but instead was encased in steel pipe. This changes the scope of work, as it will now involves [sic] a cable changeover after hours (at night). This work involves cutting the pipe, removing it and disposing it. Upon discovery of this unforeseen condition, SB[N] notified CFSC about the additional work. They were notified that the costs associated with the work would be $2,200. In a good faith effort to get the work finished, SB[N] proceeded with the added scope. SB[N] expects full compensation for the additional costs ($2,200 in addition to the previously submitted amount of $12,700). SB[N] still awaits a change order from CFSC for this work....

146

1-04. **Primary Electrical Duct Location:** **4/13/05** / The primary electrical relocation has been completed. This item will be removed from the notes....

1-05. **Existing Unmarked Gas Line Relocation:** **4/13/05** / This work has been completed, as directed by CFSC. SB[N] still awaits a change order for this work....

1-06. **Existing Communication Ducts:** **4/13/05** / SB[N] still awaits a change order for this work. It is noted that some of this work has proceeded (i.e. work associated with RFI #1 for duct bridging) and SB[N] expects full compensation for the added work.... **The CFSC position of this request is that is non-compensable.**

1-09. **Schedule Update:** **4/13/05** / The current overall schedule update, as well as the 4-week look-ahead schedules were distributed for review and discussion. It was discussed that the Substantial Completion date on the current schedule update is May 4, 2006. It was also discussed that all of the schedule impacts are being tracked on the schedule. It was noted that there will be impacts to the schedule with regards to the underground conduit/piping if the Owner does not provide the required information necessary to complete the design. Pending information has been submitted in RFI's #35 and #40. **CFSC has not made any contractual changes to reflect a revised contract completion date. Therefore no impacts are capable of being tracked. Owner has requested full-size, scaled, clean, design plans to be able to answer the questions posed on the RFI's.**

....

2-04. **Boiler/Chiller Design Change:** **4/13/05** / CFSC has indicated that the original proposed system would be used on the project. However CFSC has not acknowledged or accepted the additional costs

147

associated with the boiler/chiller design, and then the redesign back to the original system. SB[N] still awaits a change order from CFSC for this additional work. **CFSC position on this is that all costs incurred to comply with RFP are non-compensable.**

....

2-07. **95% Design Submittal: 4/13/05** / It was discussed that once the Trickle Vent System has been reviewed and accepted by CFSC, the 95% submittal date can be established. SB[N] will advise of this date when it is established. **CFSC has rejected the trickle vent system.**

....

5-01. **Resolution and Change Orders: 4/13/05** / It is SB[N]'s understanding that Drew Dyer and/or Bart Bartholemew [sic] of CFSC will be in town sometime the week of 4/25/05. At this time there will be a meeting to discuss and resolve all of the outstanding change order issues. It is noted that most change order issues have been outstanding for several months. CFSC has not even issued change orders for the items and costs they accepted and gave direction on almost three months ago. Change Orders must be issued so the appropriate parties can be paid for all of their additional efforts. **Mr. Bartholomew has the action on items he directed. He is not attending this week's progress meeting. All other outstanding changes or alleged changes will be negotiated at a yet unscheduled date.**

....

The next Progress Meeting will occur April 28, 2005....

Notes prepared by [SBN's] Tim Hanson
**CFSC comments prepared by Drew Dyer**

(R4, tab 390)

148

150. The parties continued to discuss the issue of trickle vents (R4, tabs 391, 1092; tr. 3/179-80). COR Dyer denied the use of trickle vents "once and for all" and SBN's Montoya responded that SBN planned to go forward with them in its design (R4, tabs 396, 1094). As of 19 April 2005 SBN's design was not yet complete and Botting was still asking about areas/items to discuss/redesign (R4, tabs 393-95).

151. On 22 April 2005 SBN's Roberts reported to SBN's Montoya, Hanson and Zeman that on-site subcontractors were reporting "a significant amount of overexcavation for our footings" (i.e. more than six feet deep) and that SBN should report it to CFSC as a differing site condition:

> I would do that, but the ridiculous conditions we are working under on this project because of CFSC's improper actions in regard to my pass and position, prevent me from doing what needs to be done. So, I will provide you with the information you need to start the ball. Unfortunately, this information is second and third hand, because I have not been able to personally observe the conditions, determine the quantities involved, or discuss the issues first hand with the majority of the participants.
>
> ....
>
> Fortunately, for both [SBN] and the Owner, depending on who pays for it, the geotechnical engineer has determined that the existing unsuitable material that has to be overexcavated, is only unsuitable because it is loose, so that same material can be placed back in the overexcavated footings and compacted to 95% density. This reduces the need for imported structural fill.
>
> ....
>
> We are encountering buried piping that was not shown on the information furnished us by the Owner or marked by locates done for the digging permits, and that the trench lines that those pipes were buried in are filled with unsuitable material that we have to, at a minimum, remove and either replace or recompact to achieve suitable density

for bearing. That too, is a differing site condition that should be held to the Owner's account.

(R4, tab 169 at 3766-67, tabs 397-99, 1093)

152. On 23 April 2005 both CO Bartholomew and COR Dyer advised SBN that its Quality Control Management program managed by Jensen/Fey was not being implemented as required by the contract (R4, tab 1098).

153. On 25 April 2005 ORB's Monson provided input to CFSC for a response to SBN about over-excavation:

> Disagree with the term "significant" and "...most of the excavations...." One has to look at the overall project to be able to define the extent of "over excavations". At the date of this RFI [#42 (22 April 2005)] it is true the Division One contractor is experiencing excavations below the 6 foot line along Grid lines Q and R from column line 24 to approximately 14. It is expected that this will hold to be true along the entire[ty] of Grids Q and R.
>
> "Over excavations" must be evaluated on the basis of all footing excavations, when completed, for this project.

(R4, tab 1099)

154. As of 27 April 2005, SBN was aware that Botting's last-minute proposal to use trickle vents was holding up completion of the 95% design submittal:

> I have now seen three written rejections from Drew Dyer of the trickle vent system, and nothing from Botting for us to relay to Drew, that offers the credit he has requested. I'm not sure that Botting understands that until it is determined which way we are going, i.e., trickle vent, or ducted make up air, we cannot complete our 95% design submittal. This is the only item that we need resolution on to release everyone on the design, and we cannot release them without this decision. **The trickle vent decision affects the building footprint at all four floors and the roof. It affects the electrical design, and the fire sprinkler piping. It affects partition types and chase locations on all four floors.** No one can make the changes to the drawings that are necessary to accomodate [sic] the

150

trickel [sic] vent, until we know which system we are using. **It is the single largest issue on the project, and has been for a month now. [Botting's] Burrus will not return my calls or my emails**. We have written direction from the Owenr [sic] to provide the gas pack system we originally proposed, with ducted make up air to the guest rooms. If you can't get Burrus to respond with a credit so we can get approval from Drew for the trickle vent, then we are going to have to tell all the designers to proceed to 95% with the original system. **The issuance of the 95% submittal is critical to getting this job bought out, and to preventing it from stopping because we don't have the subs and materials to continue the work beyond the structural phase**.

(R4, tabs 403, 1094) (Emphasis added) Botting did not believe a credit was warranted (R4, tab 404), and on 29 April 2005, Botting again expressed its intention to include the trickle vent design in the 95% design submission despite the express disapproval of it by COR Dyer (R4, tab 405):

> Ron Montoya is working behind the scenes with Bart and Drew to get them to accept a credit and the trickle vent concept. I am somewhat hopeful that there will not be another resubmission of the design. If the Trickle vent is rejected, there will be an REA submitted to capture our additional costs as well as other members of the design team.

(R4, tab 406)

155. SBN's Roberts prepared a Project Progress Report dated 2 May 2005 that included the following information pertinent to the matters before us. SBN's project staff and the percentage of time each was assigned by SBN to the project was listed as:

| Project Manager: | Bill Roberts | 100 Off Site |
|---|---|---|
| Superintendent: | Tom Zeman | 100 |
| Asst. Project Mgrs: | Tim Hanson | 50 |

Is staff adequate for this project? .... No    If no, explain:

The staff would probably be adequate if we had all of the staff working full time on this project, and working together. Presently, we still have Tim Hanson, the

> Assistant Project Manager, working part time on this
> project, and part time on his previous project. He is needed
> full time on this project. We also have the team split up
> because the Project Manager has illegally been denied
> access to the base, and that problem has not been rectified.

(R4, tab 409 at 21498-99, tab 1103 at 21498-99) Under the heading of Construction the following Challenges were listed:

> This is a design/build hotel for the U.S. Army on Fort
> Lewis Army Post, Fort Lewis, Pierce County, Washington.
> It is a 100,100 square foot, four story building, that will be
> constructed on a 6.19 acre site, on the fort. The building
> footprint is approximately 29,600 square feet. There are
> 185 guest rooms in the building, with a front
> desk/lobby/breakfast area on the first floor, housekeeping,
> laundry, and administrative office support areas included.
> Site development includes 110 parking spaces, covered
> entry walks, storm water detention systems and
> landscaping. The exterior of the building is a mixture of
> CMU, brick veneer and stucco, with windows in every
> room and a storefront entry and breakfast area. The roof is
> a red standing seam metal roof that matches the other roof
> structures in the vicinity.
>
> ....
>
> Ran into some over excavation issues due to encountering
> a certain amount of unsuitable existing soils. The over
> excavation is impacting the schedule by a few days. Will
> have to try to gain it back, as we were into the delay before
> we realized it, and then it was over before we could try to
> counter it with additional equipment. The unsuitable soil is
> a condition that the documents warned could be
> encountered with the exception of areas where we
> encountered buried debris, and trash. Those areas represent
> areas that will require a change order from the Owner for
> additional excavation, removal, disposal and replacement
> with suitable material, however, they are not significant,
> from what I have been told.
>
> ....

152

The architect is still preparing the 95% design for this work at this time. The design process has been agonizingly slow, as the architect does not appear to be the caliber that is needed to do this level of design work. This process should finally be completed in the next couple of weeks.

....

The Electrical primary site work is complete, a temporary transformer is being energized, and the electrical underground work is underway. The missing information from the Owner has impacted underground electrical work the most, but the electrician is roughing in according to his best guess, and that will have to be sufficient.

....

The Owner directed us to proceed with the installation of the mechanical system that was originally proposed by our mechanical design/build partner. Our mechanical partner has proposed one variation to the original system, a trickle vent outside air system for the guest rooms. The Owner has rejected that proposal in writing three times now, however, mechanical insists that it complies with the RFP and that the original system it proposed, and the Army insists on having, does not. The largest issue here does not seem to be the functionality of the trickle vent system, as much as the amount of credit that will be offered to provide it. [SBN] has directed all of the design team to proceed to the 95% design submittal, utilizing the trickle vent system, and be ready to submit the design by 19 May 2005, at the latest. Due to the fact that the building construction is progressing, if the Owner rejects the 95% submittal because of the trickle vent system, it will be too late to revert to the original ducted system without suffering severe cost and schedule problems.

....

Construction re-started on the 28th of March 2005. To date, no change orders have been received for the additional costs, delays and impacts for the delay, differing site conditions, and additional design due to the mechanical

system issues. The work that has been re-started is only the work that we were to proceed with previously under the [LNTP] issued 25 October 2004. The total REA for all of these issues is $1,288,211.00, and includes 152 calendar days of time extension. The Owner was scheduled to review and negotiate the many issues that make up this REA at the end of March, and then at the end of April, but has not done so yet. The idea of traveling back to Virginia to meet with the Owner to negotiate the REA is being considered, for the third week in May.

The Owner has still not reinstated the project manager's pass, and the combination of no change orders from the Owner, showing good faith on its part, and no backing from [SBN's] management to support its project manager has created a morale problem on the job. The subs and staff are concerned that if [SBN] will not support its project manager, that it won't support them if and when they need it either. It is an extreme hardship to try to manage a project that you are not allowed to visit, more [sic] less work on.

(R4, tab 409 at 21497-98, tab 1103 at 21497-98) On the subject of "potential cost and/or schedule impact issues" SBN reported:

We have a problem here. Up to the first of March, the Owner had been notified of all potential cost and or schedule impact issues, however, on 1 March the Owner decided to shoot the messenger and took our project manager's pass to get on site away. We heard it was because our project manager asked the Owner a question about when we would receive direction regarding the mechanical system issue. This creates a concern that providing the Owner notification of changes and impacts may cause additional retribution on the Owner's part. Part of the Owner's action in taking our P.M.'s pass was to threaten to have the Military Police escort our P.M. off base, and to take all of our team's passes if our P.M. did not surrender his. The team is now concerned that providing contractual required notices may put another [SBN] team member in jeopardy of being removed from the base. This is an untenable situation, that has now existed for the entire month of March and April, without

154

resolution. No notices were provided during the past month.

The on site Quality Control representative, who is a licensed architect employed by the project architect, is the vehicle that is presently being utilized to at least give initial notice via RFI's, of issues, as the Army has stated that the Q.C. must be the initiator of issues for them to recognize them. Unfortunately, this person has no real knowledge of contractual relationships, or notice requirements, so we have to tell him what to do from behind the scenes, which often leads to it not getting done timely, or correctly, or at all.

(R4, tab 409 at 21499-500, tab 1103 at 21499-500]; tr. 5/11-14) On the subject of "Fee" it was reported:

The project is still under design. The fee opportunities and the risks lie in the quality of the estimate, the frugality of the design and the success of the buyout. We have identified numerous budget shortfalls, and have determined that the project will lose a considerable amount of money. We are still exploring a kitchen unit substitution to plug some of the holes, even though the Owner has now rejected the substitute. In the rest of the buyout, we will be aggressive to see what opportunities we may uncover but the outlook is grim.

(R4, tab 409 at 21500, tab 1103 at 21500) It was also reported, with respect to the project schedule:

The **project is not behind schedule at this time, and there are no critical schedule issues**. We have submitted an REA for the issues and delay, and have requested a 152 calendar day time extension and the extended general conditions direct costs associated with that delay. The resolution of the mechanical system that we are to provide has delayed the completion of the 95% design submittal, which has delayed the buyout of the project significantly. This is going to cause problems with procurement of materials to build into the work. Miscellaneous metal is of particular concern at this time. The completion of the 95% design that is scheduled for just over two weeks from now,

155

will help this problem, but some impacts will result from it.

....

Is there enough General Conditions to finish the job? ....
No    If no, explain:
The general conditions provided in the estimate are not sufficient for the project. The project team has submitted an estimate of what they believe to be sufficient, which is $500,000.00 + more than is presently in the budget.

(R4, tab 409 at 21501, tab 1103 at 21501)  The following items were listed under the heading "CHALLENGES / RISKS / ISSUES / OPPORTUNITES" [sic]:

[Mechanical trickle vent outside air system] We are proceeding with the completion of the design utilizing the trickle vent system as it is purported to be superior to the previously proposed system, it complies with the RFP, and it complies with DOD force protection requirements where the previously proposed ducted system does not appear to. The Army has rejected the trickle vent system to date, however, they have not agreed to accept the responsibility for the ducted system's failure to comply with the force protection requirements of the Contract, either. We are gambling on the force protection issue, combined with the credit that the subcontractor is offering for the trickle vent to be sufficient for the Owner to ultimately accept the trickle vent. To date, the credit offer has not been sufficient for the Army to approve the trickle vent, and the Army has stated that if the 95% design is submitted with the trickle vent included, the entire submittal will be rejected. If that happens, the notice to proceed beyond the structural shell will not be issued, and the job will ultimately stop dead, waiting for a design resubmittal with different mechanical system, or some other approach, such as arbitration, to produce a solution that will cause the Army to issue the full NTP. The decision to switch to the trickle vent system as a design basis for the project, rather than propose it as a V.E.[45] issue, has now delayed the 95% design submittal

---

[45] We understand this to refer to the term "Value Engineering."

by two months, so it is imperative that the Army accept the trickle vent design.

.....

[Concrete subcontractor issues] Our concrete formwork, rebar, place and finish subcontractor has recently absorbed some serious financial setbacks on other projects, and we are concerned that his financial health may be in jeopardy. We have given him instructions on how to proceed financially, and are getting the financial controls in place with which to monitor his financial health on the project.

(R4, tab 409 at 21501-02, tab 1103 at 21501-02) Under the heading "RECENT ACCOMPLISHMENTS / MILESTONES" it was reported that:

The mechanical design continued to delay the completion of our 95% design submittal for the entire month of April. We have now concluded how the mechanical design is to proceed and the entire design team has been released to complete the design work. The 95% design is now scheduled to be completed by 19 May 2005. The completion of that design will allow us to bid out the remainder of the project, and determine what the total cost and schedule picture will be.

(R4, tab 409 at 21502, tab 1103 at 21502) In the section of the report labeled "RELATIONSHIPS" the following was reported:

OWNER:
What is the quality of the relationship with owner?
Not Good
Owner had our project manager's pass to enter the base and access the jobsite revoked. (No real explanation of this action has been received.) This is seriously impacting the project team's efficiency and productivity. Owner has not provided any change orders for additional work that they have directed us to perform, or agreed to a firm date and time to discuss and negotiate the REA issues.

ARCHITECT:
What is the quality of the relationship with architect?
Good

157

This is a design/build project so the architect in this instance is a subcontractor to us. The significant issues we have with the architect is keeping him on schedule, within the budget, and providing quality control to the design. This Architect is not sophisticated enough for projects of this size and complexity, so getting an adequate performance from him has proven to be impossible. We have examined the option of replacing him on more than one occasion, but have never been allowed to follow through with that action, which is, in all likelihood [sic], a serious mistake. [See, e.g., R4, tabs 414-15, 420-21, 423-26, 440, 482-83, 503, 593 at 5572]

CONSTRUCTION MANAGER:
What is quality of the relationship with construction manager?
The Owner is the construction manager.
The construction manager has a volatile personality. He has expelled our project manager from the base by having his base pass revoked. The construction manager has not provided any explanation for his action. This has created huge morale problems with the job team, and the subcontractors. Everyone feels they are working under a cloud with the possibility of a hammer dropping on them any time the Army's construction manager feels like it. The negative ramifications of this could be significant, and it has polarized the project. Now that the work has re-started, the absence of the project manager from the jobsite is causing considerable problems for the project due to the absence of the on site decision making ability of the P.M. This is an additional risk that is a major concern of the job team, and a number of the subcontractors. The fact that the job team and the subcontractor's [sic] have seen no action on this issue from [SBN]'s management is further deteriorating morale, and dividing the team.

PROJECT STAFF:
What is quality of the relationship with project staff?
Not Good
The staff has not heard any word from management on how the expulsion of the P.M. is going to be handled, and that it, in fact will not be tolerated. This issue has now festered for two entire months, March and April. At this

158

time, the staff feels that management is not backing them up. Management needs to address this issue, as it is seriously damaging the morale and commitment of the project team.

SUBCONTRACTORS:
What is the quality of the relationship with subcontractors?
Very Good

(R4, tab 409 at 21502-03, tab 1103 at 21502-03)

156. As of 9 May 2005 SBN's Henrickson had advised CO Bartholomew that Montoya had been promoted to Division Manager for Seattle and that Henrickson's role would be "more regional from now on but I will be keeping my hand in the contracts we have" (R4, tab 1100). CO Bartholomew replied:

Congratulations to Ron [Montoya]; however, my suggestion was that even though he had little or no design build experience, he was a good communicator, non-confrontational, and was able to grasp what was needed light years before Bill Roberts and Bill's handling of the earlier design submissions for Ft. Lewis.

(R4, tab 1100)

157. As of 20 May 2005 SBN Project Manager Roberts had resigned (R4, tab 169 at 3123). Montoya testified about the impact on the project of Roberts' resignation:

The project manager is the orchestrator of the entire project. So, he tries to keep everything functioning in harmony, which would be the subcontractors, the design team and the owner team, everything working in concert.
He typically holds the most knowledge on the project, and even no matter how much documentation you put in the project, there is still those nuances that he retains, whether it be personality styles, how to deal with certain individuals on the project team, what types of communication strategies work best with people, and also, one of the most important things, he has already built up trust with the team.
So you take that out of the project, now, everybody, not only our immediate project team, but subcontractors

159

alike, are trying to figure, okay, so, where are we going? Who is doing what, and more importantly, who is the next guy going to be coming in, and what is going to happen and what is he going to do? What is his style like? Do we know him? Do we not know him?

So, there is a lot of confusion that goes on, when a project manager leaves the project.

Q:     Did that same confusion occur...when Mr. Roberts left [SBN]'s employment?

A:     Yes, absolutely, to the point that it caused some concern with the other two team members, Tim Hanson and Tom Zeman, as well, and I did get some phone calls.

Fortunately, I had some relationships in the past, working with some of the subcontractors, so, when they understood what was going on, they would call me personally saying, you know, what is going to happen, and I said, "I'm still involved with the project. We just got to work through it."

So, I tried to smooth everything out, as best as I could, but there is other subcontractors that I had never worked with on that project, as well.

(Tr. 3/163-64; *see also* tr. 3/235-39, 244-45, 6/121-24, 209-11, 239-47) SBN's Senior Superintendent Zeman resigned effective 27 May 2005 "[due] to the recent resignation of Bill Roberts and other issues at Ft. Lewis" (R4, tab 1207 at SUPP-130; tr. 1/221, 3/164-67, 6/122-24, 240-44). By 20 July 2005 SBN's Assistant Project Manager Hanson, who had worked part time on this project, had also resigned (R4, tab 81; finding 155; tr. 3/164-67). By email dated 23 May 2005 SBN's Chris Bischoff was "tentatively" identified as SBN's new Project Manager (R4, tab 1102).

158. As of 24 May 2005, the Fund was still waiting for SBN to submit a 95% design package (R4, tab 72 at 2583). CO Bartholomew responded to questions from SBN and Jensen/Fey about the 95% design submittal:

Why are you sending this to us in pieces and why are we just getting this request? We need a concerted effort on your part. The design time under the contract has long since passed and will be impacting the construction GC's which we will not cover.

To refresh everyone's memory of the contract:

(Does not include govt review time):
35% design completion and submittal / 21 days
65% design completion and submittal / 49 days
95% design completion and submittal / 12 days!!!!!
100% design completion and submittal / 35 days

TOTAL DESIGN TIME WITHOUT GOVT REVIEW
TIME: 145 DAYS

The contract was awarded 11 May 2004 and design started
shortly thereafter. I will dig out the contract files if needed,
but let's all be sensitive to getting this thing moving.

(R4, tab 72 at 2581-82, tab 437 at 11397, tab 1104)

159. By letter dated 27 May 2005 SBN's new Project Manager Bischoff
advised COR Dyer that SBN intended to submit for review and approval a
HVAC/mechanical system design that included PTAC outside air dampers instead of
the contract-required "forced, tempered makeup air" system (finding 145):

We are confident this system will be [sic] meet the
requirements of the project and eventually will be
accepted. We will also be including this system in the 95%
design package.

(R4, tab 436)

160. On 1 June 2005 COR Dyer acknowledged receipt of "yet another change
in the mechanical system design approach" (R4, tab 72 at 2581, tab 437 at 11395, tab
1104) and advised SBN's Bischoff that:

The 95% submittal is not a point to be introducing a new
design approach. The time to discuss approaches to design
is long over.

(R4, tab 72 at 2581, tab 1104)  ORB's John Patterson also responded to SBN's
Montoya that:

At this point your 95% design should depict the
mechanical systems as approved back in February…. If
you seriously want my assistance in staffing the PTAC

damper option I need information, similar in depth to the package you brought me regarding your trickle vent idea.

It is between [SBN] and CFSC/Lodging what this does or doesn't do to your 95% schedule.

(R4, tabs 73, 438)

161. By email dated 3 June 2005, CO Bartholomew advised SBN that:

Drew just advised the 95% was to be shipped with mechanical changes. This is a CONTRACTING OFFICER DIRECTIVE: Do not distribute to any Army players or consultants. We will not review unless there is a considerable cost value to us to do so.

You are otherwise directed to correct your drawings to include the mechanical system approved with the 65%. If you need to replace W.A. Botting, or anyone else, then you should do so. Our contract shall prevail.

(R4, tab 74 at 2588, tab 1107; tr. 5/20-21) SBN's Montoya replied:

It was represented to us that a considerable cost savings would be around $100,000. We informed CFSC that we would be able to achieve that and address the other three items noted in the original response as well....

We will continue with the completion of the 95% drawings based on the foregoing that everyone we [sic] will be treated fairly. We are not asking any more from CFSC than what has been asked of us.

(R4, tab 74 at 2588) CO Bartholomew replied:

You are missing a "0" on the number that I would consider a considerable cost savings. The additional maintenance and potential for mold with 7 CFM outside air, that cannot be electronically controlled by the required control system, would eat up $100K in maintenance and extra room checks before we were much out of warranty. Cost savings to us are life cycle costs from every perspective.

162

I am the one that would ultimately determine what a considerable savings is. The back and forth with the mechanical system, the design rejections at the 35%, 65%, and now 95%, since last summer, will likely cost you over $200,000 in various costs including extra design, extended general conditions for the late delivery of the design documents, and other construction delays.

We hope to get on with this soonest and save you money that you should not be expending!

(R4, tab 74 at 2587)

162. On 8 June 2005 SBN's Montoya notified CO Bartholomew by phone of significant SBN personnel changes for this project:

Lots of changes this week at [SBN]. Keith Henrickson abruptly resigned and sold his house. There is to be a replacement for [Bischoff] as PM and there will be a new Super[intendent].

(R4, tab 75) SBN's Montoya hired Rick LaSharr as Project Manager in June 2005 and Scott Bowman as Superintendent in August 2005, with both of whom he had worked in the past (tr. 3/167-70, 4/90-97, 5/9-10). LaSharr testified that when he came on as SBN's new Project Manager, SBN's ability to "move forward with the project" was not impacted by the absence of Roberts and Zeman (tr. 4/104). On 10 June 2005 CO Bartholomew sent the following email to J. Hoopes at SBN corporate offices:

Subject: U.S. Army / Ft. Lewis, WA / 185 Room Army Lodge / Swinerton Months Behind Schedule in both Design and Construction

....

We need your immediate help on an Army Lodge project awarded to [SBN] at Ft. Lewis, WA in May 2004.

We have had multiple [SBN] PM's [sic], including the newest one showing up unannounced two days ago at a progress meeting, multiple QC managers, a new project exec, serious issues with the mechanical design and design quality control, the recent unannounced departure of the project Superintendent we had great respect for, and this

163

week's unannounced departure of Keith Henrickson, the one person we have had a strong relationship with at [SBN] for a number of years. There is virtually no one now on the project with design-build experience. This must be corrected immediately.

I have left you a lengthy message about our PM and I meeting with you next Thursday afternoon, in your San Francisco office, about this project, in advance of likely negative actions against your firm and bonding company.

(R4, tabs 76, 1107)  CO Bartholomew also forwarded his email to Henrickson (who had resigned from SBN) and Henrickson responded that he believed the CO was "taking the correct approach" (R4, tab 76).  In a later email on 14 June 2005, Henrickson also suggested that the Fund get SBN president, Gordon Marks, involved (R4, tab 78).

163.  As of 11 June 2005 there still had not been agreement between CFSC and SBN regarding the mechanical system design and the slab subcontractor was concerned about proceeding with its work until the design was resolved (R4, tab 446).

164.  On 13 June 2005 COR Dyer replied to ORB's Monson's 13 May 2005 request regarding a CFSC response to Jensen/Fey's request for information (finding 146):

Bob, thanks for your interest in keeping the concrete work going in earnest. I went back and checked my electronic records. All I've rec'd from David [Lee] were the breakfast bar serving and prep area layouts, a couple of weeks after my last visit (April 28). I have seen no scaled, dimensioned, full size floor plans on the Lobby and administration areas. As was discussed during that progress meeting, the 95% design was going to be delivered by the middle of May…now we're in the middle of June and NOTHING.

Even if we have the documentation to provide [SBN] the answers that they need, I have expressed many times (and very clearly) that I am not going to staff each and every design issue separately until we get a fully integrated 95% design. [SBN] has had over 4 months since the mechanical design approach was accepted by all concerned to provide us the 95% design. If they find themselves not being able

164

to produce in the field under the Limited NTP, they have only themselves to blame. Any construction hold up is entirely the fault and blame of [SBN]. We, the Gov't, are not going to be caught up in designing by the seat of our pants.

(R4, tab 1108) Mr. Monson agreed with COR Dyer's approach (R4, tab 1109).

165. On 15 June 2005 SBN notified the Fund of its staffing plan for the project:

| | |
|---|---|
| Senior Project Manager: | Rick LaSharr |
| Interim Project Manager: | Chris Bischoff (see note below) |
| Assistant Project Manager: | Tim Hanson |
| Assistant Project Manager: | John Elswick |
| Superintendent: | Pat Fry |
| Safety: | Christine Russell |
| Scheduling: | Jeff Pinter (Bellevue office) |

Chris Bischoff, as Interim Project Manager, will be involved through the 95% design approval, buyout, and a full transition to Rick LaSharr. He will be available beyond that to help when needed.

(R4, tab 79) Also on 15 June 2005 Botting acknowledged its receipt of the "directive to proceed with a fully ducted system for each floor" (R4, tab 452; tr. 5/128).

166. Progress Meeting #12 took place on 22 June 2005. Meeting notes were prepared by SBN's Hanson and included:

> 1-05. **Existing Unmarked Gas Line Relocation: 6/22/05** / A change modification has been issued by CFSC. SB[N] has billed for this work and awaits payment from CFSC. There are outstanding invoices due to Subcontractors, which have been past due since April. SB[N] will pay the Subs once the Funds are received from CFSC....

(R4, tab 460)

3. 95% Design

167. SBN's 95% design was submitted to CFSC on 14 July 2005 (R4, tab 479). SBN's Montoya admitted the submission was incomplete (R4, tabs 80, 82; tr. 5/36).

165

168. By internal email dated 18 July 2005 Botting acknowledged that its DDC design incorporated in the 95% design submission did not comply with the RFP:

> Our published specification in our 95% submittal does not match the RFP in any way shape or form! Our specification is a complete substitution geared around Johnson Controls and I don't think it is going to fly. I do not want to waste any time going down a dead end road, especially since we are out of time. The RFP clearly states that "An existing ONITY "Senercomm" InnPulse On-line System will be relocated from the existing building to the new facility. The entire facility operation is specified around ONITY. They are using ONITY electronic door locks and ONITY electronic controls to the room Safes. It only makes sense to me that the Programmable "Senercomm Sensor-stats" are used and not a substituted product. The owner probably will not consider a substitute and we will only lose more time.
>
> In addition, the specifications that we wrote don't cover the RFP Section "J-4". The specifications clearly state that the specified Tridium JACE network area controller will be provided for the network interface to provide global supervisory control functions. Our controls specification doesn't even address the requirement for network interface. It is clearly stated in the RFP that the Tridium JACE system will be provided and no other systems or gateway-based technologies will be acceptable. Johnson controls would need an interface panel to communicate with the Tridium processor and there is no way the Army will accept that. In my opinion, this is heading down a dead end road and I think we should proceed with Honeywell system from Sound Energy. I need your thoughts on this ASAP because I need the Controls guy onboard now!

(R4, tabs 480, 1114; tr. 4/52) SBN's expert witness, Mr. Kommers testified that the Johnson Controls thermostats could not communicate with the existing ONITY Senercomm InnPulse system (tr. 7/152-54, 161, 164-65 (bldg. 2111 ONITY which was Unix-based couldn't communicate with Lonworks/BACnet protocol controllers like the Johnson Controls thermostats), tr. 7/154-57). Automated Controls' Magruder described the lack of communication between the existing ONITY system and the

166

proposed Johnson Controls thermostats by analogy to spoken languages, i.e. both components spoke Spanish but one component spoke the Mexican Spanish dialect and the other spoke the Castilian Spanish dialect (tr. 7/193-94).

169. On 26 July 2005 BCE completed its review of SBN's 95% Design Submittal:

> Because the list of comments is rather extensive, and their resolution will require inter-discipline coordination, we are recommending that the submittal be returned "not approved". Review comments that could possibly affect the sizing of major system components need to be addressed and the missing information needed for evaluation of the design, need to be submitted before the review can be completed.
>
> Major mechanical elements in question are:
>
> - The specification still reflects a 4-pipe fan coil system with gas-fired boiler and air-cooled chiller.
> - The ventilation airflow rates shown on the plans do not meet ASHRAE standard 62-1999 (see attached .pdf file).
> - Design Analysis: Some major equipment sizing calculations are missing. Sizing of the domestic hot water heaters and storage, air equipment external static pressure calculations, etc. can't be confirmed.
> - EMCS information: No DDC system drawings or diagrams have been provided.
>
> Major electrical elements are:
>
> - Electrical load calculations must be coordinated with revised mechanical equipment electrical requirements.
> - Emergency lighting system inverter system has not been specified nor indicated on the drawings.
> - The room panel risers need to be recalculated showing actual mechanical loads and room configurations.

167

(R4, tabs 83, 485-86; tr. 11/125-27, 180-85) BCE's Heiberg testified that:

[T]here were specifications that were provided with this submittal; however, the specifications reflect a four-pipe fan coil system and gas fired boiler and air cooled chiller, which wasn't on that submittal.

So you had a Chevrolet here and you had a Ford that was shown on the drawings. The specs didn't match up with the drawings. The design analysis and major equipment siting calculations were missing. Domestic hot water heaters,… but we still didn't have that roadmap to be able to confirm that they were on the right track, or at this point had a big enough room for the hot water storage system. ENCS information, no DDC system drawings or diagrams had been provided yet.

And we're getting to a point, and I think there's some notes here, load calculations must be revised with the mechanical contractor and designer. We're basically reviewing electrical drawings at the same time, and we're able to follow the electrical drawings fairly well, but we're getting towards the end here, and we haven't seen calculations, and at 95%, drawings should be really just pick up some typographical errors and whatever review comments and go to 100% and publish it, but they were still in a design development stage, it was obvious.

No one had thought through the controls yet, it was evidenced by their absence. We're still missing energy calculations to confirm that they're even going to meet the energy goals required by the RFP, and we're really concerned as to the impact on the electrical side of things because SME's 95% electrical design, at 95% is reasonable to assume that they've got all the loads that they need, and that they've taken every diversity factor to get that size of service down. A lot of times it starts big, and through the design process, it goes down and then dial it in. Well the mechanical equipment was still up in the air, and mechanical represents a very large portion of the electrical service requirements.

So we're going uh oh, you know, if they come back and put a bigger pump in and so forth, we're going that's going to upset the electrical design, and it's going to cause delays and problems with getting to issue for [the] construction set.

168

....

> [W]e're still looking at specification sections that are blank, we're looking at no development or any content on the mechanical drawings that shows any—that anyone has given any thought to the DDC controls for the system. We're simply trying to bring it up; it's unusual not to have it to be in a 95%, and to have this information still missing. I guess at this point we're as concerned with that as we are with the electrical service being adequately sized when the mechanical equipment is still changing.

(Tr. 11/127-29, 133)

170. On 28 July 2005 Botting reported internally that it had awarded the DDC work to Automated Controls and that a purchase order had been written for ONITY components (R4, tab 487).

171. On 5 August 2005, BCE provided the following "overview" of the 95% review meeting held on 2 August 2005:

> Representatives for WA Botting, SME Electric, Patriot Fire and [SBN] were present at the meeting.

> ....

> The overall consensus was that the MEP documents, both specs, drawings, supporting calculations, need a lot of work. Mechanical and electrical design coordination needs to happen. [COR Dyer] verbalized his displeasure with the status of the 95[%] design and that promises made at the 65% (to get things coordinated and fixed by the 95%) were broken. [SBN] assigned a new PM to the Project and there was some visible optimism and hope that the lost ground will be made up between the 95% and 100% submittal. [SBN] is proceeding to the 100% with a whole lot of work to do. We can expect to see a lot of new material in the documents at the next submittal, which may generate a series of new comments. This will be especially true for the specs because they are were [sic] not in a reviewable state at the 95% submittal.

169

SME Electric was the only designer that had developed and distributed written responses to the electrical comments....

Mechanical:

Botting accepted most of the comments.

....

WAB to provide Onity controls and Tridium DDC Controls.

....

WAB to fix full load electrical data with SME.

Specifications will be fixed, UFGS guide specs will be used.

....

[W]e can expect to review corrected submittal data in the next few weeks.

(R4, tabs 86, 497, 1122; tr. 11/135-38) BCE's Heiberg testified that:

I guess I'll summarize by saying the quality of the submittals were—the representative produc[t] where everybody, all the designers seemed to go do their own thing and then merge documents without any coordination. So they were poorly coordinated, they were behind schedule because it seems like systems were changing and sizing was changing, and I've never seen such a poor design submittal before.

....

I would limit that to the mechanical. We had a few electrical issues, but for the most part, you could follow the design and it was where it needed to be at each particular phase of the design.

(Tr. 11/138)

170

172. In an internal Botting email dated 9 August 2005, Botting's Wade Bailor responded to an internal suggestion that the controls subcontractor edit Botting's specs for the next submittal:

> [T]here is something seriously wrong with this picture!!! Automated [Controls] is not obligated to edit Botting's specification so that it complies with the RFP. We have and always have had an obligation to design the project to the RFP. Our engineering department didn't even write a Sequence of Operation and [if] they would have thoroughly explored the RFP requirements, we never would have written our specification around Johnson Controls. This is very frustrating!! I am not going to ask [Automated Controls] to write his own specification!

(R4, tab 498)

173. SBN promised to submit for re-review the "mechanical items that are missing/need revised" as well as associated electrical load calculations on 12 August 2005 (R4, tab 85 at 2679).

174. On 15 August 2005 SBN met with ORB/BCE to provide its resubmittal of the 95% design. With the concurrence of SBN's LaSharr, the resubmittal was rejected. While SBN and its electrical subcontractor, SME, "made a good faith effort" in the resubmittal, Botting's HVAC/mechanical design still had no DDC drawings and the DDC specification was "very sketchy and incomplete overall":

> [Botting] admitted that they have some distance to go with DDC and controls in general and expected to have a more complete submittal "in two or three weeks". He stated that Botting had gotten a "late start" in changing over [to] the required control systems. Both [SBN's LaSharr] and [ORB/BCE] told him that was unacceptable. [LaSharr] is working closely with Botting to generate an acceptable submittal.

(R4, tab 89 at 2688-89) COR Dyer expressed "shock[] that the Mechanical design remains so disjointed" and disappointment that SBN did not review Botting's design before incorporating it into SBN's submittal. As a result, COR Dyer recommended that CO Bartholomew issue a cure notice:

171

[I]t is apparent that [SBN] has no clue how to get their mechanical subcontractor, Botting, to perform. [SBN] also has no clue on how to QC a deliverable.... We demand a full and complete 95% mechanical submittal. We have been asking for this since early February 2005. It has been SIX months! Nothing we've said or done has worked.... [SBN] has to understand that they are responsible for the DESIGN. Where was Jensen-Fey, the Architect of Record on this deliverable? Are they even involved?

(R4, tab 89 at 2688, tab 1120) In an internal email Botting's Bailor provided the following input from the meeting with SBN and ORB of the same date:

I transmitted the Re-submittal to [SBN] this morning and had a brief review meeting with ORB. It looks like we need to do a few more things before they will submit for official review. The following is a list of actions that need to be taken:

1. They are expecting a complete control system design that is at least 95% as a standalone submittal. They are furious that this is not farther along in the process. I informed them that we will expedite a "Sequence of Operation" for the BMS and the Onity System and that's all we can give them this week. I said that product data for the control devices will be available next week but they probably want to look at that in conjunction with the engineered drawings and the engineered drawings won't be complete for two or three weeks.

Status: I have Automated Controls dropping everything they are working on to expedite a sequence of operation. Brad said if he puts everything else aside, he can get it to me by Wednesday or Thursday.

2. We need to clean up our DDC Temperature Controls Specification 15900. The specification still makes reference to the Onity "SennerComm" System or equal. We need to get rid of the "or equal". The specification still makes reference to the MRC digital thermostat in several locations. This is

172

a Johnson product and needs to be removed from specification.

....

4. The Army will not accept notes on the equipment schedule that describes the features of the AAON Equipment. They are looking for an entire specification that describes what they are getting with each AC-Unit. The specification should include makes, models, sizes, construction methods, performance criteria, bells & whistles and so on! They have the impression that all these requirements were conveyed to us in a meeting clear back in February[.]

Action: Botting to write a detailed specification for the AC-Units that conforms to their expectations.

[SBN's] Rick LaSharr made it very clear that this submittal is critical to the next partial notice to proceed.

(R4, tabs 501, 504)

175. After email discussion of what was required for mechanical resubmission to comply with the RFP (R4, tabs 90-91), COR Dyer forwarded ORB/BCE input to SBN on 17 August 2005:

Rick [LaSharr], I see your message below on what's being planned for delivery tomorrow.... Unless you have all of the below information, don't bother submitting. The deal is all or NOTHING. No more piecemeal. We are supposed to see all major mechanical systems and components fully designed at 95%. Between 95-100[%], it should be just dotting i's and crossing t's....

We normally don't do what we're doing with your designers...pointing out EXACTLY what they should be doing! All one would have to do is to follow the comments to understand what is expected. I'm beginning to think your designers don't really understand what they're doing! That would be a worrisome sign for me, to say the least.

> The folks I pay to perform peer review are not to design
> for you.

(R4, tabs 92, 507; tr. 8/82-83, 87) As of 18 August 2005, ORB/BCE was still providing information to SBN and Botting to assist them in understanding their design responsibilities (R4, tabs 93, 509). On 19 August 2005 SBN advised that it intended to resubmit its 95% design on 25 August 2005 (R4, tabs 94, 508, 513). On 26 August 2005 SBN notified CO Bartholomew that the 95% design resubmittal from Botting still "did not include the corrected DDC spec" (R4, tabs 513, 1123).

176. ORB/BCE received the updated 95% design resubmittal from SBN on Saturday, 27 August 2005. On Monday, 29 August 2005, ORB/BCE advised CO Bartholomew and COR Dyer that:

> Again I find myself in the position of recommending refusal of [SBN's] latest 95% resubmittal. [ORB/BCE] are somewhat encouraged in that we are at least seeing some movement in the quantity of information provided by Botting, but we are STILL not seeing acceptable specifications. I don't know how much clearer we can make it, the designers need to go to the Fort Lewis Design Standards website, download all appropriate specifications and guidance for HVAC and DDC, and use them to create compliant specifications. The RFP and all review comments to date have been crystal clear on this issue. Neither Fort Lewis or BCE will accept anything less.

> I am also disappointed in the lack of review and QC performed by [SBN] and the QCM. [S]houldn't someone have insured compliance with our comments before we were asked to make a third review? We would appreciate some assurance from [SBN] that they have compared the next submittal with the requirements BEFORE we are asked to look at the 4th go-round.

(R4, tabs 95, 514, 1128) The next day COR Dyer advised CO Bartholomew of the situation and how COR Dyer planned to address it:

> I'm going to call corporate headquarters in Los Angeles and attempt to get someone to listen to me. Rick LaSharr is unable to accomplish the task of providing the requisite 95% design of the mechanical system and integrated controls. We have repeatedly tried to help these folks, to

no avail. After three strikes, I'm no longer going to waste [ORB/BCE's] time. I asked you to issue a design cure notice weeks ago, but you convinced me it would do no good. Fine, then I will find a way to get their attention, and but good!! Their invoice for August will be arriving any day now. I will sit on the entire sum until the requisite design is provided and accepted by the Fund. No further monies will be authorized from my hand.

We have wasted many hours and dollars with our effort to help [SBN]. I'm through with help! [SBN] is capable of handling a job of this magnitude. They have unfortunately allowed themselves to be held hostage by a mechanical subcontractor who is totally incompetent and a non-team player.

(R4, tab 96)

177. Handwritten notes on a hard copy of a 30 August 2005 email printed from SBN's Morris's email account included:

W A Botting / 4 weeks after 95% review (3 submittals) all
    rejected. Rick cannot make this happen
    We cannot proceed w/100% until complete.
Drew will not release pay to SB[N] until 100% complete.
    will sit on next requisition

> Honeymoon is over w/ Rick / Mechanical is Issue /

(R4, tab 515; tr. 9/118-20)

178. On 31 August 2005 Botting emailed SBN's LaSharr voicing Botting's objection to the format in which it was being required to draft its HVAC/mechanical specification and asking for direction from SBN (R4, tabs 516, 1128; *see also* R4, tab 169 at 3894-943]; tr. 5/47-51, 7/130-31, 191-93, 265-66, 11/157-61). By letter dated 6 September 2005 SBN responded:

Please accept this letter as formal direction to immediately proceed with the completion of the mechanical design documents as outlined within e-mail correspondence, dated August 29, 2005 by John Patterson of ORB. This correspondence has been previously forwarded and is

175

herewith attached. It is the understanding of the Owner that the methods outlined in this e-mail are necessary for WA Botting to complete their design and allow for an expeditious review and approval of the mechanical design documents, and are furthermore clearly outlined in the RFP documents.

Be advised that WA Botting's inability to obtain approval is currently impacting our schedule and has exposed [SBN] and others to potential non-recoverable costs. These impacts will be substantial if WA Botting does not obtain 100% design approval, thus allowing [SBN] to receive a full notice to proceed with the Work. Please be aware that [SBN] will seek full recovery from WA Botting for all associated delays and impacts.

Furthermore, be advised that the Owner has notified us that they will be withholding all payments due [SBN] and associated Subcontractors until this submission is approved.

Please produce your re-submittal no later than September 9, 2005. A failure to complete all documentation as noted above may require that [SBN] direct all subcontractors to proceed with the work in advance of full approval from the Army to avoid further delays to the schedule. If this were to occur, [SBN] will seek full recovery from WA Botting for changes that may be necessary as a result of the final approval documents.

(R4, tab 520; tr. 9/118-20) Botting objected to SBN's direction (R4, tabs 523, 1124, 1128).

179. On 8 September 2005 SBN's Chris Morris provided the following information to COR Dyer:

Thank you for the e-mail. WA Botting was directed to complete the design and specifications. The format for the submittal was to be as requested in the recent correspondence from your consultants on August 29 and the RFP. This will be complete by Friday, Sept 9, 2005. Rick [LaSharr] will review this information with Jensen-Fey and WA Botting to make sure it is complete prior to forwarding this to your group for review and

176

approval. Your assistance would be appreciated in the expediting of this approval. I know this has been frustrating and we should be coming to an end and moving to the next phase. Let us know if there is anything we can provide to assist with this process.

....

Is it possible to get approval for the framing as an extension to our current limited notice to proceed to allow the work to progress? If so, what is the process[?]

(R4, tabs 97, 524)  COR Dyer denied the issuance of another limited NTP and stated that the full NTP for construction would be issued only upon satisfactory completion, review and acceptance of SBN's 100% design (R4, tabs 97, 98; tr. 8/83-85).

180.  On 8 October 2005 COR Dyer provided to SBN the consolidated comments on its 95% design resubmittal (R4, tab 99).  As of 17 October 2005 SBN's Montoya acknowledged that the mechanical portion of the 95% design resubmittal was still not complete and agreed that its completion should take precedence over any discussion of SBN's existing REA (R4, tabs 100-01).  That same day SBN's LaSharr provided SBN's responses to the 95% design comments by email and requested a meeting to discuss them on 20 October 2005 (R4, tab 103).  The review meeting was set for 26 October 2005 at Fort Lewis with all parties present, including Botting's DDC subcontractor, Automated Controls (R4, tab 103).

181.  By email dated 19 October 2005, SBN's LaSharr again requested a further limited NTP, which was denied by CO Bartholomew:

We do not concur with the issuance of any additional LNTP's until the mechanical and 95% design issues are settled. We have now been in design on this project almost 17 months! The delays in design are affecting the government's ability to get this needed project completed for the Soldier's at Ft. Lewis!

.... We also need to get on with the REA. Further delays in the design affect both of us and will impact the REA issues/their resolution.

(R4, tab 104 at 2739; tr. 5/41-42)  As of 20 October 2005 COR Dyer reported that "the structure is almost done" yet SBN "has not received the Final NTP as the 100% design has not been accomplished" (R4, tab 1130).

177

182. On 21 October 2005 SBN's Morris acknowledged that:

> The 95% approval is critical. We are all aware that the mechanical contractor has dragged this process out, however, the exterior skin and roofing completion is critical for the other elements of the work to proceed timely until the 95% documents are approved. By not approving this work we are being exposed to additional risk and costs that will only create problems and claims from the other subcontractors. This action seems punitive and does not support the future success we are both trying to achieve.
>
> Again, we are committed to moving forward to the successful completion of this project. We respectfully request that the elements of the work not effected [sic] by the mechanical design move forward so that we do not lose additional time on the project schedule.

(R4, tab 104 at 2737-38, tab 535) CO Bartholomew responded:

> I have empathy just as I hope you have empathy that our side has spent almost $200K extra dealing with the mechanical issues and have lost a year. We all need to focus. There is nothing punitive. Every project we do is executed almost the same way. Our side is at a greater risk if your mechanical guy plays more games. Only you can deal with that at this point.... No one on our side wants to risk going forward without some better assurances that things are on track / which they have not been for a year on the design side.

(R4, tab 104 at 2737, tab 536)

183. On 26 October 2005 the Fund authorized an additional LNTP as follows:

> This limited notice to proceed supplements the original notice to proceed to include the installation of the mock-up (rooms 139 and 141) complete, exterior facade, interior framing, electrical rough in, plumbing rough in, and Fire Protection rough in. LNTP also allows for installation of

178

pre-rock drywall at locations to allow for rough-in
activities to proceed (typically above ceiling).

(R4, tab 105; tr. 5/42) The document was signed by CO Bartholomew and COR Dyer and also contains the following handwritten language above CO Bartholomew's signature:

> Authorized to proceed contractually with the above LNTP,
> subject to no HVAC authorization.

(R4, tabs 105, 1132; tr. 5/72-73)

184. On 27 October 2005 SBN's LaSharr notified SBN, Jensen/Fey and subcontractor personnel that:

> In a somewhat surprise outcome, we have been able to
> obtain an additional [LNTP] from the Army. It was
> understood via our meeting with the Army on 10/25/05
> that they would not issue any [NTP] until resolution of the
> 95% documents. Currently the issues remaining to resolve
> the 95% documents are associated with two RFI's that are
> being reviewed by [Botting] at this time [*see*, finding 186].
> It is our understanding, that upon resolution of those two
> RFI's / we will be able to obtain an additional NTP
> associated with the HVAC work.
>
> At this time, all parties associated with the 100%
> documents, should complete their documents such that
> same can be reviewed by [SBN] and resubmitted to the
> Owner by 9 Nov 2005.
>
> Please advise of any questions.
>
> All parties, be advised that we are intending to start
> framing as soon as possible and will be having site
> meetings to discuss scheduling of the framing and
> plumbing, electrical and fire protection rough-in.

(R4, tabs 539, 1132) Botting took issue with SBN's position regarding the 26 October 2005 LNTP and what effect it had on Botting's work (R4, tabs 544, 1133). On 30 October 2005 there was an internal Botting meeting during which there was discussion of Botting pulling out of the project (R4, tab 1131).

179

185. On 2 November 2005 COR Dyer confirmed that the 26 October 2005 LNTP signaled the approval of the 95% design "with the exception of the comments reviewed on-site 8/1/05 and 8/2/05 and comments addressed on 10/26/05. Each of these comments will be addressed within the final 100% documents." However, he also reminded SBN's LaSharr that the CO had not yet issued a NTP to produce the 100% design. "This will not be issued until the mechanical and controls issues raised in last week's meeting are submitted and accepted by the owner's team." (R4, tabs 107, 541-42)

186. Also on 2 November 2005, SBN advised that:

> [W]e need to revise the suspense dates as outlined below:
>
> 5.    WA Botting has taken exception to certain items in the RFP. We need to receive a consolidated list of these items for a determination if they are in or out of the contract. [SBN] to provide this list ASAP. Suspense: Friday, October 28. Revised suspense date Wednesday November 9
>
> 6.    Prepare RFI submitting a red-lined, edited, version of the Ft. Lewis DDC design specification, 15910 for preliminary acceptance. Suspense: November 2 Revised suspense date Wednesday, November 9
>
> 7.    Prepare a 2nd RFI that describes the level of detail for the DDC graphics package to be provided per the RFP. Suspense: November 2 Revised suspense date Wednesday November 9

(R4, tabs 106, 1137) On 2 November 2005 CO Bartholomew responded:

> Please be advised that every day we are delayed over the mechanical system is a day we lose in getting the building built. For all, we are in our 17th month of design.
>
> We reserve all of our rights to compensation for the design delays and will likely have to involve our lawyers if this is not squared away soon.

We do not have a warm fuzzy with the mechanical systems
and urge you to look at all your options as this may
become an even costlier proposition for you.

(R4, tabs 108, 1137, 1143)

187. A 13 November 2005 internal Botting email stated:

In an attempt to save the $85k we are spending on Onity
controls, it was my intention to use the flawed controls
specification to try and get out of buying the ONITY
Controls and put them on the owner. After spending the
afternoon going through all the correspondence from last
year on this issue, it would be foolish for me to go down
this path now. If we attempted to take this position at the
start of the project, we might have had a slim chance.
However, the project record clearly indicates that we were
planning on providing an alternate system from day one
and we had several opportunities in the past to put this on
the owner. We don't need to lose anymore credibility on
this project.

(R4, tab 1136)

188. On 28 November 2005 SBN submitted a revised DDC specification which
it said included revisions to address the previous review comments (R4, tabs 109,
579). The revised DDC specification was reviewed by the next day and determined to
"look[] good." BCE recommended it be incorporated verbatim into the 100% design
submittal. (R4, tab 110)

189. The CFSC inspection of the mock-up units took place on 13 December 2005
(R4, tabs 574, 576; tr. 5/54-61, 85-87, 12/19-22, 47-48, 138-39). On 14 December 2005
SBN sent an email to CO Bartholomew regarding corridor ceiling heights:

It is my understanding from conversations with [COR
Dyer] on site yesterday, that the LNTP for the HVAC
rough-in is currently being held up based on the corridor
ceiling height being 8'-0" shown on the construction
documents in lieu of the 8'-4" shown on the FDS sheets.
Previously, it was my understanding that the issue was
within the rooms and as you know we have acknowledged
and revised those ceiling heights at the entries. We are
currently reviewing the issue at the corridors and the

181

correspondence that has resulted in the ceiling heights being at 8'-0", upon determination of same we will advise. It should be noted that we are being impacted by being unable to proceed with the HVAC work at this time.

(R4, tab 570)

190. As of no later than 15 December 2005 SBN was authorized to proceed with 100% design documents. COR Dyer reiterated that the design documents were to show "all RFP ceiling heights being attained." (R4, tab 112)

191. On 19 December 2005 comments from the mockup unit inspection were collected and forwarded to SBN:

| No. | | REVIEW COMMENT |
|-----|--------------------|---------------------------------|
| | **Extended Stay** | |
| 1 | | SBNW admitted room was approx. 293 SF, below the 300 SF standard. The reason is apparently due to the shear wall adjacent to the adjoining ES room. SBN[] was requested to issue RFI informing Lodging how many rooms in the entire building fall below the standard. **VERY IMPORTANT!** |

....

| | **Family Suite** | |
|-----|--------------------|---------------------------------|
| | | |

....

| 5 | **NOTE:** | **Provide RFI-Non-loading bearing steel studs installed 24" on center. RFP specifically calls for studs at 16" on center. SBN[] was advised until this is reviewed and acted upon, continuing the 24" on center was at their own risk.** |
|-----|--------------------|---------------------------------|

....

| 8 | **NOTE:** | After the inspection, we returned to the **conference trailer for further discussion**. Items decided or actions to be taken include: |
|-----|--------------------|---------------------------------|
| | | 1. Proceed to produce the 100% design. The mechanical controls spec. 15910, and graphics |

| | | example were accepted by review team. |
|---|---|---|

....

| | | 3. **Columns**-Lodging doesn't want column protrusions in any room. Lodging's typical layout furniture plans show no bump-outs or other interferences that interferes with furniture placement. The word "flush" was used vs. "furr" when speaking about a wall. SBN[] agreed to "flush" out walls where the columns protruded 3-4" into the finished room, as long as Lodging agreed to the loss of SF. This was agreed. In every other room where a column can not be "flushed" with the wall, a ¼" scaled plan, on 8 ½" x 11", will be provided. This will allow Nancy and Sheryl the opportunity to make furniture placement decisions on a room-by-room basis. Since the mockup room furniture requires immediate ordering to comply with SBN[]'s schedule, **Lodging requests the plans on the non-standard configured rooms immediately! All rooms that are not "normal" per the RFP shall have individual scaled plans produced immediately.** |
|---|---|---|

(R4, tab 576; tr. 5/61, 63-65) SBN's electrical subcontractor, SME, informed SBN of how SME's work was impacted by SBN's unilateral decision to change the stud spacing:

> Truss design was not finished or approved at the time of the deck pours. Because of the lack of structural detail SME could not give consideration to the placement of structural studs and no verbal direction to do so was provided by either Jensen Fey or SB[]N.

(R4, tab 784)

> We would have questioned the use of narrow studs because of the difficulty of install ¾"conduit in them. This problem also occurs wherever the conduit has to go around a corner as the radius of ¾" conduit does fit around a narrow stud corner. This total of this issue about doubles

183

our labor costs for the guest rooms, which also impacts the schedule.

(R4, tab 591; *see also* R4, tab 578)

192. On 20 December 2005 SBN forwarded to Botting the revised specification for the DDC system that included annotations characterized as "now...accepted by the Owner. Please insure that same is incorporated into your design." (R4, tab 579)

193. By letter dated 22 December 2005 to CO Bartholomew, SBN stated its position regarding the corridor ceiling heights and the delayed HVAC LNTP:

> As has been noted through various e-mail's [sic], it is understood that the [LNTP] for the HVAC has been held up due to the elevations within the corridors being 8'-0". It was originally understood that the HVAC LNTP would be released upon the resolution of the HVAC controls issue on two separate occasions. Currently the continued delay to release the HVAC LNTP is adversely affecting the project.
>
> In our follow up of the latest issue (i.e. 8'-4" on FDS sheets vs. 8[']-0" on the construction documents), it is apparent that this issue was specifically discussed at the 35% design review meetings. Reference the attached pdf document from the Army in which item #24 clearly indicates that a discussion was held and it was apparent that ceilings would have to be lowered and it was acknowledged that same would not be below 8'-0". In review of the 65% documents, it once again was specifically addressed again in notes dated 9/17/2004/9/22/2004 [sic] from the Army where in item #44 (attached pdf) it is specifically noted regarding a 7'-11" ceiling height in the lobby and it was specifically understood that the heights would not go below 8'-0". In follow-up, the 65% interim documents clearly identified the ceiling heights to be at 8'-0" in the corridors.
>
> Based on the aforementioned, it was clear that all parties understood and agreed that the 8'-4" ceiling heights within the corridors were unachievable with the design requirements and this was accepted at the early stages of

184

the project which is evident by the documents provided by the Army. As noted in same / it is true that this item has not been changed via the change process, but it is clear that all parties were amiable to the revision. It is our belief that this revision at the 35% documents and 65% document review provide agreement with the revised ceiling elevations and allowed for the reduction in the ceiling height to 8'-0". As such, we request the release of the [LNTP] with the HVAC based on the prior agreement of the 8'-0" ceilings being acceptable.

(R4, tab 581; tr. 5/147-50)

194. On 22 December 2005 CO Bartholomew reminded SBN that:

Your contract technically ends tomorrow and I have yet to see your schedule for project completion which I have repeatedly requested this fall. This is a contract requirement and I need this to issue an interim, non-compensable extension, until such time as we meet/resolve (hopefully in January 06) on your Request for Equitable Adjustment.

(R4, tab 113)

195. On 23 December 2005 CO Bartholomew advised SBN that:

I would have an incredibly hard time believing anyone on our end would permit a lowering of ceiling heights without a serious discussion and a significant credit. This issue has come up on a number of other projects in the past and is a Lodging "Hot Button". While the reduction of 4" may not have been picked up in our reviews, there has been no contractual action taken to lessen the contract requirement for ceiling heights in this building. I refer back to a letter that is part of the contract signed by an ind[iv]idual who signed the bid that [SBN] would be materially compliant with the RFP.

(R4, tabs 114, 586) A week later on 30 December 2005 the CO further advised SBN on the subject of ceiling heights:

185

Lodging has advised the lowered ceiling height is not acceptable / period. You will have to address this prior to producing the 100% drawings / even if it delays them. You also need to address in RFI's any areas you think you may not comply with RFP before expending time and resources (yours and ours).

(R4, tabs 114, 586; tr. 5/74-75, 12/17-18)

196. On 5 January 2006 COR Dyer advised that:

The 100% design shall show all corridor ceiling heights at 8'-4". Also, we are waiting to hear of how many rooms are being constructed under the programmed sq footage of 300 and 450 respectively.

(R4, tab 590 at 11794; tr. 5/65-67)

197. By letter dated 10 January 2006 to CO Bartholomew, SBN's Architect of Record weighed in on the subject of corridor ceiling heights:

We acknowledge receipt of your e-mail regarding the requirement for 8'-4" ceiling heights. It should be specifically noted that the 8'-0" ceiling heights were included in the 35% submittal documents and are very clearly shown in the 65% and 95% documents and were subsequently discussed during the review conferences with the Army Team at each phase. The agreement on this issue was relied upon to develop the progress drawings and therefore shown on the drawings and constructed in the field.

In an effort to accommodate your latest request to revert back to the 8'-4" ceiling height, a design meeting was held at the site on January 5, 2006 to review options available. After numerous discussions and strategies we were unable to come up with any solutions to revert to the 8'-4" ceiling height (short of tearing the building down and starting over).

Therefore, we believe that the 8'-0" ceiling heights aesthetically have no significant impact on the quality or

186

performance of the facility and shall remain as previously noted.

(R4, tab 599; tr. 7/278-79; *see also* tr. 5/53-54, 142-44, 7/236, 9/23)

198. By letter dated 12 January 2006 SBN responded to CO Bartholomew:

> It is our position that the revision to the 8'-0" ceiling heights had previously been accepted through the design process, and now we are to understand same not to be the case. Therefore, it is requested that a change be issued to resolute [sic] the ceiling heights to 8'-0".
>
> [SBN] is currently delaying the submission of the 100% documents per your direction and upon resolution of this issue it is understood that we will be able to proceed with submission of the applicable documents. In addition, it is requested that the LNTP for the HVAC be released at this time.

(R4, tab 115 at 2815, tab 604) COR Dyer considered SBN's position unacceptable:

> The Architect has nothing to corroborate his story that the ceiling heights were discussed in each of the design meetings. As I stated in the MFR from the 35% design meeting, the ceilings in the corridors were shown at...8'-4" in the design. Therefore, Mr. F[r]itzmeier's assertion that the ceilings have always been shown at 8'-0" is false. My only suggestion at this point [is] to seek a form of compensation for the error and omission. I know this is a copout, but what other option do we have except to tear down the building and start again? What is really disturbing is that Lodging is being asked to accept something different than was specifically stated in their requirements (again). Why do we always have to bend over, especially when it's a clearly written requirement in the proposal that we send to hand selected design-builders?

(R4, tab 115 at 2813, tab 632)

199. On 20 January 2006 COR Dyer reported:

> [T]he need to go to Ft. Lewis is no more. We had hoped to
> have a 100% design review conference [on 30-31 January].
> Bart and I were also targeting that week to begin the effort
> to sort through the issues composing the REA. Since we're
> at an impasse with the corridor ceiling heights, I have
> asked Bart to intercede with the highest levels of [SBN]
> management in the corporate office in San Francisco. We
> are all tired of being asked to accept things outside the
> scope of the RFP. Once a contract is signed, the Contractor
> is contractually bound to follow the guidance in the RFP
> during the design. We are not responsible to double check
> every little thing when we perform the reviews. Any
> changes to the RFP must be incorporated by means of a
> contract modification.
>
> [SBN] has reached the end of the rope with me on both the
> Dugway and Lewis projects. I am currently sitting on $1M
> in pay requests and will not process until we reach
> acceptance on the outstanding issues at both projects....
> [SBN]'s lack of management at both projects is costing the
> Army (Lodging) immeasurable amounts of lost time and
> money.

(R4, tab 1154; tr. 9/118-20) SBN's LaSharr testified that he was not aware of any
delays to project performance as a result of a delay in processing of SBN's pay
applications (tr. 5/151).

200. On 23 January 2006 CO Bartholomew responded to SBN's LaSharr
regarding corridor ceiling heights:

> I would like to reiterate what has been passed on in other
> e-mails and telecons. Nothing in the meeting minutes
> authorized any reduction in ceiling heights. Mr. Dyer's
> comments were just that as a result of the meeting on what
> was said. There has been no authorization to lower ceiling
> heights and there would not be a relief from the contract
> requirements without consideration. We have had many
> instances of design variances which is [SBN]'s (the
> design-builder) responsibility.

188

> We have lost almost a year directly related to the recalcitrance of your mechanical subcontractor to provide what was required by the contract.
>
> This project is perilously close to a situation that neither side will be pleased with.

(R4, tab 169 at 4333, tab 617; tr. 3/189-90) He also renewed a previous request to the Chairman and CEO of SBN, Gordon Marks, to schedule a meeting about the project (R4, tabs 117-18, 617). On 19 January 2006 the following summary was provided to Mr. Marks by SBN's Morris in anticipation of a meeting with CO Bartholomew:

> **Fort Lewis / 185 Lodging Units, 4 stories:**
> **Original Completion Date: 12/24/05**
> **Current Estimated Completion Date: 9/07/06**
>
> ....
>
> At this time we have (3) significant issues that are being discussed.
>
> 1. **RFI Approval:** They will not review or approve RFI's, however, they will not accept the 100% documents unless the RFI's are included in the documents.
>
> 2. **Corridor Ceiling Heights:** The RFP calls for 8'-4" ceilings in the corridors and during the design development it was discussed that with the concrete structure and the overall building height limitations, this requirement could not be achieved. We relied on the Army's agreement (via e-mail at the 35% design comments) on the 8' ceiling heights during the design and the issue has re-appeared. They expect a credit, or consideration; we have informed Bart that there was no cost savings to us to pass along.
>
> 3. **Unit Square Footage:** over 100 units do not meet the RFP minimum requirements. The dimension busts are taken off the CAD drawings. We will be developing our letter to the

189

Owner. Bart is not completely knowledgeable of the magnitude of the issue at this time.

The impacts to the square footage were a result of drawing completion and shear walls that were added within the building space that affect the net rentable area, design deficiencies with the architect. There is some confusion as to how the square footage was originally calculated; we are in the process of figuring this out.

Units Summary Breakdown

| Less | 16 to 21 SF | 4 Units |
|------|-------------|---------|
| Less | 10 to 12 SF | 4 Units |
| Less | 6 to 9 SF | 56 Units |
| Less | 1 to 5 SF | 56 Units |
| Gain | 1 to 5 SF | 24 Units |
| Gain | 6 to 9 SF | 7 Units |
| Gain | 12 to 14 SF | 3 Units |
| Gain | 15 to 20 SF | 5 Units |

Total Square Units Impacted          159 Units
Total Square Feet Lost               345 Square Feet

(R4, tab 621)  SBN's Montoya testified that the reduction in room square footage occurred when SBN was required to "fur-out" walls to eliminate corner column offsets in the rooms (tr. 3/186-88; *see also* finding 191).

201. On or about 23 January 2006 CFSC provided comments on Botting's DDC Controls submittal which included Johnson Controls products:

1. GENERAL

- **REVIEW COMMENTS:** "The Controller Products submitted for section 15910-2.1 "*DDC System*" not applicable to this paragraph as the submitted controllers do not constitute a "**DDC SYSTEM**" under this contract.

- Furthermore, the products description and listed specification section compliance reference do not match in described details for that section, paragraph and sub-paragraph. The listed controllers

190

are inappropriate for the intended use on this project and are conceptually inconsistent with the Fort Lewis Design Standards Topology and System Architecture which uses a standard PC Workstation and Tridium Niagara R2 suite of software to integrate field device controls to the enterprise level platform Supervisory controllers within a distributed control network.

- It is evident by the conflict in literature and the products listed in the submittal register that…the intended architecture is to provide a system that does not provide a Web enabled Supervisory Software Application on a Workstation PC Platform as specified. The submitted Niagara AX software model is not the same version or generation of software solutions as the existing original Tridium Niagara R2 framework provided by Vykon and can [not[46]] provide the same functionality that is bundled with Supervisor AX applications served to a browser from an embedded JACE platform.

(R4, tab 618)

4. 100% Design

202. In a letter to CO Bartholomew dated 24 January 2006 on the subject of "Ceiling Height/100% Documents," SBN's LaSharr stated:

As [SBN] is eager to move the project forward, we will be offering a reasonable credit associated with revision of the ceiling heights. Please note that we make this offer even though we still believe that this issue has already been resolved through the design submittal process. In advance of this offer, we are enclosing 100% documents inclusive of all previous design review comments for your approval. It is critical that the Army accepts and reviews these documents immediately to mitigate the ongoing delays caused by the previous refusals to accept these documents.

---

[46] It is obvious to us from the context of the surrounding language that the author was communicating a lack of functionality as it applied to the proposed DDC design.

191

Furthermore, the project cannot continue absent the release of the limited notice to proceed for the HVAC with the design as submitted in the 95% documents along with the subsequent clarifications. We have currently reduced our forces and suspended work on all areas that are being affected by the failure to provide additional LNTP and failure to address RFI's that are delaying the sequence of work (specifically 164, 168, 171, 172, 173, 174, 175, and 177). Once we have received the additional [LNTP] and response to the critical RFI's we will continue with that portion of Work and will advise of the impacts and costs associated thereto independent of the REA addressed above.

We hereby request that you forward the appropriate [LNTP] for the HVAC scope of work and request an expedient review of the 100% documents such that a final notice to proceed can be issued in order to mitigate further impacts to all parties. This letter also serves as formal notification that the Army's failure to accept the 100% Documents for review and its failure to issue a [LNTP] with the HVAC scope of work has caused, and continues to cause, significant impacts to the Project Schedule and, potentially, the Project Cost. Consequently, [SBN] will continue to perform its contractual obligations pursuant to a full reservation of rights.

(R4, tab 1155)

203. In emails dated 30 January 2006 SBN requested information from CO Bartholomew regarding non-payment of its invoices, citing payment clauses in the contract that provided for withholding only 10% retainage (finding 24). CO Bartholomew responded that those clauses only apply when the work is satisfactory (R4, tab 1157; *see also* finding 21 (clause H-21-4.1 provides that entire payments can be withheld when there is unsatisfactory progress)).

204. By letter dated 31 January 2006 SBN offered a $10,953 credit as consideration for changing certain ceiling heights from 8'-4" to 8'-0" and an $8,492 credit as consideration for a net reduction of 198 square feet in the room areas in the

192

entire project.[47] SBN also enclosed 100% design documents and requested an LNTP for the HVAC work as well as the final NTP upon an "expedient review" of the 100% design. (R4, tabs 118, 169 at 4018-31; tr. 3/191-93, 5/76; *see also* R4, tab 169 at 3124) By letter dated 2 February 2006 SBN increased its offered consideration to a total of $100,000 (R4, tabs 119, 642, 644; tr. 3/194-96). CO Bartholomew responded on 3 February 2006 that Army Lodging:

> Authorized [the CO] to accept the two variances for corridor ceiling heights, and room sizes only...for no less than $200,000.... Please be advised the number I was provided by lodging was a lot higher than $200,000, but I told them that termination and delay costs for reprocurement had to be factored into the equation.

(R4, tab 121 at 2852, tab 670; tr. 3/197-98, 219; *see also* R4, tab 1158; tr. 3/190) SBN accepted the Fund's counteroffer of $200,000 on 6 February 2006 to resolve the corridor ceiling height and an unspecified number of guest room square footage variances, as well as associated variances (i.e., light switch locations, ceiling fans, etc.) (R4, tab 121 at 2851-52, tab 169 at 4339, tabs 645-650, 1159; tr. 3/198-02, 7/279). CO Bartholomew later rejected the $200,000 amount (finding 206; tr. 3/202-204). The parties continued to negotiate and reached a final settlement of the issues associated with ceiling heights and room sizes in the amount of $500,000, reserving only the issue of delay (finding 212). SBN's Montoya testified that it was CO Bartholomew's near constant threat of termination for default that prompted SBN to agree to a credit of $500,000 (tr. 3/204-20).

205. On 10 February 2006 CO Bartholomew tasked ORB's Monson with reviewing SBN's 100% drawings submitted on 31 January 2006 with respect to the room square footage and ceiling height variances (finding 204):

> If the design is at fault, we can call Jensen Fey errors and omissions insurance. If constructability is different from the design we could terminate or reprocure some or all of the construction work deviations under the bonds and then also go after the E&O insurance under the A/E of Record's CQC responsibilities.
>
> Something will happen very soon as the contract ends 21 February and will not be extended without imposing

---

[47] (*See* finding 209 (SBN and Jensen/Fey acknowledged that, of the 185 rooms in the project, 127 "vary from the RFP requirement. Of these 127 units, 60 are associated with square footage less then [sic] that required by the RFP."))

liquidated damages and a high 6 or 7 figure consideration offering if it were to be considered.

(R4, tab 1160)

206. Also on 10 February 2006, CO Bartholomew provided the following information to SBN representatives and copied to CFSC, ORB and Army personnel in two emails:

> The situation at Ft. Lewis is approaching a meltdown. In addition to at least 34 serious non-conforming rooms, low ceilings, and the latest list of other room problems, the following is now noted:
>
> ....
>
> We will not accept a $200,000 credit for all the room and ceiling deficiencies noted and had not previously considered the issues herein until reporting had verified actual conditions. You are strongly urged to review these matters as we are.

(R4, tab 1161)

207. On 15 February 2006 SBN provided Botting and Jensen/Fey with its comments regarding "noncompliance issues associated with the RFP" in Botting's mechanical submittal (R4, tab 654). Also on 15 February 2006 there was an "Onity Meeting" attended by SBN, SME, Botting and Fort Lewis Lodging personnel (R4, tab 655).

208. On 16 February 2006 SBN acknowledged receipt of a 23 December 2005 email from CO Bartholomew granting a unilateral 60-day extension of the contract performance period[48] however, SBN objected to the 60 days as inadequate and expressed its belief that any extension should also be compensable (R4, tab 125 at 2869). CO Bartholomew responded the same day:

> The 60 day noncompensable extension was granted since the Army Lodging Fund may be responsible for up to 60 days due to some unforeseen site issues we encountered in the late fall of 2004. If it is determined that time is compensable, or any other additional time, it will be

_____

[48] We do not find a copy of the 23 December 2005 email in the record, nor is there an explanation for why it took SBN nearly two months to acknowledge its receipt.

194

granted when we discuss your Request for Equitable adjustment and all of the delays and costs the Fund has experienced for deficient design and nonconforming construction.

(R4, tab 125 at 2867) Also on 16 February 2006, CO Bartholomew emailed SBN's Sundgren:

> Ft. Lewis has had some serious delays, deviations and variances. As the contracting officer on that one, I am not sure of at this writing what we are going to do. That contract had a 60 day noncompensible extension until next Tuesday – after which liquidated damages are assessible if we go forward. We have been blindsided here of late with all kinds of problems that should have been raised a year ago. We also, sadly, put up with 18 months of non-compliance on the mechanical design – and that is my fault because we relied on the trust [SBN] earned on [another] project....

(R4, tab 122 at 2855)

209. On 17 February 2006 SBN and Jensen/Fey acknowledged that, of the 185 rooms in the project, 127 "vary from the RFP requirement. Of these 127 units, 60 are associated with square footage less then [sic] that required by the RFP" (R4, tabs 120, 123, at 2858-59, tab 124 at 2865-66, tab 126 at 2871, tab 127 at 2874, tabs 657-59, 1158). CO Bartholomew responded:

> Gentlemen: We cannot digest all of the impacts and information at this time. It appears that if we go forward, there will be a need for considerable consideration, possibly/probably on the order of $750,000 to $1 million, considering all issues, costs and delays.
>
> In the interim, I will authorize a 10 day non-compensible [sic] extension of the contract completion date, from 21 February 2006 to 3 March 2006. We reserve all rights including the right to issue a Show Cause why we should continue and not Terminate for Default. I am copying both our Deputy General Counsel, and the Senior Contracts Attorney on this project.

(R4, tab 126 at 2870)

195

210. On 2 March 2006 SBN recorded the following in a handwritten document identified as "Minutes of Mtg":

SUMMARY

- AN AGREEMENT WAS REACHED AFTER SEVERAL ROUNDS OF NEGOTIATION IN WHICH [SBN] AGREED TO A $500,000 DEDUCTIVE CHANGE ORDER

- IN CONSIDERATION THEREOF THE ARMY CFSC ASSURES THAT

  ① NO LIQUIDATED DAMAGES WILL BE ASSESSED THRU THE END OF [SBN]'S NEXT SCHEDULE UPDATE WHICH WILL INCLUDE THE REVISED MOCK-UP PROCESS AGREED UPON IN THIS MEETING

  ② THE MINOR DEVIATIONS WILL BE FLUSHED OUT DURING THE REVISED MOCK-UP PROCESS AGREED UPON IN THIS MEETING. A RESOLUTION WILL BE AGREED UPON FOR EACH. ARMY LODGING WILL BE INFORMED, PRIOR TO PUNCH LIST PROCEEDINGS, THAT THE MINOR DEVIATIONS HAVE BEEN AGREED UPON AND CONSIDERATION PROVIDED.

THE REVISED MOCK-UP PROCESS AGREED UPON IN THE MEETING INCLUDES THE FOLLOWING STEPS:

3/7/06   [SBN] WILL PROVIDE RESPONSES TO THE CFSC MOCK-UP COMMENTS INCLUDING PROPOSED SOLUTIONS

3/14/06   CFSC WILL RESPOND TO THE ABOVE COMMENTS AND PROPOSED SOLUTIONS.

3/17/06   [SBN] WILL ISSUE A REVISED PROJECT SCHEDULE TO INCLUDE THE REVISED MOCK-UP PROCESS AND THE IMPLEMENTATION OF THE SOLUTIONS TO THE MINOR DEVIATIONS.

3/21/06   AN ON-SITE JOB WALK WILL BE HELD WITHIN
THRU     THREE WEEKS OF 3/21/06 AT WHICH ALL ISSUES

196

> 4/11/06  WILL BE REVIEWED AND FINALLY RESOLVED.
>
> 3/31/06  100% DRAWINGS WILL BE SUBMITTED
> INTEGRATING THE RESOLUTIONS TO THE MINOR
> DEVIATIONS.

(R4, tab 1168)

211. CFSC conducted a second Mockup Rooms Inspection on 9 March 2006 (R4, tab 1169).

212. On 30 March 2006 CO Bartholomew and SBN's regional director Sundgren executed contract Modification No. P00003 which incorporated by reference the parties' 23 March 2006 settlement agreement:

> a. Subject Contract is hereby modified to reduce the sum of the contract by $500,000.00 in accordance with the attached Settlement and Release Agreement, dated 24 March 2006.[49] A new completion date will be agreed to by the parties and codified in an appropriate modification to follow.
>
> b. Previous Contract Price      $17,397,806.26
>    Modification P0003        (500,000.00)
>    New Contract Price Not to Exceed  $16,897,806.26
>
> c. All other terms and conditions of the aforementioned contract remain unchanged and in full force and effect.

(R4, tabs 68, 371) The attached Settlement and Release Agreement provided:

> C.    [SBN] and CFSC desire to fully compromise and settle all current disputes between them regarding certain Project design nonconformance issues relating to the Project, as more fully described below, without the admission of liability on the part of either [SBN] or CFSC.
>
>    ....

---

[49] The actual date on the settlement agreement is 23 March 2006 (R4, tab 371; *see also* finding 210).

1.     **Settlement Amount.** The Parties agree to a settlement amount of...$500,000...in full and complete satisfaction of all known claims and disputes between [SBN] and CFSC which are in any way related to the Project which either Party may have as of the date of this Settlement Agreement except as expressly reserved herein. The Parties agree that the Contract price shall be reduced in the amount of $500,000 upon execution of this Settlement Agreement by both parties and issuance of an appropriate modification to the Contract by the authorized CFSC Contracting Officer.

2.     **Release.** Upon execution of an appropriate modification to the Contract, the Parties, on behalf of themselves and all of their respective predecessors, successors, affiliates, administrators and assigns, hereby release and forever discharge the other and each of their respective officers, directors, employees, predecessors, successors, affiliates, and assigns, of and from any and all claims, liabilities and causes of action relating to those issues identified in paragraph 3 of this Settlement Agreement and subject to the reservation of rights in paragraph 4. The claims released hereby are hereafter referred to as the "Released Claims," and the Parties giving a release hereunder are hereafter referred to as the "Releasing Party(ies)." In addition to the foregoing, CFSC expressly waives any right it has or may have to assess or seek liquidated, direct or consequential damages related to any actual or alleged deficiency under the Contract related to the Released Claims.

3.     **Released Claims.** The following are the Released Claims and are related to variations in the Contract's requirements.

    A.     **Ceiling Heights.** CFSC accepts [SBN]'s proposed ceiling heights as shown on the construction documents (including construction drawings), including, but not limited to, those ceiling heights within the corridors of the Project which are reduced to eight feet (8'-0") and the ceiling heights in G-28, G-39 and G-51 units which are reduced from an eight feet, four inches (8'-4") requirement to eight feet (8'-0").

198

B. **Square Footage.** CFSC accepts [SBN]'s revisions to all floor plan square footage and configuration requirements for individual rooms in the Project whether the proposed square footage and configuration is either more than or less than the requirements of the Contract, including necessary adjustments to individual room components.

C. **Impacts Resulting From Ceiling Height or Square Footage.** The Parties acknowledge that there are and may be direct or indirect impacts to the design of the Project resulting from the changes to Ceiling Heights and/or Square Footage as described herein. The Parties agree that reasonable changes in the configuration, variation and location of, by way of example, light switches, furniture, PTAC units, doorway entry widths, door swing direction, bedroom door configuration in family suites, closet widths, window blinds and draperies which are either directly or reasonably related to the changes to Ceiling Heights and/or Square Footage will be accepted if such changes meet all performance requirements of a facility of the type and size contemplated in the Contract, including, but not limited to those related to the Americans with Disabilit[ies] Act, safety and functionality.[50]

D. **Memorialization of Changes.** The Parties acknowledge that at the time of final acceptance of the Project there will be changes in the final product as a result of this Settlement Agreement. Accordingly, the changes to which the Parties agree shall be incorporated into the Construction Documents (100% Design Submissions) and will be accepted by the Army as a baseline for final acceptance of the facilities.

4. **Reservation of Rights.**

Except as expressly provided for in this Settlement Agreement, [SBN] and CFSC reserve all of their rights

---

[50] Ms. Moinette agreed that the reduction in the room sizes from the sizes required by the RFP presented no functional or visual impacts to lodging guests (tr. 12/44).

under the Contract. Notwithstanding any provision of this Settlement Agreement, [SBN] expressly reserves its rights to assert a request for equitable adjustment and/or a claim for time and associated cost impacts which result from or are in any way related to the Contract. CFSC agrees, pursuant to the Contract, to review and consider any request for equitable adjustment and/or claims submitted by [SBN].

....

6.     **Covenant Not to Sue.** The Releasing Parties agree that they will not institute, cause to be instituted or participate or cooperate in the institution of any claim, action or litigation against any Released Party in which liability is sought in any way to be predicated upon any of the Released Claims.

7.     No Admission of Liability. [SBN] and CFSC have entered into this Settlement Agreement solely for the purposes of avoiding the expense and inconvenience of contesting the claims, with potential subsequent litigation. By entering into this Settlement Agreement, neither [SBN] nor CFSC admits liability or wrongdoing of any kind, and in fact each continues to deny that it has engaged in any wrongful conduct or is in any way liable to the other concerning the Released Claims.

(R4, tabs 68, 371; *see also* finding 259) Reading the express terms of Modification No. P00003 as a whole, and harmonizing its terms as much as possible[51], we find that SBN agreed in Modification No. P00003 not to submit claims for anything other than time and associated cost impacts where the subject of the claim was either a dispute in existence prior to 23 March 2006 or was associated with the "Released Claims" of ceiling heights, square footage and/or impacts resulting from them.

213. On 4 April 2006 SME reported to SBN that SBN's superintendent, Bowman, "called the military police onto the site yesterday, directing them to speak with our superintendent...Padgett" when he refused to leave SBN's trailer until he got an answer to his question (R4, tabs 703-04). The personality conflict between SBN's Bowman and SME's Padgett continued through June 2006, when Mr. Padgett was

---

[51] *LAI Services, Inc. v. Gates*, 573 F.3d 1306, 1314 (Fed. Cir. 2009).

asked to leave the 20 June 2006 subcontractor meeting (R4, tab 773), and July 2006 (R4, tabs 772, 778).

214. On 5 April 2006 the CO asked when SBN would submit updated 100% design documents that included the issues of door swings and light switches in 17 extended-stay rooms which he identified as "a Contracting Officer directive" (R4, tabs 130, 707). SBN considered "these changes [to] fall within our recent settlement agreement, Modification #3, paragraph C" and stated its intention to "submit an appropriate change request" and to submit updated 100% design documents on 10 April 2006 (R4, tabs 130, 707). SBN confirmed that it had hired a third-party inspector to review Botting's mechanical work and COR Dyer stated that he intended to have ORB/BCE also provide "an extra measure of oversight" (R4, tab 707).

215. In a handwritten document dated 20 April 2006, signed by both CO Bartholomew and SBN's LaSharr, it was agreed that:

> The NAFI hereby authorizes a mechanical Notice to Proceed for all mechanical/HVAC/Plumbing, subject to an RFI verification/acceptance of the RBI Boiler and restamped drawings, effective this date.

(R4, tab 1171; tr. 5/77-78)

216. On 4 May 2006 SBN provided to its architect and subcontractors the following schedule for "completion of 100% submittal documents (both drawings and specifications":

> **May 4 / May 8** Jensen Fey to forward updated backgrounds to all designers.
> **May 4 / May 8** Designers to incorporate as-built conditions and RFI's into documents (only RFI's with Army CFSC Response)
> **May 8 / May 12** Designers incorporate updated backgrounds and make adjustments to coordinate the documents. **Drawings must be stamped by licensed engineer. Drawings must have updated title block with correct date of May 15, 2006, 100% Submittal.**
>
> **May 15** All Designers to have updated, coordinated plans and specifications in our office for [SBN] review, printing, and distribution to the Army.

> **These dates cannot slip, as submittal of these coordinated documents is critical to the forward progression of this project.**

(R4, tab 733; tr. 9/182-85)

217. On 4 May 2006 SME identified numerous errors and conflicts in SBN's most recent project schedule:

> After reviewing the schedule from SBN[] it appears that who ever [sic] put this schedule together has not followed the agreements that have been previously made by Rick LaSharr and our team. The start and finish dates for each area according to the new schedule has overlapping occurances [sic] for every area. Also they are showing SME to go into the rooms 4 different times. Wall rough-in, ceiling rough-in, finish trims, and Dwyer install will need electrical connections made up. If we were to follow their current schedule we would need to double even our most recent manpower calculations. The schedule also has many occurances [sic] with trades stacked into rooms to do trim outs with very minimal days to do the work. The schedule also has areas of work that are already shown completed that we have not been able to work in i[.]e. the Lobby Area. The schedule does not show anytime allowed for walkway lighting or canopy lighting. This schedule does not match the 4-week look ahead schedule issued to the Subs. Bottom line is that this schedule has many conflicts and needs to be fixed.
>
> The substantial completions have moved ahead about 3 months.

(R4, tab 732)

218. As of the 18 May 2006 progress meeting COR Dyer reported:

> 1. The 100% design will be finalized and distributed middle of next week (May 24)....
>
> 2. The next CFSC site visit is intended to "kill 2 birds with 1 stone". Review/inspect the mockup rooms and conduct a 100% design review meeting. IF [SBN] does provide the

202

design as stated by the above date, and IF [SBN] does complete the work for the 2 mockup rooms, the earliest that CFSC will make the site visit is the week of June 12....

3. You said that I cancelled the May 29 on site review by CFSC. May 29 is a federal holiday, Memorial Day. The cancellation of the site visit discussed during our April visit is being done because the mockup rooms are not "guaranteed" to be finished by the scheduled date. Rick LaSharr told me/us in April that the mockup rooms would be completed by middle of next week. During yesterday's discussion, you admitted this was not possible. Therefore, the decision to cancel the site visit to review the mockup rooms had to be made.

(R4, tab 132)

219. On 23 May 2006 COR Dyer advised that SBN had delayed the submission of its 100% design documents further:

Rick LaSharr, [SBN] Project Manager, informed me today that the 100% design is "potentially" not going to be shipped out this Friday, May 26. If so, this will not allow us 2 full weeks of review time prior to the week of June 12, which was supposed to be the week after the mockup rooms will be finished. As you know, we have cancelled next week's journey to Lewis because of carpet delivery issues, etc. [*see e.g.*, R4, tabs 750, 755]. Unless everyone wants to go to Lewis in back-to-back weeks, I don't think it's wise to separate both functions.

(R4, tab 749) Also on 23 May 2006, SBN advised CO Bartholomew that the mockup rooms would be complete by 12 June 2006 (R4, tab 751). CFSC experienced a "travel lockdown" that precluded travel by CO Bartholomew and COR Dyer from Virginia to Fort Lewis for the scheduled walk-through of the mock-up rooms and the 100% design review meeting during the week of 12 June 2006. COR Dyer notified SBN of the lockdown and advised that the events scheduled for the week of 12 June 2006 would be rescheduled as soon as the lockdown was lifted. (R4, tab 169 at 4046) The events were rescheduled to take place on 11-12 July 2006 (*id.* at 4055).

220. By letter dated 30 May 2006 SBN notified SME "that the current schedule is being driven by SME and is affecting the completion date of the project" (R4, tab 757). On 31 May 2006 SBN forwarded CO Bartholomew's direction to install

203

outlets beneath the PTCA units to SME. SME responded that "[r]edoing the 2 mockups is 1 thing, but we have already roughed-in 22 additional units and counting." (R4, tab 759) SME estimated that the roughed-in outlets at 40 PTAC units would require relocation (R4, tab 762).

221. On 26 June 2006 SME notified SBN that SME could not complete its scheduled rough-in work at nine (9) listed locations due primarily to incomplete work by the framing subcontractor who assured SME "he would do what he could but at some locations he was waiting for HVAC to be completed before he could continue (R4, tab 769). On 2 August 2006 SME notified SBN that, per SBN's Schedule S46V, its work was being delayed 16 days by lack of framing and "HVAC shaft duct work not done" (R4, tab 782).

222. On 11 August 2006 SBN provided to the CO SBN's responses to the 100% design review comments (R4, tab 133).

223. On 9 October 2006 COR Dyer emailed the following to CO Bartholomew, ORB/BCE representatives and Stedman regarding the importance of the mock-up rooms and SBN's quality control procedures:

> [Bob Monson,] I also want to speak to you about the schedule to have both mock-up rooms completely finished and truly becoming the standard for workmanship and quality. After the mess I saw, we must emphasize to [SBN] the importance of these two rooms, and how they indeed establish the level of quality and workmanship throughout the entire facility.... It may be beneficial to get the team assembled once more to have one final look at both rooms and stress to SBN[] how we plan on conducting our pre-final (shortly after Thanksgiving?)....
>
> ....
>
> PS-Modification P00004 established a contract completion date of February 12, 2007. Just 4 months away? Bart, I asked Rick [LaSharr] to take one more "hard" look at his schedule and to once and for all determine his date. I have a sneaky suspicion that he'll be coming back to us asking for March 1 or March 15. Either date is fine with me. I just wanted [SBN] to understand that the QC pre-final inspection and correction of the Architect's/Engineer's of Record list(s) must be done within the contract time. Before [SBN] declares that they are ready for the

Government's pre-final, we'll have a signoff by the
Architect and Engineer's [sic] that their punch lists have
been satisfactorily completed in accordance with the
Quality Control plan and workmanship and quality
established in the Mock-up rooms.

(R4, tab 816)

224. On 12 October 2006, several years into the contract, Jensen/Fey asked SBN what Jensen/Fey's responsibility was as CCQC as it related to coordination with the various subcontractors and inspection of their designs and installations (R4, tabs 819-20).

225. By agreement dated 20 November 2006, and executed on 21 November 2006, SBN agreed to pay Botting against its claim as follows:

> c. Any payment to [Botting] required above under
> Paragraph 2(b) is expressly conditioned and contingent
> upon the outcome of the litigation between [SBN] and
> Owner and [SBN]'s actual collection of sums from Owner
> for [Botting]'s Pass-Through Claim.
>
> ....
>
> h. ...[I]t is specifically agreed that [SBN] shall be
> liable to [Botting] only to the extent that the Owner is
> liable to [SBN] for such sums....

(R4, tabs 842, 1180; tr. 4/64-66) Similar agreements were made with Paras (concrete subcontractor) on 27-30 November 2006 (R4, tab 1181), Jensen/Fey on 1 December 2006 (R4, tab 1182), and SME on 1 November 2007 (R4, tab 1200).

226. On 22 December 2006 CO Whitley issued a Letter of Concern to SBN stating that SBN's 6 December 2006 project schedule showed a loss of production on the critical path of 30 calendar days and requesting a "viable Recovery Plan" within 5 days. SBN replied that it would respond after the holidays. (R4, tab 135)

227. Modification No. P00005, dated 4 January 2007, provided notification that, effective immediately, CO Whitley replaced CO Bartholomew as the assigned contracting officer; the modification also formally accepted SBN's 100% design and issued a full NTP for construction of the project. There was no change to the project completion date of 12 February 2007. (R4, tabs 136, 860; tr. 5/91, 95-100, 12/164-165; finding 223)

5. Project Completion

228. As of 8 January 2007 Jensen/Fey had not provided updated Daily Reports to ORB's Monson as requested; Monson advised that SBN's December 2006 pay request for $870,000 would not be processed until the Daily Reports were received (R4, tab 1183; tr. 9/118-20). Again on 18 January 2007, Monson reported that SBN had not provided Daily Reports "since around the last part of October [2006]" (R4, tab 1185).

229. The 17 January 2007 Progress Meeting #52 minutes contained the following items pertinent to the service gate and intercom:

> **Hydr[au]lic Gate**
> 12/6/06 Rick provided new proposed design to Drew [Dyer]. Drew was satisfied with the proposal, but requested a formal submittal. SBN[] will provide submittal information with pricing. SBN[] will provide cost/credit info associated with gate to CFSC by 12/13.
> 12/14/06 SBN[] forwarded pricing info to CFSC.
> 12/20/06 Sheryl requested a method for lodging personnel to open the gate w/o interaction with the front desk. This is not called for in the RFP. SBN[] will provide intercom submittal. Rick will provide associated pricing with intercom. The Delta Scientific gate and associated labor was deducted and the new gate and labor was added. The new gate will require additional electrical lines to power the second boom.
> 12/27/06 CFSC to approve hydraulic gate.
> 1/3/07 CFSC to approve hydraulic gate.
> **1/17/07 Direction to proceed provided by [CO] Reginald [Whitley], but no modification has been issued.**
>
> ....
>
> **Intercom/Extention of Phone System**
> 12/6/06 Drew requests copy of intercom submittal. There is a meeting at 9:00am on 12/7 with SME, Onity, Jensen Fey, and SBN[] to coordinate the operation of intercom, front doors, and hydraulic gates. SBN[] will forward intercom submittal to CFSC after 12/7 meeting.
> 12/14/06 Rick to forward submittal.
> 12/20/06 Intercom is not required to be separate from phone system per RFP. Duane consulted the DOIM

Communications officer and determined that the government does not prohibit the simultaneous use of their lines, but stipulates that the government will not be liable for any problems on lines connected to other systems. Intercom will be installed separate from government lines and Rick has forwarded associated costs to CFSC. Drew will recommend to [CO] Reginald [Whitley] that CFSC disapprove increase[d] costs associated with separate intercom lines. Rick requests CFSC issue direction quickly.

12/27/06 [CO] Reginald [Whitley] to provide direction.

1/3/07 [CO] Reginald [Whitley] to provide direction.

**1/17/07 Intercom will not be tied to phone system. Direction to proceed provided by [CO] Reginald [Whitley], but no modification has been issued.**

(R4, tab 169 at 4101, 4109-10)

230. As of 18 January 2007 Botting's DDC specification submittal still did not meet all the RFP requirements as it was deficient in 29 specification sections (R4, tabs 1186, 1187). The list of deficiencies was provided to SBN on 17 April 2007 (R4, tab 1184 at 3125).

231. On 25 January 2007 CO Whitley requested from ORB a copy in electronic form of all documentation associated with this project in order to respond to a FOIA request (R4, tab 1189; tr. 10/109-12).

232. In an Information Paper dated 2 February 2007, CO Bartholomew[52] reported the following information to Army Lodging's Ms. Moinette:

SUBJECT: Status of Nonappropriated Fund (NAF) Contract for New 185-Room Army Lodge at Ft. Lewis, WA

1. Purpose: Advise CG of NAF construction contract for the new Army Lodge at Ft. Lewis, WA

2. Project Overview: A design-build contract was awarded in May 2004 to [SBN], Bellevue, WA, for

---

[52] CO Bartholomew was no longer the assigned CO for the project as of 4 January 2007 (finding 227), but was reassigned again effective 1 February 2007 (finding 234).

$17,359,397. Contractor design delays and subsequent project delay resulted in a negotiated contract reduction of $500,000 in March 2006. The project completion date was extended to February 2007. Construction work is good to very good.

3. Background.

a. Project Scope. This Army Lodge project includes the construction of a new 185-room Army Lodge to be integrated into a three-building "campus". The Contractor is responsible for both the design and construction of the new building. Renovation of the second existing building in this complex is under design review and project development for award to another contractor.

b. Recent Changes. Two months of additional delays have resulted in a further delay of the project completion date from February 2007 to mid-April 2007. It will take an additional 4 to 6 weeks to correct minor deficiencies and load the furniture into the building. Soldiers can begin to occupy the building in late May 2007. Routine change orders in progress will not further delay the project.

c. Pending Development Plans. The NAF Contracting, Construction and Army Lodging staffs are conducting weekly progress review meetings and teleconferences to ensure all aspects of the project come together for May 2007 occupancy.

4. Related Issues:

a. Two of [SBN]'s subcontractors are seeking additional money from the contractor. They have submitted Freedom of Information (FOIA) requests to FMWRC. Other issues in dispute with the Contractor are currently under Contracting Officer review. These issues will not delay project completion.

b. The storage and staging for the furniture, fixtures and equipment (FFE) for the new facility is being closely

worked by the project team to ensure smooth transition and
storage cost control.

(R4, tab 1191)

233. On 13 February 2007 SME provided to SBN a list of its work items that
were unable to be completed by "the date of the owner punch (3/13/07)" due to work
still remaining to be done by other trades (R4, tab 873).

234. Modification No. P00006, dated 16 February 2007, formally assigned
CO Bartholomew again to the Fort Lewis project, effective 1 February 2007 (R4,
tabs 137, 870; tr. 5/95, 12/164-65). On 16 February 2007 he directed SBN to proceed
with "a complete Duress Alarm System" and providing a bead of clear caulk at
specified locations (R4, tabs 876-77).

235. On 20 February 2007 CO Bartholomew signed Modification No. P00004
in the amount of $252,154.20 as compensation for 13 items of previously directed
changed work; the modification also revised the contract completion date to
12 February 2007 (R4, tab 134). We have found no explanation in the record for why
the modification shows an effective date of 6 October 2006.

236. Modification No. P00007, dated 23 February 2007, established final
pricing for the 13 items of work listed in Modification No. P00004 by decreasing the
contract price by $14,273.00 and extending the contract performance period 60 days
from 12 February 2007 to 13 April 2007 without additional compensation. The cover
page of the Modification included:

> The NAFI reserves the rights to determine if liquidated
> damages are assessible [sic] and the Contractor reserves
> their right to seek authorized or comepensible [sic] time.

(R4, tabs 138, 883) However, the detailed list included in the Modifications stated:

> 14) Add 60 days to the contract completion date without
> assessment of liquidated damages or additional
> compensation. Both the NAFI and Contractor reserve
> their rights to revisit this extension. The new contract
> completion date is 13 April 2007.

(*Id.*)

237. By letter dated 28 March 2007 the Architect of Record expressed its
determination that the project was substantially complete and requested a pre-final

209

inspection be scheduled two weeks later (R4, tab 139; tr. 5/101-05, 7/279-82). The next day SBN sent a letter to CO Bartholomew formally requesting a pre-final inspection. CO Bartholomew scheduled the pre-final inspection to begin on or about 16 April 2007. (R4, tab 140; tr. 5/105-07)

238. On 2 April 2007 SBN's LaSharr requested information from Botting regarding the installed DDC controls which did not permit workstation access to the building control system and "the LON cards that continue to be an issue" (R4, tab 1192).

239. On 30 April 2007 it was discovered that SBN had not provided the DDC software required by its own DDC specification dated 28 November 2005. CO Bartholomew requested that SBN do so before requesting a final inspection. (R4, tabs 141, 892) SBN responded that it had already requested that Botting do so (*id.*). CO Bartholomew advised that a final inspection would not be scheduled until the software was installed and tested. In addition:

> We also will need resolution of the punchlist for the interiors and any technical comments from our consultants revised. It is our intent to transmit our formal list within the next week.

(*Id.*)

240. Modification No. P00008, dated 3 May 2007, increased the contract price by $313,854 for 20 listed items of previously directed and changed work. The Modification specifically reserved the Fund's right to consider assessment of liquidated damages and reserved SBN's right to seek an extension of the performance period for any associated delays to the critical path. (R4, tabs 143, 895)

241. On 8 May 2007 CFSC provided to SBN the Pre-Final Inspection punchlist which was "only for the areas that could be inspected and did not include an exterior inspection of the building" (R4, tab 144).

242. A "DDC Conference Call" was held on 15 May 2007 which resulted in the following:

> 1. [SBN] will issue direction today to [Botting] to provide/install Workplace Pro and Lonmaker software[.] Automated Controls will install software [*see also*, R4, tab 205]. Lead time is short.
> 2. The Notebook computer referenced in Spec 15910 Section 2.1.5.1 is not required.

3. [Botting] will provide to [SBN] by Friday a copy of all commissioning documentation, the T&B report, and a response to the Owner's DDC RFI.

4. Automated Controls will provide by next Tuesday, 5/22/07, all control parameters specified in Spec 15910 Section 2.1.3.2 or a response clarifying why a specific parameter listed can not be provided.

5. Following #4 (above), Randy Hieburg [sic] (BCE) will meet onsite with Automated Controls, [Botting], [SBN] and DPW. Automated will then demonstrate compliance with Spec 15910, including each available setpoint, etc. Randy Hieburg [sic] will then clarify, if necessary, what additional points are required to conform to Spec 15910.

(R4, tabs 145, 897, 1199) BCE's Heiberg testified that:

> [T]he system wasn't usable, there were some concerns that were raised by [DPW]...and what we found was that the JACE, the system was extremely slow, there were points that hadn't been commissioned, so things weren't working, things weren't controlling. There were graphics that would cue up as you looked at a piece of equipment, but extremely slow, and there were operational issues with ventilation equipment, serving the ventilation air to all the rooms. They were cycling, burners were coming on and going full fire and then shutting off, and full fire and shutting off.
>
> So temperature swings all over the place, and once we got into it in a few more details, we discovered that a single JACE panel had been installed, and all of the graphics—I mean a global controller has certain memory capabilities, it's not a big PC, and they had graphics resident on this while all of the controls for the building were being—so basically the architecture needed some tweaking in their design of their system. The graphics should have been, and were later moved to another controller so they weren't inhibited by serving up the graphics that the controller, the main controller, the main JACE was being used to control all the hard points and hardware, the control functionality of all of the equipment connected to it.

There was another, I believe at some point, another controls contractor that came in and took care of some of those issues.

....

[A] global controller is the next step up in an architecture from a unitary controller. A heat pump serving this room would be a unitary controller. It would talk to the next level up, which would be a global controller.... Then that global controller would talk to 31 other global controllers if this was a huge complex.... And then you could go up to the next level to a piece of equipment. Well, they basically tried to put way too much equipment and graphics serving requirements on one global controller serving the whole building. So the design was somewhat flawed inasmuch as they taxed—I mean, it would eventually serve it up, but it made the system so slow that it wasn't usable....

So while the machine is serving up graphics, it's trying to make computations to decide what to do with the heat pump that it's controlling also, ..., or some other piece of equipment. So it had to time share, it just simply had too many tasks to do.

[The issue was resolved when] [t]hey put in a server, a graphics server, site based to take care of all the graphics.

(Tr. 11/144-46) Mr. Kommers, SBN's expert witness, testified that the slowness of the system was because CFSC had required more than the RFP did in the way of graphics and interface (tr. 13/78-79).

243. The final 100% design drawings and specifications are dated 15 May 2007 (R4, tabs 1175-76).

244. On 24 May 2007 SBN advised Botting that there were still errors in the DDC computer system being able to communicate with the units. SBN also stated that it had not received "the commissioning check list or response to the RFI as requested numerous times." (R4, tab 900)

245. On 24 May 2007 COR Dyer recommended to CO Bartholomew that the project be "conditionally" accepted on 25 May 2007:

212

We provided [SBN] with copies of the final remaining items yesterday and today. [SBN] did an outstanding job of reducing the interior punch list from almost 4,000 to approx. 120 as the team ended day one of the final inspection. The leftover items were being corrected today and will continue tomorrow. There are a few items on order (mirrors, refrigerator doors, etc). I may be able to check off several more items before the day ends tomorrow.

The quality and level of work is outstanding. The spirit of cooperation and upbeat attitude of everyone on the job was very refreshing considering recent projects.

(R4, tab 146) That same day, CO Bartholomew formally notified SBN's Montoya by letter that:

The Army Lodging Final Inspection Team has been on-site this week evaluating the work [SBN] has done on the Pre-Final Punch List items, previously provided to [SBN], and other work not previously reviewed or inspected at the new Lodge. I am pleased to report the Team has been impressed with the work done to correct items on the Pre-Final Punch List. There has also been significant work done on the outside of the building. I also received other positive comments regarding [SBN's] cooperation, positive attitude, and efforts to complete this project.

In view of the foregoing, the Fund will Conditionally Accept the new Ft. Lewis Lodge tomorrow, May 25, 2007. The one-year Warranty of Construction will then begin for all accepted work. The items reported to me that condition the building acceptance are:

1.      Mechanical equipment, to include DDC's and Specification 15910. This includes receipt of all appropriate software licenses.

      ....

Tomorrow will also be established as the Conditional Beneficial Occupancy Date/Substantial

213

Completion Date (with conditions). Ft. Lewis Army Lodging will also take control of the building tomorrow. All card keys, and keys to locks accessing the building, are to be turned over to Ms. Cindy Moinette, Lodging Manager, or staff she specifically designates to receive them. Beginning tomorrow, all access to the building, by [SBN] and their subcontractors, to complete the work above and other punch list items, will be requested through, and controlled by, Ms. Moinette or her designated staff. Please ensure the Fund Project Manager, Mr. Drew Dyer, is copied on all written and e-mail communications.

A Final Inspection Punch List will be provided as soon as it is available. A stairwell and exterior punch list (essentially a Pre-Final Punch List for those areas), as received, will be provided to you today by e-mail. Please inform the Fund's Project Manager, and the undersigned, when all remaining items of work have been completed.

We appreciate your efforts to complete the remaining work, while we perform other work in the building, and trust it will be done as quickly as possible so that we may begin closing out the contract. We look forward to opening the new 185-room Army Lodge for Soldiers' use.

(R4, tab 147; tr. 5/107; *see also* R4, tabs 1193, 1207 at SUPP-118)

246. Ms. Moinette testified that, as originally awarded, the project was supposed to be complete within 18 months but that, as a result of the delayed completion, Army Lodging suffered actual damages:

[I]t was a big impact as far as sending bed nights off post, because we were so busy. Therefore, not only did we lose the income, also the travel account and expenses increased, because they had to pay downtown rates rather than our rates, which are normally 50 percent of per diem.
When I did a scale to see approximately how much actually [sic] revenue was lost, it was about 2.5 million dollars because of the late opening of the lodge. I mean, that's two summers that were critical.

. . . .

214

[T]hen you run into that they have to have transportation. And having soldiers off post is very difficult if they are not entitled to have a rental car.

Some of them do not get authorized rental cars. So, therefore, it was an issue if your family is coming from Europe, they don't have transportation. So, that becomes a bigger issue that they have to take their family downtown without vehicles.

....

I sent way over 120 some thousand bed nights off post in one year.

(Tr. 12/27-29)  We find no evidence that liquidated damages were assessed against SBN.

247.  Almost three months after CFSC took beneficial occupancy of the Lodge (finding 245), 13-15 August 2007 was set as the date for the demonstration and acceptance of the DDC along with the provision of:

[T]he final testing and balance report(s), commissioning and start-up reports, O&M manuals, record drawings, and all other appropriate documentation.

(R4, tab 905 at 12834)  On 31 July 2007 CO Bartholomew expressed frustration to SBN that "Botting is jerking you, and us, around and it needs to stop (R4, tab 905 at 12835).  By return email dated 2 August 2007 SBN responded that:

We have reviewed the submittal that we received from WA Botting and find same not to be complete. We met with them today, and they are going to review the issues with the controls contractor. We can send you what we have, and advise what is missing, but I know the preference is to get all the information.

I am very aware that this is not what you wanted to hear.

(Id. at 12833)  CO Bartholomew replied:

Your assessment is correct! [COR Dyer] has set aside the 13th and 15th of August for us to wrap this up. WE NEED TO DO IT THEN!

215

I will also be available during that time. It is imperative we get the documents and schedule the demonstrations those days. The hotel is opening and the installation has raised this and other issues.

We have privity of contract with you. Please do what you need to do to make this work so we can energize our consultant(s) [ORB/BCE] to assist. I do not want this to get ugly after the building has turned out so well in almost all other respects.

(*Id.*)

248. By 15 August 2007 the DDC software installation, testing and documentation had still not been provided and SBN was concerned:

[CO Bartholomew] called and he is threatening to call the bond on the Fort Lewis project today if he does not receive the software and response for the DDC. Problem is that the systems cannot be balanced and filters are clogged. Work is required. If they do not receive the software and a response to the warranty or problematic work today they will procure all necessary materials and services to complete the work and charge against our bond.

(R4, tabs 907, 1195)

249. On 17 August 2007 SBN issued a "Notice to Cure Subcontractor Default" to Botting:

This letter serves as formal notification that W.A. Botting is in default of its contractual obligations with [SBN] on the above-referenced project.... W.A. Botting is directed to immediately comply with all project requirements. As described in previous correspondence, W.A. Botting has materially breached the contract....

....

Per the Subcontract Terms and Conditions, W.A. Botting is liable for all costs, direct and indirect, related to the delays and disruptions caused by W.A. Botting's failure to

perform its contractual obligations. Such damages will include damages to the Owner, [SBN], as well as damages incurred by other subcontractors.

(R4, tab 908) The copies of the letter in the record show that it was sent to Botting by certified mail and that the letter was stamped as received by Botting on 21 August 2007 (R4, tabs 908-09). However, Botting obviously received the letter before that date because, on 20 August 2007, it made reference to the letter in its own "Notice to Cure Subcontract Default" to Automated Controls (R4, tab 910).

250. As of 28 August 2007 Botting had still not completed the DDC software installation, testing and documentation required by Specification 15910 (R4, tabs 148-53, 903). COR Dyer expressed to SBN that, if he had known that this issue would still be open, he would not have recommended that the Fund take possession of the building in May (R4, tab 153; *see* finding 245). On 4 September 2007 CO Bartholomew issued a "Requirement to Cure DDC Software Issues":

> Unfortunately things are not all in order and there are problems with the software system and its functionality as currently set up.
>
> [COR Dyer] has been communicating with our technical folks and John Timmers. I had a brief telecom with the both of them this afternoon.
>
> According to John Timmers, the DPW authority at Ft. Lewis, changes made to the controls set points can be made on the Supervisor but nothing happens at the VAV.
>
> Additionally, there are problems with the AAON units function and variance of discharge from 85 degrees down to 55 degrees. There are issues with the sequence of operations and the modulating unit capability is apparently not working.
>
> This is an electronic notice to Cure this condition. It may be followed with a formal demand on the Performance Bond issuer that the DDC controls for the facility, accepted conditionally in May 2007, are not properly working.
>
> We have invested almost two years of time and untold hours and meetings dealing with these issues. Our meeting on 15 August 2007 led decision-makers on our side to

217

grant an extension to 24 August. Efforts were made by the [SBN] Team to get us the needed software licenses and O&M manuals that were way overdue. However, the DDC controls issue seems to be a continuing problems [sic] with the functionality and operation (or lack thereof) of the system.

Please respond with the remediation plan to correct these issues by 1700PDT tomorrow, 5 Sep 17 or we will take any and all actions necessary to get this work corrected and charge back against any remaining monies yet to be paid or a demand on the bond issuer who has been copied.

(R4, tabs 154, 911) As of the next day, 5 September 2007, SBN stated that it considered the DDC issue corrected and closed (R4, tab 157).

251. The Grand Opening of the Rainier Inn took place on 13 September 2007 (R4, tabs 1197-98; tr. 5/108, 9/253-54, 12/31). In addition to the Rainier Inn (designated as Building 2107), the Fort Lewis lodging complex included two pre-existing lodging facilities of 80 rooms each (Buildings 2110 and 2111), as well as a maintenance building (Building 2108) (tr. 12/53-54).

252. Again, on 14 September 2007, CO Bartholomew advised SBN of "many disturbing reports…that the [DDC] situation is not fixed." After Botting advised on 18 September 2007 that it was taking control of the situation, CO Bartholomew replied to SBN:

> I am at a total loss as to what the [Botting] e-mail below means. WA Botting has been responsible for the controls all along. For two years they have failed to hire a proven firm capable of installing and making the Tridium and related softwares [sic] HVAC interfaces/points work properly. The building was accepted conditionally in May and here we are the end of September. We met on site with two of the Bottings, TRS[53] and Automated Controls representatives and I gave your team a couple weeks to resolve. It has cost us thousands of extra dollars to have our consultants go in and look at what is going on / only to be told it is still not correct.

[53] TRS replaced Automated Controls and sometime between 8/15/07 and 9/26/07; the replacement contractor was an approved DDC contractor for Fort Lewis (R4, tabs 149, 160 at 3063, 3067).

218

> If you do not choose to get new blood into this project
> immediately (by COB today), we will take all necessary
> actions to get the system fixed and charge back/call
> bonds/etc. I again reiterate that we have provided you the
> names of the three Tridium licensed firms that Ft. Lewis
> DPW has used successfully and you may obtain that
> information again from Mr. John Timmers.

(R4, tabs 158, 914; *see also* R4, tab 913)

253. On 24 September 2007, when the DDC controls work in accordance with Specification 15910 had still not been completed, CO Bartholomew directed that software programming could continue but further directed that all "mechanically oriented work" was not authorized until an appropriate "ACTION/REMEDIATION PLAN" had been submitted by SBN and authorized by CFSC (R4, tab 160).

254. As of 2 October 2007 SBN acknowledged that the DDC work by TRS was not complete (R4, tab 160 at 3060). SBN advised COR Dyer that "a complete functional test of the system" was scheduled for 15-16 October 2007 when COR Dyer was at the project site (R4, tab 161 at 3078). The DDC installation and testing was considered complete after the Thanksgiving holiday, however, as of 31 December 2007, the contract-required documentation was not complete. Nevertheless, COR Dyer recommended to CO Bartholomew that the DDC system be accepted as of 1 December 2007. (R4, tab 162)

255. On 25 February 2008 CO Bartholomew advised SBN that the DDC documentation was considered complete and confirmed 1 December 2007 as the start of the one year warranty for the DDC controls (R4, tab 163). CFSC acknowledged receipt of mechanical system as-builts, including DDC, on 20 May 2008 (R4, tabs 166, 169 at 3129).

256. SBN submitted an REA to CFSC on 2 April 2008 (R4, tab 1207 at SUPP-121). We have not found a copy of this REA in the massive record before us, presumably because it was subsumed in SBN's 2010 certified claim (finding 267). On 8 April 2008 CO Bartholomew acknowledged receipt of a four-volume REA from SBN in the amount of $7,561,051.89:

> The claim is apparently based on "unnecessary delays to
> [SBN's] design and construction of the Project" and there
> are reservations for interest, attorneys [sic] fees and other
> unforseen [sic] costs. Please recall that we negotiated a
> $500,000 contract reduction, in lieu of termination for

219

default, in March 2006. We also did not accept the DDC system (digital mechanical system controls) until last month, retroactive to December 1, 2007. The controls were not completed correctly when we took the building in May 2007 and had been both a design and construction discrepancy for several years.

....

I will review the documentation in the next 24 hours and keep you informed.

(R4, tab 164) Later the same day, CO Bartholomew provided further input to SBN regarding the REA:

We have received [SBN's] [REA] and have it under review. I have copied our contract attorney, project manager, and Army Lodging program manager.

Our review of your request will be detailed. Unfortunately, I am unaware of any [SBN] management still present in your office that was involved in 2003/2004 during the solicitation and award process. Those records/history shortly after award resulted in much of the [SBN] difficulties in the start of this project and the delays which ensued / including the failure by [SBN] to investigate the site properly until after the 35% design submission. This was further exacerbated by [SBN] assignment of the first project manager, new to [SBN] and with no design-build construction experience/capability, or understanding of the contract and process, and [SBN's] clear intent not to follow the contractual requirements for the Contractor Quality Control Management System that was to be headed by the Architect of Record. The Architect of Record repeatedly told us that they had not been hired to be responsible for the overall design management, which was confirmed by the former [SBN] executive who signed the contract (subsequently "released" by [SBN]).

We acknowledge there are unpaid contract funds (retainage). We [] have repeatedly requested an invoice for $125,000 to release that portion of the retainage following final acceptance, retroactively, for the DDC

220

controls/system over 6 months after the conditional acceptance of the building, and after more than two years of back and forth on what was required by the Ft Lewis Installation Design Guide (and the Ft Lewis Department of Public Works). This lost two years is a critical path. We advised the remaining retainage would be released with receipt of as-builts and a close out invoice with a Release of Claims. The $125,000 will still be released with an invoice request in that amount.

(R4, tabs 165, 920)

257. By email dated 23 June 2008, CO Bartholomew provided to SBN an informal summary of his review of the "major issues" contained in SBN's April 2008 REA, specifically stating that it was not a contracting officer's final decision:

> I will call you Wednesday at a time you are available, to discuss how we can separate out these issues, plan to conduct telecom and/or face-to-face meetings, involve consultants as needed, and go over the documentation and process necessary prior to issuing a final decision. I expect that we will conduct a number of meetings and information exchanges before getting to a final decision on those items where there is not agreement. Once a final decision is issued by the contracting officer, it may be appealed to the [ASBCA].
>
> ....
>
> Again, I am open for additional discussions, clarifications and exchanges of information on what you have submitted. I do not believe we have acted unreasonably or required anything that unjustly enriched us at the expense of [SBN] or any of their subcontractors.

(R4, tabs 167, 922, 1201) CO Bartholomew later stated that his 23 June 2008 response to SBN's REA was a "complete denial" but included the possibility of further negotiation (finding 259).

258. By email dated 10 July 2008, SBN's Montoya responded:

> I have reviewed your email and while this issue is significant, and the sums involved are as well, I am

suggesting the following steps be taken in order to resolve this between us.

1.      We need to determine whether there are major disagreements on the relevant facts denoted in our REA. From the general nature of the response provided I am unsure. The response provided does not include any analysis for our review. Once each component in our REA is addressed we can move to the next step.

2.      Once step 1 is completed we can identify the facts we agree/disagree on. For those items we agree on we can resolve the associated dollar amounts at this time.

3.      For those items we disagree on we can review the facts together to better understand each other[']s position. If necessary we can each provide additional information to support our respective positions.

4.      We negotiate a settlement based on the information reviewed in step 3.

The process identified above may take 2 or 3 meetings at the most. I recommend we meet the week of 28 July to accomplish Step 1 and Step 2. We can then meet the week of 18 August to address step 3 and 4. Let me know what date and location for each week works for you.

(R4, tab 168 at 3115-16, tab 923; tr. 3/221-25)  CO Bartholomew responded that he was out of the office on business through the first week in September, but he suggested a few dates in August that could work for an initial meeting (R4, tab 168 at 3115, tab 923).

259. In a "Pre-negotiation Meetings Plan" dated 1 August 2008, CO Bartholomew stated the following:

**Background**: The Ft Lewis Lodge (185 rooms) was competitively awarded under a design-build RFP to [SBN], Bellevue, WA for $17.36 Million in May 2004. [SBN] attempted to change the mechanical system design requirements from the outset and they were not accepted. [SBN] also completed the initial designs/35%/later designs without performing required site investigation/geotechnical exploration until later in the design process. This led to

222

required design changes in the foundation system and site elevations, among others, in December 2004, due to fiber optic lines running immediately under the proposed building layout along grid line 13. Subsequently, the entire [SBN] management and project teams were changed/replaced from late 2004 through 2005. This included multiple project managers, quality control chiefs, superintendents and upper management at the Bellevue, WA regional office. Mechanical and design issues resulted in protracted back-and-forth and extensive project delays. In early 2006 it was proposed by the Construction Directorate to terminate the contract for default. In February 2006, the Contracting Officer alternatively proposed seeking a bilateral contract reduction, in six figures, in consideration of not terminating for default. In March 2006, a $500,000 contract reduction was negotiated in lieu of contract default. Counsel for both parties sought to include reservations of all rights and they were incorporated in the bilateral agreement. Part of the agreement included accepting some non-standard rooms and shortened ceilings.

The project was conditionally accepted in late May 2007. The DDC controls system for the HVAC was not complete and not accepted by the Contracting Officer. Many changes were necessary and the system was not accepted until early 2008, retroactive to December 1, 2007.

In April 2008, [SBN] submitted a large four (4) volume REA totaling $7.6 Million. On 23 June 2008, the Contracting Officer issued a denial of the entire REA. However, the response did acknowledge the holding of retainage and a previous decision of the Contracting Officer to release $125,000 of the $251,000 retainage upon receipt of an invoice for same. An invoice was received on July 2008 and the $125,000 retainage was released via wire transfer within a few days.

**Other Comments**: Manufacturing problems have been encountered with the McQuay packaged terminal air conditioning (PTAC) units provided by the contractor (actually under a subcontract with W.A. Botting, the mechanical subcontractor, who has a claim for seven

223

figures as part of the overall REA request). Approximately half of the PTAC units require replacement and work is underway under the Warranty of Construction contract clause.

**Contracting Officer Summary of Actions Taken**: Following a lengthy review of the REA documentation [SBN] provided in four large volumes, a complete denial was made 23 June 2008, but it did include the possibility of additional consideration with a bifurcation of some issues and additional documentation. The initial finding by the Contracting Officer was not a final decision, and [h]as not been reviewed by a staff attorney. In the denial, the Contracting Officer anticipated a number of meetings and information exchanges before getting to a final decision on those items where there is not agreement.

. . . .

**[SBN] Request**: Following the Contracting Officer's initial denial of the REA, a dialogue was opened with the [SBN] Vice President/Division Manager, Mr. Ron A. Montoya, who oversaw the end of the project. He requested face-to-face dialogue meetings that were agreed to by the Contracting Officer. [SBN] requested the first of the meetings to be held 19/20 August in Arvada, CO so that their outside counsel, who participated in the bilateral agreement in 2006, could participate and understand the process. The first meeting will be to: 1) go over the original submission in detail; 2) identify areas where additional consideration is possible; 3) identify areas where a formal denial will occur/where there is no agreement; 4) discuss the intent of reservations taken with the agreement in march 2006; and 5) discuss the bifurcation of certain issues that might result in additional consideration (issues that [SBN] considers continued after the March 2006 agreement).

**Negotiation Plan**: The plan would be to conduct two face-to-face meetings followed by additional submissions, if appropriate, by [SBN] and their subcontractors. The initial meetings on 19/20 August 2008 are pre-decisional. A second meeting will likely be scheduled in Seattle, late September/October 2008, to take advantage of any

required technical input/participation by: the Architect of Record, Jensen Fey Architects; W.A. Botting, mechanical systems subcontractor; SME Electric, electrical subcontractor; other subcontractors as appropriate; ORB Architects, NAFI consultant; BCE Engineers, subconsultant to ORB Architects; and Ft Lewis, WA DPW representatives who were involved in establishing the Installation Design Guide requirements for HVAC systems and the DDC tridium controls. A Final Decision of the Contracting Officer is not expected until at least November 2008.

(R4, tab 1202)

260. CO Bartholomew and SBN representatives participated in a "lengthy conference call" on 19 August 2008 (R4, tab 170 at 1-3; tr. 3/221-25). The record contains no evidence of any later discussions between CO Bartholomew and SBN representatives.

261. CO Bartholomew retired at the end of December 2008 and, thereafter, did not participate in any further discussion or resolution of SBN's 2008 REA (R4, tabs 170, 1203, 1207 at SUPP-121; tr. 12/163, 190-93). SBN's Montoya left SBN's employment on 1 January 2009 (tr. 3/220).

262. In February 2009 CO John Wallace was assigned as the successor contracting officer responsible for the contract matters now at issue (tr. 12/129-30). He has been a senior contracting officer in the Major Projects Division for NAF contracts since 1992. CO Bartholomew had been his supervisor from 2004-2007 but they had no conversations about the specifics of the Fort Lewis lodging project before or after CO Bartholomew's retirement. (Tr. 12/129, 140, 147-48, 156, 163, 169-74) CO Wallace had previously been contracting officer, with COR Dyer as project manager, on two Navy lodging projects and one Army lodging project (tr. 12/140-41, 213). At the time CO Wallace became involved with the project now at issue:

Our office [CFSC] was in the middle of the BRAC relocation and the Army Lodging Organization was in the last phases of its relocation to San Antonio.

Their area on the fourth floor of our building, which we were part of, had been vacated. All their books and boxes and everything were packed up for shipment and were on their way to San Antonio.

When I was assigned as the contracting officer on the Fort Lewis Lodge, I was looking for contract

documents, I was looking for emails, I was looking for any documents I could get my hands on.

I was informed that some boxes had been / may have been shipped to San Antonio. I was informed that there may have been boxes that were shipped to self-storage. And I was informed that a lot of boxes had been shipped to archives and they couldn't tell me whether or not any of them were referencing this particular project.

Q: At the time you came on the project in 2009, were there any contractual actions outstanding on the Fort Lewis Lodge contract?

A: I wasn't sure, because I could not gather all the documents that I was looking for. I had read the [2008 REA]. I had reviewed the documents that I had available to me. And at that point I said, well, there's something here, but I can't verify without documentation, and there were portions that we were looking for.

I had tasked our Information Management Office to provide me with all the emails that were in the archives or records from Mr. Bartholomew, from Mr. Dyer and from Army Lodging personnel that were involved in the project.

That took about four months to get collected.

(Tr. 12/141-43; *see also* tr. 12/162-63) Among the documents that CO Wallace could not find was the official contract file:

I could not find all of the file. And that's what I was referring to as constantly looking for documents. The files were scattered all over the place.

. . . .

[W]hen I was given the project, I was told there are three boxes in that file cabinet over there where all of [CO Bartholomew]'s files are.

I went there, went into [his] old office, laid them out on the table and looked at it and said, there's nothing here. I have to go back and start looking for all the missing packages.

There were sections of the RFP file that had been torn out, and I don't know why and I don't know how, of

226

the folder and kept together in a clip binder. There were
other parts that were loose.

I have a feeling based on what I was looking at, at
the time, is people started rummaging through the files as
they were packing their files to go to San Antonio and
there was a big mess in there.

And I spent / and I think I believe I spoke with you
[referring to SBN's counsel] on several occasions where I
kept telling you I'm still looking for documents.

(Tr. 12/159-60, 162-64; tr. 12/167) Although CO Wallace had no first-hand
involvement in drafting the specific RFP for the Fort Lewis project, he had developed
and was the original author of certain "boilerplate requirements and language that was
incorporated into" Sections C, H and L of that RFP (tr. 12/131, 170).

263. Botting filed bankruptcy on 19 May 2009:
Company incurred large losses and subsequent claims on
several projects while managed without Peter Botting in
period 2003-2006; resulted in "liquidity crisis"

(R4, tab 926 at 13238; tr. 4/74-75, 79-88 (Chapter 11 in 2009, later converted to
Chapter 7))

264. On 26 July 2009, CO John Wallace informed SBN's counsel of his
intention to hire a schedule consultant to analyze SBN's delay claims. CO Wallace
expressed appreciation for SBN's patience:

Based on the above, I do not anticipate completing my
review and issuance of my decision until after the end of
the fiscal year (09/30/09).... How long thereafter will not
be known until I get the analysis and report from the
scheduling consultant. I regret any inconvenience this
causes, but I will not issue a decision without knowing all
the facts surrounding allegations from both sides....

(R4, tab 1203) SBN's counsel sought a further status report from CO Wallace by
email on 23 September 2009 (R4, tab 1203).

265. By email dated 6 January 2010 CO Wallace responded to a request for
update from SBN's counsel, stating that he had been hospitalized and out of the office
for two weeks. CO Wallace also informed SBN's counsel that the schedule consultant
had questions, the answers to which needed to be provided by SBN.

227

> Upon receipt of [SBN]'s responses to these questions, I
> will forward to our consultant and schedule a meeting with
> them to discuss their overall assessment and report on the
> REA delay allegations. After that meeting, I anticipate
> being able to provide you and [SBN] a date certain of my
> decision on the REA.

(R4, tab 1204)

266. On 17 February 2010, again in response to a request for update from SBN's counsel, CO Wallace informed counsel that:

> I was working with the schedule consultants and they were
> developing their questions and comments based on the
> [SBN] documents and available information. Some of the
> questions they asked were answerable based on information
> in my possession. I was attempting to provide the consultants
> with some key relevant documents (including emails) when
> my computer crashed on January 20th.
>
> Our IM folks were having a difficult time retrieving the
> e-files, documents and emails out of the old hard drive.
> After the recent historic snow storms in the DC area
> (Federal Govt closed for almost a week), I didn't get most
> of these items back on my new computer until February
> 12th (some files appear[] to have been lost and hard copies
> are being tracked).
>
> I regret the delay...it was unfortunate and untimely. As
> soon as I can assemble the rest of the hard documents, I
> will forward these documents to the consultant in order for
> them to refine their questions and re-submit them to me for
> forwarding to you and [SBN]. I will notify you when I plan
> to forward the consultant's questions related to [SBN]'s
> REA (Delay Allegations) as soon as possible.

(R4, tab 1205)

D. Certified Claim and Appeal

267. On 7 June 2010, SBN formally withdrew its 2 April 2008 REA (finding 256) and submitted to CFSC a disk containing its nearly 6,800-page certified claim in the amount of $6,768,830.26:

228

It has now been 26 months since [SBN] submitted its REA. There has been no substantive response from the Army, no attempt to discuss the specifics of the REA and no decision. As [SBN] has not received a final decision nor has the Army acted within a reasonable time, [SBN] believes the Army's lack of action implies a rejection of the REA. Accordingly, [SBN] considers the REA to be in dispute, and, as required by the Disputes clause, [SBN] hereby submits its certified claim....

As stated in the Claim narrative, [SBN] demands a modification to the Contract in an amount of $6,765,830.26. The Claim, which is included in the enclosed CD, includes a narrative, schedule analysis and supporting documents. The Claim is substantially the same as the April 2, 2008, REA although the schedule analysis has been updated to include description of a number of delays and disruptions not included in the original REA. Since your earlier emails indicated that you and your scheduling consultants had reviewed the REA and should be familiar with it, we request a Contracting Officer's decision on the Claim within the required sixty (60) days.

We direct your attention to the circumstances surrounding the Army's removal of [SBN's] Project Manager early in the project. The Army's action adversely impacted [SBN's] ability to complete the project in a timely manner. We believe the documentation, including email, which is contemporaneous with the removal of our Project Manager demonstrates less than good faith on the part of certain Army personnel.

(R4, tab 170 at 9911-14, tabs 1206-07; tr. 5/203-04)

268. The disk containing SBN's voluminous claim was delivered to CFSC while CO Wallace was on extended official travel:

At the time the claim came in, I was actually on travel traveling through Korea, Alaska, Hawaii. And got back to my office and I got in about two and a half weeks after they told me the FedEx package was on my desk.

229

I found the FedEx package, opened it up and read that it was a certified claim. And I started thumbing through the disk to see what the claim was all about.

It was an expansion of the initial REA, but I had to get hard copies made of it. And at that point, I notified Army Lodging that I needed to get printing of this document, because it was about 6,800 pages of documents.

....

Well, we were in the process of getting the documents printed and reviewed. And in the meantime, I was still traveling. I had 25 projects that I was working on at the time and still traveling around the country.

When I got back, the printed boxes were on my desk / or the printed copies were stacked on my desk and I began to go through them.[54]

And at that point around early August I got a letter...that there was an appeal before the Armed Services Board of Contract Appeals.

And I continued my review, but I was working on / towards a response, but was not ready to issue a final decision at that point.

(Tr. 12/143-45, 178-204) CO Wallace admitted he never formally acknowledged to SBN receipt of the claim, stating "[i]t slipped through the cracks" (tr. 12/208-12).

269. The claimed amount was broken down as follows:

| | |
|---|---|
| Contract balance | $110,650.00 |
| General Conditions | $1,571,629.95 |
| Labor and Material Escalation | $225,668.67 |
| Disputed Change Orders | $348,836.07[55] |
| Subcontractor Claims | $4,665,045.57 |
| Liquidated Damages | $(153,000.00) |
| **\*Requested Contract Modification** | **$6,768,830.26** |
| Unabsorbed Home Office Overhead | $328,020.44 |

---

[54] The printed hard copy of SBN's certified claim in the record consists of 15 (fifteen) 3-inch binders of paper and contains a half-page table of contents for sections of the claim (some containing thousands of pages) with no tabs to assist in finding documentation referenced in the narrative.

[55] (*See* app. br. at 293; R4, tab 169 at 5182)

*The Unabsorbed Home Office Overhead costs are additive to the Requested Contract Modification requiring an adjustment upon offer of settlement in order to avoid duplication of requested overhead in line items above.

(R4, tab 169 at 3126)  The claim summarizes the delays asserted by SBN as follows:

- Actual Delay / 518 Calendar Days  [12/23/05-5/25/07]
- Compensable Delay / 393 Calendar Days
- Excusable Delay / 23 Calendar Days
- Non-excusable Delay / 102 Calendar Days [SBN responsible]
- Delay Mitigation / 37 Calendar Days

(R4, tab 169 at 3125)

270.  The Subcontractor Claims submitted to SBN and included within its own claim were broken down as follows:

| | |
|---|---|
| Jensen Fey Architecture & Planning | $477,918.00 |
| KHS&S | $443,539.00 |
| Olympic Construction Sitework Contracting | $80,917.00 |
| Paras Concrete Contractors | $57,383.00 |
| SME Electrical | $2,059,820.00 |
| W.A. Botting | $1,596,122.00 |
| Non-Compensable Delay Deductions | -$482,343.63 |
| Change Order Request Deductions | -$269,665.00 |
| **Damages Disputed Changes** | **$3,963,690.37** |
| Overhead/Fee Insurance | $701,355.20 |
| **Total Subs Claims** | **$4,665,045.57** |

(R4, tab 1207 at SUPP-160)

271.  CO Wallace failed to respond to SBN's Claim within sixty (60) days of receipt (*see* finding 25, § (f)) and, to date, no contracting officer's final decision (COFD) has been issued by CFSC.  When asked at the hearing why no COFD was prepared, CO Wallace testified:

> Once…the lawyers got involved, I was not prepared to issue it, because there was still a lot of documentation that I did not have.

(Tr. 12/144-46)

231

272. SBN appealed to the Board from a deemed denial on 18 August 2010 (R4, tab 1207 at SUPP-121; tr. 12/145).

DECISION

The subject of this appeal is the design and construction by SBN of the Rainier Lodge, a 185-room, four-story lodging facility at Fort Lewis, Washington. As the voluminous record demonstrates, this was a project with all the attendant challenges inherent in such a complex undertaking. SBN seeks compensation from the Fund in the amount of $6,768,830.26. We address the disputed matters before us, as much as possible, in the chronological order in which they occurred during contract performance and in which they were presented in SBN's 3 June 2010 certified claim.

Preliminary Matters

A. Conduct of CO and COR

Before addressing the rest of SBN's positions and arguments in this appeal, we will address its allegation that the Fund administered this contract with an intention to harm SBN (*see, e.g.*, app. br. at 306-07, 376; app. reply at 4-5). The Fund argues that CO Bartholomew and COR Dyer were not motivated by animosity or ill will, but were merely resolute in fulfilling their obligations on behalf of the Fund to ensure that the contract requirements were met (gov't br. at 226-28). The extensive record in this appeal is replete with expressions of frustration, pique, and even anger by representatives of both parties to the contract, as well as their agents and subcontractors. In any project the parties work in their respective best interests to accomplish the common goal of a well-executed project. However, especially in a project of the size and complexity of this one, the parties' interests can often appear to be at odds. Finding common ground is essential but it often takes considerable patience, professionalism and give-and-take. It is obvious that there are specific instances in this record where the actions of one party/individual or another were ill-advised or out of proportion to the triggering event(s). But in our analysis, we are required to look at the totality of the circumstances and to consider specific alleged examples in context and not in isolation.

Both parties to a contract are subject to the implied duty of good faith and fair dealing. *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005). The duty is breached by the Fund only upon proof by clear and convincing evidence of a specific intent to injure SBN's ability to obtain the benefit of the express terms of the contract or by actions intended to delay or hamper SBN's performance. *Metcalf Construction Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014); *Puget Sound Environmental Corp.*, ASBCA No. 58828, 16-1 BCA ¶ 36,435. After careful

232

consideration of the voluminous record in this appeal, there is no evidence that the Fund intended to injure SBN or to delay or hamper its contract performance. Quite the opposite, it is clear to us that CFSC's actions on behalf of the Fund were intended to resolve delays and move the contract forward. When we consider the totality of the actions and inactions of both parties and all the various actors, we do not find the overall conduct of any of the parties over the course of the project to rise to the level of clear and convincing evidence of bad faith or to provide a separate basis for compensation. As was the case in *The Clark Construction Group, Inc.*, JCL BCA No. 2003-1, 05-1 BCA ¶ 32,843 at 162,500-01 (citation omitted):

> [T]he record contains numerous examples of a lack of communication and cooperation between the parties, who often took extreme or untenable positions..., which enhanced an adversarial and distrustful atmosphere.... While we are not prepared to conclude that either party acted in bad faith, the lack of mutual confidence and respect caused and exacerbated many of the disputes raised in this appeal.

We have considered SBN's arguments alleging that the overall conduct of CO Bartholomew and COR Dyer over the course of the entire contract performance period constituted a breach of the implied duty of good faith and fair dealing and find them unpersuasive. We have separately addressed below several specific instances of the CO's and COR's conduct alleged by SBN to entitle it to damages.

### B. Delay Damages

SBN has asserted claims for alleged excusable or compensable delays associated with a number of the substantive claims addressed in the following sections of this decision. A compensable delay is one for which both a time extension and monetary relief are due and an excusable delay is one for which only a time extension is due. *M.E.S., Inc.*, ASBCA No. 56149 *et al.*, 12-1 BCA ¶ 34,958 at 171,857 n.3. In order to prove that it is entitled to delay damages in the form of time and/or money, SBN must prove that the government was responsible for specific delays, overall project completion was delayed as a result and the government-caused delays were not concurrent with delays within SBN's control. *Versar, Inc.*, ASBCA No. 56857 *et al.*, 12-1 BCA ¶ 35,025 at 172,128. Normally only delays to work shown to be on the critical path at the time of the alleged delay will cause a delay in overall project completion. *States Roofing Corp.*, ASBCA No. 54860 *et al.*, 10-1 BCA ¶ 34,356 at 169,661. Damage is also an element of entitlement and, while mathematical certainty

is not required[56], some proof of damage is required. *BAE Systems San Francisco Ship Repair*, ASBCA Nos. 58810, 59642, 16-1 BCA ¶ 36,404 at 177,503; *Lear Siegler Services, Inc.*, ASBCA No. 57264, 12-2 BCA ¶ 35,112 at 172,425. For each of SBN's claims for delays we will apply these elements to the relevant facts.

I. <u>HVAC/Mechanical Design</u>

The single largest and most pervasive dispute between the parties was also the first to present itself. As SBN stated in its brief: "The mechanical design was an important element of the overall Lodge design because it affected costs and impacted many other disciplines including the architectural and electrical designs" (app. br. at 390). We first summarize the facts pertinent to the matter of SBN's HVAC/mechanical design for the common areas which comprised 10-12% of the total Lodge space designed to receive conditioned air (findings 69, 74, 76, 100).

The original RFP was based on a 10% concept design and specifically encouraged "innovative, creative, or cost-saving proposals that meet or exceed the RFP-specified requirements" (findings 2, 7). Amendment No. P00005 reiterated that encouragement when it stated that "[a]lternative systems may be submitted by Offerors for consideration" (finding 36). However, Offerors were not given *carte blanche* by either the original RFP or Amendment No. P00005:

> The requirements in the RFP are **minimum** standards and
> may be exceeded by the Offerors. Deviations from these
> technical or functional requirements shall be **clearly
> identified** for Government review and **may** be approved if
> considered by the Government to be in its best interest.

(Finding 7) (Emphasis added) In other words, any proposed deviations from RFP requirements were required to be specifically called to the attention of the government and identified as deviations that the government may, or may not, approve and formally incorporate into any resulting contract (findings 32, 49).

The RFP required that the HVAC designed for the Lodge was to use PTAC units in the guestrooms and DOIM room and that the rest of the building (often referred to by the parties as "common areas") with conditioned air (estimated to be approximately 10-12% of the total conditioned space):

> [S]hall be part of a VAV system utilizing constant volume
> fan powered terminal boxes, air cooled chiller and hot

---

[56] Specific proof of the amount of monetary damages is a quantum issue which is not
before us.

234

water boiler for primary air handler and re-heat at the terminal unit [*see* finding 17]. Code-required outside air ventilation and make up air shall be provided the primary air handling unit using chilled water cooling and hot water heating to precondition all outside air before delivery through ductwork to each space.

(Finding 14) RFP Section L-20-1 was explicit in its requirement that:

Requirements, codes, standards and any other information contained or specified in SECTION C and elsewhere in this RFP will be *assumed to be included and to be a part of the Offeror[']s proposal*. It need not be repeated therein. All alternates shall be specifically addressed and expanded upon in the proposal. The criteria specified in this RFP are binding contract criteria and in cases of any conflict, subsequent to award, between RFP criteria and Contractors['] submittals, the RFP criteria shall govern unless there is a written agreement between the Contracting Officer and the Contractor waiving the specific requirement or accepting a specific condition pertaining to the offer.

....

Proposals will be evaluated for conformance to the minimum criteria in the RFP and for quality scoring.

(Finding 32) In addition, in order to be considered technically responsive, the proposal was required to include: (1) a narrative describing any alternative HVAC system proposed; (2) why that particular system was selected for proposal; and, (3) catalog cuts of the particular equipment proposed (finding 32).

SBN's proposal included an alternative HVAC system instead of the boiler/chiller system required by the RFP "because we couldn't meet the price with the boiler and chillers. And it didn't fit [our] design." (Findings 35, 64, 74) However, SBN's HVAC/mechanical proposal narrative, prepared by Botting, did not expressly state that it included any alternatives or deviations from the RFP requirement for a boiler/chiller system in the common areas, nor did it offer any narrative at all as to why an alternate system was selected and there were no catalog cuts of the proposed alternative equipment (findings 42, 76). As quoted just above, the RFP put SBN on notice that, in the absence of a specifically identified alternative/deviation, the proposal would be presumed to meet RFP minimum requirements (finding 32). SBN

235

and Botting now admit that the proposed HVAC/mechanical system for the common areas did not meet the RFP requirements (findings 64, 66, 76). However, SBN takes the position in its claim that the use of the term "packaged" as descriptive of the proposed system, together with the absence of the words "boiler" or "chiller," in the proposal's brief narrative as it relates to the common areas, equipment list and drawings was enough to put the government on notice that the proposal included a deviation from the RFP (finding 64; app. br. at 391-92; app. reply at 26-29). We disagree; the mere use or non-use of the words "packaged," "boiler," or "chiller" in the HVAC/mechanical system narrative without an affirmative, clearly identified statement that an alternative/deviation was proposed instead of the RFP-required boiler/chiller system and why it was proposed, did not meet the RFP requirements for the proposal of a deviation/alternative.

SBN's proposal was one of nine submitted to the CFSC for review. Approximately two hours were spent on the review of each entire proposal. SBN's proposal was so lacking in information regarding the HVAC/mechanical system design that it was rated ninth out of the nine proposals and fifth out of nine overall (finding 45). SBN argues that CFSC was negligent because the members of the proposal review team did not include anyone who was experienced in the HVAC/mechanical field and that, had the team included such a person, the team would have been able to interpret SBN/Botting's design as an alternative/deviation from what the RFP required (app. br. at 11-24; app. reply at 26-29). However, the RFP's guidance to prospective contractors provided that "professional evaluation" would first be part of the review process at the time of the 35% design review and made no such statement about the makeup of the proposal review team (finding 20). We understand the RFP requirement that alternatives/deviations were to be clearly identified and explained in the narrative to provide a mechanism by which the proposal review team would be alerted that something other than the RFP requirements were included and that additional attention and/or expertise might be needed to review a proposed alternative/deviation. In the absence of the RFP-required clear identification of an alternative/deviation in SBN's HVAC/mechanical proposal, including the required specific narrative, an explanation of why the alternative/deviation was proposed and catalog cuts for proposed equipment, there was nothing to alert the proposal review team that anything other than the RFP minimum requirements were proposed.

We find that the government proposal review team followed the RFP guidance (finding 32) and that, given the limited amount of time for review of each proposal and in the absence of an express statement by SBN calling the government's attention to a proposed deviation from, or alternative to, the RFP requirements, the proposal review team was justified in assuming that SBN's mechanical/HVAC proposal met the RFP requirements for a boiler/chiller system (*see* finding 32). SBN's failure to specifically advise the government that its HVAC/mechanical proposal included a deviation from the RFP requirements was repeated when, in response to questions from CO Bartholomew

236

seeking clarification of its proposal, SBN again failed to identify the alternative design and why it was proposed and merely stated that its proposal was "fully compliant with the technical requirements of the RFP" (finding 46).

Notes from a telephone conference on 5 March 2004 stated that CO Bartholomew was still seeking clarification of the HVAC/mechanical portion of SBN's proposal. SBN's Henrickson testified that he did not recall having a discussion about the HVAC/mechanical proposal, rather, "[t]hey just wanted us to clarify. We had already stated that was a package, but they wanted more clarification." (Finding 48) Nevertheless, SBN now argues that during this telephone conversation, CO Bartholomew acknowledged and approved SBN's alternate HVAC/mechanical design (app. br. at 393-94; app. reply at 53-54). We find absolutely no contemporaneous documentary evidence in the extensive record before us of such a detailed discussion or agreement (*see* finding 49) and note that in the entirety of the voluminous record before us there is nothing to document that SBN ever even made an allegation of the existence of such an agreement until it submitted its 2010 claim, six years after the alleged agreement and several years after contract completion. SBN urges us to assume that such an agreement was memorialized in CO Bartholomew's Determination and Finding for Award, a document which is not in the record because the official contract file was never found (app. reply at 53-54; *see also* findings 262, 266, 271). However, in the absence of the document, it would be inappropriate to find that such an important agreement was, or was not, in the document without further contemporaneous corroborating evidence. Rather, given the importance of the HVAC/mechanical design and associated design and performance issues and delays documented throughout the record, we find it hard to believe that if, as SBN now claims, CO Bartholomew had approved of the alternate plan prior to contract award, SBN would not have made its own detailed record of the alleged agreement and raised it loudly and often with CFSC from 2004-2010. There is no evidence that SBN did so. We, therefore, conclude that the hearing testimony, many years after the fact, alleging the existence of such an agreement to be uncorroborated by any detailed contemporaneous evidence and to have little credibility.

In its 23 March 2004 BAFO, SBN's mechanical/HVAC proposal stated that:

- The lobby and administrative areas are served from a packaged variable volume unit located on grade as indicated on the mechanical concept drawings. Air is distributed to fan powered terminal units with electric heat to provide energy efficient comfort zoning.

(Finding 50) Again, there is nothing in this description specifically calling to the Fund's attention that what is proposed is a deviation from, or alternative to, the RFP-specified boiler/chiller system nor does the narrative state why an alternative is

237

being proposed. Once again, SBN argues that the mere use of the term "packaged" was sufficient to put the government on notice that the proposal included something other than the RFP-specified boiler/chiller system and, once again, we disagree. SBN's own expert witness, Mr. Kommers, testified that there are such things as packaged boiler and chiller systems and we have found that heat generation boilers are commonly powered by gas or electric (finding 50). Once again, the mere presence or absence of the words "packaged," "boiler," or "chiller" in SBN's BAFO was insufficient to specifically identify and call attention to SBN's inclusion of an alternative HVAC/mechanical design and not the RFP-required boiler/chiller design.

On 26 March 2004 SBN again assured CO Bartholomew that:

> Our proposal complies with the RFP and if awarded a contract we ensure material compliance with the RFP requirements. We have reviewed and verified our pricing and it is acceptable for the basis of a firm fixed price contract if awarded this project.

(Finding 51) Again SBN made no mention of its known proposed deviation from, or alternative to, the RFP-required boiler/chiller system. The RFP specifically obligated SBN to expressly identify any alternative/deviation (finding 32), and we cannot agree with SBN that, upon its failure to make such a specific identification, the CFSC proposal review team was required to hunt through SBN's proposal to see if it could unearth clues to such an alternative. The CFSC BAFO proposal review team again, in compliance with the terms of the RFP and in the absence of a specific statement by SBN that it was proposing an alternative/deviation, had no reason to believe SBN's proposal included anything other than the RFP-specified boiler/chiller system (findings 32, 52).

The contract was awarded to SBN on 11 May 2004 and both the RFP and SBN's BAFO proposal were incorporated by reference. By its express terms, in the case of a conflict between the contract and SBN's proposal, the contract "shall prevail" unless there is a written agreement waiving the specific RFP requirement or accepting a specific deviation from the RFP (finding 32). SBN argues that the mere act of incorporation of SBN's entire BAFO proposal into the contract was sufficient to meet the contract requirement for a specific waiver by CO Bartholomew of the RFP-required HVAC design for the common areas. (App. reply at 26-27) In order to show waiver, SBN must show that CO Bartholomew expressly and knowingly rescinded the Fund's contract right to require the specific RFP-required HVAC system for the common areas. *General Dynamics C4 Systems, Inc.*, ASBCA No. 54988, 09-2 BCA ¶ 34,150 at 168,818. In addition, the express terms of the contract require that such a waiver be in writing (finding 53). We have found no evidence, nor has SBN directed us to any, of such a written agreement at the time of contract award regarding

238

a specific waiver of the RFP-required HVAC/mechanical system for the common areas, nor have we found any evidence of the existence of a specific acceptance of SBN's proposed alternate HVAC system for the common areas at the time of contract award. (Finding 53) We, therefore, hold that SBN's alternative HVAC/mechanical system design for the common areas was in conflict with the RFP-required boiler/chiller design and that the conflict must be resolved in favor of the RFP-required boiler/chiller design. CFSC was, therefore, justified in demanding that SBN provide the boiler/chiller HVAC/mechanical system that was specified in the RFP and resulting contract.

SBN submitted the 35% design on schedule on 10 June 2004 (finding 58). In review comments dated 1 July 2004 it was noted that SBN's 35% design did not include the boiler/chiller system specified in the RFP for the common areas (finding 60). In response, SBN stated that it had proposed and included in its design something other than the RFP-specified boiler/chiller system based on its assessment of the "most energy efficient application" and "lowest energy cost" (findings 61, 66). As we have found above, this information as to why an alternative/deviation was selected by SBN/Botting was not in either SBN's original proposal or its BAFO, even though the RFP required such information be provided if an alternative/deviation was proposed. As of 8 July 2004, the date of the 35% review meeting, CFSC required that SBN was to "provide justification for HVAC systems proposed for use or change to comply with RFP" as soon as possible because of the impact on the rest of the building's design (findings 62-63, 65-66, 79).

On 28 July 2004 a meeting with COR Dyer and DPW personnel was held at which Botting presented to the government further information and analysis of its proposed alternative system (finding 66). Even though SBN's proposed alternative/deviation proposal had not been approved by CO Bartholomew and the contract had not been amended to change the requirement for the boiler/chiller system, SBN/Botting took the position that, if they were required to include the RFP-specified boiler/chiller system in their design, it constituted a change to the contract entitling them to additional compensation (findings 66, 67). SBN/Botting again presented the alternative design to COR Dyer and DPW personnel, among others, on 16 August 2004 (finding 69).

In additional 35% review comments provided on 5-6 July 2004, SBN was given a due date of 27 August 2004 for the 65% design and CFSC expressed its intention to issue an LNTP "for construction to allow mobilization and site work (civil, utility, foundation, and structural activities)" after completion of a 21 September 2004 design review meeting (finding 60). As of 23 August 2004, SBN/Botting's alternative HVAC/mechanical design had not been approved (finding 48). Nevertheless, SBN elected to keep the alternative design in the 65% design submittal, due to be submitted on 27 August 2004, along with the structural, electrical and other designs that relied

upon the alternative HVAC/mechanical design (findings 70, 74). On 24 August 2004 SBN requested an LNTP for mobilization to the jobsite the week of 13 September. CFSC denied the request due to concerns about the outstanding issue of the HVAC/mechanical design. (Finding 72)

On 26 August 2004, 10 days after SBN/Botting's second presentation of its alternative design to the government, DPW rejected the alternative design and insisted that SBN/Botting be required to provide the boiler/chiller system required by the RFP (finding 74).

On 27 August 2004 SBN submitted its 65% design on schedule but the design included the alternative HVAC/mechanical design that had been rejected, not the contract-specified boiler/chiller system (finding 75). On 2 September 2004 SBN's 65% design submittal was rejected because it did not include the contract-required boiler/chiller system and SBN was directed to resubmit the HVAC/mechanical portion of the 65% design with the contract-required system while the review of the 65% design submission for other trades continued. SBN immediately directed Botting to resubmit a contract-compliant HVAC/mechanical design so that the government's review of the 65% submission stayed on schedule. In response to Botting's mention of "cost impacts of the change," SBN replied that, until Botting produced a contract-compliant design, there would be no discussion of costs. (Finding 76) Botting also admitted in internal correspondence that:

> I feel though we might have a weak hand. We don't have an email or document that points out that our proposal did not meet the RFP when we proposed it to [SBN]. WAB does not have e mails or documents that showed who made the decision to change to packaged units.

(*Id.*)

On 4 September 2004 COR Dyer provided advance comments to SBN on the civil design portion of the 65% design submittal. SBN forwarded the comments to its Architect of Record, expressing embarrassment that the 65% design submittal was "not ready" when it was submitted (finding 77). On 15 September 2004 SBN resubmitted the HVAC/mechanical 65% design and the design review meeting was rescheduled for 28 September 2004 (findings 79, 83). The resubmitted design included 4 small boilers and 4 small chillers instead of the single boiler/chiller system specified in the contract. On 21 September 2004, while expressing reluctance to move forward before the HVAC/mechanical design issue was resolved, COR Dyer authorized SBN to move several trailers to the jobsite (finding 80).

The 65% design review meeting took place on 28 September 2004 as scheduled. The minutes of the meeting, prepared by SBN, reported that:

Major issues, and points covered:

1. The mechanical re-design was not approved. The Owner provided direction that the mechanical system must be re-designed using a single boiler and single chiller. The design is to be submitted to the Owner for review on 7 October 2004. This is an interim submission that will occur between the 65% and 95% review submittals.

2. The Owner stated that the [LNTP] will not be issued at this time. The Owner stated that the pre-construction conference is scheduled for 13 October 2004, on Fort Lewis. Part of the purpose of that meeting will be to determine when the [LNTP] will be issued. A complete mechanical re-design along with the architectural, structural and civil design to accommodate it (see paragraph 1 above), will be part of the requirement for the issuance of the LNTP.

....

24. [CO] Bartholomew agreed to issue [SBN] the authorization to mobilize to the site, set up its camp, fence the perimeter, and perform minor operations such as clear and grub, site demolition, silt fence installation, etc. The letter will be issued this coming Friday, authorizing [SBN] to begin mobilizing on Monday, 4 October 2004.

(Finding 83; *see also* finding 82) The authorization to mobilize on 4 October 2004 was just 8 work days later than CFSC's originally expressed date for issuance of a mobilization LNTP for 21 September 2004 (finding 60, *see also* finding 80). We find that the 8 days of delay was due to SBN/Botting's proposal of a deviation/alternative HVAC/mechanical system without identifying it as such in its proposal and BAFO, as well as their persistence after award in trying to convince the government to approve an alternative HVAC/mechanical design instead of the boiler/chiller system specified in the contract.

There is evidence that on 29 September 2004 SBN/Botting submitted its third HVAC/mechanical 65% design which included a single boiler/chiller system and:

> [T]he piping required to make it work. The piping was accommodated by making all corridor ceilings no higher than 8'-0" and by raising the second floor by four inches, and taking two inches off of the distance between the third and fourth floors.

(Finding 84) On 11 October 2004 SBN/Botting's third 65% HVAC/mechanical design submittal was determined to have addressed the reviewers' concerns with regard to the boiler/chiller system, however, nothing had yet been submitted with respect to the DDC portion of the HVAC/mechanical design, determined to be an "important element" of the entire project. As a result, the reviewers recommended that the 65% submission not be approved until a DDC design submission was received. (Findings 86, 87) At the Pre-Construction Conference on 13 October 2004 the parties apparently agreed that the DDC would be "fully addressed in the 95% submittal" (finding 88).

On or about 30 November 2004, SBN requested direction to "furnish the original mechanical system" proposed by Botting "or for a change order to provide the system that employs the boiler/chiller" system (finding 100). As we have previously found, in the absence of a formal approval by the CO of Botting's proposed alternative HVAC system and a commensurate change to the contract requirements, SBN/Botting was required to provide the RFP-required boiler/chiller system. Nevertheless, as of mid-to-late December 2004, Botting refused to sign a subcontract with SBN and elected to "stop the coordination process in its tracks and start effecting [sic] the ability of others to proceed with the project" unless it was granted additional compensation for providing the contract-required boiler/chiller system (finding 108).

Also in mid-to-late December 2004, there is evidence that SBN again re-submitted its original 65% design submittal that included its alternate design and not the single boiler/chiller system, claiming that it was directed to do so by CFSC. We find no documentation of such a direction to support SBN's allegation. Needless to say, this re-submission of a non-compliant HVAC design resulted in confusion and frustration between the parties and further delayed the project for SBN and its subcontractors. (Findings 107, 110, 112)

As of 14 January 2005 Botting was still refusing to sign a subcontract or to provide input for the 95% design submission (finding 115). On 26 January 2005 SBN submitted an REA to CO Bartholomew seeking compensation for providing the contract-compliant boiler/chiller system (findings 118-19). Just a few days later, on 3 February 2005, Botting contacted CO Bartholomew directly and offered some

242

hardware changes and additional preventative maintenance, training and warranties if CFSC would agree to accept Botting's amended alternative HVAC/mechanical design that included AAON packaged units (finding 122). On 11 February 2005 CO Bartholomew stated that, pending the receipt of additional information from Botting regarding the AAON packaged units it proposed to use instead of the single boiler/chiller system, as well as DDC design information, he was "prepared to accept" Botting's 3 February 2005 HVAC design "at no additional costs" to the government (findings 126-27). Contract Modification No. P00002 dated 14 February 2005, memorialized the CO's intention to accept the 3 February 2005 amended alternate HVAC/mechanical design upon the receipt of the additional information he had requested (finding 129). As of 24 February 2005, CFSC confirmed to SBN that acceptance of the AAON packaged units was resolved (findings 132-33). The issue of the DDC portion of the HVAC/mechanical design was still open and is addressed separately in Section VI below. As of early March 2005 COR Dyer confirmed to CO Bartholomew that, as a result of SBN's confirmation that the DDC design would comply with the RFP, all conditions for acceptance of Botting's 3 February 2005 HVAC/mechanical design had been met (findings 135). On 8 March 2005 the CO directed that the amended alternate HVAC/mechanical be used at no additional cost to the Fund (finding 137).

On 30 March 2005 Botting proposed a change to its 3 February 2005 amended HVAC/mechanical design when it proposed to use trickle vents for ventilation air to the guestrooms (finding 145). The trickle vent proposal was first rejected by CFSC on 7 April 2005 (finding 147). Nevertheless, as of 1 June 2005 SBN/Botting was still proposing guestroom ventilation air changes to the HVAC/mechanical design (findings 159-60). This topic is addressed more fully in Section IV below.

SBN argues that it is entitled to compensation on the basis of several theories of recovery related to the Fund's actions or inactions with respect to SBN/Botting's HVAC/mechanical design.

A. Changed Work and Constructively Changed Work

It is SBN's position that the contract, as awarded, included its alternate HVAC/mechanical design for the common areas and that the Fund's insistence that SBN/Botting provide the boiler/chiller system required by the RFP was a change to the contract (app. br. at 364, 397-401; app. reply at 26-29). We disagree.

As we have already held above, SBN/Botting's proposed alternate mechanical design did not meet the requirements of the RFP and was not accepted or approved by CO Bartholomew at the time of contract award. There was also no express waiver of the RFP requirement for a boiler/chiller system. At the time of the contract award, then, the boiler/chiller was required to be included in SBN/Botting's design, and,

contrary to SBN/Botting's vociferous arguments otherwise (app. br. at 394-403; app. reply at 26-29), that requirement was not formally changed until Contract Modification No. P00002 was issued providing conditional acceptance of Botting's 3 February 2005 amended alternative design at no additional cost to the Fund (finding 129; *see also* findings 126-27, 132-33; app. br. at 401-03).

It is evident to us from the great weight of the record evidence, that CFSC approved SBN/Botting's alternate design only after: (1) negotiation and Botting's amendment of its design with respect to certain hardware and included additional training, maintenance and warranties not included in its original alternative design[57]; and, (2) because SBN/Botting's continued insistence on providing an alternative HVAC/mechanical system in the common areas instead of the RFP/contract-required system had delayed the design process by many months. The Fund is not required to exercise the patience of Job in the administration of its contracts[58] and we find nothing in the contemporaneous record to characterize the reason for the Fund's approval of Botting's 3 February 2005 amended alternative design as an abandonment of its reasons for disapproval of Botting's original alternative design.[57] Rather, we see CFSC's approval of the amended alternative design as the result of its concern about the length of delay to contract performance caused by SBN/Botting's continued insistence on an alternative HVAC/mechanical design and Botting's offered additional training, maintenance and warranties. CFSC could have continued to require the contractually-required boiler/chiller system, but its approval of the 3 February 2005 amended alternative design acted as a mitigation of the negative effects of SBN/Botting's continued resistance to providing a timely contract-compliant HVAC/mechanical design that forced work to be performed out of sequence, if it could be performed at all, and which impacted the design and contract work of SBN and its other subcontractors. (Findings 63, 66-67, 69, 74, 76, 79, 84, 129, 140, 161, 178, 182, 217, 221) We believe the weight of the record shows that CFSC was hesitant to issue LNTPs or a full construction NTP while Botting's design was in limbo out of a concern that Botting might be replaced as the mechanical subcontractor, which could have created even more design and construction delay (findings 176, 182, 186). There is evidence that Botting considered pulling out of the project (finding 184), and that it was suffering a company-wide financial crisis (finding 263).

On the basis of the foregoing, we deny SBN's claim that CFSC changed the contract work when it insisted that SBN/Botting provide the boiler/chiller HVAC/mechanical system required by the RFP and the contract as awarded. SBN also claims that the alleged government "change" requiring the boiler/chiller system

---

[57] Concerns about maintenance, warranties and training had been raised as objections to the alternative system from the time of the 35% design review (findings 14, 17, 63, 66, 69, 76).

[58] *Delfour, Inc.*, VABCA No. 2049 *et al.*, 89-1 BCA ¶ 21,394 at 107,855.

244

constituted a constructive change under the contract. We have considered SBN's arguments in this regard and reject them for the same reasons outlined above.

## B. Delay

The HVAC/mechanical design delays impacted the floor plan spacing and other structural impacts, which then also impacted the architectural, civil, plumbing, electrical and other designs. The HVAC/mechanical design was on the critical path (findings 63, 66; app. br. at 401). As SBN's claim put it:

> Absent the impact of the Mechanical Design Delay on the Construction LNTP, the later design delays would not have impacted the construction of the Project.

(R4, tab 169 at 3129)

> The delay's impact on the initial stages of construction was somewhat mitigated by CFSC's issuance of a [LNTP] on 25 October 2004. Nevertheless, in the absence of the delay resulting from the HVAC design dispute, the LNTP would have been issued at an earlier date.... The revised mechanical design delayed the critical path of design prior to issuance of the LNTP and following resolution of several differing site conditions....

(*Id.* at 3357)

We agree with SBN that the alternative HVAC/mechanical design delays set the stage for later design and performance delays. The record shows that by the time SBN, its Architect of Record (Jensen/Fey) and SBN's various design subcontractors submitted the 35% design, the building design incorporated the alternative HVAC/mechanical design even though it was never identified to, nor approved by, CFSC. Botting admitted that it had not even identified to SBN that Botting's proposal contained an alternative and not what the RFP required (finding 76). By the time the Fund received the 35% design and required SBN/Botting to provide the RFP/contract-required boiler/chiller system, the pervasive impact on all aspects of the design was apparent to all concerned and spawned later claimed issues involving electrical design/installation, concrete work, mock-up rooms, and ceiling heights/room sizes, among others.

SBN claims that the issues associated with the alternative HVAC/mechanical design delayed the project from 8 July 2004 through 8 March 2005 and that the Fund is solely responsible for the delay (app. br. at 39). Elsewhere in its brief and 2010

claim, SBN claims that the delay ended on 29 March 2005 (app. br., App'x 3; R4, tab 169 at 4994) but we find no support for that date. SBN further argues that the delay experienced from 8 July 2004 through 24 October 2004 was on the critical path and that, upon the issuance of the LNTP on 25 October 2004 (finding 92), the critical path shifted to other work associated with excavation and the foundation (finding 98). We disagree. Because of the extreme importance of the HVAC/mechanical design to the overall design of the building and the designs of other trades, we find that the HVAC/mechanical design was on the critical path for the entire time of the delay which ended on 8 March 2005 (finding 137) and that the delay was solely caused by SBN/Botting. We therefore deny entitlement to compensation for any part of the HVAC/mechanical design delay.

## II. Differing Site Conditions

The contract includes clause I-40, DIFFERING SITE CONDITIONS (finding 27). SBN has alleged that it encountered Type I differing site conditions which are defined in the clause as "subsurface or latent physical conditions at the site which differ materially from those indicated in this contract." Upon encountering such conditions, SBN was required to promptly provide written notice to CO Bartholomew before the conditions were disturbed. In order to prevail on a claim of Type I differing site conditions, SBN must prove, by a preponderance of the evidence, that:

> (1) [T]he condition indicated in the contract differs materially from those actually encountered during performance; (2) the conditions actually encountered were reasonably unforeseeable based on all information available to the contractor at the time of bidding; (3) the contractor reasonably relied upon its interpretation of the contract and contract-related documents; and (4) the contractor was damaged as a result of the material variation between expected and encountered conditions.

*Optimum Services, Inc.*, ASBCA No. 58755, 15-1 BCA ¶ 35,939 at 175,653-54.

> A Type I differing site condition claim is dependent on what is "indicated" in the contract. *Foster Constr. C.A. and Williams Bros. Co. v. United States*, 435 F.2d 873, 881 (Ct. Cl. 1970) ("On the one hand, a contract silent on subsurface conditions cannot support a changed conditions claim.... On the other hand, nothing beyond contract indications need be proven."). A contractor cannot be eligible for an equitable adjustment for Type I changed conditions unless the contract indicated what those

246

conditions would supposedly be. *P.J. Maffei Bldg.*
*Wrecking Corp. v. United States*, 732 F.2d 913, 916 (Fed.
Cir. 1984); *S.T.G. Construction Co. v. United States*, 157
Ct. Cl. 409, 414 (1962).

*NDG Constructors*, ASBCA No. 57328, 12-2 BCA ¶ 35,138 at 172.503; *see also C.R.*
*Pittman Construction Co.*, ASBCA No. 57387 *et al.*, 15-1 BCA ¶ 35,881 at 175,427.

The first element of SBN's burden of proof is met by the record evidence that the RFP provided express "indications" of existing utilities in a topographic drawing of the jobsite showing the locations of various existing underground utilities at the time the RFP was issued (findings 8-9, 40-41). The second element requires that SBN show that, based upon the information reasonably available to it at the time of its proposal, the actual conditions it encountered were unforeseeable. Prospective contractors were cautioned to perform their own reasonable site investigations (findings 8, 28, 40). The parties disagree as to what constituted "reasonable site investigation." The Fund argues that SBN was unreasonable to rely on the RFP's representations as to the location and characteristics of existing utilities and that SBN should have performed its own pre-proposal subsurface investigations (gov't br. at 269-275). SBN and its subcontractors maintain that a requirement for pre-proposal subsurface investigation is unreasonable, given that they were not permitted to do any digging until after issuance of an LNTP and a digging permit was granted by DPW (*see* finding 17; app. br. at 353-59). We agree with SBN. The record shows that SBN and several of its subcontractors attended a pre-proposal site visit and compared what they observed at the site with the representations of the utilities in the RFP (findings 19, 34). Further subsurface investigation, such as would have revealed any of the alleged differing site conditions before us, was not mentioned nor required by the RFP and we find the Fund's argument in this regard unreasonable. We therefore find that SBN has met its burden of proof with respect to the second element. On the basis of the record before us, as well as our holdings with respect to elements one and two, we also find that SBN has met its burden of proof as to the third element that it reasonably relied upon its interpretation of the RFP and contract documents with respect to existing utilities. The fourth element requires that SBN prove that it was damaged as a result of the material variation between expected and encountered conditions. We will address below SBN's claimed damages associated with each of the individual differing site conditions claimed.

SBN further argues that the Fund breached the doctrine of superior knowledge because the Fund was allegedly in possession of more current utility drawings than were provided to SBN (app. br. at 362-63). SBN did not assert a claim for superior knowledge in its certified claim and it is, therefore, not properly before us.

On 25 October 2004 SBN was issued an LNTP for foundations, underground utilities and the building structure (finding 92). SBN requested a digging permit on 29 October 2004 and the permit was issued on 1 November 2004 (finding 95). SBN could not proceed to work on the jobsite until after issuance of the LNTP. SBN claims that it was delayed from proceeding with work on the project starting 1 November 2004 (findings 117, 119). As of Progress Meeting #3, held on 5 January 2005, SBN reported that it was waiting for direction from CFSC regarding alleged differing site conditions identified in RFIs 15-19 (finding 113; *see also* findings 104, 106). Each of the alleged differing site conditions for which SBN now seeks compensation will be addressed in detail separately below.

On 26 January 2005 and 8 February 2005 SBN submitted REAs 031 and 035 seeking a total of $514,315.00 and a 127-day extension to the contract performance period due to alleged differing site conditions and associated delays (findings 119, 124). On 23 December 2005 CO Bartholomew unilaterally granted a noncompensable extension to the contract performance period for 60 days associated with "unforeseen site issues we encountered in the fall of 2004" (finding 208).

A. DOIM Communication Duct Bank

On an unidentified date prior to 19 November 2004, SBN's excavation subcontractor encountered existing underground communication (DOIM) ductwork that had less than the contract-specified 3-foot amount of cover (*see* finding 47). There is evidence that SBN notified CFSC of the issue on or about 12 November 2004. On 19 November 2004 SBN met on-site with representatives from Fort Lewis DOIM and ORB. The DOIM representative "approved" SBN's proposed method to lower the ducts "so they would be well below [SBN's] designed finish grades." SBN then sought a change order from CO Bartholomew to accomplish the work, pointing out that the DOIM communication duct issue needed to be resolved concurrent with resolution of primary electrical ductwork issues discussed in more detail below. (Finding 97)

Another meeting was held on 30 November 2004 attended by a variety of Fort Lewis DPW personnel and COR Dyer regarding "Utility Issues." It was determined that lowering the DOIM ductwork was not compatible with the building and site design and that the DOIM ducts, cables and manhole would have to be relocated. (Finding 103) There is evidence that this information was conveyed to SBN on 1 December 2004 (finding 109).

On 20 December 2004 SBN submitted RFI #19 to "confirm[] delay" associated with the DOIM communication ductwork (finding 109). On 10 January 2005 CO Bartholomew attended a meeting at the jobsite. SBN's minutes of the meeting reported that CO Bartholomew acknowledged that relocating the DOIM ductwork

248

would "probably delay the project at least 60 days and will have considerable cost impacts." CO Bartholomew then requested that SBN prepare a civil redesign of the site that accommodated the existing DOIM ductwork and he acknowledged that this was compensable extra-contractual work. It was his intention to then present the civil redesign to DPW for consideration. It was agreed that SBN and its subcontractor would provide the requested redesign. (Finding 114) As of 21 January 2005, CO Bartholomew acknowledged responsibility for the DOIM ductwork redesign and sought funds from DPW (finding 116). The civil redesign was dated 19 January 2005 and SBN's 8 February 2005 REA 031 sought a total of $154,803.49 for the redesign and changed work as well as an extension to the contract performance period for associated delays (finding 124).

SBN now seeks a total amount of $106,369.94 for the direct costs and associated critical path delays from 2 November 2004 through 29 March 2005[59] resulting from the DOIM ductwork differing site condition (ex. A-7; R4, tab 169 at 4994, 5182; app. br. at 291, 293-94, 296, 298, 359, 383, 384).

As of the 13 April 2005 Progress Meeting #7, CFSC had still not issued a change order for the DOIM ductwork and the meeting minutes stated that "The CFSC position of this request is that [it] is non-compensable" (finding 149). The item still remained open for resolution as of the 22 June 2005 Progress Meeting #12 (finding 166). Even though CO Bartholomew acknowledged responsibility in January 2005 (finding 116), the Fund takes the position in this appeal that SBN is not entitled to compensation (gov't br. at 267-79). We agree in part.

Under the terms of Modification No. P00003, SBN agreed that all disputes existing prior to 23 March 2006, except those for time and associated costs, were released (finding 212). The DOIM differing site condition existed prior to 23 March 2006 and SBN's claim for the costs of performing the associated work were not reserved in Modification No. P00003. The only claim reserved was for associated delays.

With respect to delay damages, SBN claims that it is entitled to be compensated for critical path delays associated with the DOIM ductwork from 2 November 2004 through 29 March 2005. The period of delay from 2 November 2004 through 8 March 2005 is concurrent with the SBN/Botting-caused HVAC/mechanical design delay on the critical path (*see* Section I above). CO Bartholomew granted a non-compensable 60-day extension of the contract performance period due to SBN's encountering a

---

[59] SBN states in its brief that the CFSC delay in providing direction regarding the DOIM ductbank ended on 8 March 2005 (app. br. at 384) and that the extra work was completed on 30 March 2005 (*id.* at 383). Its 2010 claim (R4, tab 169 at 4994) and Exhibit A-7, however, assert that all delay associated with the DOIM ductbank ended on 29 March 2005.

variety of differing site conditions (finding 208). We find that SBN is entitled to be compensated for the critical path delay period from 9-29 March 2005 (15 calendar days) which was solely caused by the Fund. The amount of compensation for the delay is a quantum issue which is not before us.

B. Telephone Cable

The RFP provided, with respect to telephone cables, that:

> E. Telephone: Telephone wiring will be run into and through a Communications Manhole adjacent to the site. An existing ductbank travels west from this manhole to Bldg 2003, DOIM main switch building. Coordinate installation of new twisted pair bundle in this ductbank back to 2003. The Contractor will make cross-connections at 2003 under DOIM supervision/direction. Coordinate all requirements with Post DOIM during design and construction.

(Finding 9)

Sometime after 1 November 2004 (findings 116, 119), SBN encountered underground telephone cables that "pass[ed] through the building pad in three locations" and, as of 29 November 2004, had been advised that DPW would remove them (finding 99). On 1 December 2004 SBN was informed that the underground telephone line discovered at the east end of the project could not be abandoned and removed as previously stated by DPW because that telephone line was active and provided phone service to the existing hotel to the east of the jobsite. That line passed through the loading dock area of the new Lodge design which had footings deeper than the telephone cables' existing location. Both CO Bartholomew and COR Dyer were on-site that day to observe the situation. The next day SBN provided formal written notice of a differing site condition. (Finding 102) On 16 December 2004 SBN submitted RFI #18 seeking direction with regard to the active telephone cable (finding 109).

As of 21 January 2005, internal CFSC communications admitted liability for the telephone cable issue; the only question seemed to be which government organization's funds should be used for the payment (finding 116). On 11 February 2005 SBN thanked CO Bartholomew for his direction on that date for SBN to perform the work of rerouting the active telephone cable for a price not to exceed $12,694.26 (findings 124, 126, 133). Contract Modification No. P00002, with an effective date of 14 February 2005, memorialized the parties' agreement (finding 129).

On 10 March 2005 SBN advised CFSC that the telephone cable reroute work would require additional time and cost because it was discovered that it was not direct-buried but encased in steel pipe (finding 138). As of the 13 April 2005 Progress Meeting, SBN reported that the work was completed (finding 149). As of 22 June 2005 SBN reported that CFSC had issued a change order for the work associated with rerouting the telephone cable and that SBN was awaiting payment for the costs of the work (finding 166). In the absence of evidence to the contrary, we find that SBN has been compensated for the cost of performing the changed work associated with rerouting the telephone cable.

SBN also seeks critical path delay damages for the period from 1 December 2004 when the live telephone cable was discovered through 29 March 2005 when the telephone cable reroute was completed (app. br. at 65, 359, 383-84). The period of delay from 1 December 2004 through 8 March 2005 is concurrent with the SBN/Botting-caused HVAC/mechanical design delay on the critical path (*see* Section I above). The remaining claimed period of delay is the same as the delay period sought by SBN for the DOIM ductwork and for which we have found SBN to be entitled above. We therefore find that SBN is not entitled to any further compensation for delay associated with the telephone cable reroute.

## C. Primary Electrical Interconnect Cable

The RFP provided the following regarding a primary underground electrical distribution line:

> D. Electricity: There is an existing 13.8KV, 3-phase primary electrical distribution line on the perimeter of this site. Coordinate the services drop location with DPW during design and construction. An existing underground feeder line and pad-mount transformer exists on the site and may have to be rerouted/relocated depending on the final site plan arrangement.

(Finding 9) RFP Amendment No. 00005 included the following additional information:

> 7     NOTE: There is a pad-mount transformer on the site which will be removed by DPW with demolition of the two wood buildings on site. Removal of existing wood poles, OH electrical lines, and the transformer pad will be accomplished by the Contractor. There is also an underground secondary electrical feeder...running through the site which will have to be rerouted around the building footprint as required.

(Finding 36)

SBN's electrical subcontractor, SME, testified that it conducted a pre-award site walk during which it observed nothing materially different from what was represented in the RFP. However, SME contends that, after contract award while meeting with DPW for the purpose of establishing temporary power at the jobsite, certain DPW personnel provided site-specific information that differed from what was included in the RFP (finding 91). The record indicates that on 22 October 2004 SBN/SME provided notice that they believed they had encountered a differing site condition with respect to the underground primary electrical interconnect (finding 109). On 28 October 2004 ORB advised CO Bartholomew that DPW would not permit the primary power interconnect to remain under the building and that SBN was required to relocate it from under the building footprint (finding 94). On 29 November 2004 SBN notified COR Dyer of SBN's plan for rerouting the primary electrical interconnect (finding 99; *see also* finding 103). It was DPW's position that the work of relocating the primary electric interconnect was required by the contract (finding 103). SBN also notified CFSC that resolution of the DOIM ductwork issue (*see* Section IIA above) would need to be performed concurrent with the primary electrical interconnect work (finding 97). SBN's RFI #15 requesting direction as to the primary electrical interconnect was submitted on 16 December 2004 (finding 109).

As of 10 January 2005, it was agreed between CFSC and SBN/SME that responsibility for the work required to be performed with respect to the primary electrical interconnect was "split" between them:

> 1-03. **Electrical Duct Rerouting: 1/7/05 /**
> [CO Bartholomew] confirmed that the existing electrical primary power duct bank will be rerouted, as necessary, to allow for the construction of the new building. It was confirmed by CFSC, [SBN] and SME[], that there is a split responsibility for this rerouting. The Contractor is responsible for the portion of the rerouting that is included in the SME[] design drawings and CFSC is responsible for the additional rerouting to make the interconnection from Pendleton Avenue to Utah Street. The additional rerouting includes the portion of the duct bank from SME's transformer vault around to the Utah Avenue side of the site. SME will provide a drawing showing the new interconnect arrangement. CFSC has a Contractor to do the work. The additional scope for [SBN] will be included in a Change Directive from CF[SC]. Pat Ellwood of SME[] suggested that relocating the existing

252

cross-connect vault would save some money.
**Action: CFSC/SME**

(Finding 114) On 8 February 2005 SBN provided details regarding the work associated with the primary electrical interconnect and how responsibility for it was split (finding 124). On 11 February 2005 CO Bartholomew directed that:

> 1. Effective...(14 February 2005), [SBN] is authorized to begin all electrical site reroute work and will coordinate other electrical work by the garrison DPW as appropriate. Any legitimate additional change costs for this piece of work shall be negotiated but the work is directed.

(Finding 126) On that same date SBN thanked CO Bartholomew for the direction and advised that "DPW has already started the interconnect work" (*id.*). The parties' agreement regarding the work was memorialized in Contract Modification No. P00002 (finding 129).

On 24 February 2005 SBN reported that DPW had done all of the primary electrical interconnect work but SBN still requested that CFSC issue a change order to SBN on account of that work (finding 133).

The record shows that the electrical reroute work was performed by DPW and not SBN or SME. SBN now seeks compensation for alleged critical path delays caused by the discovery of the primary electrical interconnect and the performance of the associated rerouting work from 28 October 2004 through 24 February 2005 (app. br. at 78, 359). Elsewhere in its brief SBN claims it experienced critical path delay from 22 October 2004 through 11 February 2005 (*id.* at 384). We find that the discovery of the primary electrical interconnect and the completion of the associated work delayed the critical path from 22 October 2004 to 24 February 2005. The period of delay from 2 November 2004 through 24 February 2005 is concurrent with the SBN/Botting-caused HVAC/mechanical design delay on the critical path (*see* Section I above). We therefore find that SBN is entitled to be compensated for the critical path delay period from 22 October 2004 through 1 November 2004 (7 calendar days) which was solely caused by the Fund. The amount of compensation due for the delay is a quantum issue which is not before us.

### D. Natural Gas Line

The RFP provided that:

> F.    Natural Gas: Natural Gas is available at the site. Puget Sound Energy (PSE) owns the lines.

Coordinate connection points and construction requirements with DPW and PSE during design and construction.

(Finding 9) On 15 November 2004 it was reported that a gas line that had not been marked by DPW was ruptured while a tree was being removed; the gas company repaired the ruptured line (finding 96).

As of 29 November 2004 SBN had identified that the existing underground gas lines would have to be relocated because they were in the area where the storm sewer system was to be installed (finding 99). Internal DPW communication on 7 December 2004 concerned the issue of who would pay for relocating the natural gas line that had not been identified in the digging permit (finding 103).

SBN's RFI #17, dated 16 December 2004, sought direction from the government with regard to the natural gas line (finding 109). In the minutes of a 10 January 2005 "Site Issues" meeting, SBN noted that:

> 1.) [CO Bartholomew] indicated that the gas line would probably be lowered. Direction may be given to [SBN] to proceed with this work as an added scope to the contract. [SBN] awaits a Change Directive from CF[SC] on this issue.

(Finding 114) As of 21 January 2005, CO Bartholomew described the situation and sought funds from DPW:

> The gas [line is] directly impeding our contractor's ability to proceed with excavation work / estimated cost to relocate comm[unication] and gas lines is $25K. Current cost of the delay associated with the inability of our contractor to proceed is $100K / some portion of this is associated with the time to identify the redesign solution to the DOIM telecommunications trunks....
>
> ....
>
> We have no choice but to absorb the redesign/site work (associated w/DOIM trunks) increase of $40K as a project cost. Similarly we are stuck with funding the delay costs of $100K (associated with work stoppage due to all the unidentified/misrepresented utilities). However, as we discussed it seems unreasonable for the project to bear the

total $115K cost associated with the previously
unidentified/misrepresented communication and gas lines
as well as to fund any requirement for back-up power tie in
to another building when such was not represented in the
plans the installation provided as a departure point for our
contractor's design effort.

(Finding 116) By email dated 11 February 2005 CO Bartholomew authorized SBN to
perform the work associated with the natural gas line:

4. The contractor is authorized and directed to perform the
gas line reroute for a Not To Exceed cost of $23,793.00.
Contractor is asked to coordinate this reroute to the extent
necessary to avoid impacted site features and the new
building. Request that unnecessarily longer reroutes by the
gas utility subcontractor be strongly discouraged
and coordinated with our on-site representative
Mr. Bob Monson and/or John Patterson.

(Finding 126; *see also* finding 124) This exact language was included in Contract
Modification No. P00002 (finding 129). As of 24 February 2005 SBN reported that it
had contacted a subcontractor to perform the work (finding 133). SBN's gas line
subcontractor reported that, as of 22 March 2005, it was still waiting for a digging
permit from Fort Lewis (finding 143). SBN reported that the work was complete in
the minutes of the 13 April 2005 Progress Meeting but that SBN was still waiting for a
change order from CFSC (finding 149). In the minutes of the 22 June 2005 Progress
Meeting SBN reported that CFSC had issued a contract modification and SBN had
submitted an invoice to be paid for the work associated with the rerouting of the gas
line (finding 166). In the absence of evidence to the contrary, we find that SBN has
been compensated for the cost of performing the changed work associated with the
natural gas line.

SBN now seeks compensation for critical path delays to excavation work from
15 November 2004 through 7 April 2005 caused by encountering a natural gas line not
marked by the gas company (app. br. at 71, 359, 384). We find that the discovery of
the unmarked natural gas line and the completion of the associated work delayed the
critical path from 15 November 2004 through 7 April 2005. The period of delay from
15 November 2004 through 8 March 2005 is concurrent with the SBN/Botting-caused
HVAC/mechanical design delay on the critical path (*see* Section I above). The period
of delay from 9-29 March 2005 is concurrent with the delay already granted for the
DOIM ductwork (*see* Section I above). We therefore find that SBN is entitled to be
compensated for the critical path delay period from 30 March 2005 through 7 April

255

2005 (7 calendar days) which was solely caused by parties outside SBN's control. The amount of compensation due for the delay is a quantum issue which is not before us.

## E. Over-Excavation

On 22 April 2005 SBN's Project Manager Roberts reported internally that its on-site subcontractors were encountering "a significant amount of overexcavation for our footings" (i.e., more than six feet deep) and requested that CFSC be given notice of a differing site condition:

> Fortunately, for both [SBN] and the Owner, depending on who pays for it, the geotechnical engineer has determined that the existing unsuitable material that has to be overexcavated, is only unsuitable because it is loose, so that same material can be placed back in the overexcavated footings and compacted to 95% density. This reduces the need for imported structural fill.

(Finding 151) As of 2 May 2005 Project Manager Roberts reported that the areas involved were "not significant" and the whole issue from beginning to end encompassed "a few days" (finding 155). Despite the contemporaneous report of its own Project Manager, SBN now argues that it suffered a critical path delay to the foundation construction from 25 April 2005 through 9 June 2005 as a result of various differing site conditions (app. br. at 102-03, 360). We have addressed SBN's allegations of critical path delays for all alleged differing site conditions other than overexcavation above. We find no support for SBN's allegation of critical path delay due to overexcavation and deny entitlement.

## III. Removal of SBN's Project Manager

It is undisputed that SBN's Project Manager Roberts was barred from the jobsite by CFSC and Army Lodging. SBN argues that there was no contractual provision that permitted the government to do so and that this impermissible action had a detrimental effect on SBN's ability to perform under the contract (app. br. at 84-101, 309, 341; app. reply at 29-32; finding 139).

The contract provided that:

> The Contractor agrees to utilize only experienced, responsive and capable people in the performance of the work. The Contracting Officer may require that the Contractor remove employees who endanger persons or property, or whose continued employment under this

256

contract is inconsistent with the interest of military
security.

(Finding 26) In addition, the contract required SBN to have on the jobsite at all times during contract performance:

> [A] competent superintendent who is satisfactory to the
> Contracting Officer and has authority to act for the
> Contractor.

(Finding 31) The contract is silent as to a remedy available to CFSC in the case of a failure by SBN to comply with the requirement.

In June 2004, the month after contract award, SBN hired Mr. Roberts and assigned him as its Senior Project Manager, responsible for SBN's on-site performance of the project now at issue (finding 55). The first mention we find in the record of government dissatisfaction with Project Manager Roberts is in an email dated 22 December 2004 in which COR Dyer referred to Roberts as "inept" and stated that he thought Roberts should be removed from his position (finding 110; *see also* findings 141, 156). Five days later on 27 December 2004, CO Bartholomew advised SBN's Henrickson that:

> Our relationship is in serious jeopardy. We will in no way
> accept Mr. Roberts' statements...about RFI's and may ask
> you to have him removed from the project. He has been an
> impediment at most turns and will not pick up the phone
> and call instead of this childish behavior. Swinerton
> Corporate should be advised that our holdings of your
> stock is [sic] dropping like a rock into an abyss. I may have
> to make a formal notification that I do not want to make.

(Finding 111)

On 25 February 2005 CO Bartholomew and SBN's Montoya discussed during a telephone call what the CO characterized as "Bill Roberts...continues to be the communication problem." After the call, Montoya sent the following email to the CO and copied COR Dyer, SBN's Henrickson and ORB's Monson:

> I appreciate the insight you have given me on the project.
> As we discussed, we believe it would be in our best
> interest if I became your main point of contact. As I said
> earlier, I might not have an immediate answer for you but I

> will gather the information and provide same as best and as
> timely as I can.
>
> We agree that we need to resolve these items once and for
> all so we can move forward with construction and not
> continue to "carry this baggage" any longer. The process
> you described with regards to the handling of these items
> also seems reasonable.

(Finding 134) We understand Mr. Montoya's 25 February 2005 communication to express SBN's agreement with the CO that it was in neither party's best interest for Project Manager Roberts to remain SBN's primary contact with respect to the project.

As of 2 March 2005 Project Manager Roberts' base pass was rescinded by Army Lodging's Moinette, who was the official sponsor of all the passes associated with the project. Project Manager Roberts testified that he did not turn over his pass on 1 March 2005 when Ms. Moinette first requested it, but did so the following day. Ms. Moinette and SBN's Montoya and Roberts all testified that they were never given a reason by CO Bartholomew or COR Dyer for why Project Manager Roberts' pass was directed to be rescinded. Both SBN's Montoya and COR Dyer testified that it boiled down to a personality conflict between Project Manager Roberts and COR Dyer. Thereafter, Project Manager Roberts conducted project business and met with SBN and subcontractor personnel off-site. (Finding 136) CFSC, however, declined to acknowledge Mr. Roberts as SBN's Project Manager as of 9-10 March 2005 (finding 139).

Project Manager Roberts testified that he got a day pass to get on base several times and was reported to be on the jobsite on 21 March 2005 (finding 141). CO Bartholomew's response was:

> I will send an e-mail to appropriate authorities that
> identifies Mr. Roberts as an objectionable employee and
> possible security threat to Ft. Lewis and seek to have him
> denied access. He can appeal and I will be happy to
> respond to the Garrison and/or Corps Commander. They
> will have to take responsibility for him if he is
> subsequently allowed access to the installation.

(*Id.*) We find no evidence in the record to support a characterization of Project Manager Roberts as a security threat (findings 141-42). On 22 March 2005 Mr. Coulson, Chief of Army Lodging Operations, stated that "[t]he Project Manager personnel issue was resolved in Jan 05" (finding 142). We find no other mention of a "Project Manager personnel issue" in the record before us so we are unable to determine whether facts

258

surrounding it were, or could have been, the basis for the rescission of Project Manager Roberts' base pass. According to Mr. Freeman, the Head of Physical Security Fort Lewis, on or about 25 March 2005:

> An individual having access to Fort Lewis can only be barred entry due to the committment [sic] of a crime or other violation.... [T]he original sponsor...can remove or take possession of an individual's ID pass card and vehicle sticker so he cannot obtain entry. If he gets another pass through other temporary means then the original sponsor can have the MP's come and take his ID and vehicle passes again and escort him off the base.... [T]he "list of undesirables" at the main gate guard house is for those individuals that have committed a crime or "other violation".

(Finding 144)

As of 2 May 2005 Project Manager Roberts reported that the project was not behind schedule (finding 155). Project Manager Roberts resigned on or about 20 May 2005 and Senior Superintendent Zeman resigned effective 27 May 2005. SBN's Montoya hired new Project Manager LaSharr, who started in June 2005 and remained on the project through its completion, as well as new Superintendent Bowman who started work on the project in August 2005. Project Manager LaSharr testified that, when he came on as SBN's new Project Manager, SBN's ability to "move forward with the project" was not impacted by the absence of Roberts and Zeman. (Finding 162) We find Mr. LaSharr's testimony to be credible as he was SBN's on-site project manager responsible for the project's progress.

While Project Manager Roberts complained to SBN's upper management about the rescission of his base pass (findings 151, 155), we find absolutely nothing in the record to show that SBN's management registered any contemporaneous disagreement or displeasure with CFSC about the matter (finding 139) until the submission of its REA in 2008 and its certified claim in 2010 (finding 267), both of which were submitted years after contract completion and Mr. Roberts' resignation. We note that, in addition to an absence of any record of contemporaneous complaint or objection to Mr. Roberts' removal, in June 2005 SBN also made a number of its own upper management and project management changes that, according to CO Bartholomew, resulted in a dearth of design-build experience on the project (findings 162, 165).

SBN argues that it is entitled to compensation on the basis of several theories of recovery related to the Fund's actions or inactions with respect to the rescission of Project Manager Roberts' base pass.

259

A. Breach of the Implied Duty of Good Faith and Fair Dealing

SBN argues that the Fund breached its implied duty of good faith and fair dealing by rescinding the base pass of SBN's on-site Project Manager Roberts (app. br. at 309-16). It is well established that the implied duty of good faith and fair dealing applies to the government as it does to every other party to a contract and:

> [R]equires a party to refrain from interfering with the other party's performance and from acting to destroy the reasonable expectations of the other party regarding the fruits of the contract.

*SupplyCore, Inc.*, ASBCA No. 58676, 16-1 BCA ¶ 36,262 at 176,907.

The only contract provision for the removal of contractor personnel from the jobsite was on the basis that they were a danger to persons or property or they were a security risk/threat (finding 26). We find no credible evidence that Mr. Roberts was a danger to persons or property, nor that he was a security risk or threat. CFSC has never provided a reason to SBN, nor even internally within the government, for Mr. Roberts' removal. The Fund argues that Mr. Roberts was objectionable because he did not meet the contract requirements of "experienced, responsive and capable" (gov't br. at 208-31; findings 26, 141) It is a matter of record that Project Manager Roberts was inconsistent in holding Botting responsible to provide the contractually-required HVAC/mechanical design and in holding Jensen/Fey responsible for its contractual design and quality control obligations as Architect of Record, both of which resulted in design and contract performance delays and inefficiencies for other subcontractors (findings 18, 73, 77, 89, 101, 111, 105, 106, 111, 115, 119, 133, 140, 152, 155, 217, 221). SBN also created its own causes of delay and inefficiency on the part of its subcontractors by changing the building design from a steel structure to a post tension concrete structure (finding 76) and by directing that its framing subcontractor install studs 24" on center instead of the designed 16" on center (finding 191). However, the contract does not provide to the government a unilateral remedy in the form of removal of an individual from the project for such management shortcomings. The record contains evidence of a personality conflict between Mr. Roberts and COR Dyer (and perhaps CO Bartholomew), but we find that is also not enough to justify his removal in the absence of a contract provision that authorizes such a removal.

We have held that the government does not have the right to remove subcontractor personnel without obligating the government to compensate the prime contractor for additional costs incurred to perform the contract work as a result of the

260

removal. *Advanced Engineering & Planning Corp.*, ASBCA Nos. 53366, 54044, 05-1 BCA ¶ 32,806 at 162,320.

> There is no greater interference with the manner and method of performance, short of termination of the work itself, than the ordered replacement of the craftsmen originally chosen to do the work.

*Liles Constr. Co. v. United States*, 455 F.2d 527, 531-33 (Ct. Cl. 1972). The Court in *Liles* further held that such a change in the method or manner of performance was a compensable change entitling the contractor to recover excess costs proven to have resulted from the government's direction of removal. We find CFSC's removal of Mr. Roberts by rescinding his base pass and refusing to acknowledge him as the prime contractor's Project Manager to be improper in the absence of an express right to such a removal under the contract.

SBN now claims that Mr. Roberts' removal resulted in damages in the form of "immediate and long-term impacts" in an unspecified amount of time or money (app. br. at 309, 314-16). The record before us is devoid of even a single contemporaneous letter, email or telephone call from SBN management or corporate offices expressing concern about, or even requesting an explanation of, CFSC's removal of Mr. Roberts from the jobsite. In fact, there is evidence that SBN's corporate management agreed that the removal of Mr. Roberts was "reasonable" and that Mr. Montoya, not Mr. Roberts, was the more appropriate person to be CFSC's primary SBN contact (finding 134). There is also no contemporaneous communication from SBN, other than the writings of the aggrieved Mr. Roberts, that SBN experienced any financial or other impact at the time. In fact, Mr. Roberts' replacement, Project Manager LaSharr, testified that he did not believe the project experienced any impact as a result of Mr. Roberts' removal from the project (finding 162).

Nevertheless, SBN now seeks damages in the form of "interest, attorney's fees and costs" in an unspecified amount as a result of the alleged breach (app. br. at 341).

> On a purely hypothetical basis, one can conclude that surely there must have been some impact on appellant's operations.... But, we do not operate on the basis of pure theory. We are more pragmatic than that. We want some *proof* of an effect and *proof* as to any extra costs which may have been incurred.

*Space Age Engineering, Inc.*, ASBCA No. 25761 *et al.*, 86-1 BCA ¶ 18,611 at 93,472. Proof of the element of damages, while not necessary to a mathematical certainty, is necessary to a finding of entitlement on the basis of the alleged breach of the implied

duty. *BAE Systems San Francisco Ship Repair*, 16-1 BCA ¶ 36,404 at 177,503; *Military Aircraft Parts*, ASBCA No. 60009, 16-1 BCA ¶ 36,388 at 177,410. Where, as here, no amount of damages has even been alleged to have resulted from Mr. Roberts' removal, much less proven, SBN has failed to establish a necessary element of its alleged breach and, on that basis, we deny entitlement on the basis of the rescission of Project Manager Roberts' base pass.

### B. Breach of Contract

SBN also seeks unspecified damages allegedly incurred as a result of the rescinding of Mr. Roberts' base pass under the theory of breach of contract (app. br. at 341). We deny entitlement for the same reasons stated above.

### IV. Trickle Vents and 95% Review Process

The RFP required the following for outside air ventilation to guestrooms:

> Code-required outside air ventilation and make up air shall
> be provided the primary air handling unit using chilled
> water cooling and hot water heating to precondition all
> outside air before delivery through ductwork to each space.
> The outside air handling unit shall have the outside air
> intake at least 10 feet above grade. The central AHU shall
> be provided with minimum 30% efficiency prefilters
> followed by 65% efficiency filters.

(Finding 14) RFP Amendment No. 00005, dated 22 December 2003, reiterated the encouragement contained in the original RFP (finding 7) for the submission of alternative systems for consideration (finding 36). RFP Amendment No. 00006 provided that:

> 1. Outside air shall be supplied to the guest suites by a
> separate HVAC system. Outside air intakes shall not
> be provided at individual PTAC units (See Section
> C-5 Page 32).

(Finding 37) RFP Amendment No. 00007 further clarified the requirement for outside air ventilation to the guestrooms:

> 1. There have been a number of requests for
> clarification of air intake and centralized air distribution
> system requirements since the question and answer
> (Q/A #61) in Amendment #005, and the clarification in

262

Amendment #0006. The new lodge requires a central air distribution system, to distribute fresh air to the rooms. Individual PTAC units in the rooms are not to be used for make up or outside air intake, as stated in Section C-5.15.4d.

(Finding 38) This *verbatim* language was reiterated in RFP Amendment No. 00009, dated 9 March 2004 (*id.*).

Over *one year* later, on 30 March 2005, SBN/Botting proposed for the first time, in its 95% design submission, the use of passive trickle vents instead of the contract-required tempered forced air ventilation. There is testimony that the trickle vents were proposed in an effort to "simplify the system" and to save money. (Finding 145) The trickle vent proposal was rejected by CFSC on 7 April 2005 as not in compliance with the contract requirements for tempered forced air ventilation (findings 147, 149). On 13 April 2005 Botting replied that, despite CFSC's rejection of its proposed alternative, it was going forward with the trickle vents because without them, it opined, its HVAC system did not meet the required DoD Antiterrorism standards (findings 148, 150, 155). We note that, if Botting's stated position was true, then the HVAC system it had proposed at the 35% and 65% design phases was also not in compliance with contract requirements and, if it was as important a consideration as SBN/Botting now claims, the fact that neither Botting nor SBN nor Jensen/Fey recognized the deficiency in their HVAC design for over a year is inexcusable.

By 27 April 2005, less than 30 days after SBN's trickle vent proposal, CFSC had rejected the trickle vent proposal in writing three times while holding out the possibility of approving the proposal if a credit acceptable to CFSC was offered. Nevertheless, Botting was still pressing for approval of the trickle vents without offering any credit, obviously not wanting to share the alleged cost savings of the trickle vents with the Fund (findings 154-55). SBN recognized that the trickle vent issue was delaying its ability to complete its 95% design submission:

> I'm not sure that Botting understands that until it is determined which way we are going, i.e., trickle vent, or ducted make up air, we cannot complete our 95% design submittal. This is the only item that we need resolution on to release everyone on the design, and we cannot release them without this decision. The trickle vent decision affects the building footprint at all four floors and the roof. It affects the electrical design, and the fire sprinkler piping. It affects partition types and chase locations on all four floors. No one can make the changes to the drawings that

263

are necessary to accomodate [sic] the trickel [sic] vent, until we know which system we are using. It is the single largest issue on the project, and has been for a month now. [Botting's] Burrus will not return my calls or my emails. We have written direction from the Owenr [sic] to provide the gas pack system we originally proposed, with ducted make up air to the guest rooms. If you can't get Burrus to respond with a credit so we can get approval from Drew for the trickle vent, then we are going to have to tell all the designers to proceed to 95% with the original system. The issuance of the 95% submittal is critical to getting this job bought out, and to preventing it from stopping because we don't have the subs and materials to continue the work beyond the structural phase.

(Finding 154) On 29 April 2005, Botting again expressed its intention to include the trickle vent design in the 95% design submission despite CFSC's express disapproval (*id.*). As of 2 May 2005, even though it agreed that the trickle vent system did not meet contract requirements (finding 147), SBN also expressed its intention to include the unapproved trickle vents in its 95% design submission and its intention to force the government to accept the proposal:

> Due to the fact that the building construction is progressing, if the Owner rejects the 95% submittal because of the trickle vent system, it will be too late to revert to the original ducted system without suffering severe cost and schedule problems.
>
> ....
>
> We are gambling on the force protection issue, combined with the credit that the subcontractor is offering for the trickle vent to be sufficient for the Owner to ultimately accept the trickle vent. To date, the credit offer has not been sufficient for the Army to approve the trickle vent, and the Army has stated that if the 95% design is submitted with the trickle vent included, the entire submittal will be rejected. If that happens, the notice to proceed beyond the structural shell will not be issued, and the job will ultimately stop dead, waiting for a design resubmittal with different mechanical system, or some other approach, such as arbitration, to produce a solution that will cause the Army to issue the full NTP. The decision to switch to the

264

trickle vent system as a design basis for the project, rather
than propose it as a V.E. issue, has now delayed the 95%
design submittal by two months, so it is imperative that the
Army accept the trickle vent design.

(Finding 155) By letter dated 27 May 2005 SBN proposed including PTAC air dampers instead of trickle vents in its HVAC/mechanical system design (finding 159-60). On 3 June 2005 CO Bartholomew responded that, unless SBN/Botting provided a significant 6-7 figure credit, they were directed to incorporate into the 95% design submittal the 3 February 2005 amended HVAC/mechanical design that included the contract-required outside air system for the guestrooms (finding 161). As of 11 June 2005 there was still no agreement with respect to the guestroom outside air system, causing the overall design to be in limbo and subcontractors to be concerned about moving forward without an approved design (finding 163). On 15 June 2005 Botting acknowledged its receipt of SBN's directive to proceed with its 3 February 2005 design that included a "fully ducted system for each floor" and did not include trickle vents (finding 165).

SBN admits that:

The CO had a right to refuse this value engineering
proposal or to impose conditions such as a reasonable
credit. The CO was *not* required to accept the trickle vent
proposal.

(App. br. at 404) What SBN complains of is what it characterizes as the CO encouraging SBN/Botting to continue to pursue the trickle vents rather than disapproving it outright when it was proposed (*id.* at 404). The record, however, shows us that the trickle vent proposal was disapproved in writing three times within less than 30 days of its submission (findings 147, 149) and that it was SBN/Botting who nevertheless persisted in pursuing the use of the trickle vents despite the express written disapprovals (findings 148, 150, 154-55). It was only after SBN/Botting prolonged the discussion over trickle vents for nearly two months, from their initial disapproval on 8 April 2005 to 3 June 2005, that CO Bartholomew suggested a 6-7 figure credit (finding 161). Nevertheless, Botting persisted in its pursuit of the use of the trickle vents until, on 15 June 2005, it was directed by SBN to proceed with its approved 3 February 2005 amended design that included a "fully ducted system for each floor" (finding 165). As a result of Botting's persistence in pursuing its trickle vent and PTAC damper proposals long after they were rejected by CFSC, SBN's 95% design submission was delayed until 14 July 2005 (findings 165, 167; app. br. at 405). Even then, SBN's Montoya admitted that the 95% submission on 14 July 2005 was incomplete (findings 167). In fact, SBN's 95% design submission was not complete for many months (*see* Section V below).

265

SBN further states that it is not seeking compensation for alleged delays associated with SBN/Botting's trickle vent proposal:

> Although [SBN] is not claiming time or money for delays related to the trickle vent option, the back-and-forth, which lasted about two months, is relevant to evaluating delays to the 95% design submittal, which was ready on June 3, 2005. Absent the Fund's encouragement of [SBN] and WAB to continue pursuit of the trickle vent option, the 95% design submission and review could have occurred earlier. Had the Fund said initially that a seven figure credit would be required for the trickle vent option, or unequivocally denied the proposal, the time involved in the back-and-forth would have been saved. Furthermore, absent the earlier [alleged] design changes related to the HVAC system, the outside air proposals never would have occurred or certainly would have occurred at a much earlier date.

> The Fund's handling of the trickle vent proposal was a violation of its duty to cooperate and the Fund is responsible for associated damages. Those damages are difficult to measure, but are part of the overall cumulative impact experienced by [SBN].

(App. br. at 405; *see also* app. br. at 109) We disagree. As summarized above, the record demonstrates that SBN/Botting caused the delay associated with the 11th hour trickle vent proposal and that SBN was fully aware that the trickle vent delay was delaying the 95% design submission. The record also shows that, even after the trickle vent delay was resolved, the 95% design submission was not complete.

On the basis of the foregoing, we deny SBN's claim that the Fund is responsible for any delays or impacts associated with the trickle vent proposal and the delayed submission of the 95% design.

## V. Framing LNTP and Direct Digital Controls (DDC) Design

Prior to construction of the new Lodge (Building 2107) which is the subject of this appeal, the existing Fort Lewis Lodge (Building 2111) had a check-in desk and ONITY equipment (thermostats, key control and safes). Once the new Lodge was constructed, the RFP required relocation of the check-in desk and associated equipment to the new Lodge, but the relocated equipment in the new Lodge was still required to control the thermostats in Building 2111, the existing Lodge. The ONITY

equipment relocated to the new Lodge was required to communicate with the base-wide Tridium-based DDC system that controlled HVAC systems base-wide[60] at Fort Lewis from a series of PCs or laptops located in DPW. There were two independent ONITY control systems at Fort Lewis. DPW was responsible for ongoing maintenance of the common areas and central mechanical systems at Fort Lewis and managed one ONITY system. The second ONITY system that controlled guestroom PTAC units was managed by MWR. Tridium R2 was the legacy version of the open protocol network for BACnet or Lonworks based controllers used by Fort Lewis and JACE was a graphics program "that brought this information in to PCs and allowed them to customize access into each building with floor plans and graphics." Tridium AX was a newer, different protocol that did not interface with the existing Tridium R2 protocol used by Fort Lewis. (Findings 14-17)

RFP Section C-1 required that SBN/Botting's proposed HVAC system be controlled by the specified DDC system:

> D. Controls: The HVAC system shall be controlled by a DDC system that complies with the Fort Lewis Design Standard DDC Design Guide Specification (See Section J). Each AHU and terminal unit shall have a LonWORKS or BACnet DDC controller connected to a Tridium JACE controller. The JACE controller shall be connected to the building LAN (Ethernet Cat 5) and routed to a desk-top computer, with Tridium Niagra Web Supervisor and Workplace Pro, installed in the mechanical room. The maintenance staff shall have access to the system through any computer connected to the Network via use of a web browser that is password protected.

> E. ...An existing ONITY "Senercomm" *InnPulse* On-line system will be relocated from the Check-in point in existing Building 2111 to the new facility. Senercomm "SensorstatDDC" programmable digital thermostats or equal will be provided in new guest rooms. Connect all

---

[60] Over the course of 10-15 years, Fort Lewis had been including DDC systems with new HVAC systems when installed so they would communicate with the base-wide DDC system; older HVAC systems did not communicate with the base-wide DDC system (finding 14).

new room thermostats and Bldg 2111 thermostat system to the relocated *InnPulse* Server, update software/system as required.... Coordinate with comm./data requirements and electrical capacities.

(Finding 14) This section of the RFP also required that, if SBN/Botting's proposal did not include identified substitutions, they were required to "provide the products listed in the RFP" (finding 10).

RFP Section C-5 required, with respect to DDC:

**15. MECHANICAL**

15.1 General:

....

G. The contractor shall have the responsibility to coordinate Mechanical equipment as it interfaces internally with DDC controls and externally with Division 16.

....

15.6 Automatic Temperature Controls: Controls shall be stand-alone DDC and compatible with the Fort Lewis EMS "Tridium" system. The system will be connected to the Post-wide EMS system at a later date. The DDC system shall monitor HVAC equipment as defined in the paragraph herein. See Design Requirements in Section C3 & C4 for additional information regarding the control system. The DDC control system shall monitor, report and/or alarm the following HVAC functions and any other points required to control, operate and maintain the critical areas of the facility.

....

F. Direct Digital Control (DDC) Points List: The following is a list of the minimum required DDC points:
   1. Air Handling Units (AHU)

....

268

4. PTAC Heat Pump Units

....

5. Fans (other than AHU system fans)

....

6. Terminal Units

....

7. Boiler System

....

8. Chiller System

....

G. The DDC system shall provide automatic control of the common area HVAC system. This includes the AHU's their zone terminal units and associated exhaust fans and heating/cooling equipment.
   1. In addition, provide for DDC control of individual PTAC heat pump units. This shall be a sub-DDC system designed specifically for the hospitality industry (ONITY "SenerComm" *SensorstatDDC* or equal), yet compatible with Tridium EMS for future connection to the Post system. Contractor shall be required to provide information about the DDC system submitted including: history, capabilities, compatibilities, useful life, maintenance costs, experience and reliability for use in this PTAC / heat pump application. The intent is to control/adjust each guest PTAC from a central control point using the ONITY "InnPulse" on-line monitoring/reporting system at the front desk, in addition to providing occupied/unoccupied sensing and setbacks and allowing the individual guest to control/adjust at the guest room.

(Finding 17)

269

RFP Section L required that SBN's proposal include:

> (f)   HVAC System:
>
>       ....
>
>       (vi) DDC Controls: Provide narrative
>            description of intended EMS Control
>            system and catalog cuts of equipment to be
>            provided.

(Finding 32) Contrary to the RFP requirements, neither SBN's original proposal nor its BAFO included any DDC information (finding 82). SBN did confirm to CO Bartholomew, however, that it intended to be fully compliant with the RFP's requirements (finding 9). Likewise, none of SBN's 35% or multiple 65% design submittals included any information at all, compliant or not compliant, about what it specifically intended to provide to meet the RFP's DDC requirements (findings 86-87). SBN's 95% design submittal was the first one to include any DDC information (findings 88, 128) and SBN admitted that the submitted information was incomplete (finding 167).

Botting's DDC subcontractor, Automated Controls, was a dealer for Johnson Controls equipment and a system integrator that took:

> [C]hillers, boilers, air handlers, cooling towers,... all these
> different systems, some with different protocols and we
> marry them all into one system.... [W]e kind of define it as
> the brain of a building and we make them all work, talk to
> each other.

(Finding 71) Automated Controls admitted that, in the pre-award proposal phase, it was not provided a design specification by Botting[61] but it nevertheless provided Botting with an amount of $10-20,000.00 to include in Botting's HVAC proposal to SBN for the entire DDC system (finding 130). Later, after being provided the RFP design requirements, Automated Controls admitted to Botting that it had made incorrect assumptions:

> Project History:
>
> •   We quoted our standard DDC system...including
>     [thermo]stats for the rooms but not a hotel system as

---

[61] We understand this to mean that Botting did not provide a copy of the RFP as it related to the DDC.

called out in the design build spec. We were not given the design spec.... [their budget up front to Botting before Botting provided the design spec did not include a hotel system that now they see is what is required (tr. 7/180-181, 197-201)]

- [Botting's] Dave [Fillo] and I met to figure out how to cover the cost of the flat spec'ed Onity Hotel System (terms in spec also list "or equal" but after meeting with the Lodge personnel and review the existing facility they will be going with Onity).

- Dave and I submitted on the JCI Hotel System (equal) with the intent it would be rejected and then we would request a scope change to cover the cost of the Onity Hotel System.

This is a government specification and a tough one to work around

(Finding 130) Automated Controls estimated that providing the contract-specified DDC system would cost $50,000.00 more than the amount it had provided to Botting for inclusion in the proposal (finding 71).

The president of Automated Controls testified that the RFP "called out Onity or equal as the base system...[i]t's just all one system" (finding 71). However, our review of the RFP reveals that it actually only provided for the possibility of an "or equal" as it pertained to the thermostats. The RFP was otherwise very clear that the Fort Lewis system was ONITY and that the other components of the system were required to interface with the existing Fort Lewis ONITY system. (Findings 14, 17, 131)

Regardless of the RFP requirement for interface of DDC components with the existing Fort Lewis ONITY system, Automated Controls intended to:

[B]ring [a Johnson Controls system] and do a comparison of [the Fort Lewis system]. Once we walked around the [existing lodging] facility, they showed us into the rooms. They showed us their thermostats. They went and showed us the front end of their system and they said it's Onity. And then we all sat down to review okay, how are we going to look at this project as a design-build. **We quickly knew that the or equal side of that was not an option. They wanted Onity. They made it really clear to us they**

271

**wanted Onity.** I don't even know if I got my product
submittal out of my bag to even show them at that point in
time.

(Finding 71) (Emphasis added)  Even though Automated Controls admits it knew that
Fort Lewis wanted an ONITY system, it still proposed a Johnson Controls system at a price
that it knew was approximately $50,000 less than the ONITY system would cost (*id.*).

> Q:    Why did you do that?
>
> A:    We wanted it to be documented that they
> weren't accepting the or equal from the project, so there
> would be a justification for the costs associated with going
> to the Onity.

(Findings 71)  As we held above, the RFP permitted submission of an "or equal"
product for the thermostats only, not the entire DDC system.  And Botting did not do
an independent review of Automated Controls DDC submission before including it in
their proposal to SBN (finding 131).

In early February 2005, CFSC, DPW and Army Lodging agreed to accept
SBN/Botting's 3 February 2005 amended alternative HVAC/mechanical system
design (*see* Section I above) so long as two conditions were met, one of which was
that the DDC system provided by SBN/Botting/Automated Controls met the
RFP/contract specifications (findings 132, 135, 164).  As of the end of February 2005,
DPW had made clear that it would not accept a DDC system that was not compliant
with the RFP/contract (finding 132) and SBN was reporting that "Botting understands
what the RFP is calling for, and they will provide it, *if they have to*" (findings 133,
135) (emphasis added).

On 14 July 2005 SBN submitted an admittedly incomplete 95% design to CFSC
(finding 167; *see also* Section IV above).  Despite SBN's promise that the DDC system
provided would meet the RFP/contract requirements, Botting's DDC design
incorporated into SBN's 95% design submission was not in compliance "in any way
shape or form!" and did not contain any of the required drawings or diagrams
(findings 168-69, 171-72).  SBN promised to resubmit the "mechanical items that are
missing/need revised" on 12 August 2005 (finding 173).  As of 15 August 2005 SBN
agreed to the rejection of the resubmittal, which it had not reviewed before submitting,
because it still had no DDC drawings and the DDC specification was "very sketchy and
incomplete overall."  Botting acknowledged that SBN had made clear that the DDC
submittal was "critical" to the issuance of the next LNTP.  (Finding 174)  As of
29 August 2005, SBN/Botting's re-submittal was still not complete (findings 175-78).

272

By letter dated 6 September 2005, SBN directed Botting to immediately complete the mechanical design documents for re-submittal no later than 9 September 2005 and that:

> Be advised that WA Botting's inability to obtain approval is currently impacting our schedule and has exposed [SBN] and others to potential non-recoverable costs. These impacts will be substantial if WA Botting does not obtain 100% design approval, thus allowing [SBN] to receive a full notice to proceed with the Work. Please be aware that [SBN] will seek full recovery from WA Botting for all associated delays and impacts.
>
> Furthermore, be advised that the Owner has notified us that they will be withholding all payments due [SBN] and associated Subcontractors until this submission is approved.
>
> Please produce your re-submittal no later than September 9, 2005. A failure to complete all documentation as noted above may require that [SBN] direct all subcontractors to proceed with the work in advance of full approval from the Army to avoid further delays to the schedule. If this were to occur, [SBN] will seek full recovery from WA Botting for changes that may be necessary as a result of the final approval documents.

(Finding 178; *see also* finding 179) As of 26 October 2005, almost two months later, SBN agreed that its 95% submission was still not complete (findings 180-82). On 26 October 2005 CO Bartholomew authorized an additional LNTP, "subject to no HVAC authorization" (findings 183-85). In an internal Botting email, dated 13 November 2005, the DDC design was apparently still not finalized:

> In an attempt to save the $85k we are spending on Onity controls, it was my intention to use the flawed controls specification to try and get out of buying the ONITY Controls and put them on the owner. After spending the afternoon going through all the correspondence from last year on this issue, it would be foolish for me to go down this path now. If we attempted to take this position at the start of the project, we might have had a slim chance. However, the project record clearly indicates that we were planning on providing an alternate system from day one and we had several opportunities in the past to put this on

the owner. We don't need to lose anymore [sic] credibility on this project.

(Finding 187) On 28 November 2005 SBN/Botting submitted a revised DDC specification (finding 188; *see also* finding 192). No later than 15 December 2005, SBN was authorized to proceed with 100% design (finding 190). In the 23 January 2006 comments to the 100% design submittal, the reviewers stated that the proposed DDC design still did not comply with the RFP:

- Furthermore, the products description and listed specification section compliance reference do not match in described details for that section, paragraph and sub-paragraph. The listed controllers are inappropriate for the intended use on this project and are conceptually inconsistent with the Fort Lewis Design Standards Topology and System Architecture which uses a standard PC Workstation and Tridium Niagara R2 suite of software to integrate field device controls to the enterprise level platform Supervisory controllers within a distributed control network.

- It is evident by the conflict in literature and the products listed in the submittal register that...the intended architecture is to provide a system that does not provide a Web enabled Supervisory Software Application on a Workstation PC Platform as specified. The submitted Niagara AX software model is not the same version or generation of software solutions as the existing original Tridium Niagara R2 framework provided by Vykon and can [not] provide the same functionality that is bundled with Supervisor AX applications served to a browser from an embedded JACE platform.

(Finding 201) On 15 February 2006 SBN provided Botting with its own comments regarding RFP noncompliance issues in Botting's mechanical design. On that same date there was an "Onity meeting" attended by SBN/Botting and Fort Lewis personnel. (Finding 207) SBN expressed its intention to submit the 100% design on 10 April 2006 (finding 214). On 20 April 2006 CO Bartholomew authorized an HVAC LNTP (finding 215). Thereafter, SBN extended the 100% design submission date almost another month to 15 May 2006 (finding 216). SBN did not submit the 100% design until sometime between 26 May 2006 and 11 August 2006 (findings 216, 218-19,

274

222). On 4 January 2007, CFSC accepted the 100% design and issued a full NTP for construction of the project (finding 227).

As it turned out, the existing ONITY equipment could not be relocated to the new Lodge because the distance between the existing and new Lodge buildings made interconnectivity difficult and because the new ONITY equipment installed in the new Lodge (thermostats, key control and safes) could not communicate with the existing ONITY system (finding 16). The cost of providing a new ONITY InnPulse Server (app. br. at 127), as well as equipment SBN claims it was required to provide that was not specified in the contract (*id.* at 133-37) is included in SBN's claim.

Throughout April and May 2007 there were multiple issues with the DDC system installed not being in compliance with SBN/Botting's own design and specifications to the point that it was "unusable" (findings 238-39, 242, 244). CFSC conditionally accepted the new Lodge effective 25 May 2007, subject to, among other listed items, the completion of the DDC system, including all required software licenses (finding 245). The DDC system was set for completion, demonstration and acceptance on 13-15 August 2007 (finding 247). However, by 15 August 2007, the DDC software installation, testing and documentation had still not been provided by Botting/Automated Controls (finding 248). On 17 August 2007 SBN issued a cure notice to Botting on the basis of the stated default of not meeting its contractual obligations and Botting had, in turn, issued a cure notice to Automated Controls several days later (finding 249). When the DDC open issues had still not been resolved by 28 August 2007, CO Bartholomew issued a cure notice to SBN requiring the matter to be resolved by 5 September 2007 (finding 250). The ceremony opening the new Lodge took place on 13 September 2007 (finding 251). However, as of 14 September 2007, it was determined that the DDC issues still had not been corrected; SBN, even after Botting had replaced Automated Controls with TRS, acknowledged that, as of 2 October 2007, the DDC work was not complete. In fact, the work was not considered complete and accepted by CO Bartholomew until 1 December 2007 and the final documentation was not provided and considered complete until 25 February 2008 (findings 252-55). On 20 May 2008, the Fund acknowledged receipt of as-builts (finding 255).

SBN argues that it is entitled to compensation on the basis of several theories of recovery related to the Fund's actions or inactions with respect to the DDC design.

A. Breach of the Implied Duty of Good Faith and Fair Dealing

It is SBN's position that the Fund breached the implied duty of good faith and fair dealing when it refused to issue the LNTP for framing based on then-existing issues involving the DDC portion of the HVAC/mechanical design (app. br. at 335-37). SBN

argues that the DDC issues were unrelated to the framing LNTP and that the delay in issuing the LNTP pushed the framing work into the rainy winter months (*id.* at 336-37).

SBN has not asserted a claim for any amount of damages as a result of the alleged breach. Proof of the element of damages, while not necessary to a mathematical certainty, is necessary to a finding of entitlement on the basis of the alleged breach of the implied duty. *BAE Systems San Francisco Ship Repair*, 16-1 BCA ¶ 36,404 at 177,503; *Military Aircraft Parts*, 16-1 BCA ¶ 36,388 at 177,410. Where, as here, damages have not even been alleged, much less proven, SBN has failed to establish a necessary element of its alleged breach and, on that basis, we deny entitlement.

## B. Delay

SBN argues that CFSC's failure to issue a timely LNTP for framing on the basis of the non-compliant DDC design delayed work on the critical path from 17 August 2005 through 30 October 2005 (app. br. at 119, 385-86; ex. A-7). SBN further argues that DDC design issues, for which it alleges SBN and CFSC share responsibility, delayed work on the critical path from 2 August 2005 through 6 December 2005 (app. br. at 119, 385; ex. A-7). On the basis of the foregoing, we find that SBN was solely responsible for critical path delay caused by the failure of the DDC design to comply with the contract requirements from 2 August 2005 through 6 December 2005 and CFSC was solely responsible for critical path delay from 17 August 2005 through 30 October 2005 due to its failure to issue a framing LNTP. As SBN's caused delay is fully concurrent with CFSC's caused delay, we find that SBN is not entitled to delay damages.

## VI. Ceiling Heights, Room Sizes and Mechanical LNTP

As we held above, the parties agreed in Modification No. P00003 that no claim based upon ceiling heights, square footage or associated impacts could be brought after 23 March 2006 except as reserved in paragraph 4 of the modification. The only claims reserved were those for "time and associated cost impacts" (finding 212). We therefore reject SBN's claim for damages due to a breach of the implied duty of good faith and fair dealing on the basis of the ceiling height and square footage issues. We will limit our discussion here to SBN's claim for delay damages which was reserved in Modification No. P00003.

The RFP required that "Offerors who choose to submit alternate building or site configurations must meet all requirements in the RFP" (finding 7) which included:

> Guest Room floor plan, layout and sizes shall be in
> accordance with the concept guest room drawings provided

276

in the RFP. Mechanical chases, plumbing chases, etc. are
to be integrated without reducing net areas shown or
specified.

(*Id.*; *see also* finding 13) RFP Amendment No. 00005, Question and Answer 34,
reiterated the RFP's requirement that corridor ceilings were to be a minimum of 8'4"
(finding 36). On 29 January 2004 SBN assured CO Bartholomew that SBN's proposal
was compliant with the square foot requirements of the RFP (finding 46).

As of the 8 July 2004 35% design review meeting, it was noted by COR Dyer that:

> 24. Corridor ceiling heights are shown 8'-4". There may
> be cases where corridor ceiling heights are adjusted
> downward to account for piping and ductwork. **In
> those cases, CFSC will be advised beforehand.**
> Swinerton will not design or construct any corridor
> ceiling heights less than 8'-0".

(Finding 62) (Emphasis added) SBN's 65% mechanical design, as a result of
including the RFP-required boiler/chiller and its associated piping, also included:

> The piping was accommodated by making all corridor
> ceilings no higher than 8'-0"and by raising the second floor
> by four inches, and taking two inches off of the distance
> between the third and fourth floors.

(Finding 84) In the 22 September 2004 65% Design Review Comments, COR Dyer
made a reference to an understanding that ceilings would be no lower than 8'-0" but
there is no indication that the referenced understanding extended beyond the single
item to which he made the comment (finding 81). By the time SBN and its
subcontractors met on 27 October 2004 to discuss the 95% design, SBN acknowledged
that all the guest room dimensions were too small and that the ceiling heights in all the
public corridors were at a maximum height of 8'-0" (finding 93).

If, as argued by SBN/Botting, it changed its designed ceiling heights to 8'0" to
accommodate the piping necessary for the boiler/chiller system, it follows that
SBN/Botting's original design that included a not-yet-approved alternative design
included the required 8'4" ceiling heights. In early February 2005 CO Bartholomew
approved Botting's 3 February 2005 amended alternative design which no longer
needed the space for the piping associated with the boiler/chiller (*see* Section I above).
SBN, however, made the unilateral decision not to change the building design back to
the 8'4" corridor ceilings because the designs of SBN and its subcontractors had
already been changed to accommodate the 8'0" ceiling heights and SBN sought to

277

mitigate the impact of the HVAC design delays on the designs of SBN and its other subcontractors (findings 129, 197).

On 14 December 2005 SBN contacted CO Bartholomew about the LNTP for HVAC rough-in being held up due to corridor ceiling heights less than 8'4":

> Previously, it was my understanding that the issue was within the rooms and as you know we have acknowledged and revised those ceiling heights at the entries. We are currently reviewing the issue at the corridors and the correspondence that has resulted in the ceiling heights being at 8'-0" upon determination of same we will advise. It should be noted that we are being impacted by being unable to proceed with the HVAC work at this time.

(Finding 189) As of 15 December 2005 COR Dyer stated that SBN's 100% design documents were to show "all RFP ceiling heights being attained" (finding 190). The 19 December 2005 mock-up room inspection comments noted that:

> SBNW admitted [the extended stay (ES)] room was approx. 293 SF, below the 300 SF standard. The reason is apparently due to the shear wall adjacent to the adjoining ES room. SBN[] was requested to issue RFI informing Lodging how many rooms in the entire building fall below the standard. **VERY IMPORTANT!**

(Finding 191)

By letter dated 22 December 2005, SBN advised CO Bartholomew that the lack of a LNTP for HVAC rough-in was "adversely affecting the project" and that:

> [I]t was clear that all parties understood and agreed that the 8'-4" ceiling heights within the corridors were unachievable with the [boiler/chiller] design requirements and this was accepted at the early stages of the project which is evident by the documents provided by the Army. As noted in same / it is true that this item has not been changed via the change process, but it is clear that all parties were amiable to the revision. It is our belief that this revision at the 35% documents and 65% document review provide agreement with the revised ceiling elevations and

allowed for the reduction in the ceiling height to 8'-0".
As such, we request the release of the [LNTP] with the
HVAC based on the prior agreement of the 8'-0"
ceilings being acceptable.

(Finding 193) CO Bartholomew responded the next day:

I would have an incredibly hard time believing anyone on
our end would permit a lowering of ceiling heights without
a serious discussion and a significant credit. This issue has
come up on a number of other projects in the past and is a
Lodging "Hot Button". While the reduction of 4" may not
have been picked up in our reviews, there has been no
contractual action taken to lessen the contract requirement
for ceiling heights in this building. I refer back to a letter
that is part of the contract signed by an ind[iv]idual who
signed the bid that [SBN] would be materially compliant
with the RFP.

(Finding 195) A week later, CO Bartholomew again stated that there had been no
contractual action to reduce the required ceiling heights from 8'4" to 8'0" and that the
RFP-required ceiling heights must be included in the 100% design submission "even if it
delays [the submission]" (finding 195). This direction was reiterated by CO Bartholomew
and COR Dyer on 5 January 2006 (finding 196). By letter dated 10 January 2006, The
Architect of Record, Jensen/Fey, weighed in on the subject of ceiling heights:

We acknowledge receipt of your e-mail regarding the
requirement for 8'-4"ceiling heights. It should be
specifically noted that the 8'-0" ceiling heights were
included in the 35% submittal documents and are very
clearly shown in the 65% and 95% documents and were
subsequently discussed during the review conferences with
the Army Team at each phase. The agreement on this issue
was relied upon to develop the progress drawings and
therefore shown on the drawings and constructed in the
field.

In an effort to accommodate your latest request to revert
back to the 8'-4" ceiling height, a design meeting was held
at the site on January 5, 2006 to review options available.
After numerous discussions and strategies we were unable
to come up with any solutions to revert to the 8'-4" ceiling

279

height (short of tearing the building down and starting over).

Therefore, we believe that the 8'-0" ceiling heights aesthetically have no significant impact on the quality or performance of the facility and shall remain as previously noted.

(Finding 197) COR Dyer denied the allegation that the 8'0" ceilings had been discussed and resolved during the 35%, 65% and 95% design review meetings, however:

My only suggestion at this point [is] to seek a form of compensation for the error and omission. I know this is a copout, but what other option do we have except to tear down the building and start again? What is really disturbing is that Lodging is being asked to accept something different than was specifically stated in their requirements (again). Why do we always have to bend over, especially when it's a clearly written requirement in the proposal that we send to hand selected design-builders?

(Finding 198) CO Bartholomew agreed that there had been no contractual action to change the contract requirement for ceiling heights at a minimum of 8'4" and that he would not approve any deviation without consideration in the form of a credit from SBN (finding 200).

As of 19 January 2006 SBN admitted that 159 of the 185 guestrooms did not meet the contractual square footage requirements:

3. **Unit Square Footage:** over 100 units do not meet the RFP minimum requirements. The dimension busts are taken off the CAD drawings. We will be developing our letter to the Owner. Bart is not completely knowledgeable of the magnitude of the issue at this time.

The impacts to the square footage were a result of drawing completion and shear walls that were added within the building space that affect the net rentable area, design deficiencies with the architect. There is some confusion as to how the

square footage was originally calculated; we are in the process of figuring this out.

Units Summary Breakdown

| Less | 16 to 21 SF | 4 Units |
|------|-------------|----------|
| Less | 10 to 12 SF | 4 Units |
| Less | 6 to 9 SF | 56 Units |
| Less | 1 to 5 SF | 56 Units |
| Gain | 1 to 5 SF | 24 Units |
| Gain | 6 to 9 SF | 7 Units |
| Gain | 12 to 14 SF | 3 Units |
| Gain | 15 to 20 SF | 5 Units |

Total Square Units Impacted      159 Units
Total Square Feet Lost      345 Square Feet

(Finding 200)

By letter dated 31 January 2006 SBN offered a $10,953 credit as consideration for changing certain ceiling heights from 8'-4" to 8'-0" and an $8,492 credit as consideration for a net reduction of 198 square feet in the room areas in the entire project. They also enclosed 100% design documents and requested an LNTP for the HVAC work as well as the final NTP upon an "expedient review" of the 100% design. (Findings 202, 204) Several days later SBN increased the offered credit to $100,000 for both the ceiling height and room square footage issues (finding 204). CO Bartholomew responded that he and Army Lodging would accept no less than a $200,000 credit. SBN agreed to the amount of $200,000 but stated that it would be a credit to cover the ceiling heights, room square footages, as well as associated variances such as light switch locations, ceiling fan locations, etc. A contract modification was never issued memorializing the credit of $200,000 and its basis. The parties continued to negotiate and CO Bartholomew:

> Authorize[d] a 10 day non-compensible [sic] extension of the contract completion date, from 21 February 2006 to 3 March 2006. We reserve all rights including the right to issue a Show Cause why we should continue and not Terminate for Default.

(Finding 209)

On 2 March 2006 SBN recorded the following in a handwritten document identified as "Minutes of Mtg":

281

SUMMARY

- AN AGREEMENT WAS REACHED AFTER SEVERAL
  ROUNDS OF NEGOTIATION IN WHICH [SBN] AGREED
  TO A $500,000 DEDUCTIVE CHANGE ORDER

- IN CONSIDERATION THEREOF THE ARMY CFSC
  ASSURES THAT

  ① NO LIQUIDATED DAMAGES WILL BE ASSESSED
  THRU THE END OF [SBN]'S NEXT SCHEDULE UPDATE
  WHICH WILL INCLUDE THE REVISED MOCK-UP
  PROCESS AGREED UPON IN THIS MEETING

  ② THE MINOR DEVIATIONS WILL BE FLUSHED OUT
  DURING THE REVISED MOCK-UP PROCESS AGREED
  UPON IN THIS MEETING. A RESOLUTION WILL BE
  AGREED UPON FOR EACH. ARMY LODGING WILL BE
  INFORMED, PRIOR TO PUNCH LIST PROCEEDINGS,
  THAT THE MINOR DEVIATIONS HAVE BEEN AGREED
  UPON AND CONSIDERATION PROVIDED.

THE REVISED MOCK-UP PROCESS AGREED UPON IN THE
MEETING INCLUDES THE FOLLOWING STEPS:

3/7/06   [SBN] WILL PROVIDE RESPONSES TO THE CFSC
MOCK-UP COMMENTS INCLUDING PROPOSED
SOLUTIONS

3/14/06   CFSC WILL RESPOND TO THE ABOVE COMMENTS
AND PROPOSED SOLUTIONS.

3/17/06   [SBN] WILL ISSUE A REVISED PROJECT SCHEDULE
TO INCLUDE THE REVISED MOCK-UP PROCESS AND
THE IMPLEMENTATION OF THE SOLUTIONS TO THE
MINOR DEVIATIONS.

3/21/06   AN ON-SITE JOB WALK WILL BE HELD WITHIN
THRU     THREE WEEKS OF 3/21/06 AT WHICH ALL ISSUES
4/11/06   WILL BE REVIEWED AND FINALLY RESOLVED.

3/31/06   100% DRAWINGS WILL BE SUBMITTED
         INTEGRATING THE RESOLUTIONS TO THE MINOR
         DEVIATIONS.

(Finding 210) In these contemporaneous notes of the agreement memorialized in Modification No. P00003, SBN makes no mention or other indication that it considered the negotiated amount to be what it now claims was "excessive" and "extortionate" (app. br. at 316; app. reply at 22; gov't br. at 181-82). Nor do we find any other contemporaneous support for this allegation. Bilateral Contract Modification No. P00003, in the amount of a $500,000 credit, was executed on 30 March 2006 (findings 204, 210, 212).

SBN argues that it is entitled to compensation for delays to the critical path from 14 December 2005 to the 20 April 2006 issuance of the mechanical LNTP (finding 215; app. br. at 175). The alleged period of delay occurred during Period 4 in which trade rough-in was on the critical path (finding 98; app. br. at 281; ex. A-7).[62] We find no evidence that the contract requirements for ceiling height and room square footage were ever formally modified. The parties disagree as to whether there was an informal agreement to accept corridor ceiling heights at 8'-0", however, we have found no evidence of any agreement by CFSC to accept room square footage changes prior to the agreement memorialized in Modification No. P00003. SBN admits that, as of 14 December 2005, it was aware of CFSC's concerns about nonconforming room sizes (app. br. at 175). We find that the changes in the room square footages as constructed occurred because of the design confusion resulting from the HVAC/mechanical design issues early in the contract (*see* Section I above) and the out-of-sequence work and re-work required of SBN and the other subcontractors (findings 63, 66, 67, 69, 74, 76, 79, 84, 129, 140, 161, 178, 182, 217, 221). As of 19 January 2006 SBN acknowledged that 159 of the 185 guestrooms "do not meet the RFP minimum requirements," with some rooms being larger and some smaller and that CO Bartholomew "is not completely knowledgeable of the magnitude of the issue at this time" (finding 200). About a week later, SBN offered a credit as consideration for CFSC's acceptance of the non-conforming room sizes. The parties reached agreement on the amount of the consideration on 2 March 2006, which was then memorialized in Modification No. P00003 dated 30 March 2006. (Finding 212)

We find that SBN was solely responsible for the critical path delay due to nonconforming room sizes from 14 December 2005 to the 2 March 2006 agreement on consideration. We find that SBN is entitled to be compensated for the critical path

---

[62] Curiously, SBN does not show this alleged delay to the critical path on Exhibit A-7, nor does it discuss this alleged delay in its critical path delay narrative. This omission, however, does not negate SBN's arguments regarding the delay elsewhere in its brief.

delay period from 3 March 2006 through the 26 April 2006 issuance of the mechanical LNTP (39 calendar days) which was solely caused by CFSC and the claim for which was expressly reserved in Modification No. P00003. The amount of compensation due for the delay is a quantum issue which is not before us.

## VII. Mock-up Rooms and 100% Design

The contract required the construction of external (outside the building) stand-alone mock-up concept rooms for each of the two guestroom types on the project site. The mock-up rooms were to be subject to a "walkthrough of rough construction" by CFSC at the time of the 35% Design Review Meeting. The final walkthrough of the completed mock-up rooms was to take place "at an appropriate time to allow for design corrections and adjustments prior to submission of the final design." The contract also required the completion of two Final Concept Rooms inside the building. (Finding 7) Throughout the record both parties refer to both the external mock-up rooms and the internal Final Concept Rooms as the mock-up rooms.

In CFSC's detailed 35% review comments, it was stated that it was CFSC's intention to accept completed mock-up rooms on or about 21 September 2004 after the 65% design review meeting (finding 60). On or about 22 September 2004, in the context of 65% design review comments, it was noted that the external mock-up rooms were no longer to be constructed; however, there is no record of a contract modification to delete this work or to give the Fund a credit for the deleted work. The first CFSC inspection of the two internal Final Concept Rooms (referred to by the parties as mock-up rooms) took place on 13 December 2005 (finding 189). The 19 December 2005 inspection comments (finding 191) raised the issue of room sizes and several other issues addressed in Section VI above. SBN's 100% design was submitted on 31 January 2006 (finding 204). A second CFSC inspection of the Final Concept Rooms (mock-up rooms) was conducted on 9 March 2006 (finding 211).

As of 30 March 2006 the parties had resolved their differences over ceiling heights and room square footage and the express terms of Modification No. P00003 specified that the results of their agreement were to be incorporated into a 100% design resubmission (findings 205, 212, 214). As of 23 May 2006 SBN had still not submitted its 100% design to CFSC and was not sure it would meet its promised submission date of 26 May 2006 (findings 216, 218-19). The 100% design was submitted sometime between 26 May 2006 and the week of 12 June 2006, the week scheduled for the 100% design review and a walk-through of the internal mock-up rooms (findings 218, 219). Sometime around 7 June 2006 CFSC experienced a travel lockdown and was unable to travel from Virginia to Fort Lewis during the week of 12 June 2006. When the travel lockdown was lifted, the 100% design review and the walk-through of the mock-up rooms was rescheduled for 11-12 July 2006. (Finding 219) As of 9 October 2006, the quality of the Final Concept Rooms

(mock-up rooms) was still an issue and a post-Thanksgiving inspection was suggested (finding 223).

SBN argues that it is entitled to compensation on the basis of several theories of recovery related to the Fund's actions or inactions with respect to the mock-up rooms.

## A. Breach of the Implied Duty of Good Faith and Fair Dealing

SBN argues that CFSC breached the implied duty of good faith and fair dealing by intentionally failing to respond to numerous RFIs associated with the mock-up rooms (app. br. at 337-40). However, SBN has not asserted a claim for any amount of damages in the form of either time or money as a result of the alleged breach. Proof of the element of damages, while not necessary to a mathematical certainty, is necessary to a finding of entitlement on the basis of the alleged breach of the implied duty. *BAE Systems San Francisco Ship Repair*, 16-1 BCA ¶ 36,404 at 177,503; *Military Aircraft Parts*, 16-1 BCA ¶ 36,388 at 177,410. Where, as here, damages have not even been alleged, much less proven, SBN has failed to establish a necessary element of its alleged breach and, on that basis, we deny entitlement.

## B. Constructive Changes

There is no dispute that the mock-up room process was changed when the requirement for the exterior mock-up rooms was deleted. Even though work was deleted without deleting a commensurate amount of money from the contract amount as a credit to the Fund, SBN alleges that it and its subcontractors performed extra work and incurred additional costs during the claimed period from 6 January 2006 through 9 May 2006 due to the Fund's deletion of the external mock-up rooms over a year earlier in September 2004 (app. br. at 148-49, 154, 374-76; app. reply at 49). It is clear to us from our examination of the extensive record in this appeal that SBN and its subcontractors did indeed perform additional and out-of-sequence work because of the extensive delays and design confusion associated with the nonconforming HVAC design and later DDC design (*see* Sections I , IV and V above). SBN has failed to show that it incurred specific costs and/or experienced specific delays directly as a result of the deletion of the external mock-up rooms. We, therefore, deny entitlement.

285

## C. Delay

SBN argues that it experienced a constructive suspension of work on the critical path from 7 June 2006 through 12 July 2006, the time between CFSC's notification to SBN of a travel lockdown that precluded its ability to travel to Fort Lewis during the week of 12 June 2006 and the rescheduled dates of 11-12 July 2006 for the 100% Design Review Meeting and the walk-through of the mock up rooms (app. br. at 178, 386-88). SBN further claims:

> The delay to the Mock-Up and 100% design review impacted the Project critical path. Absent prior delay and disruption to the design and Mock-Up process (see sections on The 95% Design Review Process, Direct Digital Controls and Initial Mock-Up Room Process) these activities would not have been on the critical path at this time. Because of those prior delays, however, the 100% design review and Mock-Up completion were critical and the Fund is responsible for the delay....

(App. br. at 178)

We found above in Section IV that SBN was responsible for the critical path delay to the 95% design review process. We found in Section V that, while the Fund was responsible for critical path delay from 17 August 2005 through 30 October 2005 due to its failure to issue a framing LNTP, that delay was concurrent with the critical path delay caused by the failure of the DDC design to comply with the contract requirements from 2 August 2005 through 6 December 2005 for which SBN was solely responsible and, as a result, we found that SBN is not entitled to delay damages. If we were to follow SBN's reasoning in its brief, those delays, for which we have found SBN responsible, were what caused the mock-up room walk-through and 100% design review to be on the critical path and that would also be SBN's responsibility.

In addition, the delay period claimed by SBN is the period between the originally-scheduled events to take place during the week of 12 June 2006 and when they actually took place on 11-12 July 2006 due to the CFSC travel lockdown. There is no evidence of when the lockdown actually ended, nor have we found any evidence of discussions between the parties about whether the rescheduled dates were a function of the availability of SBN participants, CFSC participants or a combination of both. As a result, we have no basis upon which to find that the period of time upon which SBN bases its claim was unreasonable under the circumstances. We, therefore, deny SBN's claim for delay damages associated with the reschedule of the mock-up room walk-through and the 100% design review.

286

## VIII. Final and Other Direct Changes

SBN argues that it is entitled to compensation under the contract's Changes clause for the following directed changes to its work. SBN argues in the alternative that, should we not find the following to have been direct changes, they were constructive changes. SBN also seeks delay damages associated with the alleged changed work as specified below. (App. br. at 364-74, 376-78; app. reply at 47-48)

### A. Changed Work

#### 1. Final Changes
   a. Front Desk Modifications—Casework
   b. Front Desk Modifications—Camera monitoring
   c. Front Desk Modifications—Alarm system
   d. Irrigation System
   e. Building Corbels
   f. Service Gate and Intercom

Five of the six (6) claimed Final Changes were included in unilateral Modification No. P00008 (finding 240), however, SBN argues that Modification No. P00008 did not compensate it at all for the costs associated with the service gate and intercom. With respect to the other five (5) claimed components of Final Changes, SBN claims that the work was directed by CO Bartholomew and agrees that Modification No. P00008 partially compensated it, however, the compensation was for less than the amount of the increased costs it incurred in performing the work. SBN now seeks $4,697.00 for the service gate and intercom[63] plus an additional amount for the other five listed Final Changes which it characterizes as "disputed mark-up only" (app. br. at 178-86, 291, 293, 364-66; R4, tab 169 at 5182).

With respect to the first five claimed Final Changes (all but the service gate and intercom), the Fund agrees that they were changed work and SBN is entitled to compensation for that work. The Fund, however, argues that SBN was fully compensated in Modification No. P00008 for its increased costs (gov't br. at 280; app. br. at 365-66). The additional amounts now sought by SBN for disputed mark-up are questions of quantum and the proof thereof which is not now before us.

The Fund argues that it denied change order requests for work associated with the service gate and intercom (gov't br. at 280, 285), however, the Progress Meeting minutes of 17 January 2007 show that CO Whitley authorized both changes during the

---

[63] SBN seeks the difference in the cost of the revised service gate and intercom that was installed ($17,226.00) and the originally designed service gate ($12,529.00) (app. br. at 186, 291, 293).

meeting (finding 229). From 4-31 January 2007 CO Whitley was the person with authority to bind the Fund (findings 227, 234). On this basis, we find SBN entitled to be compensated for the service gate and intercom work authorized by CO Whitley. The amount of the compensation is a question of quantum and quantum is not before us.

### 2. Furring Out Walls

SBN argues that the Fund directed that one wall in Rooms 215, 315, 216, 316, 256, 236 and 336 was to be furred out between columns (app. br. at 291, 366, 376-77). SBN claims the work was completed and now seeks compensation for the work in the amount of $3,414.00 (app. br. at 291, 293; R4, tab 169 at 5182, 05234-36). The Fund responds that this work was associated with the square footage issues which were specifically released by SBN in Modification No. P00003 (gov't br. at 283-85; *see also* Section VII above). We agree and deny entitlement.

### 3. Revisions to Administration Rooms

SBN claims that the Fund directed certain design revisions to the administration rooms in the new Lodge and that the work was completed on 14 September 2006. SBN now seeks compensation for the work in the amount of $6,539.50. (App. br. at 291, 293, 366-67, 377; R4, tab 169 at 5182) The Fund's briefs do not dispute this portion of SBN's claim. We therefore find SBN entitled to be compensated for the claimed work. The amount of the compensation is a quantum matter which is not now before us.

### 4. Revise Rubber Stair Treads and Risers

SBN claims that the Fund directed it to install rubber stair treads and risers instead of the contract-required VCT resilient flooring and that the work was completed 10-13 March 2007. SBN now seeks compensation for the work in the amount of $9,838.30. (App. br. at 292-93, 367, 377; R4, tab 169 at 5182). The Fund's briefs do not dispute this portion of SBN's claim. We therefore find SBN entitled to be compensated for the claimed work. The amount of the compensation is a quantum matter which is not now before us.

### 5. Relocation of Electrical Boxes

SBN claims that the Fund's direction to install outlets directly below the PTAC units (finding 220) was a change to the contract requirements and that the work was completed. SBN now seeks compensation for the work in the amount of $17,823.00. (App. br. at 292-93, 367, 377-378; R4, tab 169 at 5182) The Fund's briefs do not dispute this portion of SBN's claim. We therefore find SBN entitled to be paid for the

288

claimed work. The amount of the payment is a quantum matter which is not now before us.

### 6. Installing Laundry Floor Drain

SBN claims that the Fund's direction to add a floor drain in the main laundry room (Room G-40) was a change to contract requirements. SBN seeks compensation for the work in the amount of $3,861. 00. (App. br. at 292-93, 367, 377; R4, tab 169 at 5182). The Fund's briefs do not dispute this portion of SBN's claim. We therefore find SBN entitled to be paid for the claimed work. The amount of the payment is a quantum matter which is not now before us.

### 7. Installing Change and Soap Vending Machines

SBN claims that the Fund changed the contract requirement for the change and soap vending machines from government-furnished/government-installed equipment to government-furnished/contractor installed equipment. SBN now seeks compensation in the amount of $1,191.00 for its installation of the equipment. (App. br. at 293, 367-68, 378; R4, tab 169 at 5182). The Fund's briefs do not dispute this portion of SBN's claim. We therefore find SBN entitled to be paid for the claimed work. The amount of the payment is a quantum matter which is not now before us.

### 8. Other Direct Changes

      a. COR 26: Furnish freezer & refrigerator
      b. COR 27: Add vanity base cabinets
      c. COR 31: Revise break room configuration
      d. COR 32: Remediate P-lam at mock-ups
      e. COR 35: Extension at refrigerators
      f. COR 42: Supply & install mangler
      g. COR 46: Washer & Dryer pricing
      h. COR 52: Revise carpet layout

With respect to the eight (8) claimed components of Other Direct Changes, SBN seeks the total amount of $4,766.77 for which it was not compensated in Modification No. P00008 and which it characterizes as "disputed mark-up only" (app. br. at 290, 293, 368, 378; R4, tab 169 at 5182). There are no claims for delay damages associated with the Other Direct Changes. The Fund's briefs do not dispute this portion of SBN's claim. We therefore find SBN entitled to be paid for the claimed work. The amount of the payment is a quantum matter which is not now before us.

## B. Delay

SBN seeks critical path delay damages from 17 January 2007 through 26 March 2007 due to front desk changed work (app. br. at 179-81). The front desk work was on the critical path until the end of Period 6 which was 6 February 2007 (finding 98). As we discussed above, the Fund has agreed that it directed the front desk changed work and that it is responsible for the costs associated with performance of the work. With respect to the claimed delay damages associated with the front desk changed work, the Fund's position is that SBN has already been compensated for the delay in the modification issued for the changed work (ex. G-5 at 8). It is well established that a contractor is presumed, in the absence of a specific reservation in the modification, to have included in its cost proposal for extra work an amount to compensate it for the time required to complete the changed work. *R.W. Contracting, Inc.*, ASBCA No. 24627, 84-2 BCA ¶ 17,302; *CBC Enterprises, Inc. v. United States*, 24 Cl. Ct. 187 (1991). However, in Modification No. P00008 the parties specifically reserved SBN's right to seek additional time. This is consistent with CFSC's position throughout the record that discussions of time and delays would be addressed at the end of the project in discussion of SBN's REA/claim, which, as we address in Section XI below, never happened. We therefore find SBN entitled to compensation for critical path delay from 17 January 2007 through 6 February 2007 (15 calendar days) associated with the front desk changed work.

SBN further claims that it experienced additional delays due to other changed work that it admits were not on the critical path (app. br. at 183-84, 186). As these delays were not on the critical path, they are not compensable.

## IX. Pre-final Inspection

The contract required that SBN's design team, led by its Architect of Record, Jensen/Fey (finding 19), was to inspect the entire project and determine when it was ready for a pre-final inspection. Once SBN received the determination from Jensen/Fey, it was to notify the CO in writing that it was ready for a pre-final inspection. (R4, tab 1 at 97) SBN argues that the parties had agreed to conduct a pre-final inspection during the week of 12 March 2007 (app. br. at 187-88). However, as of 13 February 2007, SME reported to SBN that it would be unable to be ready for a pre-final inspection by mid-March 2007 due to work still remaining to be done by other trades (finding 233).

The first notification by Jensen/Fey of a determination that the project was ready for a pre-final inspection was by letter dated 28 March 2007 sent to COR Dyer, and followed up the following day by a letter from SBN to CO Bartholomew formally requesting a pre-final inspection. CO Bartholomew scheduled the pre-final inspection

to begin on or about 16 April 2007. (Finding 237) The pre-final inspection took place 17-19 April 2007 (app. br. at 188).

SBN claims that the cancellation of an alleged 12 March 2007 pre-final inspection for the convenience of CO Bartholomew constituted a constructive suspension of work on the critical path from 9 March 2007 through 17 April 2007 (app. br. at 186-89, 388-89). The record, however, demonstrates: (1) that SME, SBN's electrical subcontractor, advised SBN that it did not believe it could be ready for a mid-March 2007 pre-final inspection and (2) we find no evidence that Jensen/Fey, as head of the design team, had provided the required formal notification that it had inspected the entire project and determined it to be ready for a pre-final inspection, a contractually-required prerequisite to SBN's formally requesting a pre-final inspection. On the basis of the foregoing, we find SBN solely responsible for the claimed delay and deny entitlement to delay damages claimed with respect to the pre-final inspection.

X. Failure to Process Pay Applications and Unpaid Contract Balance

SBN argues that CFSC's failure to timely process its December 2005 pay application (findings 199, 203) was a breach of contract entitling it to damages incurred as a result of the nonpayment (app. br. at 341-43; app. reply at 41-42). SBN alleges that the failure of CFSC to timely process its December 2005 payment application "caused cash flow problems for [SBN] and its subcontractors (app. br. at 343). However, we have found no evidence in the record of when the December 2005 pay application was actually paid. SBN's arguments on this subject do not mention when actual payment occurred and we find no contemporaneous documentation to indicate that payment of the December 2005 pay application was made more than a reasonable period of time after its submission. Contrary to SBN's arguments regarding alleged impacts of untimely payment of the December 2005 pay application, SBN's LaSharr, its Project Manager from June 2005 through project completion, testified that he was not aware of any delays to project performance as a result of delays in the processing of SBN's pay applications (finding 199). The Fund argues that payment of SBN's December 2005 pay application was merely delayed and that a delay in payment does not constitute a breach of contract (gov't br. at 263-264). *See Highland Al Hujaz Co.*, ASBCA No. 58243, 16-1 BCA ¶ 36,336. Given the absence of evidence of when actual payment occurred, we have no basis upon which to determine that any delay in payment was unreasonable. We therefore deny SBN's claim for breach damages on the basis of a delay in payment of its December 2005 pay application for lack of proof.

SBN further claims that CFSC breached the contract by not paying SBN the unpaid contract balance of $110,650.00 comprised of unpaid portions of Pay Applications 19, 26, 27 and 29 (findings 259, 269; app. br. at 286-87, 411). SBN further argues that there should be no right of setoff for "any potential liquidated damages to

which the Fund may assert entitlement" because there has been no SBN breach (app. br. at 287, 411). We find no evidence in the record that the Fund has assessed any liquidated damages. The Fund argues that this was not part of SBN's claim submitted to the CO and is therefore not properly before the Board (gov't br. at 264). The Fund is incorrect, as this was very clearly set out in SBN's 2010 claim (finding 269). In the alternative, the Fund argues that the amount claimed was properly withheld from payments as retainage (finding 24) and that the Fund attempted to resolve the matter with SBN in August 2008, without success (gov't br. at 264). We find no basis for the Fund's nonpayment of retainage as promised by CO Bartholomew:

> We advised the remaining retainage would be released
> with receipt of as-builts and a close out invoice with a
> Release of Claims.

(Findings 256) We therefore find that SBN is entitled to be paid the amount of the contract balance which was withheld as retainage. The amount to be paid is a matter of quantum which is not presently before us.

## XI. Failure to Issue a Contracting Officer's Final Decision

On 26 January 2005 SBN's Roberts submitted three REAs to CFSC (findings 119, 124). From time to time thereafter the parties referred to the REAs but both parties apparently deemed it more important to first address jobsite issues current at the time (*see, e.g.*, findings 135, 180-81, 199).

On 2 April 2008, approximately six months after the Lodge was opened for use (finding 251), SBN submitted an REA that included and updated all issues for which SBN sought equitable adjustment (finding 256; app. br. at 329). CO Bartholomew responded to the REA on 23 June 2008, specifically declining to issue a COFD, and inviting further negotiation if it was desired by SBN (finding 257). SBN accepted the invitation to continue negotiations (findings 258). Thereafter, the parties engaged in continued discussions until CO Bartholomew retired at the end of December 2008 (findings 259-61; app. br. at 329).[64]

In February 2009 CO Wallace was assigned as the contracting officer responsible for matters relating to the contract now at issue. At the time of his assignment, CFSC was in the middle of a BRAC relocation and Army Lodging was completing its relocation

---

[64] SBN argues that the failure of the Fund to call CO Bartholomew as a witness at the hearing put SBN at a disadvantage (app. reply at 4), however, SBN knew CO Bartholomew was not on the Fund's witness list and yet SBN failed to request a subpoena to compel his testimony when it requested subpoenas for four other Fund witnesses.

to San Antonio, Texas. As a result of these relocations, CO Wallace had difficulty locating documents, including the official contract file, related to the Lodge project. CO Wallace advised SBN and its counsel of the difficulties in locating documents, as well as his intention to procure expert assistance in analysis of SBN's claimed delays. SBN's counsel sought updates from CO Wallace throughout 2009 and into 2010. (Findings 262, 264-66)

On 7 June 2010 SBN formally withdrew its 2 April 2008 REA and submitted to CFSC a disk containing a nearly 6,800-page certified claim which is the subject of the appeal now before us. SBN described its certified claim as including a narrative, schedule analysis and supporting documents and "is substantially the same as the April 2, 2008, REA although the schedule analysis has been updated to include description of a number of delays and disruptions not included in the original REA." (Findings 267, 269, 270) Before CO Wallace could review SBN's claim, it had to be converted from the submitted disk to a hard copy consisting of fifteen (15) 3-inch binders. A hard copy is in the record; the table of contents does not include page numbers and the various sections of the voluminous claim are not divided by tabs or otherwise identified within the voluminous document. CO Wallace never formally acknowledged receipt of SBN's claim. (Finding 268) CO Wallace failed to respond to SBN's claim within 60 days of receipt, never provided SBN with a date by which a COFD would be issued and neither CO Wallace nor any other contracting officer for CFSC has ever issued a COFD (finding 271). SBN appealed from a "deemed denial" on 18 August 2010 (finding 272).

## A. Breach of the Implied Duty of Good Faith and Fair Dealing

A CFSC CO has a duty to make a reasonable attempt to negotiate disputes that arise between a contractor and the Fund. In the absence of a successful settlement, the CO is then required to issue a COFD. AR 215-4, § 6-11. (Finding 25) There is no dispute that, after CO Bartholomew's retirement at the end of December 2008, no CFSC CO continued negotiations with SBN on the subject of its 2 April 2008 REA, no CFSC CO attempted any negotiations with SBN on the subject of its 7 June 2010 certified claim, and no CFSC CO has ever issued a COFD on the subject of the 2010 claim.

SBN argues that CFSC's failure to negotiate and failure to issue a COFD are a breach of the Fund's implied duty of good faith and fair dealing (app. br. at 329-35; app. reply at 35-37). We would agree that SBN has shown that the Fund had a duty to issue a COFD and that it failed to perform that duty. However, SBN has not asserted a claim for any identified amount of damages resulting from the failure to issue a COFD. Proof of the element of damages, while not necessary to a mathematical certainty, is necessary to a finding of entitlement on the basis of the alleged breach of the implied duty. *BAE Systems San Francisco Ship Repair*, 16-1 BCA ¶ 36,404 at 177,503; *Military Aircraft Parts*, 16-1 BCA ¶ 36,388 at 177,410. Where, as here,

293

damages have not even been alleged, much less proven, SBN has failed to establish a necessary element of its alleged breach and, on that basis, we deny entitlement.

B. Breach of Contract

On the basis of the same facts underlying its assertion of breach of the implied duty of good faith and fair dealing, SBN argues that the Fund has also materially breached the contract by failing to negotiate its various REAs and certified claim and also failing to issue a COFD (app. br. at 344-347; app. reply at 42). SBN further argues that:

> As to the element of damages, the Fund's complete
> inaction on [SBN]'s 2005 REAs, 2008 REA, and Certified
> Claim damaged [SBN] due to the lack of payment for (1)
> unpaid contract balance…, (2) change orders…, (3)
> additional costs associated with general conditions,
> unabsorbed home office overhead, and labor and material
> escalation…, and (4) amounts payable to subcontractors.

(App. br. at 347)

The four alleged damage components listed by SBN are addressed elsewhere in this decision as follows: (1) is addressed in Section X; (2) is addressed in Section VIII; (3) is understood to be a quantum issue associated with various delays claimed by SBN and addressed throughout this decision; and (4) is addressed in Section XII. SBN also seeks interest, attorney's fees, and costs in unspecified amounts that it argues are to be resolved during the quantum phase of this appeal (app. br. at 347-49). We have found SBN entitled to compensation for certain changed work, delays and unpaid contract balance in other sections of this decision. SBN is not entitled to compensation for those items again here. To the extent SBN claims additional compensation on the basis of the failure of CFSC to issue a COFD, it has failed to allege additional amounts of damage specifically caused by the absence of a COFD. As we held above, proof of damages is a necessary element of breach of contract and where such damages have not been alleged, much less proven, SBN has failed to establish a necessary element of its alleged breach. On that basis, we deny entitlement.

XII. Subcontractor Claims to SBN

SBN's claimed amount of $6,768,830.26 includes $3,963,690.37 for claims against SBN by its subcontractors, plus $701,355.20 added by SBN for "Overhead/Fee Insurance" for a total claimed by SBN for subcontractor claims against it of $4,665,045.57 (findings 269-70). Throughout its briefs SBN refers to the subcontractor claims submitted to it as "pass through claims" (*see, e.g.,* finding 225).

We are not bound by SBN's choice of words. The only party with privity of contract with the Fund is SBN and SBN has confirmed that it is the only party before us in this appeal (tr. 1/5-6, 7, 3/5; Bd. corr. 6 September 2012). The subcontractor claims against SBN were not sponsored nor prosecuted before us as separate claims, but were included by SBN within its own claim, with SBN's mark-ups added, as evidence of damages allegedly suffered by SBN (app. br. at 286, 294-305; *see also* findings 225, 270). We have addressed SBN's claimed theories of recovery between it and the Fund. In accordance with SBN's agreements with its subcontractors (*see* finding 225), to the extent that we have found SBN entitled to compensation for any portion of its claim against the Fund, it is up to SBN to resolve any associated claims between itself and its subcontractors.

## CONCLUSION

All arguments made by the parties which are not specifically addressed in this decision have been carefully considered and found not to be persuasive. The following is a summary of claim items for which we have found SBN to be entitled to compensation:

| | |
|---|---|
| Service Gate and Intercom | |
| Revisions to administration rooms | |
| Revise rubber stair treads and risers | |
| Relocate PTAC electrical boxes | |
| Install laundry floor drain | |
| Install change and soap vending machines | |
| Other direct changes | |
| Unpaid contract balance | |
| | |
| Delay damages as follows: | |
|     DOIM ductwork | 15 calendar days |
|     Primary electrical interconnect | 7 calendar days |
|     Natural gas line | 7 calendar days |
|     Mechanical LNTP | 39 calendar days |
|     Front desk changed work | 15 calendar days |
| TOTAL DELAY | 83 calendar days |

We sustain SBN's appeal to the extent of the above listed claim items. SBN's appeal in all other respects is denied. We remand the appeal to the parties for negotiation of quantum in accordance with the above.

Dated: 24 April 2017

DIANA S. DICKINSON
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 57329, Appeal of Swinerton Builders Northwest, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals